THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

UNITED STATES OF AMERICA      ]
     ]
v.      ]      Cr. No. 19-cr-142-LM
     ]
     ]
NATHAN CRAIGUE

## **MOTION IN LIMINE #2**

The defendant, Nathan Craigue, by and through his counsel, moves *in limine* for an order

precluding the government from introducing at trial:

(a) The extent of Kenneth McKenna's injuries at the worksite and resulting death;

(b) Chris Erickson's or Nicholas Ford's employment status;

(c) Evidence that Chris Erickson sustained injuries while working with Craigue & Sons;

(d) Evidence that McKenna, Ford, or Erickson were paid "under the table";

(e) Evidence that OSHA or NH DOL issued violations or judgments against Craigue or

     that they made a determination that McKenna was an employee;

(f) Evidence that Craigue's work equipment was unsafe or faulty or that the worksite

     was unsafe

(g) Hearsay and other inadmissible evidence contained in Craigue's recorded statement

     to OSHA.

 In support of this Motion, it is stated:

### OFFENSE

Mr. Craigue has been charged with two counts of violating 18 U.S.C. § 1001(a)(2), which

makes it a crime to knowingly and willfully make any materially false, fictitious, or fraudulent

1

statement or representation in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States. Specifically, the government must prove beyond a reasonable doubt that Craigue knowingly and willfully made a materially false statement when he told OSHA that Kenneth McKenna was a subcontractor and not an employee.

FACTS

At the time of the alleged offense, Craigue was the owner and operator of Craigue & Sons Home Exteriors.   In the summer of 2018, Craigue was contracted to do exterior work on a building located in Concord. Craigue tasked two individuals, Kenneth McKenna and Nicholas Ford, with the project. On August 28, McKenna had an accident at the jobsite and suffered a fatal injury.   Compliance Safety and Health Officer Scott Kelly, an investigator from OSHA, investigated the accident.

Kelly interviewed a number of witnesses, including Ford and Craigue. Ford explained he was getting paid by the job and would get a check once the project was over.   Ford made a subsequent statement to OSHA, claiming that he was actually paid by the hour "under the table."

On August 30, 2018, Chris Erickson sent an email to OSHA, reporting that he had worked for Craigue & Sons Home Exteriors, and about a month prior had fallen off a ladder, fracturing his hip. Erickson further explained that McKenna had been his roommate and both had worked for Craigue. OSHA interviewed Erickson, who stated that he was not a subcontractor, was paid by the hour, and worked about 4 to 5 roofing jobs a year for Craigue.

After conducting interviews of Craigue, both OSHA and the NH Department of Labor found that he had violated various agency rules. The NH Department of Labor issued a decision seeking penalties in the amount of $39,000 and $54,700 for various violations, including failure

to provide workers' compensation coverage and failure to keep true and accurate records of hours worked by two employees.   The U.S. Department of Labor, OSHA, issued citations and notification of penalty to Craigue for violating safety and health regulations.

## LAW AND ARGUMENT

Relevant evidence is evidence that "has any tendency to make a fact more or less probable than it would be without the evidence; and . . . is of consequence in determining the action." Fed. R. Evid. 401. Under Rule 402, "[i]rrelevant evidence is not admissible." Relevant evidence may not be admitted if its probative value is substantially outweighed by the danger of unfair prejudice. Fed. R. Evid. 403.   "Rule 403 requires a balancing of probative value and prejudicial effect. When assessing the probative value of the evidence under Rule 403, a court must consider both whether the evidence that has been offered to prove an issue that is in genuine dispute, and whether the evidentiary point can be made with other evidence that does not present a risk of unfair prejudice." *United States v. Henry*, 848 F.3d 1, 9 (1st Cir. 2017).

Federal Rule of Evidence 404(b) "prohibits the admission of prior bad acts to establish an individual's character or propensity to commit a crime." *United States v. Landry*, 631 F.3d 597, 601 (1st Cir. 2011).   Prior bad acts may be admissible "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id*.; Fed R. Evid. 404(b). The First Circuit employs a two-part test to determine admissibility.   "First, [the Court] must determine whether the evidence has 'special' relevance other than establishing propensity . . . Second, the court must consider whether Rule 403 requires

3

exclusion of the evidence because the danger of unfair prejudice substantially outweighs the probative value." *Landry*, 631 F.3d at 602.

(a) <u>The Extent of Kenneth McKenna's Injuries and His Death</u>

The government may seek to introduce evidence that McKenna suffered a fatal injury at the worksite on August 28, 2018. While an accident at the worksite is relevant to explain why OSHA initiated its investigation of Craigue & Sons, evidence of the severity of McKenna's injury or that McKenna died as a result of that accident is not relevant and would not serve to prove an issue in actual dispute. First, whether he died as a result of the accident has no bearing on any element of the charged offense, and therefore is not relevant evidence. Fed..R. Evid. 401 and 402. Second, the jury may blame Craigue's action or inaction for the death, which would unfairly prejudice Craigue and suggest he is of poor character. This evidence should be excluded pursuant to Rules 401, 403 and 404(b).   Even if the court determines that the evidence has some "special" relevance, the court must nevertheless exclude it because the probative value is substantially outweighed by the danger of unfair prejudice to the defendant. Fed. R. Evid. 403. Here, the jury is tasked with a singular job – to determine if Craigue made a false statement concerning McKenna's work status.   Because the potential for the jury to focus on the tragic death of McKenna or the severity of his injuries as opposed to the elements of the charged offense of false statement is extremely high, the evidence should not be admitted.

(b) <u>Chris Erickson's and Nicholas Ford's Employment Status</u>

The allegations in the two-count indictment against Craigue relate to McKenna's employment status.   The question for the jury is whether McKenna was in fact an employee and not a subcontractor and whether Craigue lied about it. Testimony concerning other workers and

their employment status at Craigue & Sons is not relevant to that issue.   *See* Fed. R. Evid. 401

and 402. While Erickson or Ford may claim that they had a specific work arrangement with

Craigue, that relationship has no bearing on the jury's determination of McKenna's employment

status with Craigue.   Their work status would serve only to confuse the jury and would pose an

unfair risk that the jury would assume that Craigue treated McKenna the same as Erickson and/or

Ford. *See* Fed. R. Evid. 401-403.

   Additionally, for the reasons articulated in Craigue's *Motion in Limine #1*, Ford and

Erickson should be precluded from offering opinion testimony concerning their own work status.

Application of the legal standards as to employee or independent contractor to their status is a

matter of the jury applying the law, as instructed by the Court, to the facts as the jury finds them.

Allowing Ford and Erickson to provide their own legal conclusion as to their employment status

would run afoul of Fed. R. Evid 701.

Erickson's Injury

   The government may seek to introduce evidence that Erickson was injured at the same

worksite approximately one month prior to McKenna's accident. The issue for the jury is

whether Craigue lied when he stated *McKenna* was a subcontractor and not an employee.

Erickson's injury is not relevant to the charged offense. See Fed. R. Evid 401-402. Specifically,

when Kelly questioned Craigue at the worksite, it was in response to McKenna's accident.   This

prior conduct would serve only as propensity evidence.   Because the jury would hear that

Craigue's worksite resulted in two significant injuries within a month's time, it is highly likely

that such evidence would inflame the passions of the jury, leading them to focus on those

prejudicial facts, rather than the charged offense.   This evidence should be excluded pursuant to Rule 401 to 404(b).

### (d)(e)(f) Bad acts and violations

The Court should preclude the government from introducing evidence that Craigue did not pay taxes (paying "under the table")1, that he provided an unsafe work environment, or that OSHA and the NH Department of Labor found Craigue violated certain labor laws and safety regulations.   In this case, Craigue was investigated by two separate agencies. He participated in a hearing before the NH Department of Labor and a recorded interview by OSHA, lasting .approximately one hour and twenty-three minutes.   While some of the questions during the OSHA interview were specific to identifying employment status, much of the interview focused on numerous safety hazards at the worksite at issue in this case, injuries at other worksites, and discussions about how Craigue might have prevented the outcome of the case - the death of McKenna.

These facts are not relevant to the charged offense, and should be excluded pursuant to Rule 401 and 402.   If the court determines that the evidence has some "special" relevance, the court must nevertheless exclude it because the probative value is substantially outweighed by the danger of unfair prejudice to the defendant. Fed. R. Evid. 403.   There is a substantial risk that jurors could infer that the prior misconduct demonstrates a criminal propensity, making it more likely that Craigue committed the instant offense.   In particular, the jury would likely be

---

1  As to how McKenna was paid, this evidence may be relevant to determining his employment status.

influenced by factual or legal findings made by NH DOL or OSHA as to Craigue's culpability or

McKenna's worker status.   This evidence must be excluded. Fed. R. Evid. 401-04.

   (g)  <u>Hearsay and Other Inadmissible Evidence from the OSHA Recording</u>

On October 24, 2018 OSHA Agent Kelly questioned Craigie for over an hour about the

management of his business. *See* Attached Transcript (bate stamped 19R48_OSHA-01019-1091).

This exchange included numerous topics that are irrelevant and unfairly prejudicial. For example,

Craigue explained that he took over the business when his father fell off a roof and suffered a

debilitating injury and Agent Kelly responded by asking if his father had any fall protection

equipment.   OSHA-01021-22.   Agent Kelly also asked Craigue about the company's safety

protocols, unsafe equipment, and various injuries that had occurred at his worksites. *See* OSHA-

01029-1031 (safety equipment and training); OSHA-01048- 59 (questioning about the hazards of

the Concord job site and lack of fall protection); OSHA 01059-69 (questioning about Erickson's

injury at worksite and what changes Craigie made to worksite after accident).   Throughout the

interview, Agent Kelly made conclusory statements when he identified Craigue's workers as

employees – a matter to be decided by the jury. Agent Kelly also referenced and conveyed

numerous hearsay statements.   *See* OSHA -01033-36 (referring to findings of NH Department of

Labor hearing); OSHA 1077 (Kelly stated to Craigue that witnesses saw McKenna running up and

down the roof without fall protection).   If the government intends to introduce the recording at trial,

those portions that are irrelevant, unduly prejudicial and hearsay must be redacted by the

government.

**WHEREFORE,** Craigue respectfully requests that this Honorable Court grant this

Motion and preclude the government from introducing any evidence referenced in (a) to (g).

A hearing is requested.

Respectfully submitted,

Date: October 21, 2020

*/s/ Dorothy E. Graham*
Dorothy E. Graham
N.H. Bar No. 11292
Assistant Federal Defender
22 Bridge Street, 3rd floor
Concord, NH 03301
Tel. (603) 226-7360
E-mail: Dorothy_Graham@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that the above document was served on the following person on   October 21, 2020 and in the manner specified herein: electronically served through CM/ECF to AUSA John Davis and AUSA Anna Dronzek.

*/s/Dorothy E. Graham*
Dorothy E. Graham

8

# TRANSCRIPT

www.bar-tampa.com                              813-251-4538

Page 1

October 24, 2018

     MR. KELLY:  So I asked about recording this interview and
Mr. Craigue said it was fine with him; is that true?

     MR. CRAIGUE:  Correct.

     R. KELLY:  So today's date is October 24, 2018.  The time
is exactly a quarter after 10:00 a.m.  Like I said, he writes
better than I do.  What is your actual full legal name?

     MR. CRAIGUE:  Nathan Joseph Craigue.

     MR. KELLY:  Okay.  All right.  And what is your physical
address?

     MR. CRAIGUE:  It's 41 South Street, Unit 4, Concord, New
Hampshire, 03301.

     MR. GARDNER:  All right.  Okay, we can continue.

     MR. KELLY:  So what about the contacts?  What other
contacts do you have besides just a number?  Do you have like a
private e-mail or work e-mail?

     R. CRAIGUE:                      My cell phone and
craigue@yahoo.

     MR. KELLY:  Can you give me the number then?  What's the
phone number?

     MR. CRAIGUE:  Oh,

     MR. GARDNER:  Okay.  And then you said the e-mail was
craigue?

                BAY AREA COURT REPORTING, INC.

www.bar-tampa.com                          813-251-4538

1        MR. CRAIGUE:  Yeah, my last name,

3        MR. KELLY:  So what is the legal name of the company?  Is

4    it still registered with the State of New Hampshire?

5        MR. CRAIGUE:  Craigue and Sons Home Exteriors, LLC.

6        MR. KELLY:  Okay.  Is it still registered, or do you know

7    that?

8        MR. CRAIGUE:  I do not know that.

9        MR. KELLY:  Okay.  What about -- you've got like a business

10   ID number --

11       MR. CRAIGUE:  I do have a federal --

12       MR. KELLY:  Do you know the number right off hand?

13       MR. CRAIGUE:  I do not.

14       MR. KELLY:  Okay.

15       MR. CRAIGUE:  No.

16       MR. KELLY:  So if you get a chance, you could e-mail me

17   something.  I'll give you my business card, you can do that.

18   The tax ID number?

19       MR. CRAIGUE:  That's the same thing, I believe.

20       MR. KELLY:  Would it be the same thing as your business?

21   Okay.

22       MR. CRAIGUE:  Yes.

23       MR. KELLY:  Okay.  So what is your physical address of the

24   company?

25       MR. CRAIGUE:  There is no physical -- where I live.

BAY AREA COURT REPORTING, INC.

Page 3

 1          MR. KELLY:  That would be where you live?

 2          MR. CRAIGUE:  Yeah.

 3          MR. KELLY:  Okay.  And do you know if it's -- if the

 4     company is registered with that address on it or do you know?

 5          MR. CRAIGUE:  I would -- I have not done paperwork to

 6     change the address so.

 7          MR. KELLY:  Okay.

 8          MR. CRAIGUE:  I work out of a trailer.  So it goes where I

 9     go.

10          MR. KELLY:  Okay.  And who is the actual legal owners or

11     owner of your company?  Who would that be?

12          MR. CRAIGUE:  Myself.

13          MR. KELLY:  Just yourself, no one else?

14          MR. CRAIGUE:  No.

15          MR. KELLY:  Okay.  How long has the company been in

16     business and who started it?

17          MR. CRAIGUE:  I've been -- I took over for the business in

18     '02, I believe.  And before that it was my dad's business.  And

19     I'm not quite sure -- it was the mid '80s when he started.  I

20     took over for him in '02 after he got hurt.

21          MR. KELLY:  You said your dad started in '80 something?

22          MR. CRAIGUE:  Mid '80s.  I'm not quite sure the exact year.

23          MR. KELLY:  Okay.  And I know you'd mentioned he got hurt?

24     So what exactly happened?

25          MR. CRAIGUE:  He fell off a roof.

19R48_OSHA-01021

www.bar-tampa.com                                  813-251-4538

Page 4

1      MR. KELLY:  Okay.  What was he doing up there?  Was he
2   roofing or framing or what?
3      MR. CRAIGUE:  He was helping a friend fix a roof that caved
4   in.
5      MR. KELLY:  Oh, he was working on a --
6      MR. CRAIGUE:  Yep.
7      MR. KELLY:  Okay.  And he fell.  So was he able to come
8   back out to work after that or no?
9      MR. CRAIGUE:  No, he's still in bedrest -- he's -- brain
10  injury, he can't -- he's a vegetable.
11     MR. KELLY:  Do you know how far he fell by chance?
12     MR. CRAIGUE:  30-something feet.
13     MR. KELLY:  He fell 30-something feet?
14     MR. CRAIGUE:  Yeah.  Up in Colbert, New Hampshire.
15     MR. KELLY:  Okay.  And he was like just helping a friend or
16  something?
17     MR. CRAIGUE:  Yeah, (inaudible) had a bad winter, roof
18  caved in.  He was up there -- he took his stuff up there to help
19  him out and that's what happened.
20     MR. KELLY:  Okay.  Did he -- did your dad have any fall
21  protection stuff?
22     MR. CRAIGUE:  I can't answer that.  I don't know.
23     MR. KELLY:  You don't know if he did, okay.
24     MR. CRAIGUE:  That was a long time ago.
25     MR. KELLY:  Okay.  Yeah, 2000.  All right.  So the next

BAY AREA COURT REPORTING, INC.

19R48_OSHA-01022

Page 5

1   question is who is the actual decision maker for the company?

2   Who actually has the final say with the company's business?  For

3   example, like who lines up all the jobs for the company?  Who

4   handles contracts with the clients and subcontractors?  Who

5   pulls and pays for permits?  And who purchases all the materials

6   needed to perform the work at the job site, including when

7   you're billing the clients for the materials and work being

8   performed?  Who does all of that?

9        MR. CRAIGUE:  Me.

10        MR. KELLY:  You're the only one.  There's no one else?

11        MR. CRAIGUE:  Nope.

12        MR. KELLY:  All right.  So Number 9, does the company have

13   a written safety and health program?  Do you have a written --

14        MR. CRAIGUE:  I do not.

15        MR. KELLY:  You do not?  Okay.  So what type of work does

16   your company perform, just besides -- I know you do siding.

17   What else do you do?

18        MR. CRAIGUE:  Siding and windows.

19        MR. KELLY:  And windows?

20        MR. CRAIGUE:  Yeah.

21        MR. KELLY:  What about like roofing jobs?

22        MR. CRAIGUE:  If I got a roof job, I'd sub that out.

23        MR. KELLY:  So you don't do any roofing at all?

24        MR. CRAIGUE:  I have.  I have.  But --

25        MR. KELLY:  Do you remember when the last time you did a

19R48_OSHA-01023

www.bar-tampa.com                              813-251-4538

Page 6

1   roofing job?

2        MR. CRAIGUE:  That I didn't sub out?  No, I can't.

3        MR. KELLY:  Okay.  What about like framing; do you do any

4   type of framing?

5        MR. CRAIGUE:  If we did framing, it would be like light

6   framing say on a deck or something.  But no.

7        MR. KELLY:  Yeah.

8        MR. CRAIGUE:  We did -- I -- are we going back five years

9   here?  Are we going back --

10       MR. KELLY:  Well, I mean, well, within the last five, six

11  years.

12       MR. CRAIGUE:  Because ten years ago, I was a little bit

13  bigger, with more guys, we did more things.  So I just didn't

14  want to mislead you that way.

15       MR. KELLY:  Okay.  But within the last -- so at one time

16  you were doing roofs?

17       MR. CRAIGUE:  At one time I was doing small additions.

18       MR. KELLY:  Small additions?

19       MR. CRAIGUE:  Like -- yeah.

20       MR. KELLY:  But it would include --

21       MR. CRAIGUE:  Haven't done those in a while.

22       MR. KELLY:  It would include what, the framing and roof and

23  everything else?

24       MR. CRAIGUE:  Yeah, yeah.  I would do that.

25       MR. KELLY:  Now, how long ago would you say that was?

BAY AREA COURT REPORTING, INC.

www.bar-tampa.com                    813-251-4538

1        MR. CRAIGUE:  Jesus, the last one, it was probably ten

2   years -- 2010-ish now.

3        MR. KELLY:  2010, okay.

4        MR. CRAIGUE:  Yeah.

5        MR. KELLY:  Okay.  All right.  So when you do your jobs,

6   you have jobs you guys are working on, are you usually at the

7   job site and how often are you there?

8        MR. CRAIGUE:  Usually about -- I'm out getting stuff,

9   probably a third to half of the day.

10       MR. KELLY:  Okay.  A third or half of the day?

11       MR. CRAIGUE:  Yep.

12       MR. KELLY:  Okay.  So what do you do, you just come by and

13  check on the guys and then find out what's going on?  Is that

14  kind of what you're doing --

15       MR. CRAIGUE:  Yeah --

16       MR. KELLY:  Or do you work with them some?

17       MR. CRAIGUE:  No, I do -- no.  Sometimes I throw on a belt.

18       MR. KELLY:  You -- sometimes you do that?

19       MR. CRAIGUE:  Yep.

20       MR. KELLY:  When was the last time you did that?

21       MR. CRAIGUE:  It's off and on, I mean, it's recently --

22       MR. KELLY:  Yeah, it could be anything.

23       MR. CRAIGUE:  Yeah, I mean...

24       MR. KELLY:  All right.  So when you're not there, who's the

25  competent person that would make decisions for you?  Or do they

BAY AREA COURT REPORTING, INC.

Page 8

1   just simply pick up a phone and call you and say, hey, we got an

2   issue; how does that work?  Who can make decisions for you on a

3   job site while you're not there?

4        MR. CRAIGUE:  Well, unfortunately, Mr. McKenna, he --

5        MR. KELLY:  Mr. McKenna would be the one?

6        MR. CRAIGUE:  Yeah.  He worked for my dad -- he worked for

7   my dad -- when I took over he kind of...

8        MR. KELLY:  Okay, so he --

9        MR. CRAIGUE:  In a way he showed me the way.

10       MR. KELLY:  But he -- he -- okay.  So he would make

11  decisions for you.  Could he make financial decisions or was it

12  just --

13       MR. CRAIGUE:  No, no, no.

14       MR. KELLY:  Okay.  Okay.

15       MR. CRAIGUE:  No.

16       MR. KELLY:  Okay.  All right.  So the jobs that you're

17  doing, do they require the guys to work from ladders,

18  scaffolding systems, and then also elevated surfaces, such as

19  maybe having to go on the roof to do repairs or something like

20  that?  Or do the work -- does it require them to do that type of

21  work?

22       MR. CRAIGUE:  Yes.

23       MR. KELLY:  Okay.  So as far as -- who is responsible for

24  purchasing all of your equipment; tools, supplies used at the

25  company's job site including ladders, air compressors, pneumatic

Page 9

1   air guns, scaffolding systems, all that type stuff?  Who would

2   be responsible for buying all that stuff?

3       MR. CRAIGUE:  Most of it was mine.  Kenny had some of his

4   stuff there also.

5       MR. KELLY:  So what would he have on the job site?

6       MR. CRAIGUE:  He had a couple -- he had a saw that he liked

7   to use.  And one set of the pump jacks, I believe, were his.

8       MR. KELLY:  Okay.  So he would use some of his stuff, but

9   the other ones were -- what was yours?

10      MR. CRAIGUE:  Everything that -- that I did not say was

11  his.

12      MR. KELLY:  Okay, just the pump jack and -- okay.

13      MR. CRAIGUE:  I mean, he might have brought in a couple of

14  his -- used his own drills and stuff --

15      MR. KELLY:  Hand tools or something?

16      MR. CRAIGUE:  Yeah.

17      MR. KELLY:  Okay.

18      MR. GARDNER:  And you said that was -- that was Kenny?

19      MR. KELLY:  McKenny, yeah.

20      MR. CRAIGUE:  Yeah.

21      MR. KELLY:  Tell me if I'm going too fast.

22      MR. GARDNER:  McKenny, M-C-K --

23      MR. CRAIGUE:  M-C-K-E-N-N-A.

24      MR. KELLY:  Yeah.  So he would have a pump jack, you said.

25  A pump jack and then a -- but all the other stuff would be

Page 10

1   yours?  All right.

2        Does the company have a written training program for the

3   employees who are utilizing the equipment, the company's

4   equipment?  If so, is there any documentation illustrating that

5   the employees have received training?  For example, have they

6   received training on ladders, scaffolding systems, pneumatic

7   nail guns, and stuff like that?

8        MR. CRAIGUE:  No.

9        MR. KELLY:  No?  Okay.  So who would be required to use the

10  company's equipment on the job site; and were the company's

11  tools or equipment inspected by a competent person daily prior

12  to their use?  And is there any documentation illustrating that

13  these inspections took place?

14       MR. CRAIGUE:  There's no documentation, no.

15       MR. KELLY:  There's nothing?  Was there anyone actually

16  doing this; doing any type of daily inspections?

17       MR. CRAIGUE:  Daily?

18       MR. KELLY:  Yeah, daily.

19       MR. CRAIGUE:  No.  I would be there -- every day I would

20  see the -- I would see the tools.  I would see everything every

21  day.

22       MR. KELLY:  Uh-huh.  So who would have the authority to

23  remove any damaged equipment --

24       MR. CRAIGUE:  Anyone.

25       MR. KELLY:  Anyone?

19R48_OSHA-01028

Page 11

1        MR. CRAIGUE:  Yeah.

2        MR. KELLY:  So anyone.  Who would replace it; would it be

3   you?

4        MR. CRAIGUE:  If that was the case, yes.

5        MR. KELLY:  Yeah, because I mean, you'd have to purchase --

6   if something was damaged, you would have to purchase it.

7        MR. CRAIGUE:  Oh, yeah, I'd go get it, yeah.

8        MR. KELLY:  And there was no one that was -- there was no

9   one actually there and inspecting them then?  You have no

10  documentation showing --

11       MR. CRAIGUE:  I have no documentation --

12       MR. KELLY:  -- any inspections or anything?

13       MR. CRAIGUE:  On a ladder?  No.

14       MR. KELLY:  Yeah, ladders, on the air compressors, or

15  anything that they need to use for work on?

16       MR. CRAIGUE:  Yeah.  No, I don't know how I would have --

17       MR. KELLY:  Okay.

18       MR. CRAIGUE:  It's --

19       MR. KELLY:  Okay.

20       MR. CRAIGUE:  The air compressor or anything.

21       MR. KELLY:  All right.  So 16 is who is responsible for

22  purchasing safety equipment at the company and what type of

23  safety equipment does the company own?  For example, do you own

24  body harnesses and lanyards, safety ropes and rope grabs, roof

25  anchors, hearing protection, eyeglasses, hardhats, et cetera?

19R48_OSHA-01029

Page 12

1    Who's responsible for buying all that?

2         MR. CRAIGUE:  I have all that.

3         MR. KELLY:  You do have all that?

4         MR. CRAIGUE:  Uh-huh.

5         MR. KELLY:  Okay.  So you do have all of that.  So where is

6    most of this stuff kept at?

7         MR. CRAIGUE:  In my basement.

8         MR. KELLY:  Okay.  You kept it at the basement?

9         MR. CRAIGUE:  Yeah.

10        MR. KELLY:  Okay.

11        MR. CRAIGUE:  I mean, or the trailer.  If we weren't using

12   it, it'd be thrown in the basement.

13        MR. KELLY:  The basement of your house?

14        MR. CRAIGUE:  I mean, everything that -- basically

15   everything that we had was there.  Except for the buckets of the

16   lanyards.

17        MR. KELLY:  So you do have all of this stuff then?

18        MR. CRAIGUE:  I do.

19        MR. KELLY:  Okay.  All right.  Who would be ultimately

20   responsible for the safety on the job site?  Who was enforcing

21   the use of the safety equipment and who has the authority to

22   stop the job and correct the hazards prior to allowing the work

23   to continue?  Who would do that?

24        MR. CRAIGUE:  Just -- well, who's --

25        MR. KELLY:  Who has the authority to say, hey, let's just

Page 13

1   stop.  We can't keep continue working.  We need to put on safety

2   gear, we need to do that.  Who would do that for the company?

3        MR. CRAIGUE:  Oh, anyone could say -- anyone could say this

4   is safe -- it would be my -- at the end it would --

5        MR. KELLY:  But the ultimate responsibility?

6        MR. CRAIGUE:  Call me -- if they had a problem they would

7   come to me, yes.

8        MR. KELLY:  Okay, you?

9        MR. CRAIGUE:  Yeah.

10       MR. KELLY:  Okay.  So how do you follow up on that?  How do

11   you follow up -- how would you follow up on the job site to make

12   sure that they're doing what you want them to do, safety-wise?

13   So would you -- would you -- I mean, do you go to the job site

14   and say, hey guys, you know, we need to do this.  Why aren't we

15   using this?  Why aren't we doing that?  How would that --

16       MR. CRAIGUE:  Yeah, yeah.  Usually we work off -- if we're

17   going up a wall, we have to have our staging with our planks,

18   with our pump jacks, with our safety equipment.  That's what we

19   have always done.  And usually anything else that is used off

20   ladders.

21       MR. KELLY:  Okay.  All right.  So who is responsible for

22   scheduling the company's projects and who assigns all of the

23   work at the company's job sites for the employees to do?  So who

24   would be responsible for assigning the work?

25       MR. CRAIGUE:  I mean, it would be me.

19R48_OSHA-01031

www.bar-tampa.com                    813-251-4538

Page 14

1        MR. KELLY:  So you would assign the guys?

2        MR. CRAIGUE:  Yeah.

3        MR. KELLY:  Okay.

4        MR. CRAIGUE:  Well, we do the same thing every day.  It's

5   not like it's a new assignment like --

6        MR. KELLY:  Well, I know.  But I mean, the guys have got --

7   they still have to be told, okay, guys, I know you're here

8   today.  I mean, I know how men are, you know.  They come to

9   work -- they seem to forget what they did yesterday, so you have

10  to say, hey guys, we need to do this.

11       MR. CRAIGUE:  Yeah, they knew -- I didn't really -- my guys

12  do what they did.  And I left it -- you know.

13       MR. KELLY:  Okay.  All right.  So here's -- we're getting

14  to Question 19.  So you know, again, there's questions we have

15  to ask.  So were you contacted by another government agency and

16  who was the agency that contacted you?

17       MR. CRAIGUE:  For --

18       MR. KELLY:  In regards to this?

19       MR. CRAIGUE:  Are you talking like the labor board?

20       MR. KELLY:  Yes.  Yes.

21       MR. CRAIGUE:  Yeah, I've spoken to them.

22       MR. KELLY:  Okay.  So they contact -- it was the labor --

23  New Hampshire labor board?

24       MR. CRAIGUE:  Correct.

25       MR. KELLY:  Okay.  Okay.  All right.  So what was the

BAY AREA COURT REPORTING, INC.

```
                                                    Page 15
 1   reason they contacted you?  Did it have anything to do with Mr.

 2   Erickson and Mr. McKenna's status at the company?

 3          MR. CRAIGUE:  Yes.

 4          MR. KELLY:  Okay.  So -- okay, so basically that's what it

 5   says.  Was the investigating conducted to determine the workers'

 6   comp provided to these individuals?  Is that true?

 7          MR. CRAIGUE:  They're still making -- I had a meeting with

 8   them last week and they're going --

 9          MR. KELLY:  But I mean, that's what they contacted you for;

10   is that correct?

11          MR. CRAIGUE:  Correct.

12          MR. KELLY:  Okay.

13          MR. CRAIGUE:  Yep, yep.

14          MR. KELLY:  Okay.  So there was a meeting set up.  And what

15   day did you meet with them, do you remember?

16          MR. CRAIGUE:  I want to say it was last Tuesday or

17   Wednesday.

18          MR. KELLY:  Okay.  Last Wednesday or Tuesday?

19          MR. CRAIGUE:  What's today?  Yeah, I'm sorry I don't --

20          MR. KELLY:  No, that's okay --

21          MR. CRAIGUE:  Usually I check on my phone.  I left my

22   phone --

23          MR. KELLY:  Yeah.  No, that's okay.  So last Tuesday or --

24          MR. CRAIGUE:  Last -- middle of last week.

25          MR. KELLY:  Okay.  All right.  So what was their
```

19R48_OSHA-01033

Page 16

1  investigating procedure?  For example, was it just interviews,

2  did they ask you to bring in paperwork, any type of

3  documentation from your company?  What did it consist of?

4       MR. CRAIGUE:  They were looking for documentation on

5  contracts between -- I had with Mr. McKenna and Mr. Erickson.

6       MR. KELLY:  Okay.

7       MR. CRAIGUE:  Or timecards.

8       MR. KELLY:  Oh, that type of stuff, okay.

9       MR. CRAIGUE:  That type of stuff.

10      MR. KELLY:  Okay.  So you were able to provide them with

11  that information?

12      MR. CRAIGUE:  No.

13      MR. KELLY:  Did you just -- you didn't have it?

14      MR. CRAIGUE:  No.

15      MR. KELLY:  Okay.  At the conclusion of this process, did

16  they inform you of whatever their findings were?  Did they tell

17  you what their findings were, or their ruling?

18      MR. CRAIGUE:  I think that's what they're doing now.

19      MR. KELLY:  So what did --

20      MR. CRAIGUE:  I'm not trying --

21      MR. KELLY:  Right --

22      MR. CRAIGUE:  I don't know how this -- how the program

23  works --

24      MR. KELLY:  Did they tell you what they thought their

25  opinion was or what?

BAY AREA COURT REPORTING, INC.

Page 17

 1          MR. CRAIGUE:  Yeah.  Yeah.

 2          MR. KELLY:  So what did they tell you?

 3          MR. CRAIGUE:  They told me their opinion.  And they're

 4   figuring it out now.

 5          MR. KELLY:  Okay.  So what did they say?

 6          MR. CRAIGUE:  They're trying to figure out if they're

 7   subcontractors or employees.

 8          MR. KELLY:  Okay.  And they didn't tell you what they

 9   believed their decision was?

10          MR. CRAIGUE:  They -- no.  Well, there's a process they

11   have to do, too.

12          MR. KELLY:  Yeah.

13          MR. CRAIGUE:  So they came out -- they said -- it was more

14   of a hearing, I think, and --

15          MR. KELLY:  Right, right.

16          MR. CRAIGUE:  More than anything.  So they said their side

17   and I just told them the truth about mine, you know.

18          MR. KELLY:  Okay.  So 24, did the agency determine that

19   Mr.  Erickson and Mr. McKenna were actually employees of your

20   company and not subcontractors?

21          MR. CRAIGUE:  I don't know if they can say that yet

22   because -- do you know what I'm saying?  Because of the hearing.

23   They said they had 30 days to look over everything.  I'm not

24   being --

25          MR. KELLY:  Right.

19R48_OSHA-01035

Page 18

1        MR. CRAIGUE:  I'm not trying to like go skate around this

2    answer.  That's what they told me.

3        MR. KELLY:  Okay.

4        MR. CRAIGUE:  This stuff is really new to me, so.

5        MR. KELLY:  Right, right, right.  Well, with agencies, you

6    know, honestly -- Craig, I'll be honest with you.  We do share

7    information with each one --

8        MR. CRAIGUE:  Obviously, I get it --

9        MR. KELLY:  Yeah, they got it.  Because it depends on the

10   investigation they're doing, we have to share.

11       MR. CRAIGUE:  Yeah, I totally understand.

12       MR. KELLY:  So he didn't tell you that according to them

13   that they are -- that they find that the individuals were not

14   subcontractors?

15       MR. CRAIGUE:  They told me their reasons why they thought

16   they were not, correct.

17       MR. KELLY:  Okay.  So that's what they told you, okay.

18       MR. CRAIGUE:  Yep, yep.

19       MR. KELLY:  Okay.  So do you know if you're going to

20   receive any citations by the agency for not providing Mr.

21   Erickson or Mr. McKenna with workers' comp insurance?

22       MR. CRAIGUE:  I believe I will be.

23       MR. KELLY:  Okay.  So you believe -- okay.  So Number --

24   the next one is 26.  So basically, I know when you and me met, I

25   know things were very bad because the accident just happened.

19R48_OSHA-01036

www.bar-tampa.com                                    813-251-4538

Page 19

1          MR. CRAIGUE:  Yep.

2          MR. KELLY:  And I tried to interview you and I understand

3      there was a lot of stuff going on.  I truly understand that.

4          MR. CRAIGUE:  Yep.

5          MR. KELLY:  And it's very hard.  And I'm sure it's still

6      hard.  But I mean, you know, we have to know -- I've got to have

7      the truth.

8          MR. CRAIGUE:  Yes.

9          MR. KELLY:  Really, honestly.  So I'm just asking you

10     again, I know I asked you there.  Is Christopher and Skinny, are

11     they employees of your company?

12         MR. CRAIGUE:  I've always treated them -- they would come

13     and go as they please, so I would always treat them as not

14     employees.  They came and go.  I know there's paperwork saying

15     they're not, but how I treated them was not as employees.  They

16     did what they -- they did what they wanted to do.  And I would

17     pay them.  That's the God's honest truth.

18         MR. KELLY:  Okay.  But you know, it's interesting because

19     if you look, you know, Mr. McKenna --

20         MR. CRAIGUE:  Yeah.

21         MR. KELLY:  -- had worked for your company for like

22     20-something years?

23         MR. CRAIGUE:  Off and on.  Off and on.

24         MR. KELLY:  Okay.  That's a long time to be --

25         MR. CRAIGUE:  Yep.

19R48_OSHA-01037

www.bar-tampa.com                              813-251-4538

Page 20

1        MR. KELLY:  -- be an independent contractor to work

2   somewhere for that many years.  And then what, Christopher

3   worked for three years, correct?

4        MR. CRAIGUE:  I'm not sure about how long he worked.

5        MR. KELLY:  Okay.

6        MR. CRAIGUE:  But it was off and on for a couple years at

7   least.

8        MR. KELLY:  So they were there a while.

9        MR. CRAIGUE:  Yep.

10       MR. KELLY:  Okay.  So how long did Mr. McKenna actually

11  work for the company and what was his job title?

12       MR. CRAIGUE:  Laborer.

13       MR. KELLY:  He was a laborer, okay.

14       MR. CRAIGUE:  I guess.

15       MR. KELLY:  Okay.

16       MR. CRAIGUE:  I don't know.

17       MR. KELLY:  And he worked for what?

18       MR. CRAIGUE:  He could call whatever he wanted.

19       MR. KELLY:  Okay.  So was it 20 years possibly or --

20       MR. CRAIGUE:  Yeah, off and on for that, yeah.

21       MR. KELLY:  Okay.  So how long did Christopher work for the

22  company, Mr. Erickson?

23       MR. CRAIGUE:  Off -- two summers ago.  So I want to say

24  just under a couple years.

25       MR. KELLY:  Okay.

BAY AREA COURT REPORTING, INC.

www.bar-tampa.com                                    813-251-4538

```
                                                        Page 21
1          MR. CRAIGUE:  I used him for a couple years.

2          MR. KELLY:  Okay.  And then Ford, he'd only been there a

3    few days or something?

4          MR. CRAIGUE:  Yeah.

5          MR. KELLY:  How long did he work?

6          MR. CRAIGUE:  A day.

7          MR. KELLY:  He worked one day?

8          MR. CRAIGUE:  Yep.  One full day, yep.

9          MR. KELLY:  Okay.  All right.  So in the last year, how

10   many total employees has the company had working for them

11   including any part-time folks?

12         MR. CRAIGUE:  Employees, zero.  Except for the people that

13   we talked about.

14         MR. KELLY:  So there was no one else except for the three

15   guys?

16         MR. CRAIGUE:  Correct.

17         MR. KELLY:  Basically three, okay.  All right.  So Number

18   31, who did McKenna, Erickson, and Ford all consider to be their

19   supervisor or their employer?  Who did they consider that to be?

20         MR. CRAIGUE:  Well, they're getting their money from me.

21         MR. KELLY:  Okay.  That'd be you.  All right.  So again, so

22   a lot of these questions maybe seem somewhat like they repeat

23   but, who was responsible for directing all of these guys' work

24   and assignments on the job site?  For example, who sets the

25   daily tasks for these individuals who are working, for all three
```

BAY AREA COURT REPORTING, INC.

Page 22

1   guys?  Who would do that?

2       MR. CRAIGUE:  I wouldn't have like a written up plan.  They

3   knew what had to be done.  I mean --

4       MR. KELLY:  But I mean, who would direct them?  I mean, who

5   would direct them to do what they need to do?

6       MR. CRAIGUE:  I would say we're going to do this wall.  I

7   would say that.

8       MR. KELLY:  You would do -- okay.  So was there any type of

9   written contract between Mr. McKenna, Mr. Erickson, or Mr. Ford

10  to perform any work on the job site?  And did any of these guys

11  have to provide you with any type of billing when they were

12  performing the work?  So how did that work?  So was there any

13  type of contract?

14      MR. CRAIGUE:  No.

15      MR. KELLY:  Okay, there was --

16      MR. CRAIGUE:  No.

17      MR. KELLY:  So what about say (inaudible) working the job,

18  they wanted you, you said get up here I want you to remove all

19  this wall right there.

20      MR. CRAIGUE:  Yeah.

21      MR. KELLY:  Did they have to give you receipts for doing

22  that?

23      MR. CRAIGUE:  No.  I know I should have...

24      MR. KELLY:  All right.  Okay.  So again, we talked about

25  this, too, before so.  How were Mr. McKinney, Mr. Erickson, and

19R48_OSHA-01040

Page 23

1    Mr. Ford paid by the company?  For example, were they paid by

2    check, cash, or other means?  And who set the amount of their

3    salary?  And what were they paid; by the hour, by the week, by

4    the month?  So exactly -- so were they paid by the hour?  Was --

5    let me ask you this.  Was Christopher paid $16 an hour?

6        MR. CRAIGUE:  He was paid -- he was paid around there,

7    yeah.

8        MR. KELLY:  Okay.  And then Skinny, was he paid like $21 an

9    hour?

10       MR. CRAIGUE:  21, if it was for his harder work I would

11   give him more money, you know.

12       MR. KELLY:  Okay.  So basically what -- so Mr. Erickson was

13   given $16 an hour?

14       MR. CRAIGUE:  Yep.

15       MR. KELLY:  And then Mr. McKenna was paid $21 an hour?

16       MR. CRAIGUE:  Well, him and -- him and I had a different

17   relationship.  He'd tell me what -- (inaudible) I'd pay him.

18       MR. KELLY:  So what about Ford, so what was he paid by the

19   hour?

20       MR. CRAIGUE:  We never even got there.

21       MR. KELLY:  So did he get paid anything for the day?

22       MR. CRAIGUE:  He must have.  I must have given him

23   something.  Because I don't --

24       MR. KELLY:  Okay.  So did they ever have to give you

25   receipts or anything for their job?

19R48_OSHA-01041

www.bar-tampa.com                        813-251-4538

Page 24

1      MR. CRAIGUE:  No.  No, but I should have.  And I'm learning

2   it the hard way.  Mr. Erickson did tell me he owned his own

3   business.  And he -- which comes back to me.  I didn't follow

4   up, I believed him.  But he did tell me he owned his own

5   business and he had all that stuff and.

6      MR. KELLY:  Okay.  So 35, did you have the right to

7   terminate these guys any time you wanted to?  Could you just

8   say, hey, you're fired?

9      MR. CRAIGUE:  Yeah, they had the right not to show -- yeah.

10  I mean, they come and go as they please.  I mean.

11     MR. KELLY:  But I mean, you could fire them off your jobs

12  if you wanted to?

13     MR. CRAIGUE:  Yeah.

14     MR. KELLY:  All right.  If your job sites fell apart, would

15  any of these guys suffer financially?  Not including hourly wage

16  or whatever.  But would they suffer any other way financially if

17  the job went bad and them guys were working on it?  Would they

18  lose money?

19     MR. CRAIGUE:  No.

20     MR. KELLY:  Okay.

21     MR. CRAIGUE:  No, I would take care of everyone first

22  before me.

23     MR. KELLY:  Okay.  So let's see.  Did you ever do work out

24  of town where you guys had to travel out of town some?

25     MR. CRAIGUE:  Uh-huh.

BAY AREA COURT REPORTING, INC.

1        MR. KELLY:  So who would pick up those expenses?  I mean,

2    like somebody having a hotel bill?  Who would have to pay --

3        MR. CRAIGUE:  No, we never did anything like that.

4        MR. KELLY:  You never stayed out of town where you had to

5    stay in a motel?

6        MR. CRAIGUE:  No.

7        MR. KELLY:  Okay.  So did Mr. McKenna, Mr. Erickson, or Mr.

8    Ford, did any of them have the ability to hire assistants on the

9    job sites?  Can they just hire anybody they wanted to work with

10   them?

11       MR. CRAIGUE:  Like bring them on the job?

12       MR. KELLY:  Yeah, your jobs.  Could they just say, hey, I'm

13   hiring somebody to work on the job site?  Could they do that?

14       MR. CRAIGUE:  I mean, they'd have to ask me.

15       MR. KELLY:  But I'll tell you, they couldn't -- they just

16   couldn't just go hire somebody they wanted to then?

17       MR. CRAIGUE:  I wouldn't -- no, I would have to meet

18   someone before I let them on my job.

19       MR. KELLY:  Okay.  I mean, that's what I'm saying.  It

20   was -- was it their decision to say, hey, I'm hiring another guy

21   to go to work, he's going to be my assistant.  On one of your

22   job sites?

23       MR. CRAIGUE:  If Skinny wanted a cutter, it did it in the

24   past, yeah, but --

25       MR. KELLY:  But you have the ultimate decision over there,

19R48_OSHA-01043

www.bar-tampa.com                               813-251-4538

Page 26

1   wouldn't you?  Could you just bring anybody -- he wouldn't be

2   able to just bring anyone in.  It would have to go through you,

3   wouldn't they?

4        MR. CRAIGUE:  Well, I would want to meet them first.

5        MR. KELLY:  Okay.  So have you provided these guys with any

6   type of training with Mr. McKenna, Mr. Erickson, or Ford.  And

7   is there any training records to indicate any of this?

8        MR. CRAIGUE:  No.

9        MR. KELLY:  No?  Okay.  Have you provided Mr. McKenna and

10  Mr. Erickson with a 1099 form?

11       MR. CRAIGUE:  No.

12       MR. KELLY:  W2 forms or anything.

13       MR. CRAIGUE:  No.

14       MR. KELLY:  Did any of these guys, Mr. McKenna, Mr.

15  Erickson, or Mr. Ford, ever provide you with any type of

16  liability insurance polices or anything?

17       MR. CRAIGUE:  No.

18       MR. KELLY:  Okay.  So we'll go down -- we're going to move

19  into the job down the street, okay?

20       MR. CRAIGUE:  All right.

21       MR. KELLY:  Are you okay? You fine?  Okay.  So when did

22  the job actually start?  What day did the job start on?  We can

23  kind of look at that.  Do you remember what day it started on?

24       MR. CRAIGUE:  I really don't.

25       MR. KELLY:  Do you remember when your contractual date was

BAY AREA COURT REPORTING, INC.

Page 27

1   or?

2        MR. CRAIGUE:  I want to say it was a little bit before

3   this.

4        MR. KELLY:  Oh, before July?

5        MR. CRAIGUE:  I want to say that for some reason.  Just

6   because of July 4th weekend.  I'm trying to think.

7        MR. KELLY:  So maybe late June?

8        MR. CRAIGUE:  It might be, yeah.

9        MR. KELLY:  Late June it probably started?  Okay.

10       MR. CRAIGUE:  Yeah.

11       MR. KELLY:  Okay.  So who were the guys that went to work,

12   who were they?  When you started, who was working with you?

13       MR. CRAIGUE:  The people that we talked about.

14       MR. KELLY:  So all -- except for Ford, right?  How long was

15   Ford --

16       MR. CRAIGUE:  No, correct.

17       MR. KELLY:  So it was McKenna.

18       MR. CRAIGUE:  Yeah.

19       MR. KELLY:  And then Mr. Erickson.  Okay.  And were there

20   any other contractors on the job that started or no?

21       MR. CRAIGUE:  What do you mean, contractors?

22       MR. KELLY:  Were there anybody else on the job working at

23   that time when you started?

24       MR. CRAIGUE:  No, I was the only company on -- I had --

25   someone else was helping me.

Page 28

1           MR. KELLY:  Well, then did they start at the same time?

2           MR. CRAIGUE:  No.  They were just -- no.  I don't think so.

3           MR. KELLY:  Okay.  So what was your actual scope of work;

4     what were you supposed to do?

5           MR. CRAIGUE:  Siding and windows.

6           MR. KELLY:  Siding and windows?

7           MR. CRAIGUE:  Uh-huh.

8           MR. KELLY:  Okay.  So I got the information here.  I wanted

9     to look at maybe the building with you.

10          MR. CRAIGUE:  Yep.

11          MR. KELLY:  So what I did was I made a copy of the building

12    to look at.  So how much of the building were you doing?  I

13    mean, this is all four sides.

14          MR. CRAIGUE:  Uh-huh.

15          MR. KELLY:  So what were you doing; did you do all this

16    work, did you -- well, what did you do?  What was all your scope

17    of work?

18          MR. CRAIGUE:  All the --

19          MR. KELLY:  All of it?

20          MR. CRAIGUE:  The siding and the windows.

21          MR. KELLY:  And so what -- was there a lot of damage in

22    behind this old siding or something?  Is that what happened?  Or

23    they just wanted it updated or something?

24          MR. CRAIGUE:  It was just an update.

25          MR. KELLY:  Is that what it was?  Okay.  So that was just

Page 29

1   an update.  Okay.

2          MR. CRAIGUE:  Weatherproofing it.

3          MR. KELLY:  Weatherproofing?  Okay.  And how long was the

4   job supposed to take?

5          MR. CRAIGUE:  A month.

6          MR. KELLY:  It was supposed to take a month?

7          MR. CRAIGUE:  Month and a half.  That was my guess.

8          MR. KELLY:  Okay.  So we're at 40, I believe.  Before you

9   started this job --

10         MR. CRAIGUE:  Yep.

11         MR. KELLY:  -- was there a pre-construction meeting held to

12  determine what challenges would be on this job site?

13         MR. CRAIGUE:  Yeah.

14         MR. KELLY:  You did do that?  Who took part in that

15  pre-construction meeting?  Did Shane -- was Shane there or was

16  somebody else --

17         MR. CRAIGUE:  Yeah, Shane -- we had a walk-through.

18         MR. KELLY:  You did a walk-through?

19         MR. CRAIGUE:  Uh-huh.

20         MR. KELLY:  Was there any meeting -- meeting minutes taken

21  or anything like that?

22         MR. CRAIGUE:  I don't know what you mean.

23         MR. KELLY:  Well, like did he write anything down, like

24  anything that you guys discussed, what might be the challenges

25  of this job?  Because the reason I'm asking --

19R48_OSHA-01047

Page 30

1        MR. CRAIGUE:  Yeah --

2        MR. KELLY:  So the reason I'm asking you is number one,

3   you've got an active building with not only clients, but we have

4   customers in and out of this building all day --

5        MR. CRAIGUE:  Yeah.

6        MR. KELLY:  -- and that'll be a challenge.  And these other

7   areas.  So we got other areas of the building, up here --

8        MR. CRAIGUE:  Yep.

9        MR. KELLY:  -- that we've got to figure out how we're going

10  to get up there to do the work.

11       MR. CRAIGUE:  Uh-huh.

12       MR. KELLY:  So those would be challenges.  Other challenges

13  would be like these areas where you had work up here, but you

14  were going to have to get on roofs to perform certain jobs.  So

15  did you look at those challenges and try to figure out what were

16  you going to do there?

17       MR. CRAIGUE:  No.

18       MR. KELLY:  So you didn't?  Okay.  But you did have a

19  pre-construction meeting?

20       MR. CRAIGUE:  Uh-huh.

21       MR. KELLY:  Okay.  All right.  The next one is almost the

22  same question.  It's prior to starting the project, was there a

23  hazard assessment performed on the job site to determine what

24  hazards are present?  And were the hazards identified?  And what

25  procedures were put in place to eliminate these hazards?  So

19R48_OSHA-01048

1   basically, just kind of like what we were talking about.

2        So when you're looking at a project, you're out here, one

3   thing you're going to have to know right off the bat, what am I

4   going to be doing, what am I going to be doing, what am I going

5   to be working from -- are my guys working, and how are we going

6   to accomplish this job site?  So we need to do some kind of

7   assessment.

8        So areas -- if we're looking at areas, I mean, here

9   automatic, that would be a flag.  So you're looking at the south

10  side of the building.  We know we've got to somehow -- we've got

11  to get up there.  Because this work has got to get done.

12  Someone's going to have to stand up here and do the job.  Here

13  and these areas as well.  We're going to have to get around

14  these -- this area is another one.

15       But these other areas, everywhere where there was a

16  bump-out, all these areas, there was going be some issues

17  because we have to figure out how we're going to get up there

18  and do the work all in here.  Pull this stuff off the wall and

19  get in there and do it.

20       MR. CRAIGUE:  Uh-huh.

21       MR. KELLY:  And if you're looking at it, some of the places

22  are not as wide, but you're still talking about over two feet or

23  more.  So it's hard if you're going try to do something on a

24  ladder.

25       MR. CRAIGUE:  Yep.

Page 32

1     MR. KELLY:  So did you look at those areas?  Did you look

2   at this?

3     MR. CRAIGUE:  Yeah.  Yeah.  This could all be reached --

4   even this could have been reached from a ladder from the ground.

5     MR. KELLY:  Okay.

6     MR. CRAIGUE:  And we had our staging up here.

7     MR. KELLY:  Okay.  So --

8     MR. CRAIGUE:  We had eight foot pump jacks going up the

9   side and we had two sets and we'd --

10    MR. KELLY:  Okay.  But when you -- so the pump jacks, it

11  was difficult to get on here, the way I understand.  Because as

12  they -- even if they set up their pump jacks, it was hard to get

13  over here and perform the work that needed to be done along

14  here.  Do you know what I'm talking about?  All the areas right

15  inside here.

16    MR. CRAIGUE:  Yeah.

17    MR. KELLY:  And I understand if you're up here on the side,

18  but once you put your pump jacks -- even if you got them close,

19  even if you set them here and went up this way, you would still

20  have an issue right here on all of these bump-outs.  They would

21  still be an issue.

22      And the way I understand, Nath, between interviews, with

23  interviews --

24    MR. CRAIGUE:  Yeah.

25    MR. KELLY:  -- with several people, the guys were actually

Page 33

1    having to climb up here to perform the work because they were

2    not able to do the work -- do you understand what I'm saying?

3         MR. CRAIGUE:  I got you.

4         MR. KELLY:  Do you understand what I'm trying to say?

5         MR. CRAIGUE:  Yeah.

6         MR. KELLY:  They were able -- they were trying to do it.

7    So they were having to get here.  I know they're there.  But

8    they were having to climb up here.  So did you know that they

9    were doing this?  Did you know that they had to climb up there

10   to do this work on those bump-out roofs?

11        MR. CRAIGUE:  Yeah, they had -- from what I remember, they

12   had the roof brackets going up with their staging was down

13   there.

14        MR. KELLY:  Okay.  But were they wearing fall, fall

15   protection, when they were up there?

16        MR. CRAIGUE:  No.

17        MR. KELLY:  They wouldn't -- okay.  So was there any fall

18   protection on the job site, any fall protection --

19        MR. CRAIGUE:  No.

20        MR. KELLY:  -- for those guys to wear?

21        MR. CRAIGUE:  No, I told you that.

22        MR. KELLY:  So there was nothing?

23        MR. CRAIGUE:  Nope.  If it was needed, they -- I would have

24   brought it there.

25        MR. KELLY:  So I also understand that you were there.  So

www.bar-tampa.com                          813-251-4538

```
                                              Page 34
 1   when they were working there, did you see them working up there?
 2        MR. CRAIGUE:  I don't remember that.
 3        MR. KELLY:  You don't remember seeing the guys working up
 4   there?
 5        MR. CRAIGUE:  Specific spots?  No.
 6        MR. KELLY:  But, I mean, do you remember seeing them
 7   working --
 8        MR. CRAIGUE:  Yeah.  Of course.
 9        MR. KELLY:  Working up on the roof doing that work?  Okay.
10   So was --
11        MR. CRAIGUE:  I --
12        MR. KELLY:  So when you did, was there any reason why you
13   didn't say, hey, guys, why aren't you wearing fall protection?
14   Was there any reason why you wouldn't have said that?
15        MR. CRAIGUE:  Nope.
16        MR. KELLY:  Okay.  So again, we have those -- couple --
17   those few areas there.  So as far as the fall protection, have
18   you used it in the past?
19        MR. CRAIGUE:  Yes.
20        MR. KELLY:  Okay.  Do you remember the last time you used
21   the fall protection?
22        MR. CRAIGUE:  As I said, when we stopped doing roofs, we
23   put it up.  I don't remember the last time to be honest with
24   you.
25        MR. KELLY:  You don't remember the last time you used it?
```

Page 35

1          MR. CRAIGUE:  No.

2          MR. KELLY:  Okay.  And when you did use it, do you even

3     remember what it was?  Was it body harnesses?

4          MR. CRAIGUE:  Yeah, they were body harnesses.

5          MR. KELLY:  It was body harnesses?

6          MR. CRAIGUE:  Yeah.

7          MR. KELLY:  Okay.  What about anything -- did you -- what

8     about like, did you ever use temporary railing or scissor lifts

9     or booms to do work instead of --

10          MR. CRAIGUE:  I never rented one, no.

11          MR. KELLY:  You never rented a -- okay, a scissor lift?

12          MR. CRAIGUE:  No.

13          MR. KELLY:  All right.  And you used -- but you used body

14     harnesses?

15          MR. CRAIGUE:  Uh-huh.

16          MR. KELLY:  Okay.  So again like I said, there's questions

17     we have to ask, okay?

18          MR. CRAIGUE:  Yep.

19          MR. KELLY:  Okay.  So why did you use this method of fall

20     protection and for what purpose?  Why did you use the body

21     harnesses in the past?  What was the purpose of it?

22          MR. CRAIGUE:  To follow guidelines.

23          MR. KELLY:  To prevent the falls or whatever?

24          MR. CRAIGUE:  Yeah.  To follow guidelines, yeah.

25          MR. KELLY:  And then you said the last time you used it you

www.bar-tampa.com                          813-251-4538

Page 36

 1  don't remember?

 2       MR. CRAIGUE:  I can't give you a date, no.

 3       MR. KELLY:  You don't remember?  It's been a few years?

 4       MR. CRAIGUE:  Yes.  Since we've done a roof, yeah, that's

 5  when we usually used them.

 6       MR. KELLY:  All right.  Same type question.  Who would be

 7  ultimately responsible to make the decision regarding the fall

 8  protection at the job site?  Who would be the one saying you got

 9  to put this stuff on?

10       MR. CRAIGUE:  If they feel uncomfortable doing something

11  they would talk to me.  So it would be me.

12       MR. KELLY:  And you would tell them to put it on?

13       MR. CRAIGUE:  Yeah.  Yeah.  They didn't want -- this is

14  where it's come in because they want the whole -- they want to

15  do their own thing, with the subcontracting thing until

16  something happens, you know.  They want to do their own thing.

17  And then this.

18       MR. KELLY:  Okay.  And I realize some of the questions are

19  hard --

20       MR. CRAIGUE:  Yeah.

21       MR. KELLY:  -- but they have to be asked.

22       MR. CRAIGUE:  I've been transparent with you.  I really

23  have.

24       MR. KELLY:  Okay.  Okay.  And so even the question is is if

25  you have used the fall protection in the past, what is the

BAY AREA COURT REPORTING, INC.

Page 37

1    reason that it wasn't used on this job?

2         MR. CRAIGUE:  They didn't ask for it.

3         MR. KELLY:  They didn't ask for it?

4         MR. CRAIGUE:  Yeah.

5         MR. KELLY:  Was it at the job site?  It wasn't at the job

6    site then --

7         MR. CRAIGUE:  I already told you that, no.

8         MR. KELLY:  Okay.  Does the company have a written fall

9    protection program?

10        MR. CRAIGUE:  No.  No.

11        MR. KELLY:  Is there any type of training program -- any

12   kind of training showing, illustrating that these guys have been

13   trained in fall protection?

14        MR. CRAIGUE:  No.  I'm just a one-guy show with the guy

15   that taught me the business.  And I hired the guy that I thought

16   he owned his own business.  So I'm not this big company that did

17   all this, you know.

18        MR. KELLY:  Okay.  All right.  So was there a schedule made

19   for the project?

20        MR. CRAIGUE:  No.

21        MR. KELLY:  There wasn't no schedule?

22        MR. CRAIGUE:  Not really.

23        MR. KELLY:  So how did you guys -- how did you figure all

24   this out?  How did you lay it out so that you knew that you were

25   going to meet your deadline?  Was there a deadline made?

19R48_OSHA-01055

Page 38

1        MR. CRAIGUE:  No.

2        MR. KELLY:  There were no deadlines?

3        MR. CRAIGUE:  No.

4        MR. KELLY:  So no schedule, and he didn't give you a

5    deadline when you had to be done?

6        MR. CRAIGUE:  Uh-uh.

7        MR. KELLY:  Okay.  So how did you lay this out?  I mean,

8    did you -- what area did you actually start in, do you remember?

9        MR. CRAIGUE:  I believe we started this way.

10       MR. KELLY:  So you started -- this would be the west end of

11   the building.  And you started here and then what did you move

12   to?  Do you remember what you moved to next?

13       MR. CRAIGUE:  I believe we went counter clockwise.

14       MR. KELLY:  Okay.  Because this seemed like this was your

15   last part, the south end?

16       MR. CRAIGUE:  Yeah.

17       MR. KELLY:  So this was the south end, okay.

18       MR. CRAIGUE:  I think we did wall, wall, wall, wall.

19       MR. KELLY:  Okay.

20       MR. CRAIGUE:  Something like that.

21       MR. KELLY:  Okay.  So you started on the west end.  And

22   then you started on the west end, and you said you kind of moved

23   around from -- what was that -- so we started on the -- well,

24   this is the north side.  Did you start on the north or west

25   side?

www.bar-tampa.com                               813-251-4538

1          MR. CRAIGUE:  We started on this side.

2          MR. KELLY:  So that's the north side of the -- I'm sorry.

3     I'm sorry.  That's the north side.

4          MR. CRAIGUE:  And the west.

5          MR. KELLY:  North and west.  Okay.  So you started on both.

6          MR. CRAIGUE:  Yeah, you really have to start on two sides,

7     not just one.

8          MR. KELLY:  Okay.  Also another thing.  Did you realize

9     that there were security video cameras on the building.

10         MR. CRAIGUE:  Yeah, we saw them.

11         MR. KELLY:  Did you see them?  Okay.  Did you know that

12    they were recording?

13         MR. CRAIGUE:  I would assume so.

14         MR. KELLY:  Yeah.  Okay.  They're actually being monitored

15    by the hospital.

16         MR. CRAIGUE:  Yeah.

17         MR. KELLY:  The building owner that owns them, he doesn't

18    own the cameras.  He owns the building --

19         MR. CRAIGUE:  Yeah.

20         MR. KELLY:  -- but not the cameras.  So the security at the

21    hospital, they're the ones that own all this and you know,

22    they're the ones that have all --

23         MR. CRAIGUE:  Yeah.

24         MR. KELLY:  -- the video and stuff like that.  Okay.  So

25    you knew that.  So for this job site, I know you mentioned

BAY AREA COURT REPORTING, INC.

www.bar-tampa.com                          813-251-4538

```
                                              Page 40
1    before, were you at the job site when the guys were working?

2    Here at this job site?  And how often were you there?

3         MR. CRAIGUE:  Yeah, I was at the job site.

4         MR. KELLY:  Okay.

5         MR. CRAIGUE:  About the same --

6         MR. KELLY:  And about the same thing, three quarters of the

7    time, that's what you were saying?

8         MR. CRAIGUE:  Yeah.

9         MR. KELLY:  Okay.  So I got that.  So again, this falls

10   back the same thing, when you're -- you know, when you were at

11   the job site did you see the guys working?  Which I'm sure you

12   did.

13        MR. CRAIGUE:  Uh-huh.

14        MR. KELLY:  They were working.  Did you see any safety

15   issues, like maybe they were working on the roof?  And did you

16   make any -- did you say anything about safety on the job site

17   while you were there?

18        MR. CRAIGUE:  I always tell them to put -- I always tell

19   them but the back rail up on the pump staging.  And I always

20   tell them about the -- to work off ladders.

21        MR. KELLY:  Okay.  Do they have -- for example, for the

22   staging, did they actually have fall protection for that at the

23   job to use?  Did they have it?

24        MR. CRAIGUE:  What do you mean?

25        MR. KELLY:  For the pump jacks?
```

19R48_OSHA-01058

Page 41

1          MR. CRAIGUE:  Yeah.

2          MR. KELLY:  So they did have -- did they have any fall

3     protection for that?

4          MR. CRAIGUE:  Like a backing?

5          MR. KELLY:  Or something to keep them from falling off

6     the --

7          MR. CRAIGUE:  Yeah, yeah.

8          MR. KELLY:  -- pump jack?

9          MR. CRAIGUE:  Yeah.

10         MR. KELLY:  So it was at the job site?

11         MR. CRAIGUE:  Yeah, it was --

12         MR. KELLY:  But it wasn't attached to the pump jack.

13         MR. CRAIGUE:  One of them wasn't, because we were taking

14    them down, but.

15         MR. KELLY:  Okay.

16         MR. CRAIGUE:  For the backing, yes, if that's what you're

17    asking.

18         MR. KELLY:  All right.  So this is getting to Mr. Erickson.

19    So what was the date of Mr. Erickson's accident?

20         MR. CRAIGUE:  I don't know.

21         MR. KELLY:  Okay.  So it seemed like July -- around July

22    27th.

23         MR. CRAIGUE:  Uh-huh.

24         MR. KELLY:  I believe that was probably the date.

25         MR. CRAIGUE:  Yep.

19R48_OSHA-01059

Page 42

1        MR. KELLY:  Okay.  Were you at the job site when it

2   occurred?

3        MR. CRAIGUE:  I was not.

4        MR. KELLY:  Okay.  So when were you notified and by who --

5   who notified you that there had been an accident?

6        MR. CRAIGUE:  I got a call from maybe -- probably from

7   Kenny.

8        MR. KELLY:  Kenny called you and told you about it?

9        MR. CRAIGUE:  I would assume, I'm not positive, but.

10       MR. KELLY:  Okay.  He called you.  And what did he say to

11  you then, that Christopher had just fallen off the roof or

12  whatever?

13       MR. CRAIGUE:  Yeah.  Yeah.  I don't even know what he said.

14       MR. KELLY:  Okay.

15       MR. CRAIGUE:  He said he just brought Chris to the

16  hospital.  His finger was messed up, something like that.

17       MR. KELLY:  All right.  So did you go to the job site to

18  investigate what was going on?

19       MR. CRAIGUE:  Yeah, well, I went and saw Chris at the

20  hospital.

21       MR. KELLY:  You did go to the hospital?

22       MR. CRAIGUE:  Yeah.

23       MR. KELLY:  Okay.  And what did he tell you there?

24       MR. CRAIGUE:  We didn't really talk.

25       MR. KELLY:  Okay.  So when did you find out that he

19R48_OSHA-01060

www.bar-tampa.com                           813-251-4538

Page 43

1   actually fell from the roof?  And I believe where he fell was

2   right here.  He was working up here and fell from here.

3        MR. CRAIGUE:  Yeah, he --

4        MR. KELLY:  So what did he tell you?  Or what did --

5        MR. CRAIGUE:  I didn't even know he was working from there.

6   I didn't tell him to go work on that or anything so I didn't --

7        MR. KELLY:  So he was performing some work up here.

8        MR. CRAIGUE:  Uh-huh.

9        MR. KELLY:  And according to what I understand, he was

10  removing the siding and doing some removal here to replace it.

11  And if you look at this, you -- really no way you could really

12  get on here without stepping on top of that roof to perform that

13  work, because this is almost four foot out.  If you set your

14  ladder up here, even if you try to -- it's so difficult to try

15  to set a ladder in here or in there.

16       And even here, you're still far enough away from it, you

17  can't truly work on a ladder to perform the work.  So what was

18  supposed to be -- what was he supposed to have done?

19       MR. CRAIGUE:  We never -- I'm not lying -- we never talked

20  about him doing that.

21       MR. KELLY:  Okay.  But is that part of the work that had to

22  be done, though?

23       MR. CRAIGUE:  I -- eventually --

24       MR. KELLY:  I mean, didn't it have to be done?

25       MR. CRAIGUE:  Eventually, yeah.

BAY AREA COURT REPORTING, INC.

1        MR. KELLY:  Okay.  Well then who told him that he had to

2   get up there and do that?

3        MR. CRAIGUE:  I'm not sure.

4        MR. KELLY:  So you didn't direct him or Skinny didn't

5   direct him or what?

6        MR. CRAIGUE:  Nope.  I'm not trying to be difficult.

7   That's how the job -- like these guys did what they wanted to

8   do.  Like I got my job -- you couldn't tell them what -- they

9   would do what they did.  Like, I'm not being like -- I'm not

10  telling you -- trying to be wise or anything like that.  They

11  would just go do what they did.  That's what they did.  They

12  didn't like to be told what to do.

13       MR. KELLY:  Well, so that's really the next question.  What

14  was Mr. Erickson doing and who assigned him to perform this

15  work?  I know he apparently was removing --

16       MR. CRAIGUE:  Yeah.

17       MR. KELLY:  He was removing the old siding up here.

18       MR. CRAIGUE:  Uh-huh.

19       MR. KELLY:  Okay.  So you did -- so I guess -- when did you

20  find out that he actually fell?

21       MR. CRAIGUE:  That day.

22       MR. KELLY:  So you did find out that day that he fell?

23       MR. CRAIGUE:  Yeah.

24       MR. KELLY:  Okay.  So that was July 27th.  So as part of

25  that work, for him to do that work, did it require him to stand

1   up on the roof to get it done?

2        MR. CRAIGUE:  We never talked about it.  We never talked

3   about him doing that section of that roof.

4        MR. KELLY:  But if you look at the -- so let's just say --

5   well, we'll look at it.

6        MR. CRAIGUE:  Yep.

7        MR. KELLY:  We look at it.  How is this supposed to get

8   accomplished without standing right here?

9        MR. CRAIGUE:  I'm not sure.  It was never talked about.

10       MR. KELLY:  But I mean, you're looking at it.  How would

11  you do that?

12       MR. CRAIGUE:  Yeah.

13       MR. KELLY:  I mean, like I said, even being there looking

14  at it --

15       MR. CRAIGUE:  Yep.

16       MR. KELLY:  -- it's hard to set up a ladder to reach all

17  these areas in there.  How would this be accomplished without

18  standing on that roof?

19       MR. CRAIGUE:  I can't tell you right now without being able

20  to put a ladder there and see if I could reach it.  I don't

21  know.

22       MR. KELLY:  Yeah, because you know with a ladder, you still

23  have to have three points of contact.  So it's kind of hard to

24  try to hang on with one arm and reach out to perform it.

25       MR. CRAIGUE:  Yeah.

www.bar-tampa.com                               813-251-4538

1        MR. KELLY:  So I mean, it would be -- it would be very

2    difficult to try to perform this just standing on the ladder.  I

3    mean, you know, it's just -- it's -- somebody doing that would

4    think it's feasible for them to stand up there and do it because

5    they could be standing up there, instead of trying to do it off

6    of a ladder.

7        MR. CRAIGUE:  To be honest with you, I would have taken the

8    ladder there.  He used -- I think they used a roof rake to strip

9    the rest of the place.  I don't understand why he wasn't -- we

10   never talked about him doing this or how.  Why he wouldn't just

11   take the roof rake from that ladder.  Like I don't -- that's

12   what -- I was just kind of shocked that...

13       MR. KELLY:  Okay.

14       MR. CRAIGUE:  That this was an issue.

15       MR. KELLY:  So what was the result of his fall?  What

16   injuries were sustained as a result of him --

17       MR. CRAIGUE:  He broke his pinkie.

18       MR. KELLY:  Okay.  Was that all?

19       MR. CRAIGUE:  And he told me he fractured -- he had a

20   fracture in his pelvis.

21       MR. KELLY:  So he fractured his pelvis?

22       MR. CRAIGUE:  Yep.

23       MR. KELLY:  Okay.

24       MR. CRAIGUE:  And he --

25       MR. KELLY:  Okay, so do you know when -- do you know when

BAY AREA COURT REPORTING, INC.

Page 47

1  he'll be able to return back to work?

2      MR. CRAIGUE:  He told -- he went ghost on me.  So obviously

3  something's going on.  He told me he'd be back to work in a

4  couple weeks.  And he even asked me when he could come back to

5  work right before Skinny got hurt -- before Skinny got hurt.

6      MR. KELLY:  Okay.

7      MR. CRAIGUE:  So.

8      MR. KELLY:  So was he still employed by the company or --

9      MR. CRAIGUE:  I was never -- he was never employed.  He

10  worked when he wanted to.  I'd always have work for him if he

11  wanted to work.

12      MR. KELLY:  Okay.

13      MR. CRAIGUE:  The guy was -- the guy had no place to live.

14  I met him at a job, I let him live in my basement.  He said he

15  owned his own business.  I tried to help him out.

16      MR. KELLY:  Okay.  So after his accidents, what changes did

17  you make at the company to ensure that this wouldn't happen

18  again?  For example, did you purchase any fall protection

19  equipment; did you establish a fall protection program and train

20  the employees to recognize the hazards of falling?  What changes

21  were actually made after he fell from there?  What did you do?

22      MR. CRAIGUE:  Well, obviously (inaudible) safer and we need

23  to work off ladders.  I've always been a ladder guy, like you

24  have to work off ladders like.  Because then there's no problem.

25      MR. KELLY:  Okay.  Did you -- so but did you look at the

19R48_OSHA-01065

www.bar-tampa.com                          813-251-4538

Page 48

 1   fall protection to see if you -- that something else could be

 2   done?

 3        MR. CRAIGUE:  Did I look at the fall --

 4        MR. KELLY:  Did you look at other means or whatever?  I

 5   mean, what did you do?  What changes did you make after he fell?

 6        MR. CRAIGUE:  I didn't even know -- to be honest with you,

 7   I didn't even know this is where it was until long after.

 8        MR. KELLY:  Yeah.  But I mean, you did understand that he

 9   fell?

10        MR. CRAIGUE:  Yeah.  Well, my understanding was that he

11   fell off -- he was on a ladder, he fell.  I didn't know he was

12   on the roof.  Like no one would tell -- they didn't tell me

13   anything.  And --

14        MR. KELLY:  But did you do anything else?  Did you make any

15   changes?

16        MR. CRAIGUE:  There's no changes made, just work off

17   ladders.  I have all the fall gear available anytime to these

18   guys.

19        MR. KELLY:  Okay.  So did you realize as per your contract

20   you still needed perform work in areas where the employees had

21   to access the roof to perform the work, mainly on the south side

22   of the building?  So again, we fall back to this side.

23        MR. CRAIGUE:  Yep.

24        MR. KELLY:  So if you look at that.  Even if you're looking

25   at this one picture here, I mean, there's no way you could put a

BAY AREA COURT REPORTING, INC.

19R48_OSHA-01066

Page 49

1   ladder up here and reach all this.  To do all this work, how is

2   it possible for them -- they can't do it on the ladder, Nath.

3   It's impossible for him to set a ladder and do all this work

4   that needs to be done.  So how were they going to accomplish

5   this part?  Do you see what I'm saying?

6        MR. CRAIGUE:  Yeah.

7        MR. KELLY:  How were they supposed to accomplish that?

8   Because that's still -- actually this still needed to be done.

9   How was this going to be done?

10       MR. CRAIGUE:  They should have put some pump staging up

11  there.

12       MR. KELLY:  Well, even if you'd have put the pump staging

13  out here, you'd have still been far away from it --

14       MR. CRAIGUE:  And here, he could have had it, too.

15       MR. KELLY:  Well, what else could have been used here

16  instead of nothing at all?  What could we have done in here to

17  prevent Skinny from falling?

18       MR. CRAIGUE:  Well, he's on a ladder.

19       MR. KELLY:  But -- I know.  But you still had -- he didn't

20  stand on the ladder while he did this work here, Nath.  He only

21  used the ladder in areas he couldn't reach.  This could be -- he

22  could stand on the roof and perform this work.

23       MR. CRAIGUE:  Yeah.

24       MR. KELLY:  So what else -- because he -- what could he

25  have done?  What could you have done over here?  Is there other

Page 50

1   means that could have been done here?

2         MR. CRAIGUE:  Put safety railings up here.

3         MR. KELLY:  You mean temporary guard rails is what you're

4   talking about?

5         MR. CRAIGUE:  Yeah.

6         MR. KELLY:  Was there any reason why you didn't do that?

7         MR. CRAIGUE:  There's no reason -- no, there should have

8   been.  And they're right there next -- right next to it, you

9   know.

10        MR. KELLY:  Okay.  So is there any reason why he didn't put

11  up temporary railing?  Is there any reason why --

12        MR. CRAIGUE:  No, I don't know why --

13        MR. KELLY:  -- fall protection wasn't used of some type?

14        MR. CRAIGUE:  I don't know why.  If whatever he asked for

15  from me, I would give him.  Like --

16        MR. KELLY:  Okay.  So in the end here, as it got close to

17  the end, I understood -- I mean, again, through witness

18  statements and everything else.  I know that you showed up while

19  they were working on here.

20        MR. CRAIGUE:  Uh-huh.

21        MR. KELLY:  So why didn't you, yourself, say hey, we had a

22  guy fall a month ago.  You know, I can't take this, especially

23  with this many people watching or whatever happens, whatever

24  happens here, we can't take somebody else getting hurt.

25        MR. CRAIGUE:  Yeah.

19R48_OSHA-01068

Page 51

1    MR. KELLY:  Why didn't you say, come off the roof and do

2   something?  Why didn't you do that?

3    MR. CRAIGUE:  I wish I did.  I looked up to -- (inaudible)

4   ran his own show, you know.

5    MR. KELLY:  Yeah.  Sometimes you have to think for guys.

6   You have to -- even if they don't take themselves, you've got

7   to -- you know, especially as an owner.  You have to try -- you

8   have to be on these guys.  You have to watch them so close.  And

9   I mean, there was -- you know?

10    All right.  So 58, prior to this incident, were there any

11   other fall incidents in the past with the company where

12   individuals fell and were severely injured as a result of the

13   fall?  I mean, I do understand that your dad fell.

14    MR. CRAIGUE:  Yep.

15    MR. KELLY:  But was there any other incidents where anyone

16   else fell on a job and suffered injuries?

17    MR. CRAIGUE:  Skinny fell like 10, 12 years ago.

18    MR. KELLY:  Okay.  He fell.  What happened then?

19    MR. CRAIGUE:  I don't really remember.

20    MR. KELLY:  Was he seriously injured where he had to go to

21   the hospital?

22    MR. CRAIGUE:  He did go to the hospital.

23    MR. KELLY:  Was it off a roof, off of scaffolding --

24    MR. CRAIGUE:  No.  It was a snow thing.  It was --

25    MR. KELLY:  He fell?

19R48_OSHA-01069

Page 52

1      MR. CRAIGUE:  He was on a ladder and he slipped on the

2   ladder.  It was a long time ago.

3      MR. KELLY:  So I heard of possibly another incident.  Was

4   there an incident in 2016 where Skinny actually fell off a pump

5   jack here in Concord.  They were working in White's over here --

6   White Park, here in Concord, where he was working on a pump

7   jack.  Do you remember that?  And he fell and split his head

8   open and had to go get stitches?  Do you remember that?

9      MR. CRAIGUE:  No.

10     MR. KELLY:  You don't remember that?

11     MR. CRAIGUE:  At White's Park?

12     MR. KELLY:  White's Park, the little park over here in

13  town --

14     MR. CRAIGUE:  Yeah, I know where that --

15     MR. KELLY:  There was a house they were working on, they

16  were using the pump jack and they were on the pump jack and

17  apparently Skinny fell off of it and hit his head and split his

18  head open.  You don't remember anything about that?  No?

19     MR. CRAIGUE:  No.

20     MR. KELLY:  Okay.  So I know it's been ten years ago you

21  said.  Was that back when you guys were doing more roofs or

22  something like that?

23     MR. CRAIGUE:  No.  I don't really remember.

24     MR. KELLY:  And he just fell and he was -- I guess he

25  wasn't wearing any fall protection --

19R48_OSHA-01070

Page 53

1        MR. CRAIGUE:  He was on a ladder -- this was a long time

2   ago.

3        MR. KELLY:  Okay.  So after Mr. Erickson was injured --

4   suffered his injury, was anyone else brought out to the job site

5   to help Mr. McKenny after his accident -- after Erickson's

6   accident in July 27?  Was anybody else brought out there to try

7   to help Mr. McKenny?

8        MR. CRAIGUE:  What do you mean help him?

9        MR. KELLY:  I mean, was there another subcontractor brought

10  out to provide help or did he just always work by himself?

11       MR. CRAIGUE:  He liked to work by himself, yeah.

12       MR. KELLY:  So he was all alone, nobody else helped?

13       MR. CRAIGUE:  No, I guess, yeah.

14       MR. KELLY:  So I know you mentioned earlier, that you had

15  another subcontractor there.  When did they come out and start

16  working?

17       MR. CRAIGUE:  He helped me -- Shane would help me come and

18  throw some windows in, but that was really all he did.

19       MR. KELLY:  Shane?  Was it Shane himself or was it somebody

20  else that they hired?

21       MR. CRAIGUE:  I don't know.

22       MR. KELLY:  But they're not -- they're not your guys that

23  were there?

24       MR. CRAIGUE:  No.

25       MR. KELLY:  Because there was -- there were other guys

www.bar-tampa.com                          813-251-4538

Page 54

1  there working.

2         MR. CRAIGUE:  Yeah, yeah, that's what I'm saying.

3         MR. KELLY:  Somebody was driving the dump truck.

4         MR. CRAIGUE:  Yeah.

5         MR. KELLY:  They were hauling all the windows off.

6         MR. CRAIGUE:  Yep.

7         MR. KELLY:  So who were those guys?

8         MR. CRAIGUE:  That was Shane helping me out.

9         MR. KELLY:  So that was Shane's guys?  Did he hire those

10  guys or where did those guys come from?

11        MR. CRAIGUE:  Yeah.

12        MR. KELLY:  So who -- what's the name of that company?

13        MR. CRAIGUE:  SKS.

14        MR. KELLY:  SKS?

15        MR. CRAIGUE:  Yep.

16        MR. KELLY:  Okay.  And so that's somebody that Shane got

17  ahold of?

18        MR. CRAIGUE:  Yeah.  He just --

19        MR. KELLY:  Do you know the owner?  What's -- was the lead

20  guy there or somebody there?

21        MR. CRAIGUE:  I don't --

22        MR. KELLY:  But it's SKS, what, Corporation or just Inc or

23  just --

24        MR. CRAIGUE:  Yeah.

25        MR. KELLY:  And where are they out of, do you know by

BAY AREA COURT REPORTING, INC.

```
                                                    Page 55
 1   chance?

 2        MR. CRAIGUE:  Concord, I think.

 3        MR. KELLY:  Concord?  Okay.  And what, he had, what, three

 4   guys there working?

 5        MR. CRAIGUE:  Yeah.

 6        MR. KELLY:  And what exactly -- what were they doing?  Were

 7   they also helping pull out windows and that type stuff?

 8        MR. CRAIGUE:  Yeah.

 9        MR. KELLY:  Okay.  So they were working as well.  And they

10   were working along with Skinny?

11        MR. CRAIGUE:  Yep.

12        MR. KELLY:  Okay.  And what about those guys?  Did they --

13   how did they work?  I mean, if they had to get up on -- if they

14   had to get -- so did these windows also have to come out?

15        MR. CRAIGUE:  Uh-huh.

16        MR. KELLY:  So -- okay, so who did that?  Was that them or

17   Skinny that tried to pull those out?

18        MR. CRAIGUE:  I would have to ask --

19        MR. KELLY:  And how did they do that?  Did they --

20        MR. CRAIGUE:  I don't -- I wasn't there.  I would have to

21   ask.

22        MR. KELLY:  Okay.  But it's SKS is the company that you

23   know, correct?

24        MR. CRAIGUE:  Yeah.

25        MR. KELLY:  Okay.  You don't know how many -- how long did
```

Page 56

1  they work on the job?  Do you have any idea?

2      MR. CRAIGUE:  If his guys were slow, (inaudible) guys for a

3  couple hours here and there to help me out.

4      MR. KELLY:  Okay.  And did this happen after Mr. Erickson

5  got hurt --

6      MR. CRAIGUE:  No.

7      MR. KELLY:  -- and that they needed to come in and help?

8      MR. CRAIGUE:  No.

9      MR. KELLY:  Or were they working there for a while?

10     MR. CRAIGUE:  They were there here and there, off and on.

11     MR. KELLY:  Okay.  How often did REI's project manager,

12 Shane, show up at the job site?  How often was he at the job

13  site?

14     MR. CRAIGUE:  Every day.  I think every morning.

15     MR. KELLY:  He was there every day?

16     MR. CRAIGUE:  Yeah.

17     MR. KELLY:  Okay.  So do you -- I mean, so he was there

18 every day.  So did he ever call you and tell you that he made

19 any comments about safety on the job site?  Did he ever give you

20 any comments that reflected safety?

21     MR. CRAIGUE:  (No audible response.)

22     MR. KELLY:  He never said, hey, you got guys over here --

23     MR. CRAIGUE:  I don't know, he --

24     MR. KELLY:  -- running up and down the roof, they don't

25  have no fall protection.

BAY AREA COURT REPORTING, INC.

Page 57

1       MR. CRAIGUE:  Yeah, he probably would never -- he probably

2   didn't see it.

3       MR. KELLY:  Yeah.  Because I know he was on the job site

4   walking around.

5       MR. CRAIGUE:  Yeah.

6       MR. KELLY:  And he spent some time on the job site.

7       MR. CRAIGUE:  Yeah.

8       MR. KELLY:  But he never said anything?

9       MR. CRAIGUE:  (No audible response.)

10      MR. KELLY:  Never said anything to you?

11      MR. CRAIGUE:  (No audible response.)

12      MR. KELLY:  So when did the work on the south side actually

13  begin?  When did this work begin?  Do you remember the time

14  frame?

15      MR. CRAIGUE:  I don't.  It was at the end of the project.

16      MR. KELLY:  So was it like the same week of Skinny's fall

17  or was it like a week before?  Was it a couple weeks, one week,

18  can you give me some kind of ballpark?

19      MR. CRAIGUE:  Probably a couple weeks I would say.

20      MR. KELLY:  So a couple weeks before the fall?  Or right

21  around the same time?

22      MR. CRAIGUE:  Well, we did it in sections so probably a

23  couple weeks.

24      MR. GARDNER:  That was a couple weeks before the fall you

25  said?

19R48_OSHA-01075

Page 58

1       MR. CRAIGUE:  When we started this?

2       MR. KELLY:  Yeah, when you started that?

3       MR. CRAIGUE:  I -- we could have stripped apart a month

4    before that to get a corner off it, so.

5       MR. KELLY:  Yeah.

6       MR. CRAIGUE:  Do you know what I mean?

7       MR. KELLY:  But a good -- so in the last week -- let's say

8    on the day he got injured, did he work up here that whole week

9    then?  The week of the 27th, August 27th?  Was he working up

10   here every day trying to get that done then?  Would that be a

11   fair statement or what?

12      MR. CRAIGUE:  I don't know.  We were working on that side

13   of the house (inaudible).

14      MR. KELLY:  The south side.  The south side of the

15   building?

16      MR. CRAIGUE:  Yeah.

17      MR. KELLY:  Okay.  So was he -- Mr. McKenny actually -- I

18   know he had one day with Mr. Ford.  But was there anyone else

19   helping him up there or was he just working by himself up until

20   Mr. Ford came?

21      MR. CRAIGUE:  No, by himself.

22      MR. KELLY:  He was working by himself?  Okay.

23      MR. CRAIGUE:  Unless there was someone there -- one of

24   Shane's guys there helping me with a window.

25      MR. KELLY:  Okay.  Well, I know -- and I'll be honest with

www.bar-tampa.com                           813-251-4538

Page 59

1    you Nate, I do know that there are people in this building right

2    here --

3          MR. CRAIGUE:  Yeah.

4          MR. KELLY:  -- they're all standing out -- they were coming

5    outside a lot.  And they were saying they seen Kenny running up

6    and down this roof.  They said he never had anything, ever

7    anything on the entire time he worked up there.  And it was more

8    than one person who made that statement.  So, I mean, it's like

9    every single day, he's not wearing anything.

10         MR. CRAIGUE:  I -- I -- there are other things -- we

11   thought he was on a ladder, he should have had --

12         MR. KELLY:  Yeah, but again, Nath, there's no way he

13   could -- you can't set up a ladder right here and perform that

14   work that needs to be done on these buildings, any of this

15   absolutely requires you to get on that roof --

16         MR. CRAIGUE:  Yeah, I agree.

17         MR. KELLY:  -- unless you have -- you know what I'm saying?

18   There's no way you could do that.

19         MR. CRAIGUE:  With pump staging there with railings right

20   there, though --

21         MR. KELLY:  If he had, but there was nothing there.

22         MR. CRAIGUE:  I understand.  I'm saying that's what we

23   should have -- that should have been done.  That's all I'm -- I

24   said that before.  I understand.

25         MR. KELLY:  Okay.  We're getting close to the end, I'm

BAY AREA COURT REPORTING, INC.

                                                    Page 60

1    sorry.  So again, I have to ask you.  Were you aware that

2    Mr. McKenny, in order to complete this phase of the work that he

3    had to do, were you aware that he actually had to be on the roof

4    to perform that work?  Is that true?  Did you know he had to be

5    up there to perform that work that's got to get done?

6         MR. CRAIGUE:  Yeah.

7         MR. KELLY:  Okay.  All right.  Same question.  So why

8    wasn't there any safety features -- any safety procedures put in

9    place to protect him from falling off that roof?

10        MR. CRAIGUE:  There could have been if he wanted.  He -- he

11   ran the -- he told me what he wanted.  If he wanted that there.

12   There should have been ladders there with a backing, right

13   there.  I said that -- I've said that a whole bunch of times.

14   That we had pump jacks that should have gone right there.

15        MR. KELLY:  Did you -- did you again, once again -- I mean,

16   I know it seems like I'm asking the same question.  Did you say

17   anything to him?  Did you say why don't you have fall protection

18   on or why don't you have railings?  Why don't you have

19   something?

20        MR. CRAIGUE:  I always -- I always say that to them.  Are

21   you all set, do you need anything?  Nope, I'm good.

22        MR. KELLY:  Okay.  Now -- and I know you mentioned the pump

23   jack system.  So what is the pump jack system -- what was the

24   pump jack system used for on the job site and what dates was it

25   used?  So we have -- maybe another picture of jacks, I don't

19R48_OSHA-01078

```
                                                Page 61
 1   know.  I know I had a -- so the only thing I've got is this
 2   right here, which is showing like -- we've seen the pump jack.
 3   The pump jack was set up over here.
 4        MR. CRAIGUE:  Uh-huh.
 5        MR. KELLY:  So what were they using this pump jack for?
 6        MR. CRAIGUE:  What do you mean?
 7        MR. KELLY:  That's what I'm saying.  What were they using
 8   it for?  Were they using it to put the siding on the roof or
 9   something?  Or what was -- what was it in use for, the pump
10   jack?
11        MR. CRAIGUE:  To install siding.
12        MR. KELLY:  To install siding.  Okay.  So who used -- who
13   was on this?
14        MR. CRAIGUE:  The guys that were working.
15        MR. KELLY:  So was it just Skinny or did Ford go up there
16   and help?
17        MR. CRAIGUE:  No.
18        MR. KELLY:  Ford didn't get up there?  What about Mr.
19   Erickson, what about Christopher?  Did both of them use the pump
20   jack?
21        MR. CRAIGUE:  I'm not sure.
22        MR. KELLY:  You don't know?  But you know one of -- Skinny
23   did?
24        MR. CRAIGUE:  Yeah, obviously, yeah.
25        MR. KELLY:  Okay.  Do you know when he used it?  When was
```

Page 62

1    the last time he used it?

2         MR. CRAIGUE:  I don't know.

3         MR. KELLY:  You don't know if it was the week that he got

4    injured?

5         MR. CRAIGUE:  I don't know.

6         MR. KELLY:  Okay.  All right.  Who would have assigned them

7    to work from the pump jack?  And again, same thing.  When was

8    the last day it was used?  Do you remember the last time they

9    used it?

10        MR. CRAIGUE:  I don't.

11        MR. KELLY:  All right.  Do you know -- would you assign

12   them to work from the pump jack?

13        MR. CRAIGUE:  No.

14        MR. KELLY:  Okay.  Well, so if they didn't work from the

15   pump jack how would they complete their work if he wasn't able

16   to do that?  If you told them -- if you told them they have to

17   go up there and -- they have to go up and do this work up here.

18        MR. CRAIGUE:  Uh-huh.

19        MR. KELLY:  All this work here.  So if they didn't use the

20   pump jack, how else were they going to perform this work?

21        MR. CRAIGUE:  Off ladders.

22        MR. KELLY:  Okay.  Do you know who made the pump jack?  Do

23   you know the manufacturer?

24        MR. CRAIGUE:  No.

25        MR. KELLY:  You don't know -- okay.  You don't know the

Page 63

1    manufacturer, model, or what rated gauge the --

2         MR. CRAIGUE:  No.

3         MR. KELLY:  If it's a light, medium, or heavy gauge?

4         MR. CRAIGUE:  I don't know.

5         MR. KELLY:  Is that yours or his?

6         MR. CRAIGUE:  Probably mine.

7         MR. KELLY:  Probably yours?

8         MR. CRAIGUE:  Uh-huh.

9         MR. KELLY:  Okay.  Is it -- it's set back.  So is this

10   yours, but you don't know the model or anything on it?

11        MR. CRAIGUE:  No, I don't.

12        MR. KELLY:  But were the -- but they were using it to do

13   some work; is that correct?

14        MR. CRAIGUE:  Of course they were.

15        MR. KELLY:  Okay.  Do you know how high up that pump jack

16   goes?

17        MR. CRAIGUE:  It goes 24 feet.  To the top of the pump jack

18   is 24.  So they were probably working --

19        MR. KELLY:  It's 24 feet, okay.

20        MR. CRAIGUE:  Well, the pump jack is 24 feet.  You can't go

21   that high with it.

22        MR. KELLY:  Who would have set up the pump jack and who was

23   the competent person for the company?  And how was this

24   individual trained and was there any documentation?

25        MR. CRAIGUE:  There's no documentation.  And Kenny and

BAY AREA COURT REPORTING, INC.

Page 64

1    Chris would put it up.

2        MR. KELLY:  They would -- what about training?  Was there

3    any training that those guys had on installing pump jacks or

4    scaffolding systems?

5        MR. CRAIGUE:  Training?  It's four nails.  No.

6        MR. KELLY:  So Kenny and Christopher would have been the

7    ones to set it up.  All right.  When working from the pump jack

8    system, do you know what -- when fall protection is required, at

9    what height required when you're working from that?  When would

10   you have to have fall protection?  At what height?

11       MR. CRAIGUE:  I don't want to guess.

12       MR. KELLY:  Well, I mean -- (inaudible).  Okay.  So would

13   fall -- fall protection is two --

14       MR. CRAIGUE:  (Inaudible).

15       MR. KELLY:  So with scaffolding systems, the height is ten

16   feet.  So it's ten feet with scaffolding.  But normal fall

17   protection is when it's over six foot for anything else.  But

18   for scaffolding it's ten foot.  So again, what type of fall

19   protection was used on the pump jack system when it was used?

20   What did they use?

21       Because, I mean, again, I end up doing my interviews and I

22   can base it only on interviews I've done.  I understand that

23   they didn't have -- they didn't have anything.  They were not

24   even wearing fall protection.  They just went up and started

25   working.

19R48_OSHA-01082

Page 65

1          MR. CRAIGUE:  Yeah.  There's a back to the --

2          MR. KELLY:  But where is it?  It wasn't used --

3          MR. CRAIGUE:  (Inaudible).

4          MR. KELLY:  Was it on the job site?

5          MR. CRAIGUE:  Absolutely it was used.

6          MR. KELLY:  So was it on the job site?

7          MR. CRAIGUE:  Yeah.  Absolutely.

8          MR. KELLY:  Okay.  Did you see them use it?

9          MR. CRAIGUE:  That would not go up without it being on the

10  back of it.  So yeah.

11          MR. KELLY:  Okay.

12          MR. CRAIGUE:  100 percent that doesn't go up.  You don't

13  work up there without the back of it.

14          MR. KELLY:  Okay.  But you just don't remember the last

15  time it was used then?

16          MR. CRAIGUE:  No.

17          MR. KELLY:  Okay.  Well, I guess the final question here

18  is, you know, what do you think you could have done differently

19  to change the outcome?  And what steps or procedures could you

20  have taken to prevent these incidents?  What do you think you

21  could have done here?

22          MR. CRAIGUE:  Yeah.  This question goes through my mind

23  every night.  I don't know.  Him working off a ladder.  Even if

24  I had this -- the railing system there, I still don't even know

25  how he doesn't get hurt falling off a ladder, you know.

www.bar-tampa.com                              813-251-4538

Page 66

1        MR. KELLY:  Well, I mean, you know, these -- like I said.

2    You know you said you have used, you know, fall protection in

3    the past --

4        MR. CRAIGUE:  Yeah.

5        MR. KELLY:  You have used the railing.  Even if we would

6    have had railing across here, it would have certainly kept him

7    falling off the roof.  And then even with Christopher.  Even if

8    there had been a body harness or a lanyard here --

9        MR. CRAIGUE:  Yeah.

10       MR. KELLY:  -- while he was working here.  That would have

11   prevented that from happening.  Do you know what I'm saying?

12       MR. CRAIGUE:  Which we have.  I don't know why he was doing

13   that.  But back to this, he -- if he was on a ladder.  I

14   understand what you're saying --

15       MR. KELLY:  I mean, yeah, there's -- it's just --

16       MR. CRAIGUE:  I'm not disagreeing with you.

17       MR. KELLY:  I know.  I mean, we're just talking about

18   how -- yeah, for instance, you were talking about with this

19   picture again, it shows that ladder is just -- I mean a lot of

20   this work, there's no way -- there's no way he could -- the

21   ladder would never reach because it's too far away.  He would

22   absolutely have to be up in here putting all this on, changing

23   out all this.

24       There's no way he could have done that with a ladder on the

25   ground.  Impossible.  And I mean, we said that earlier.  So he

BAY AREA COURT REPORTING, INC.

19R48_OSHA-01084

Page 67

1   would -- if we would have had -- if there would have been guard

2   rails or could you set up -- did you have any scaffolding at all

3   that you could have set along here?

4        MR. CRAIGUE:  Yeah.

5        MR. KELLY:  Was there scaffolding on the job site?

6        MR. CRAIGUE:  Well, what do you mean by scaffolding?

7   Like --

8        MR. KELLY:  Well, just regular scaffolding.  Just tube

9   scaffolding --

10        MR. CRAIGUE:  No.  No.  I have no tube scaffolding.

11        MR. KELLY:  Okay.

12        MR. CRAIGUE:  What I would have done is put up the 12-foot

13   pump jacks with the railing here.

14        MR. KELLY:  Have you done that in the past?

15        MR. CRAIGUE:  Yes.

16        MR. KELLY:  I mean, any reason why it wasn't done this

17   time?

18        MR. CRAIGUE:  He didn't want -- I know he -- I know all the

19   decisions are on me, but it's a different type of working

20   relationship I had with him.

21        MR. KELLY:  All right, well, have you got anything else you

22   want to say or?

23        MR. CRAIGUE:  Like?

24        MR. KELLY:  Well, I don't know.  Just any other comments or

25   anything?  You're more than welcome.

19R48_OSHA-01085

Page 68

1        MR. CRAIGUE:  No.  Just I'm not here to -- I'm just here

2    telling the truth.  (Inaudible) I wasn't deceiving Mr. McKenna

3    or Mr. Erickson.  They, you know --

4        MR. KELLY:  Well, there are few other things like the way

5    the ladder was set up.  So if you look at the ladder, roof

6    rackings are considered to be scaffolding standards.  The fall

7    under OSHA scaffolding standards.  So where this ladder was set

8    up, it was set up actually improperly because you can't just put

9    a ladder -- and extension ladder on plank boards.  Because

10   number one, on a small scaffolding system, the feet of the

11   ladder have to be secured where they don't slip off or disengage

12   while somebody's climbing the ladder.

13       MR. CRAIGUE:  There were nails in there, I believe, because

14   I remember taking them out.

15       MR. KELLY:  Well, the bottom of the st -- the bottom of the

16   ladder.

17       MR. CRAIGUE:  Uh-huh.

18       MR. KELLY:  That needed to be secured.  Now I'm not talking

19   about the plank boards.

20       MR. CRAIGUE:  No, I'm talking about the ladder.

21       MR. KELLY:  So you're say you nailed?

22       MR. CRAIGUE:  I did not nail.  I remember taking that stuff

23   down and then seeing nails there.

24       MR. KELLY:  Yeah.

25       MR. CRAIGUE:  For that, which would be impossible to see.

19R48_OSHA-01086

Page 69

1        MR. KELLY:  Yeah, well, see that's one item that does it.

2    So you got one that's got to be secured.

3        MR. CRAIGUE:  Yeah.

4        MR. KELLY:  The second one is see how small it is?  It

5    can't be -- you can't use an extension ladder on a scaffolding

6    system to gain height.  That's exactly what was going on here.

7    So this operation you couldn't do.  You could never use any

8    scaffolding to gain height.  For ladders on a scaffolding.  So

9    that's what I'm telling you.

10       MR. CRAIGUE:  So he's --

11       MR. KELLY:  You couldn't do this.  The ladder -- you had to

12   figure out a way to do this.  You could build --

13       MR. CRAIGUE:  We could have just --

14       MR. KELLY:  You could have done another scaffolding system

15   up in here --

16       MR. CRAIGUE:  To get to where he was we could have just

17   used a bigger ladder.

18       MR. KELLY:  Or something that would reach here and that

19   would be set up correctly.  But it's like I'm saying, the ladder

20   was not set up correctly because of this, okay?

21       MR. CRAIGUE:  So if we used a 40 footer to get to that same

22   spot --

23       MR. KELLY:  I don't know if you would have the right angle.

24       MR. CRAIGUE:  Absolutely we would've.  I tried it.

25       MR. KELLY:  Okay.  And then we also looked at this ladder.

www.bar-tampa.com                     813-251-4538

Page 70

1    So --

2         MR. CRAIGUE:  Those are user backings of the scaffolding.

3         MR. KELLY:  Well, yeah.  But I talked to Ford on the day --

4         MR. CRAIGUE:  Yeah.

5         MR. KELLY:  I asked him how did you guys get on the roof?

6    How did he get up there?  He was using this ladder as access to

7    the roof --

8         MR. CRAIGUE:  No.  There was -- those ladders were all

9    back -- not even made for that.

10        MR. KELLY:  Well, that's what he told me that they -- he

11   took down.  I asked Ford, I said, how did Skinny get on the

12   roof?

13        MR. CRAIGUE:  Uh-huh.

14        MR. KELLY:  He said that ladder right there.  I said why is

15   it on the ground?  He said, "When the rescue came I had to move

16   the ladder."

17        MR. CRAIGUE:  Uh-huh.

18        MR. KELLY:  So he told me this was the ladder that Skinny

19   used to get on the roof.  So I mean, the ladder is there,

20   it's --

21        MR. CRAIGUE:  I know it is.

22        MR. KELLY:  -- damaged.  It can't be used for -- it has to

23   be taken out of service.

24        MR. CRAIGUE:  We're using it for the back of the staging.

25        MR. KELLY:  Okay.

19R48_OSHA-01088

```
                                                   Page 71
 1         MR. CRAIGUE:  There's no back.

 2         MR. KELLY:  But on that day, now, he did tell me that

 3    Skinny used that ladder as access to the roof.  That's exactly

 4    what he said.  And he told me that when the 911 guys came he

 5    took this ladder down.

 6         MR. CRAIGUE:  Uh-huh.

 7         MR. KELLY:  So that ladder really needs to be destroyed or

 8    taken out of service.  It's in extremely bad shape.

 9         MR. CRAIGUE:  It wasn't meant for it to be a ladder, but I

10    understand.

11         MR. KELLY:  I mean, it's just -- it's in rough condition.

12    All right.  And do you know who this truck belongs to?

13         MR. CRAIGUE:  Yeah.  SKS.

14         MR. KELLY:  SKS?

15         MR. CRAIGUE:  Yep.  I borrowed it from them.

16         MR. KELLY:  Okay.  That's their truck?

17         MR. CRAIGUE:  Yep.

18         MR. KELLY:  Does that have anything to do with Shane?

19         MR. CRAIGUE:  That's his truck.

20         MR. KELLY:  Is it his business?

21         MR. CRAIGUE:  Yeah.

22         MR. KELLY:  So SKS is Shane's business then?

23         MR. CRAIGUE:  Yeah.

24         MR. KELLY:  Okay.  All right.  And the guys working for him

25    are his folks?
```

19R48_OSHA-01089

www.bar-tampa.com                        813-251-4538

Page 72

1          MR. CRAIGUE:  Yeah.

2          MR. KELLY:  Okay.  All right.  Well, you have anything else

3    you want to say?

4          MR. CRAIGUE:  No.

5          MR. KELLY:  Okay.

6

7    (END OF INTERVIEW.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

19R48_OSHA-01090