*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO MAY 12, 2021

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                        \*
UNITED STATES OF AMERICA                \*
                                        \*  1:19-cr-142-01-LM
            v.                          \*  January 20, 2021
                                        \*  2:17 p.m.
NATHAN CRAIGUE                          \*
                                        \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE LANDYA B. McCAFFERTY



Appearances:



For the Government:          John S. Davis, AUSA
                             Anna Dronzek, AUSA
                             Aaron G. Gingrande, AUSA
                             United States Attorney's Office




For the Defendant:           Dorothy E. Graham, Esq.
                             Behzad Mirhashem, Esq.
                             Federal Defender's Office




Court Reporter:              Liza W. Dubois, RMR, CRR
                             Official Court Reporter
                             United States District Court
                             55 Pleasant Street
                             Concord, New Hampshire 03301
                             (603)225-1442

P R O C E E D I N G S

THE CLERK:  For the record, this is oral argument in a motions hearing in the United States vs. Nathan Craigue, which is 19-cr-142-01-LM.

THE COURT:  All right.  I am going to just go through these argument by argument.  The -- I'm going to start with the motion to exclude the 404(b) information.  That's document number 65.

I'm going to start with the tax laws violations; the second argument will be Erickson's injury one month before McKenna died; number three will be admissibility of McKenna's 2017 worksite injuries; number four will be Mr. Craigue's statements to the Department of Labor; and then five would be his statements to the investigator, Martineau, at the Department of Labor; and then six will be McKenna's 2005 work injury and worker's comp award.

So that's the order of the 404(b) argument.

So let's start with the tax laws, evidence that Mr. Craigue broke tax laws.

Let me just state what I think the evidence is and then I'd like to hear with respect to each one of these the government's recitation as to the purpose of the introduction of this evidence.

First, and I believe this is going to come

from Mr. Erickson, that he understood that Mr. Craigue did not pay payroll taxes, that Mr. Craigue did not make contributions toward social security and Medicare as required under the FICA statute with respect to Erickson and McKenna.  That, it's not clear to me how that is coming in, but I know that is a piece of the evidence.

Also that Mr. Erickson will testify he never received a W-2 or 1099 from Mr. Craigue; and also, I think, lastly, Mr. Erickson will testify to his knowledge that Mr. McKenna never received a W-2 from Mr. Craigue.

So let me just hear from the government first with respect to these.  Am I -- have I left any out, and can you tell me the purpose of the admission with respect to each one of these?

MR. GINGRANDE:  Thank you, your Honor.  No, you have not left anything out.  That is the evidence that the government intends to submit.

When it comes to the purpose for which they're being submitted, the first is that whether an employer provides 1099 or W-2 forms and whether an employer provides the taxes for -- for payroll is relevant to the question of classification as an employee or an independent contractor.  And for that reason, we would submit that the evidence is actually intrinsic to the

case.

And it's intrinsic for the additional reason that it supports the materiality of the statements that Mr. Craigue made to OSHA inspectors that Mr. McKenna and Mr. Erickson were not his employees, since there are tax consequences and other liabilities that flow from classifying workers as employees.

Those are all reasons that it's intrinsic to the case itself.

There's additional reasons that it should be allowed if you do reach 404(b) analysis because it does have special relevance here.  And that is that, you know, the evidence is -- it shows his lack of mistake, especially when combined with the evidence that Mr. Craigue used -- used to pay worker's compensation for his workers until 2016.  It shows that he knew that the men were his employees and in saying that was, therefore, not a mistake; that he should have been paying payroll taxes, worker's compensation, for these workers.

And, therefore, because he has a -- because you have the knowledge that he would be liable for these things if they were classified as his employees, it's highly probative of his motive.

So those are, I believe, the summation of the

purposes for which the government would seek to introduce this evidence.

THE COURT:  Okay.  Let me just start with -- apparently Mr. Erickson's going to testify that Mr. Craigue did not pay payroll taxes; is that right?

MR. GINGRANDE:  That's correct.

THE COURT:  Okay.  And he has knowledge of that based on his own checks?

MR. GINGRANDE:  Yes, your Honor.  And there may be other sources of knowledge that he has for that as well, but I believe that's one of them.

THE COURT:  Okay.  How long did Erickson work for Mr. Craigue?

MR. GINGRANDE:  That is a good question.  I believe -- I -- I want to say it's in -- you know, it's over ten years.

THE COURT:  Okay.

MR. GINGRANDE:  And I -- I couldn't tell you the exact start date just offhand --

THE COURT:  Okay.  But --

MR. GINGRANDE:  -- but the very --

THE COURT:  So Mr. McKenna worked longer -- worked for him longer then?

MR. GINGRANDE:  You know, I -- I think -- I think that's right, but I'm not sure by how -- by how

long.

THE COURT:  All right.  Because I know there's
an injury in 2005.  I believe it's to Mr. McKenna.

MR. GINGRANDE:  That's right.

THE COURT:  So -- all right.  Okay.

And then did not make -- Mr. Craigue did not
make contributions towards social security and Medicare
under FICA.  How is that coming in, the same way, it's
just Mr. Erickson talking about his paycheck and what
was there and what was withdrawn, what wasn't withdrawn?

MR. GINGRANDE:  Right.  Right.  I mean, that's
one source of evidence, for sure.  Absolutely.  It would
be reflected.

THE COURT:  Okay.  All right.

MR. DAVIS:  Can I interject just briefly,
Judge, and Mr. Gingrande?

THE COURT:  Yes.

MR. DAVIS:  Mr. Erickson will testify, I
think, that he worked for about two years for
Mr. Craigue and during that entire time, he was working
with Mr. McKenna.

And so the Court's correct that Mr. McKenna
was a much longer-term employee than Mr. Erickson, but
Mr. Erickson actually became Mr. McKenna's roommate and
worked with him daily on jobsites.

The other thing I wanted to interject was generally Mr. Erickson almost always was paid cash on Fridays.  So the Court asked about his check.  He would testify there wasn't any check.  He got -- he got paid cash, just as did Mr. McKenna.

MR. GINGRANDE:  I apologize, your Honor.

THE COURT:  Okay.  So the entire -- that's okay.

For the entire two years, he got paid on Friday in cash; is that --

MR. DAVIS:  Yes.

THE COURT:  -- the gist of it?  I'm just trying to get a sense of --

MR. DAVIS:  Yes.

THE COURT:  -- how the evidence might come in.

Okay.  And Erickson's going to testify that he never received a W-2 or a 1099; is that correct?

MR. GINGRANDE:  Yes, that's correct, your Honor.

THE COURT:  And he's also going to testify somehow he knows that Mr. McKenna never received a W-2. How does he know that?

MR. GINGRANDE:  Well --

THE COURT:  Do you know how he would testify to that?

MR. GINGRANDE:  Yes.  I believe, your Honor, that the two men were -- I mean, they were very close. They worked together closely and -- and so he -- he, I believe, will say that he and Mr. McKenna were being -- being treated the same and they were not receiving different treatment.

And that's also reflected in Mr. Craigue's response to OSHA investigators that he treated the men the same.

THE COURT:  Okay.  All right.  Okay.

Okay.  Now, I'm inclined -- I'm just going to say this ahead of time so you know my thinking and you know sort of what you're up against by way of persuading me.

Right now, having read everything and prepared for this, I'm inclined to avoid a trial within a trial or anything that could possibly confuse the jury as between Mr. McKenna and Mr. Erickson.  And so my inclination would be that this type of evidence would be probative, even highly probative, of Mr. McKenna's tax status.  And I'm -- I'm not seeing unfair prejudice based on this, but I do see a problem with introducing evidence with respect to McKenna.

I know at one point in our last hearing I indicated -- I think I indicated that to the extent they

were identical or treated identically, I could see

possibly having both -- both of them presented to the

jury.  But as I -- as I think about this, I'm inclined

to see McKenna's tax -- the tax treatment of McKenna,

all those 404(b) acts, to the extent you can prove them,

you lay a foundation, knowledge, I guess through

Erickson, perhaps some of the statements of Mr. Craigue

that he did not pay payroll taxes, make contributions as

FICA requires, no W-2s, 1099s, and didn't give McKenna a

W-2 -- but I'm inclined to protect the jury, frankly,

from evidence related to Mr. McKenna.

        There's going to be, obviously, instructions

to them at the end of the case that are somewhat

complicated.  They're going to have to balance a lot of

different factors.  And I don't want them confusing

McKenna and Craigue.

        Now, my guess is you're going to tell me,

Judge, they won't, because it -- McKenna is identical.

For the two years he worked there, absolutely identical

to McKenna.

        So that's -- that's what I want you to know

ahead of time.  That's the way in which I am

analytically, I think, approaching this.

        I am protective of the jury.  I think the -- a

lot of the 404(b) information, we'll get to it

specifically, but let's start just with this tax evidence.  I am inclined to allow it as to McKenna, not as to Erickson.

So I -- I am saying that before I give you an opportunity to tell me why I'm wrong about that, wrong from the government's perspective, I'm wrong because I'm not allowing the McKenna -- I mean the Erickson evidence and wrong perhaps from the defendant's perspective because they don't think all of it's particularly relevant with respect to Mr. Craigue.

So let me -- let me have you go ahead and continue, Mr. Gingrande, with respect to the tax treatment.

MR. GINGRANDE:  Certainly, your Honor.

So to address the point that you just made, distinguishing Mr. Erickson from Mr. McKenna, the -- the first reason that I would ask you to consider before ruling that way and ruling that the evidence as to Erickson should be excluded is by directing your attention to the indictment itself.

You know, Count Two of the indictment states what the question was, the subject matter of the question of the OSHA investigator and Mr. Craigue's response to that.

The -- and the wording of that, I'll just read

it.  It says:  The OSHA compliance -- the charges that

he did knowingly and willfully make materially false,

fictitious, and fraudulent statements and

representations by stating to an OSHA compliance safety

and health officer that Mr. McKenna, who had died as the

result of a workplace accident, was not an employee of

the defendant or his business.  Specifically, when the

officer asked him whether Mr. McKenna and Mr. Erickson,

both of them, were employees of this company, the

defendant stated:  I've always treated them -- they

would come and go as they please, so I would always

treat them as not employees.

        And that is the -- the statement that is --

forms the basis of this charge, that he treated both

Erickson and McKenna, and both of whom are explicitly

referenced, the same, as not his employees.

        And so, therefore, Mr. Craigue's treatment of

Mr. Erickson is directly relevant to his -- his

treatment of Mr. McKenna.  And that's particularly true

in this case, where the evidence at issue involves

general employment practices that affected these two men

as coworkers and affected them in the same way.

        404(b) analysis employment cases allows

evidence of one coworker to be admitted in a case about

treatment of the other.  And I can say that not only

based on my own many years of experience in employment
law, but also based on the cases that we cite in our
brief, namely the *Goldsmith vs. Bagby Elevator* case and
*Sprint vs. Mendelsohn*.

          And the idea is that when one employee or one
worker, we'll say, is similarly situated to another and
one of the -- the -- the biggest factor in that being
that they have the same supervisor and there is an
employment practice that affects both people that
evidence of one -- as to one in the treatment of that
practice is irrelevant to the other.

          And then I would just add, your Honor, that
Craigue's consistency of treatment with Erickson is
independently important since as soon as the OSHA
investigation began in this case, Mr. Craigue separately
instructed both men to remember that they were
subcontractors.

          And so the testimony of Mr. Erickson and also,
frankly, Mr. Ford about their workplace relationships
with Mr. Craigue goes directly to proving Mr. Craigue's
motives in order to reduce his labor costs, his plan and
intent to mislead OSHA, which is backed up by the false
statements, and his knowledge and the distinction
between employee and contractor and the financial
implications of that distinction to which, you know,

this -- the -- all of which, really, this tax treatment
is relevant.

And for those reasons, your Honor, I would,
you know, strongly ask the Court to take that into
consideration and allow this testimony of Erickson,
especially where we do not have the benefit of having
Mr. McKenna able to testify.

THE COURT:  I understand -- and I understand
that Mr. McKenna is -- is -- he's part of this narrative
in the indictment in Count Two, so it's -- it's
certainly an allegation in Count Two that they were --

MR. GINGRANDE:  Yes, your Honor.

THE COURT:  -- both not employees, but that
doesn't render Erickson's employment status inextricably
intertwined with the charged crime.

The fact that he asserted that he did
not treat Erickson as an employee is part of the
description, but it's -- the truth of the assertion is
not at issue.  The charged crime is that he lied about
Mr. McKenna, not that he lied about Erickson.  The
charged crime, even in Count Two, is the making of the
false statement about McKenna.

So the government does not need to prove
that Erickson was the defendant's employee in order to
convict him, Mr. Craigue, of the crime charged in Count

Two.

Now, also Count Two, the wording of Count Two, heightens the danger because it's confusing that the jury's going to incorrectly focus on Erickson's employment status.  So I'm worried about the -- I'm worried about the complexity of the issue out of the box, but I'm also worried about unnecessarily confusing the jury about anything that needs to be proven with respect to Mr. Erickson's employment status.  I'm much more, I think, comfortable that the jury's not going to be confused as they listen to the evidence if, in fact, they train their focus on the employment status of Mr. McKenna and they're not focused on the employment status of Mr. Erickson.

That is -- that's my -- that's my strong feeling at this point.  I do think there will be some necessity of McKenna describing things.  Obviously he -- he may describe certain things that were said about both of them or that he overheard and it will perhaps implicate his own status, but I don't want the jury focusing on Mr. Erickson's employment relationship and employment status.  I want them focused on the charged crime, charged crimes, which are two false statements about Mr. McKenna's employment status.

MR. GINGRANDE:  Okay.

THE COURT:  Let me let Attorney Graham or
Attorney Mirhashem weigh in with respect to the tax
treatment issue.

MS. GRAHAM:  Thank you, your Honor.

I would just add to -- add on to what the
Court has said about the relationship of Erickson and
McKenna and the work status.

I think it's important -- I mean, the Court's
already identified that sort of the government had
stopped midsentence of the indictment and count, so I
think the Court's well aware of what the actual crime
is.  But I also think that taking that one statement is
really just a snippet of what that whole conversation
was about.

And, you know, in rereading and looking at the
transcript of the OSHA interview -- which really, I
think, is the best evidence that the government has --
in one particular page, it's page 76 of our attachment,
which is the transcript and page 1085 of the
government's discovery, there's discussion about the
safety hazards and what could have been done differently
and why didn't McKenna use particular safety equipment.

And Mr. Craigue says:  I know all the
decisions are on me, but it's a different type of
working relationship I had with him.  And he's clearly

talking about McKenna.

So I think -- that's just an example, I think, of the bigger picture of that relationship and how it could be confused or hearing about Erickson's relationship could confuse the jury as to McKenna.

What I'd like to do, your Honor, is also just briefly talk about the government's issue or, rather, arguments about intrinsic evidence because that is far-reaching throughout their motion.  And I think identifying evidence as extrinsic or necessary to complete a story should require some scrutiny by the Court because otherwise that could be an end run to the rules of evidence.  And, you know, specifically, any evidence could conceivably complete a story.  So the fact that admitting evidence could render stories slightly incomplete really should not be able to justify circumventing a 404(b) analysis.

And I would just point the Court to a 2020 Fourth Circuit case, which is *United States vs. Brizuela*, 962 F.3d 784.  And they have a discussion about what, really, intrinsic evidence means.  And, for example, it says that:  For evidence of uncharged conduct to be admissible to complete a story, the evidence must be probative of an integral component of the crime on trial or provide information without which

the fact finder would have an incomplete or inaccurate review of the evidence.

And so I would ask the Court to look at this case in a very different way than many of the cases that have -- have looked at particular charges as inextricably intertwined or completing the story.

So, for instance, this isn't a drug trafficking case where the tools of the trade like scales and ledgers are a part of the crime or an identity theft case where an ID maker is part and parcel of the crime.

So I just want to point out that I think that -- that the Court should undertake a 404(b) analysis with these items that I have addressed in my motion in limine.

But specifically as to payroll taxes and FICA and all of that, of the tax consequences, again, I think that the defendant's statement is the best evidence because it's the OSHA statement that goes through each of, really, the *Darden* factors in a way and it's the client who's answering those kinds of questions that explain and describe the status, the relationship, how -- you know, who -- who provided tools, who got the -- you know, the items, the equipment, and things like that.

As to method of payment, I mean, the issue really is that method of payment can be one of those factors in the *Darden* that a jury and a fact finder looks at, but I could see, for instance, an employee receiving payroll taxes and a W-2 could provide that necessary information to the fact finder that would establish, okay, I'm -- that tips the scale that this person was an employee.  Or, for instance, if a person, a worker, was provided a 1099, then maybe that would provide important information in that assessment.

The fact of the matter is that Mr. Craigue would not have to provide any of these items, right, a payroll tax, FICA, if Mr. McKenna was not an employee. But the reality of it is that he didn't supply any.

And so the question is what does that fact, standing alone, have any bearing on that decision-making or the fact finder.  He didn't file any of these taxes, he didn't file a W-2, he didn't file a 1099.  And so none -- that information alone doesn't tip the scale or allow them to bear anything from that evidence to help in that decision.

So that's why I think if -- if you're just taking that fact alone, that he didn't pay any payroll taxes or FICA, then all the -- or even a 1099, what the jury then is left with is that he just violated tax laws

without it being really relevant to that balancing test.

THE COURT:  How does the government intend to present this evidence so that the jury is hearing it sort of as a *Darden* factor?  Obviously they won't know that until the instructions, but how is it you're explaining that?  Is an OSHA witness going to talk about payroll taxes as it relates to employees and independent contractors?  How does -- how does the jury even understand his failure to pay payroll taxes?

MR. GINGRANDE:  Yes, absolutely, your Honor.

I mean, our -- our intent is to have OSHA explain, and the OSHA officers are going to explain, the tax implications of -- the fact that this distinction has tax implications; that if someone is classified as an employee, for instance, the employer would need to pay payroll taxes and would pay corresponding FICA and, you know, social security, et cetera.

So -- so, yes, that is how we would tend to introduce that evidence.

THE COURT:  Okay.  And you already have the evidence, according to Attorney Graham; you have the defendant's admissions in statements made to either the Department of Labor or OSHA investigator where he's admitting he didn't file any of these.

And so I think Attorney Graham's argument is

that ultimately, in the 403 balancing test, that that
has really -- yes, it's relevant, but you already have
evidence of the very same thing and it's coming out of
Mr. Craigue's mouth.  And it can be unfairly prejudicial
to him because it's talking about essentially violating
tax laws as opposed to understanding -- I didn't file
that paperwork, I didn't file any of this paperwork for
him -- and that it's somewhat cumulative because you
already have the evidence.

       Parse that for me, if you would.

       MR. GINGRANDE:  Well, your Honor, I mean, we
would -- we would just ask that the OSHA agents be given
the opportunity to testify to -- to these facts because
this is -- we need to show materiality in order to make
our case, and this is -- in -- unquestionably material
to OSHA.

       And I don't think that you can just by through
admission of Mr. Craigue show the importance of the fact
that he did not pay taxes and did not pay worker's
compensation through -- without actually questioning the
very inspectors who are the ones conducting the
investigation so that they can shed their perspective
on -- on the fact that this was important to that
investigation.

       I would also just note that, your Honor, if we

were to get into the 404(b) analysis, the -- the analysis does question, you know, the -- the -- the unfair prejudice -- and not just prejudice, unfair prejudice -- against the probative value of the evidence here.

And as we cited in our brief in the *Nazario-Quinones* case, this is not the type -- you know, the fact that someone didn't pay payroll taxes is not the type of evidence that is generally held to be unfairly prejudicial because it's not the type that is likely to elicit an emotional response from a jury or be so shocking or heinous that it inflames a jury and gets them to decide the case on something other than the evidence as it relates to the -- the elements of the crime charged.

This evidence isn't being presented to show that Mr. Craigue had a bad character or to suggest that, you know, because he committed that bad act in the past, it's more likely that he committed a crime in this case. And that's especially true where -- where the defendant's defense is going to be, no, I didn't actually owe these taxes because they were independent contractors.

So the risk of unfair prejudice here is extremely low -- we would actually argue nonexistent --

and that should really be taken into account in the balancing.

THE COURT:  All right.  Do you want to say anything else, Attorney Graham?

MS. GRAHAM:  Just very briefly.

I would not expect to go on and explain anything about failure to pay taxes.  I guess my point is that what is the --

(Technical difficulties.)

THE COURT:  There's something wrong with your microphone or speaker.  It's starting to --

MS. GRAHAM:  Oh, mine?

THE COURT:  -- get garbled.

MS. GRAHAM:  Oh, okay.  Let's see.  Okay.

So I think my point is that I don't understand really what the probative value is for this case in that if the OSHA agent is testifying that an employer would need to pay this, well, the defendant didn't pay it, I don't -- so there is no nexus or connection between the nonpayment of payroll taxes and, therefore, he has an employee.

So I -- I just think it's presenting information that has really no probative value and does not provide the necessary nexus.

THE COURT:  All right.  Well, I -- I agree

with the government that this evidence with respect to
McKenna is relevant.  It's probative.

In some ways, yes, it may be duplicative of
his own statements, but I think it obviously
corroborates, if it comes in as they think it will, his
own statements that he made to OSHA.  And I -- I think
it's highly probative because of the *Darden* factors and
the employment status of McKenna is squarely at issue in
the case.

Now, unfair prejudice is reserved for evidence
that really does invite the jury to render a verdict on
an improper emotional basis or for evidence that's
certainly more shocking than this.

So, ultimately, evidence that Mr. Craigue
failed to pay these taxes on Mr. McKenna's wages or
failed to provide him with tax forms is just -- doesn't
fall into that category.

So I do see it as admissible as to Mr. McKenna
and I do think it survives 404(b).  It is not intrinsic.
It has a special relevance outside of propensity because
it tends to prove the *Darden* factors and it is -- its
probative value is not substantially outweighed by
unfair prejudice or any of the other problems, confusing
the jury, undue delay, waste of time, et cetera.

Now, with respect to Mr. Erickson, even if his

tax treatment has some special relevance, its relevance is substantially outweighed by the danger of unfair prejudice.

To the extent that evidence that defendant shirked his tax obligations to Erickson has any probative value, it is largely cumulative of the probative value of the evidence that he shirked his obligations to McKenna.

Testimony that Mr. Craigue failed to comply with the tax laws creates a danger of confusing the issues before the jury and of creating a trial within a trial. The defendant's not on trial for evading tax laws, nor is he on trial for making a false statement to Mr. Erickson's -- regarding Mr. Erickson's employment status.

So I think the need to avoid distracting the jury with Erickson's employment status is particularly important, given that Count Two of the indictment, as I said, confusingly charges that the defendant made a false statement regarding McKenna's employment status by stating that the defendant treated both McKenna and Erickson as not employees.

So I am going to deny the motion as to Mr. McKenna and the evidence coming in as to Mr. McKenna and grant it as to Mr. Erickson.

I think at times I may have switched the names and I think counsel knows when I've made that mistake or that error, but hopefully I won't do that frequently throughout the hearing. But if I do, please -- please don't hesitate to point it out.

All right. The second issue, the second dispute, is Mr. Erickson's injuries at the same jobsite one month before Mr. McKenna's fatal accident.

So -- all right. Let me just -- I just want to get my head around this particular issue very quickly.

Okay. All right. Is this Mr. Gingrande as well?

MR. GINGRANDE: Yes, your Honor.

THE COURT: Okay.

MR. GINGRANDE: I will be arguing all of these this afternoon.

THE COURT: All right. I have real concerns about this evidence in terms of -- I mean, the evidence just evokes a visceral response when you, as a jury, learn about these injuries on this worksite and this injury to Mr. Erickson and specifically what happened with respect to Mr. Erickson. And, again, I'm concerned about putting all of Mr. Erickson's issues and employment status in front of the jury as if they're

going to have to weigh and decide those questions.

But I can tell you that I'm concerned about --
you know, even if we've got probative value and I think
you might be able to articulate probative value, I think
it's substantially outweighed by the danger of unfair
prejudice here in light of the evidence that the jury's
going to hear about this, you know, poor other worker
who was also injured on the job, may still be suffering
from those injuries.

So having said that, again, Attorney
Gingrande, tell me -- tell me why I'm wrong about that.

MR. GINGRANDE:  Well, I would start, your
Honor, by -- by just saying that the government will --
does not intend to introduce evidence about how the
injury occurred and has agreed not to introduce photos
or medical records about this injury or -- or any of the
injuries at issue today.  And so the -- the goal of the
government is not to try to elicit any sort of emotional
response or put in the evidence that would elicit that
emotional response to get the jury to rule on something
that they should not be considering when determining
whether the defendant is guilty or innocent.

What -- what the government does intend to
introduce is the -- the evidence of the fact that there
was a -- a worker's compensation claim that Mr. Erickson

filed resulting from a workplace injury and that
Mr. Craigue visited him in the hospital and told
Mr. Erickson not to file for worker's compensation and
that he would quote, unquote, take care of him.  And, in
fact, he later paid him $400 and Mr. Erickson has not
been able to recover worker's compensation based on
that.

And that is highly relevant and probative in
this case because, again, this is -- this is evidence
that Mr. Craigue did not pay worker's compensation that
year.  And -- and, first of all, that is --

THE COURT:  But ultimately -- ultimately --
let me interrupt.

Ultimately, the jury is going to hear -- and,
again, correct me if I'm wrong, but the jury's going to
hear that at some point in his relationship with McKenna
he was paying worker's compensation and he stopped
paying in 2016, I think.

So the jury's going to know he knows about
worker's comp, he paid into worker's comp, and in 2016,
I think, which would be about when Erickson starts
working for him, if he worked for him for two years.  So
that's ultimately probative, I think, the fact that
Mr. Craigue's aware of worker's comp, was paying
worker's comp, and then stopped paying it.

But introducing this -- honestly, this is really -- this is emotionally evocative type of evidence.  The jury is not going to like Mr. Craigue when they hear these details.  They just aren't. They're going to want to convict him because he went in to this guy and basically bribed him, tried to give him money in exchange for what would have been perhaps, you know, paying worker's comp or just didn't provide for him.  He got injured on his site.

The jury is going to really, I think, hear this type of evidence and really use it to, I think, want to find Mr. Craigue guilty.  And so that's the concern I have with this evidence.  And I'm concerned because you have the evidence with respect to his knowledge of worker's comp.

So while this evidence is really powerful, it's powerfully inculpatory.  I think you have that kind of evidence and you can present that kind of evidence in a way that is not going to completely demonize Mr. Craigue.

So that's my concern with respect to Mr. Erickson's injuries.  I understand you're saying you're not going to get into the details of his injuries, but he was injured on the site, same site, and this behavior with respect to Mr. Erickson really is

just deplorable and the jury hears it and I think the
case may be over.

So I'm very concerned about that evidence
coming in in terms of the probative value being
substantially outweighed by the unfair prejudice in
terms of what the jury hears and how the jury is going
to react to this evidence.

So, go ahead, Attorney Gingrande.

MR. GINGRANDE:  Thank you, your Honor.  Yeah,
if I could just respond briefly.

First I would say that the defendant actually
in this case is also trying to exclude the evidence that
Mr. Craigue paid worker's compensation up until 2016 and
then stopped paying it.  So that is something that's
still at issue.

THE COURT:  Well, maybe my -- maybe my
statements would give you a hint that I think that's
probably coming in.  That's probably relevant.  And, in
fact, I think it would be relevant, frankly, on this
question and wouldn't -- wouldn't carry the prejudice
that this -- this other evidence does.  So ...

MR. GINGRANDE:  I understand that, your Honor.
I would -- I would just add that -- that without getting
into any of the details of the injury or perhaps, you
know, some -- working out some compromise where we don't

even reference the accident -- which I would just say

offhandedly, you know, workplace accidents, you know,

they happen all the time.  It doesn't necessarily mean

that one person is responsible for it.  So I'm

not -- I'm not -- or that Mr. Craigue is the person

responsible for the accident.  So I'm not sure that that

would be the type of evidence that would, you know,

inflame the passions of the jury.

        But if we were to come to some agreement on

how that would be presented and not get into the details

of the injury, I think it would -- it -- the government

would -- does believe that introducing the fact that

Mr. Craigue did try to -- had this conversation with

Mr. Erickson and asked him not to file worker's

compensation is different in kind than simply saying he

paid it for years and then stopped paying it.

        Him asking someone -- and, in this case,

Mr. Erickson -- not to file the claim and to say,

please, you know, don't do this, I'll take care of you,

that is --

        THE COURT:  Can I just stop you, Attorney

Gingrande?  Another problem with that argument, though,

is that it's essentially going to Erickson's employment

status and I want the jury to be training their focus on

Mr. McKenna's employment status.  The worker's comp

evidence that I understand is coming up later, it deals
with Mr. McKenna.  It was sometime before.  But that
evidence seems to me to be highly relevant with respect
to Mr. Craigue's knowledge.  But, again, even if you
take out everything about the injury, ultimately it's
really only going to Erickson's employment status, which
I think still has a danger of confusing the issues
before the jury.

          Now, I keep interrupting you.  I want to give
you an opportunity to complete your thoughts, but I did
want to let you know that I still see this as, you know,
wrapped up in -- in Erickson's employment status.

          MR. GINGRANDE:  Understood, your Honor.  And
to that point, I would say that, you know, this is a
example where the policy, the employment policy here, is
what's at issue; is Mr. Craigue paying worker's
compensation for his workers or not.

          And --

          THE COURT:  Okay.  And he admits that he's not
paid since 2016.  I think that's one of his statements,
right?  So that's not really in dispute.  He's admitted
he's not paying worker's comp.

          MR. GINGRANDE:  But what he hasn't admitted,
your Honor, is that he knows that he should be paying it
and that is what this evidence goes to.  It is highly

probative when he is trying to tell someone, don't do
this; you know, I know ordinarily, you know -- the
unspoken part is I know ordinarily, you know, you would
be getting your worker's compensation, you'd apply for
it in this case because, you know, you would have
worker's compensation paid for, but I --

THE COURT:  Tell me how that works,
Mr. Gingrande.  If he applies for worker's comp and his
employer hasn't paid into it, does he get worker's comp?

MR. GINGRANDE:  He does not.  He does not
get --

THE COURT:  Okay.

MR. GINGRANDE:  -- the worker -- and, you
know, he's free to go around and sue Mr. Craigue, you
know, on that basis and try and recover that way, but,
you know, that was evidence that I'm sure, you know,
that -- that's of a different test --

THE COURT:  I just don't think it's as clear
as -- I don't think it's as clear to a jury as what
you're describing.  He's trying to talk his other
employee into not applying for worker's comp at a time
he knows he's not even paying worker's comp and so the
answer to an application would be no, we're not going to
give you worker's comp insurance, you're not entitled to
it.

So, again, I'm just -- I'm not seeing -- I see a lot of prejudice and very little in the way of probative value and a high possibility of confusing our jury.

So I am going to grant -- now, I -- I should allow Attorney Graham to weigh in with respect to the record on this, but my inclination is to grant your motion to the extent it is requesting exclusion of the 2017 injury -- Erickson's -- is it 2017?  No, it was one month before.

MS. GRAHAM:  Correct.  July 20, 2018.

THE COURT:  Okay.  And the offer to pay his medical bills in exchange for this forgoing of a worker's comp claim and Erickson's subsequent inability to get worker's comp, I'm not seeing the relevance -- I see that it is relevant.  I -- however, it's duplicative.  And so ultimately it's so prejudicial, I just -- in the balancing test, I am not inclined to admit it.

I also think it has a strong potential of, again, misleading the jury, confusing the jury, about whose employment status is at issue.

Do you want to add anything to the record with respect to that issue?

MS. GRAHAM:  No, thank you.

THE COURT:  Okay.  So let's go to the third issue, which is the -- okay.  This is -- this is Mr. McKenna's 2017 worksite issues.

So let me just -- I just want to get my head around this first before I hear from you.  Hold on.

All right.  Attorney Gingrande, so this is somewhat similar because -- although it's Mr. McKenna, so I am more inclined to say it survives the 404(b) analysis.

The thing that worries me, again, about probative value here is that probative with -- balanced with prejudice is that the jury's going to hear evidence that the worker's comp insurance was not available to McKenna after 2016 because the defendant said he stopped paying it as of that year.

So, again, that makes the relevance have less force, but ultimately this -- this employee/contractor distinction is an important one and requires careful balancing of all the facts and so I'm inclined to think that the jury should have as much probative evidence on that question as to McKenna's employment status as possible so that it can calibrate that -- that scale.

Also, if it's close, probative and prejudicial, I think the -- the rules would require admitting the evidence, but I would tend to think that

the details of McKenna's injury should not be
introduced -- you know, broken bones, stitches,
et cetera -- and there needs to be a limiting
instruction as to the purposes of this evidence.

So that's what I'm thinking on this.  I am
leaning toward, I think, denying this one and allowing
it in, but I want you to make me even more confident
that I'm correct about that and then I'll have Attorney
Graham tell me why I'm wrong.

Go ahead.

MR. GINGRANDE:  Your Honor, I -- I agree with
everything that you just said.  I mean, here we don't
have the same issues that arose in the context of
discussing Mr. Erickson's injury.  Here, this is highly
probative because it speaks directly to Mr. McKenna's
status and -- and answers -- addresses at least one of
the *Darden* factors as to -- as to whether or not he was
an independent contractor or an employee.

And, again, for the reasons I've said already,
it shows Mr. Craigue's knowledge that he had, you know,
an obligation to file worker's compensation.  Here,
Mr. McKenna is -- is trying to -- to file for worker's
comp, not -- not receiving it based on this injury which
would otherwise qualify him for it.

And that, again, provides a foundation to --

showing that, you know, he had a motive to lie to federal agents about the status of his workers and at the very least shows a lack of mistake.

You know, as to prejudice, again, here we could -- we can agree not to -- or you could rule that we couldn't introduce certain evidence of the medical injuries -- or the medical condition and injuries resulting from the workplace accident.  Again, don't believe that one accident on a jobsite shows that his employer has a propensity to commit a crime, which is really the question here.  This accident, you know, doesn't show that at all.

And -- and so for those reasons and the reasons that you've stated, we -- we agree that this should be admitted.

THE COURT:  All right.  I am inclined to admit, but Attorney Graham, persuade me that I'm wrong.

MS. GRAHAM:  Well, I'm unclear, your Honor.  I'm not aware that in -- and if the government can make a proffer, that's fine -- that Mr. McKenna, when injured in 2017, filed a worker's comp claim or tried to do that.  I don't think the fact that he had an accident at a worksite tends to have any probative value to the *Darden* factors.  It easily could have been that Mr. McKenna viewed himself as an independent contractor

and would have never thought about filing a worker's comp claim.

So I don't know --

THE COURT:  I thought -- I thought Mr. Erickson was aware somehow that his roommate, Mr. McKenna, had never been helped with compensation for his injury, either -- either worker's comp award or some sort of payment by the defendant, but fill me in. Again, you guys know the case better than I.

Go ahead.

MR. GINGRANDE:  That's correct, your Honor.

MS. GRAHAM:  So if -- if he was not an employee, then he would not receive a workman's comp benefit.

So in looking at the *Darden* factors, we're just explaining to the jury the fact that there was an injury on a worksite has no tendency to show that he, in fact, was an employee at that time.  So I just don't see the connection or the nexus.  You can have an injury on a worksite and still be an independent contractor and, therefore, you don't get workman's compensation.

I think that having an injury or having the jury hear there was an injury just a year before, the same worker, is highly prejudicial and, really, I think going back to what the Court said is they are just not

going to like Mr. Craigue if they're told that this
individual was injured on a worksite and then later on
was injured just a year later.

And so given that, I think if you're looking
at the probative value versus prejudicial, I think the
prejudice certainly outweighs any probative value.

THE COURT:  Okay.  Attorney Graham makes a
pretty good point about the facts.  I guess you might
have to give me an offer of proof on these facts.

He -- I know the injuries were severe enough
he was hospitalized, so he must have had hospital bills.
And Mr. Erickson, I think, would have to I think give
more information or testimony other than just, you know,
he -- he -- as far as he knows, he didn't get any
compensation for the injuries to make this as relevant
as I thought it was.

It's McKenna, so that's certainly, I think,
more probative and less confusing to the jury, but what
is -- what is this evidence showing specifically,
Attorney Gingrande?  And tell me more about the
evidence, how it's coming in.

MR. GINGRANDE:  Yeah, well --

THE COURT:  And, too, if the jury hears this
and they hear, you know, he fell off a ladder or
something and he really wasn't that injured, why would

it be relevant?  It's almost more relevant because he ended up in the hospital, had injuries, probably -- what did he have to do, pay the hospital out of pocket?  Did he have -- did have his own insurance?  If he had his own insurance, that would tend to show maybe -- that would be a *Darden* factor cutting in independent contractor favor.

         But in any event, go ahead, Attorney Gingrande.

         MR. GINGRANDE:  Your Honor, as for a proffer of proof and how the evidence would come in in this case, if I could, I would like to defer to my colleagues on this question because I think they may know more information about this than I can provide.

         Attorneys Dronzek or Davis, are you available to answer that question?

         MR. DAVIS:  I could just proffer, Judge, that Craigue was present -- I'm sorry, Erickson.  We all get the names mixed up.

         Erickson was present with McKenna at the jobsite in Concord and was there when McKenna fell. McKenna drove himself to the hospital, but Erickson went with him.  Mr. Craigue was not on the site, but he did come to the hospital within a couple of hours and they were all three at the hospital for five to six hours.

Mr. McKenna was out for five to six weeks after that.

Mr. McKenna, according to Mr. Erickson, did not make any worker's comp claim arising from the accident.  Mr. Erickson spoke to Mr. McKenna about any conversations he might have had with Mr. Craigue about getting compensation and Mr. McKenna told Mr. Erickson that he talked to Mr. Craigue and Mr. Craigue said, basically, you're out of luck, and that no payment would be made.

Mr. Erickson would further say that he and McKenna talked about McKenna making a worker's comp claim, but because Mr. McKenna was working under the table, he was not to bring it up.  And Mr. Erickson said he believes that Mr. Craigue told Mr. McKenna not to bring that up, but I don't think Mr. Erickson witnessed that or overheard that.

THE COURT:  Okay.

MR. DAVIS:  But that's -- that's the extent -- that's from Mr. Erickson's grand jury testimony.

THE COURT:  Okay.  All right.  So explain, Attorney Gingrande -- we've got the accident.  All right.  And we -- we have the person who's relevant in this case, Mr. McKenna.  And we have statements from Mr. Craigue that would indicate Mr. Craigue spoke to Mr. McKenna and said, you're out of luck, you get no

payment.

Tell me how that is going to affect the jury
on this critical question of the employment status
between the two.

MR. GINGRANDE:  Yes, your Honor.

So the -- it will -- it will inform the jury
by speaking to whether or not Mr. McKenna was treated as
an independent contractor or an employee in particular
because it -- it shows that Mr. -- Mr. McKenna was not
providing insurance for himself, he was not -- he did
not have, you know, any worker's compensation coverage
certainly for himself, and he was relying on Mr. Craigue
to provide that and Mr. Craigue -- and Mr. Craigue was
not providing it.

And when taken in conjunction with this other
evidence that Mr. Craigue stopped paying on a certain
date, again, it goes to show the -- that -- that there
was a motive for Mr. Craigue to lie about McKenna's
status.  Namely, he was trying to cut costs after 2016,
didn't want to continue paying insurance that he knew he
had to cover -- that he had -- he knew he had to cover
for his workers.  And this is highly probative.

And so -- so for those reasons, it will be --
it will be helpful to the jury and necessary background
for what the -- the comment that he made to OSHA

inspectors.

THE COURT:  Okay.  So the jury learns -- if the evidence comes in as described, the jury learns that Mr. McKenna talked to Mr. Craigue about helping him get compensation for his hospital bills and Mr. Craigue said, you're out of luck, no -- basically, no worker's comp or I'm not going to pay you anything, I'm not going to help you.

Saying it -- you're not going to get worker's comp, you're out of luck, would be consistent with what the jury is already going to learn from Mr. Craigue's statement to OSHA or the Department of Labor, I can't remember which, but a statement that Mr. Craigue has already made.  So that would be consistent with his own statements.

And then, you're out of luck, I'm not going to pay you anything, that's just -- that's just showing that, you know, he's not supporting his employee/contractor -- he's not supporting his worker who was injured on his worksite, working for him.

So I'm left again now thinking, even though this is -- this is McKenna, I'm -- I'm left wondering what kind of bang for your buck you're getting out of this by way of relevance when, in fact, when the jury hears this evidence, I'm -- once again, this is just

hideous.  The jury is not going to like Mr. Craigue for treating his employee a year or two before the -- his death by -- by essentially, you know, not helping him in the least with his injuries; you're out of luck, no payment.  That's -- you know.  So now I'm concerned that there's not as much in the way of probative value here and a ton of prejudice.

So, again, I'm not going to -- now that I know what it looks like the evidence will be, I'm pretty concerned the jury, again, is going to learn about this prior accident.  And the question is does it -- does it help the jury decide the status, the employment status. I don't see it helping on that very much, but it sure is going to help the jury hate this guy.  You know, they're going to really despise him for the way he treated this poor worker who died a year later.

So, again, I think I've been persuaded --

MR. GINGRANDE:  Your Honor --

THE COURT:  -- the other way, now that I've heard, you know, how -- how the evidence is likely to come in.

So tell me again.  Attorney Gingrande, I want to give you an opportunity, but ---

MR. GINGRANDE:  Thank you, your Honor.

But how else, other than to -- to introduce

this evidence would you actually show what Mr. McKenna's
understanding of the relationship was between the two
men based on simply the facts that the jury would be
presented with that Mr. Craigue stopped paying worker's
compensation as of 2016?  If that's all they have, the
jury is going to be left with that fact and they're not
going to know that Mr. McKenna didn't realize, for
instance, that he wouldn't be getting worker's
compensation, that something had changed.  Something
that had persisted for years is all of a sudden --

THE COURT:  Right, but the question -- hold
on.

The question that the jury has to decide is
what -- whether or not there's a lie, whether or not
Mr. Craigue made a false statement at these later dates,
and the false statement has to do with the employment
status.  And that's -- that's ultimately what the jury
needs to determine, not whether, you know, Mr. McKenna
knew that he was going to get worker's comp or wasn't
going to get worker's comp.  And, you know, I -- I'm not
seeing that this evidence is moving the ball down the
field in terms of helping you clarify for the jury the
question of their -- of their employment status.

Now, it's McKenna and -- you know, so it's
obviously important.  But I'm still thinking that the

jury is going to hear it and they are going to punish
Mr. Craigue.  They're going to hear the evidence, and
they're not getting much in the way of help deciding
this -- this employment status question, you know.  The
help is going to be, hey, he didn't pay worker's comp.
That is a factor.  He paid no worker's comp.  And that's
going to help the government show that he didn't pay
worker's comp; he knew -- you know, he knew what he was
doing and he wanted essentially to cheat the government
and not pay worker's comp.

          This evidence tends to show that he just
treated this particular employee who died really poorly.
So --

          MR. GINGRANDE:  But the fact that -- oh, I'm
sorry, your Honor.

          THE COURT:  No, go ahead.

          MR. GINGRANDE:  I was just going to say the --
again, you know, this shows that Mr. McKenna did not
have his own insurance.  That's relevant to the
analysis.  It also shows the parties' understanding,
which you so correctly pointed out at our last hearing.

          THE COURT:  Yeah.

          MR. GINGRANDE:  The understanding -- the
mutual understanding of the parties is very important in
determining their status.  And this clearly shows that

Mr. McKenna had the understanding that -- you know, at least the government would argue that he was still an employee.

And absent that, if we just have this fact that in 2016 he stopped paying worker's compensation, the defense is free to claim that the reason for that was because, oh, the employment status changed; something happened in 2016 and now there was an understanding that the parties were no longer employer and employee.

We need McKenna and we need the fact that McKenna went to Mr. Craigue, wanted this worker's compensation, understood that he would receive it, and Mr. Craigue came back and said, sorry, you're out of luck, to show what his understanding was of that relationship.

And, again, no other way to introduce the fact that he didn't have -- that he didn't have this coverage for himself, which an independent contractor --

THE COURT:  I agree with you.  I agree with you.  That -- that is a piece of evidence that is probative.

I wonder if there is a way to sanitize this somewhat so you can reduce the prejudice, but get in the evidence that McKenna didn't have his own insurance and

McKenna thought that -- I guess he thought he was an
employee.

          MR. GINGRANDE:  (Nods head.)

          MS. GRAHAM:  May I --

          THE COURT:  Is that -- is that what you're
arguing?

          MR. GINGRANDE:  Yes.

          THE COURT:  Attorney Graham, go ahead.

          MS. GRAHAM:  Thank you.

          I just wanted to interject one thing because I
think this is important that in the discovery and maybe
again in the -- I think the government is being very
speculative about this supposed conversation that
McKenna had.

          THE COURT:  But it came from grand jury
testimony apparently.

          MS. GRAHAM:  Well, from Erickson and who --

          THE COURT:  Erickson.

          MS. GRAHAM:  He was not present during this
whole, like, workman's comp, you know, discussion, but
that he just said, okay, you're out of luck.  But there
was no -- he wasn't present during a conversation about,
oh, I expected I was going to get workman's
compensation.

          What the discovery bears out is that there's I

believe other statements from, like, Mr. Ford who said,
yeah, my understanding was that, you know, he wanted to
be paid under the table so he could get state insurance.

So I think that that's a fact that's not been
presented that is important in the analysis as well,
because that at least was part of the discovery.

THE COURT:  Okay.  Now play that out for me,
Attorney Graham.

MS. GRAHAM:  Sure.  I think what the
government is presenting is that McKenna getting injured
was left in the lurch because, you know, he didn't have
workman's compensation and he didn't have any kind of
insurance.  And I don't know if that's necessarily true,
given the statements of other witnesses that are in the
discovery about how and why McKenna wanted to be paid
the way he was -- that he was being paid.

THE COURT:  Right.  And that would be a
factual dispute you can cross-examine him on, but
ultimately if the evidence comes in as described by
Attorney Gingrande and Attorney Davis -- I think on this
one I -- I need to think about this one.  I'll have to
take this particular argument under advisement.  I think
my first instinct may not be my last instinct, but I do
want to think about this one a little bit, a little bit
longer.

So what I'll do is obviously take it under advisement and let you know what I'm going to do with that.

And it may be, as with most rulings on evidentiary questions, if the evidence comes in differently, then obviously stand up, come to sidebar, and let me know.  But I'm giving you rulings based on what I understand the evidence to be.

So I want to take the 2017 worksite injuries of Mr. McKenna under advisement.

Let's go to Mr. Craigue's statements in the hearing before the New Hampshire Department of Labor.

Now, we're already at an hour and a half.  I just want to ask our -- well, actually, I came on a little bit late, but let me ask our court reporter if you need a break, because we could take a little break right now if you need that.

THE COURT REPORTER:  I think we can keep going a little bit longer.

THE COURT:  Okay.  All right.  Well, let's stop for sure by four o'clock and take a break.  So if somebody can just alert me if we start to go past 4:00.

Okay.  All right.  So we're talking about statements made before the New Hampshire Department of Labor.  Those statements were made after the accident

that led to Mr. McKenna's death, but before the OSHA
interview in later October.  It was October 15th that
he's making these statements.

Are they -- they're statements at a hearing;
is that correct?

MR. GINGRANDE:  That's correct.

MS. GRAHAM:  (Nods head.)

THE COURT:  Okay.  All right.  So here are the
following statements as I understand them:  Mr. Craigue
stopped paying for worker's comp insurance for McKenna
and Erickson in June of 2016; that he said that
Mr. McKenna and Erickson were independent contractors;
he said that McKenna asked Craigue if McKenna could be a
subcontractor because he needed medical insurance; he
said that he believed Erickson had his own business;
Mr. Craigue said he didn't have payroll records or
employee files for his workers; and, finally,
Mr. Craigue did not have documents corroborating that
any of his workers had their own businesses.

Okay.  I'm just going to cut to the chase.
And maybe this won't surprise you, but I do think that
the statements as to McKenna seem to be all admissible.
The statements as to Erickson do not.

Now, one of them, I think it's going to depend
on exactly -- you know, exactly the -- the statement.

And I'm -- I don't have the exact statements in front of me, but my sense of this is that, again, as with McKenna, I think it would come in.  As with -- as pertains to Erickson, I'm inclined to exclude it.

So, Attorney Gingrande or Attorney Davis, whomever is taking this one.

MR. GINGRANDE:  Yes, your Honor.

And so you -- you'd like me to speak specifically about the point as to why this should come in as to -- as to Mr. Erickson; is that right?

THE COURT:  Yes.  Yes.  So that would be statement one:  I stopped paying worker's comp for McKenna and Erickson.

MR. GINGRANDE:  Okay.

THE COURT:  And then statement two that McKenna and Erickson were both independent contractors; and then statement four, he believed Erickson had his own business.  I don't -- I'm not seeing how that is particularly relevant.

Go ahead.

MR. GINGRANDE:  Yes, your Honor.

So as to -- as to the first -- so maybe it would be best to just kind of address them in that order.

So as to number one, this gets into, again, an

issue of what the employment practice was.  And there's
evidence that -- that Mr. Craigue treated Mr. McKenna,
Mr. Erickson, and Mr. Ford the same way and that he
didn't pay worker's compensation for any of them.

And so if -- if we were to -- you know, say
that Mr. McKenna -- it's relevant as to Mr. McKenna,
again, it -- it -- it's relevant, the fact that he
didn't pay it for -- for anyone, because it shows
that -- that the statement that he made, that he treats
them all the same, was -- was about the fact that he
had -- that he treated them as -- as not employees; he
treated them as independent contractors; he did not
treat them differently.

And so the -- the reason that that's relevant,
of course, is for the reasons that you've stated before,
about why we need the evidence that he was paying
worker's compensation up until -- up until June 25th,
2016; that it shows that he knew he had an obligation to
pay worker's compensation because the government would
argue he knew these were his employees and he stopped
doing it to cut costs as of that date.  There's -- you
know, there's evidence that the business was -- was
declining and -- and that he -- he did that to cut the
costs and, therefore, it shows knowledge of the fact
that his statement was -- was false.  And, again, the

statement was that he always treated them the same.

And so the fact that he paid worker's compensation up until 2016 and then promptly did not in and of itself shows that that statement is false.

So that's the -- I would say, you know --

THE COURT:  Okay.

MR. GINGRANDE:  Should we break them up, you know, there and -- okay.

THE COURT:  No, I -- I don't think it's as prejudicial with Craigue saying I'm not paying worker's comp basically for either of them in June of 2016.  I don't -- obviously I'm not interested in Erickson coming in and talking a lot about his status -- employment status with Craigue or evidence that tends to show that employment status, but I do think the fact that Mr. Craigue stopped paying, you know, for all of his workers at that point and has admitted to it in a statement is not going to deflect too much from the issues and I can see where it does have some relevance.

Let me ask you as to -- he's making a statement in a hearing to a -- it's Department of Labor, and he's making a statement that Mr. McKenna is an independent contractor.  That is -- that is a -- a bad act that is remarkably similar to the charged crime and the similarity between them would tend to suggest more

prejudice.

So explain that one to me.  How do we get past the fact that these are virtually identical allegedly false statements?  It goes to show that, you know, he's making this false statement as the government has charged, you know, at time one; he's making it again at time two to OSHA; and, boy, here he is making a third uncharged false statement.

So that one, I -- is the only exception with respect to the McKenna evidence that concerns me.  So can you address that particular statement for me?

MR. GINGRANDE:  Yes, your Honor.  And we cite a number of cases in our brief to this point, but evidence of uncharged, you know, fraudulent activity that's substantially similar to the activity that's underlying the charged fraud is often admitted to show the knowledge or intent to defraud with respect to the charged fraud; in this case, those -- the statements that he made to OSHA investigators.

And so we -- we would argue that -- and we have argued that these past statements that he made to the -- the Department of Labor, both the investigation and the investigator, Martineau, but also at the hearing, show that he had a plan to describe his employees as independent contractors when he was faced

with potential liability and that he did not make a
mistake in telling federal agents that the two men were
subcontractors.  He knew they were his employees and
denied it to avoid potential financial and other
liability.

So we think that is highly probative and it
also gives this special relevance.  And, again, this is
addressed in the *Sebaggala* case.  I can give -- I'm
happy to give the pinpoint citations if you'd like, your
Honor; they're in our brief, the *Sebaggala* case the
*Guyon* case the *Rodriguez-Estrada*, all of which --

THE COURT:  Those are like charged fraud
scheme cases, aren't they?  This is a false statement
case.  This is not a complex scheme to defraud people.
It is a false statement.  And essentially you're trying
to tell me this is coming in as to his motive, his plan
to lie, but ultimately it's basically coming in to show
he didn't just lie once or twice.  He lied three times.
Ultimately it's to show propensity.

MR. GINGRANDE:  We would disagree with that.

THE COURT:  I'm just concerned -- I'm just
concerned.  The cases that you cited -- you know, you
need to prove what is in the person's mind in a complex
fraud scheme.  And so that kind of evidence, I think,
would help prove that and would be more likely to come

in.

Here it's a question of him lying at time one and time two.  So I'm inclined to keep out the highly similar false -- allegedly false statement that he made to the Department of Labor, but otherwise, it looks to me like the other statements related to McKenna look relevant to me.  I think his statement about worker's comp for McKenna and Erickson, I -- I think that that can come in.  It's part of the same -- it's part of the same statement.  I haven't -- I assume it's part of the same statement.  He basically is saying I stopped paying worker's comp for my employees.

MR. GINGRANDE:  Your Honor, if I could respond just to -- to what you were saying about the cases.

THE COURT:  Yes.

MR. GINGRANDE:  So -- so, your Honor, in the *Sebaggala* case, it's 2256 F.3d 59, that was not a fraud scheme case.  That was a case where the defendant reentered U.S. Customs with, you know, a -- it was some sum of worth -- a hundred-plus-thousand dollars worth of traveller's checks that had been reported lost or stolen and he presented customs officials with the completed customs form saying that he was not carrying currency or monetary instruments in excess of $10,000.  And so this was a -- this was a false statements case, just like

this one, not a -- not a fraudulent scheme case.

And the First Circuit upheld the lower court's admission of this mass of traveller's checks that were, you know, seized at the airport and over the objection of defendant that this was, you know, bad act overkill and just trying to show bad acts because they provided the motive to lie to customs inspectors about the value of the monetary instruments in his possession and -- and to -- to make the false statements.

And -- and, similarly, in -- in the *Guyon* case, that's 27 F.3d 723, that wasn't a -- it's true that there were multiple -- there were multiple, you know, counts of fraud in that case, but the evidence that was admitted was actually evidence of uncharged fraud that had special relevance because it showed his intent -- his applying for various other loans that were uncharged and the -- the lies that he made when filing for those loans helped show his intent in committing the fraud.

So it's not just based on, you know, the -- the same modus operandi or these indicia that the person was -- was engaging in a -- a scheme to defraud. Those are -- those are just two examples of cases where the evidence was actually admitted to show knowledge, motive, intent.

And -- and then those are the other things
that we're -- we're seeking to admit this evidence for.
It shows that he wasn't confused and he didn't otherwise
make a mistake when he said that McKenna was an
independent contractor because he had said the exact
same thing to regulators in the past.  And, thus, this
goes to show his -- his knowledge.  And so -- and,
again, we've stated many reasons or many times how this
shows motive as well.

So I would just say that that, you know, it
wasn't just on the basis of a fraudulent scheme and all
being part of the same plan that those were -- were
admitted.

THE COURT:  Okay.  Fair enough.

And that's helpful.

Is it correct, Attorney Gingrande, that in
terms of the *Darden* factors, the parties' understanding
of the employment relationship carries less weight than
some of the other factors?

MR. GINGRANDE:  I -- I don't -- I -- well,
I -- I don't -- I don't think that you can make that as
a blanket statement.  I think that there are -- there
are circumstances in which that will actually be the
best evidence of what the relationship is.

Again, using the most, you know, just kind of

basic example, if you have a contract and the contract
says these are your terms of employment and refers to
the employee as an employee, et cetera, that is the
documentation of the understanding of that relationship.
And it is -- it is highly probative and, in some cases,
more so than, you know, who provided the materials for
work, for instance, that -- that -- of that relationship
and that the employment relationship was intended.

THE COURT:  Okay.  With respect to this
question of him saying basically the same alleged lie to
the Department of Labor that he stated in the charged --
in the indictments, in the indictment, I am going to --
I'm going to keep that out.  It's cumulative.  It's
unnecessary to the government's case.  There are going
to be other -- there's other evidence, indeed, the
charged crimes, and I think the risk of unfair prejudice
is high because the statements to the Department of
Labor that McKenna are not a contractor seem virtually
identical to the charged false statements in this case.
And the more the prior bad act resembles the crime, the
more likely it is the jury will infer that a defendant
who committed the prior bad act would be likely to
commit the crime charged.  I think the risk that the
jury will infer that Craigue has a character for lying
to employment officials about his workers is very high.

However, should there be -- I mean, it seems to me that if evidence is introduced somehow to show that he was mistaken, he was just, whoops, confused, then I think it becomes highly relevant and the defense could open the door to that evidence.

So -- but without that kind of, you know, context for the evidence, I think it just stays out at this point.  I think it -- I could see a scenario where that would become relevant, but I don't think it should just be introduced in the government's case in chief out of the box.

So it's almost the exact same statement.  So I think under the 403 balancing, I'm going to find that it does not come in.

Let me give Attorney Graham a shot with respect to the other statements.

You're muted.

MS. GRAHAM:  Thank you.

Yes, I think that it is unfairly prejudicial to Mr. Craigue for the following reasons:  The jury is going to hear that he was brought before another state agency, that he was clearly under investigation, and that clearly he must have done something wrong to bring him before this -- this agency and hearing.

So I think in that respect it is more

prejudicial and unfairly prejudicial for a jury to hear
that not only was he brought before the OSHA to talk
about an OSHA-specific offense, but he was also brought
in before the labor board, because they will then be in
a position to believe that he -- he, you know, violated
some labor laws in addition to the OSHA one.

          And just to speak to intent, I think the
government is attempting to present this as a plan and a
fraudulent scheme and -- in that it's his attempt to
misconstrue and to place and describe his workers in
a -- in a way to limit his liability.

          And my response to that is if you look at
the -- the different proceedings, especially the OSHA
one, which is very lengthy, he's asked -- he's asked a
number of questions that he responds to.  And I don't
think the government is saying that his responses were
necessarily false about the way he paid them, the tools,
et cetera.

          And so it's not ultimately how he's describing
his employee or workers as they are.  He's not
minimizing or changing that.  It's just that final
statement that they're saying is false.

          And so I think that if there -- there really
was not this plan and if, in fact, there was a plan to
describe him in a way to limit his liability, he did a

very poor job at it because it -- OSHA relied on those
statements at the hearing.

          THE COURT:  Attorney Gingrande, do you want to
respond to that?

          MR. GINGRANDE:  Yes, your Honor.  I would just
ask that they're clarifying which statements we're
specifically discussing right now because --

          THE COURT:  Yeah, I -- I will do that and
I'll -- I will go through each of the statements and
tell you what I am going to do with each one.

          I think Attorney Graham is saying all of these
statements are bad because the jury's going to hear that
he's making these statements to another separate entity
and that he's -- he must have done something wrong
because he's being hauled before, you know, the
Department of Labor.  And -- and ultimately I think that
the special relevance -- that these statements have
special relevance.  They go right to the probative --
the question at issue, the status, employment status, of
McKenna and Craigue.  And so I think that any prejudice
from that is not unfair prejudice.  I think that the
probative value outweighs any such prejudice.

          So what I don't -- I'm not persuaded by that
argument and I think these statements are relevant.

          Now, let me go through each statement so that

counsel can understand what I am ruling and give you a
last shot.  I'll give you each a last shot to tell me
why I'm wrong.

But I intend to grant this motion as to the
statement that, you know, McKenna and Erickson were
independent contractors for the reasons I explained.
It's identical, and it's essentially a prior bad act
showing propensity.  So I'm keeping -- I'm granting the
motion as to that statement.

I'm granting -- I don't see any relevance to
Craigue believing that Erickson had his own business.
Again, that goes to Erickson, not McKenna.  So I'm
granting the motion as to that statement.

The statements, however, that I think come
in -- despite the arguments I just heard from Attorney
Graham, I think these statements still pass 404(b),
both -- both prongs:  Craigue stating that he stopped
paying worker's comp for his employees, McKenna,
Erickson; that McKenna asked him if he could be a
subcontractor because he needed medical insurance; that
Craigue didn't have payroll records or employee files
for his workers and didn't have documents corroborating
that any of his workers had their own businesses.

Those statements I would say come in and so I
would deny the motion as to those statements.

Having said that now, Attorney Gingrande, do you have anything else to add by way of argument?

MR. GINGRANDE:  Your Honor, I -- I would just actually like to take this opportunity to -- to make perhaps a point for the record that -- that because some of these statements are -- are broader than just affecting McKenna -- Mr. McKenna and Mr. Erickson, that -- that there's another employee who -- who these statements may be relevant to as well, who is Mr. Ford. We haven't discussed him as much today.  A lot of this has focused on Mr. McKenna and Mr. Erickson.

But Mr. Ford was -- was hired just before Mr. McKenna died and he worked with Mr. McKenna on the site for a day.  And similar to some of the other issues that we've already discussed, Mr. Craigue had told him that when he was hired, he would be paid in cash and that -- you know, the government would argue it was clear that it was under the table, but -- and there were no forms and no taxes paid.  And Mr. Craigue, you know, told him when to show up to work and where and -- and, similarly, never mentioned that Ford would be a subcontractor.

So we -- you know, I would like to just introduce that as -- as relevant to the discussion and just get some -- you know, obviously I think it's clear

what you're -- what you're ruling on here, but for the
record and --

THE COURT:  Well, with respect to Craigue's
statement to the Department of Labor, this particular
subsection of this motion, I can tell you that to the
extent there are more statements -- and, again, I -- I'm
assuming that I'm looking at the major statements.

But to the extent there are other statements
like this, it seems to me that if Craigue is talking
about Ford, Erickson, and McKenna all in the same
breath, all -- he's making statements describing how he
does something, but it really applies to all three of
them and it's coming from Craigue, that seems to me to
be much like -- you know, I mean, it's -- it's part of
his statement and I don't think it's going to confuse
the jury because we're not going to go down that road
and let them hear a ton of evidence with respect to
these other employees and the employment relationship.

So I think to the extent it overlaps with
McKenna, any of Craigue's statements, then it seems to
me I'd be more inclined to say it's just not -- it's
coming out of Craigue's mouth, it's a statement that the
jury's going to hear, but we're not going to focus on
bringing in all kinds of other evidence.  They're just
going to hear that, oh, okay, he treated McKenna that

way, but he also had these other employees, treated them
the same way.

So to the extent -- I'm keeping it within the
context of statements to the Department of Labor right
now, but to the extent you're talking about something
else, then you're going to have to probably clarify that
for me as we go along.

But does that answer your question, Attorney
Gingrande, in terms of how I'm likely to rule?

MR. GINGRANDE:  It does, your Honor.  I
appreciate that.  Again, I'm just stating for the record
that there's this other employee that some of these
other statements may apply to as well.

THE COURT:  Okay.  And ultimately, too, as the
evidence comes in, it depends on how it -- you know,
what the defense theory is, what -- what's -- what the
defense is arguing or putting into the case in terms of
opening the door to something.  Again, I can't predict
that right now.  But I do think --

MR. GINGRANDE:  Right.

THE COURT:  -- that it's going to depend on,
you know, how the evidence comes in and my rulings could
be adjusted based on -- based on the specific context.

So that's -- I think I'm ready to move to the
next one but first want to take a little bit of a break

before we go to -- I think it's the -- it's Craigue's statements to Inspector Martineau, which is also Department of Labor.

And I think my ruling on this one's going to be quite -- I think quite similar.  I'll get my head wrapped around that while we're taking the break and we'll give our court reporter just a little time.

And we'll be back on -- do you want to say 4:15 let's get back on.

So turn your video and your audio off just for the moment and then come back at 4:15 and turn everything back on.

Court's adjourned just temporarily.

MR. GINGRANDE:  Thank you, your Honor.

(Recess taken from 4:02 p.m. until 4:15 p.m.)

THE COURT:  All right.  Let's then start in with the motion to exclude Rule 404(b) evidence, and we're talking now about Mr. Craigue's statements to the Department of Labor investigator, Mr. Martineau.

And I want to shorten this somewhat by telling you that I'm going to rule in exactly the same way and for the same reasons with respect to his allegedly -- I guess this would be his fourth false statement that McKenna was a contractor, not employee.  So that is out. So the motion's granted to that extent.

However, with respect to the rest of the
statements and, again, if it's Mr. Craigue actually
making statements and the statements lump multiple
employees together or he indicates in a single statement
that, you know, I assigned work to Mr. McKenna and
Mr. Erickson and Mr. Ford, it seems to me that that is
okay.  That's part of the same statement.

However, if in an interview early on in the
interview he says, I assigned work to Mr. McKenna, but
then later he talks about assigning work to Erickson, it
seems to me that you can easily redact that, the portion
that deals with Erickson.  It's not particularly
relevant.  It is relevant ultimately that he's
describing the *Darden* factors, the very *Darden* factors
at issue that the jury's going to have to decide with
respect to Mr. McKenna.

So with respect to the statement -- the
remaining statements, I think they all come in, so the
motion would be denied with respect to the remaining
statements.  Let me go over those and just make sure I'm
correct and we're on the same page.

So Mr. Craigue stated he assigned work to
McKenna and Erickson.  Mr. Craigue stated he provided
work equipment for McKenna and Erickson.  He stated he
couldn't provide contracts or agreements stating that

McKenna and Erickson bore liability for the work they performed and he couldn't provide those documents with respect to them being required to obtain workers's comp insurance for themselves, and he couldn't provide federal ID numbers for either one.

So I think those all bear on and have special relevance and I think that the fact that he's being interviewed by an inspector, I get -- presumably before he testified at that hearing would not necessarily surprise anyone and I don't think would add unfair prejudice or would confuse or mislead the jury.  I don't see the probative value of those statements being substantially outweighed by any of those other factors.

So that's my ruling with respect to Mr. Martineau and the statements made.  Anybody else want to be heard before we move to the -- McKenna's 2005 work injury?

And the only reason I'm pressing ahead is because we spent so much time on the last argument, the testimony, and I think ultimately I -- I heard the arguments carefully of both counsel and that's how I am weighing it.

I do want to give you an opportunity -- an opportunity to put something on the record if you'd like.

MR. GINGRANDE:  Your Honor, the government would just, you know, for the record, say that it would have made the same arguments on that -- on the other category of evidence that you've already ruled on.

MS. GRAHAM:  I have nothing to add, your Honor.

THE COURT:  Okay.  All right.  Thank you.

All right.  So the 2005 work injury and the worker's comp award, who testifies as to this and how is this coming in?

MR. GINGRANDE:  So, your Honor, it's -- just to make sure we're on the same page, that is that Mr. Craigue provided worker's compensation insurance to Mr. McKenna for a work-related injury in 2005 and continued --

THE COURT:  Keep talking.  I can hear you. I'm going to shut my door.

MR. GINGRANDE:  And that he continued --

THE COURT:  Go ahead.

MR. GINGRANDE:  -- worker's compensation through June 25th, 2016.  Is that right?

THE COURT:  Yes.  This is evidence of Mr. McKenna's 2005 work injury and his worker's comp award.

MR. GINGRANDE:  Yes.  So, again, this -- this

testimony would -- well, we've already discussed the
paying worker's compensation through June 25th, 2016,
and how that comes in and then the -- the -- the fact
that he had -- Mr. McKenna had applied for worker's
compensation and received it from Mr. Craigue is -- is
testimony that would come in through -- through Mr. --
Mr. Erickson.

          THE COURT:  So basically Mr. Erickson talked
to Mr. McKenna when he was alive and learned this from
him.

          MR. GINGRANDE:  Yes, your Honor.  And I would
just --

          THE COURT:  Okay.

          MR. GINGRANDE:  I would -- and if there are
any other sources of evidence for that -- any other
source of evidence, excuse me, to support his injury
that we plan to introduce, I would defer to Attorneys
Davis and Dronzek on that issue.

          MR. DAVIS:  So, Judge, I'm not certain about
this.  Maybe Ms. Dronzek is.

          But I believe there is a state record of the
worker's comp payments so that there is -- there is a
labor record that documents, I think, that that payment
occurred.  I'm not a hundred percent on that.

          THE COURT:  Okay.  Attorney Graham.

MS. GRAHAM:  I think that evidence, your
Honor, is cumulative as well as prejudicial; cumulative
in the sense that the Court has already decided that my
client's own statements are coming in to say that he had
workman's compensation until 2016.  So I think it only
serves as propensity and to prejudice my client because
then what they'll hear is potentially not only was this
injury in 2018, potentially in 2017 if the Court rules
that that comes in, and then again in 2005.

And, again, it's -- the jury is just going to
decide this case based on just being very unhappy with
Mr. Craigue's treatment of this particular individual.

It really does not bring any -- anything to
the table in the sense that -- other than to show that
he was injured previously, so I would ask the Court to
exclude it.

THE COURT:  Attorney Gingrande.

MR. GINGRANDE:  Well, your Honor, this is --
this is not a prior bad act even.  I mean, this is --
this is an instance in which he was actually providing
worker's compensation.  I don't understand what -- how
that would infuriate a jury.  Here the evidence is that
he actually --  that -- that Mr. McKenna filed for
it and received it.

So I -- I'm not quite sure why we're -- we're

even, you know, discussing this in the context of -- of
it being unfairly prejudicial.

And, again, this evidence is -- is intrinsic,
you know, to this case in the sense that it -- it does
show, again, that Mr. Craigue knew he had an obligation
to pay for worker's compensation for his employees and,
therefore, it supports that he knew McKenna was his
employee.  And there's no evidence of -- at least that
the government is aware of -- showing that that
employment relationship changed at some point between
2005 and the present such that he would not need to
provide worker's compensation to his -- to his
employees.

So this is, you know, direct signs or evidence
showing that he knowingly made -- well, it's -- it shows
his knowledge of the status of the employee and, again,
there's nothing about it that's a bad act.  It's --
it's -- if anything, you know, it just shows that he
paid this worker's compensation claim.  It's not -- I
just don't think that would engender unfair prejudice.

THE COURT:  I think the fact that he was
injured on the job on three separate occasions is going
to cause the jury not to -- not to think well of
Mr. Craigue.  Nonetheless, I do think that this is
admissible.  I think that no details with respect to

this 2005 injury, the fact that he had an injury, and the fact that Mr. Craigue paid, you know, and that he -- there was a worker's compensation award I do think is relevant, but needs to come in.

If there is some document that would -- that would detail this, that seems the easiest way to bring it in and bring it in without really any prejudicial details.

So there should be no details about any injury, just that he -- he had an injury and it was -- and he got worker's comp for it.  And I do think it is relevant and I'm not seeing that its relevance is substantially outweighed by any of the other factors.

So that -- that portion of the motion is denied, although I am urging the parties to introduce it without details so that there aren't prejudicial and completely unnecessary details about the injury.

Okay.  So let me go back to -- let me come back to the 2017 injury because I definitely was flip-flopping there and I think ultimately Attorney Gingrande persuaded me that there is a piece of evidence that the jury will hear that's important that is not -- did not come out of Mr. Craigue's mouth and it is that Mr. McKenna did not have his own insurance.

So to that extent, it is probative.  I think

the risks can be minimized with respect to the details of the injury.  The fact that he was injured, he went to the hospital and, you know, that he did not have his own insurance or a way to pay for it I think is separately relevant and I -- I think that any prejudice can be minimized by keeping out the details, prejudicial details, of the injury.

And then I would obviously give a limiting instruction as well and I would urge counsel to propose limiting instructions with respect to any of this evidence before the trial so that I can review your limiting instructions and be ready to give those in a way that I think addresses -- addresses your concerns. And those are -- those limiting instructions I'm sure you can reach an agreement on.  Run those by each other, get agreement on them, and then give them to me, propose them to me.

But I think that with respect to the 2017 worksite injuries, ultimately that -- the motion is denied, that evidence comes in, assuming it comes in with no details, no prejudicial details, about -- about the injury.

Okay.  That takes care of document number 65. So I'm going to move that to the side and we're going to pick up Motion in Limine #2, which is document number

36.

And we're going to start with the extent of McKenna's injuries and the fact of his death. And I can tell you right now the fact of his death is -- is coming in. I -- I've looked at this and studied it. That -- I don't think that that's a close call. That's part of the -- it happened and it happened right before the statements and it's -- it's part of the narrative of this story, so I think the fact of his death comes in.

But let me hear -- with respect to the severity or the extent of the injuries that caused McKenna's death, any reason that you are intending to introduce that, Attorney Gingrande?

MR. DAVIS: Your Honor, I -- I'm on this pleading.

THE COURT: Okay.

MR. DAVIS: And the short answer is no. We would certainly introduce evidence of the -- of the scene and where -- where it happened. It's going to be obvious that it's a fall, but nothing about -- I mean, as we stated, nothing about the severity or details. We're not going to use death scene photos or blood, and consistent with the Court's other rulings, we -- we think we will be able to present those without inflammatory details.

THE COURT:  Okay.  Now, my recollection from something I read along the way a while ago about the case is that Mr. McKenna had some sort of issue, maybe a heart issue or something that caused him to be dizzy. He sat down, then he got back up and kept working, and then fell off the roof.  And that certainly was evidence that tended to indicate it wasn't some workplace issue; it was -- it was more an accident that happened because of his -- some sort of dizziness that he experienced.

So I don't -- obviously I want to give the defense an opportunity to weigh in on this.  Tell me why I'm wrong, that the fact of his death should be excluded, and -- and then with respect to his injuries and what happened, if you could address that as well.

Is this you, Attorney Mirhashem, or still Attorney Graham?

MR. MIRHASHEM:  It's Attorney Graham, your Honor.

MS. GRAHAM:  Yes, thank you, your Honor.

We would ask the Court to exclude it for the following reasons.  Now that the Court has ruled regarding the prior injuries, a jury is now going to hear that Mr. Craigue provided a worksite that resulted in an injury to Mr. McKenna in 2005, 2017, and then ultimately a worksite that resulted in his death.  And

that is unfairly prejudicial to Mr. Craigue.

Hearing this evidence, I can't imagine a jury
will ultimately decide the case on -- on the issue
before it, which is whether or not he knew that the
statement was false.  I don't -- I would argue that
there's no special relevance to that -- to that fact to
allow admissibility, especially given the Court's
rulings on the other prior injuries.

I think that I don't really have anything else
to say, your Honor, except that I think a jury hearing
all of those injuries, all occurring under Mr. Craigue's
watch, whether or not it was his fault or not, will
result in the jury just finding him guilty based on
those facts alone.

THE COURT:  Okay.  And what about what I was
just talking about, though, the fact -- the
circumstances of his death.  Is there evidence
consistent with what I'm talking about or am I
misremembering that?

MS. GRAHAM:  Well, no, you're correct in that
there is evidence to suggest that he -- he was not
feeling well before, but there's certainly other
evidence during the OSHA interview that clearly implied
that had safety precautions been used, then, you know,
this probably could have been avoided.

So, I mean, clearly he was found in violation by OSHA.  I know probably the jury's not going to hear that --

THE COURT:  No.

MS. GRAHAM:  -- but -- but that's part of the discovery, too.

THE COURT:  Okay.

All right.  Attorney Davis.

MR. DAVIS:  So, Judge, I think the Court has it right.  There's no way to try this case or to explain what happened without understanding at the beginning that Mr. McKenna died.

The -- the defendant is not charged with a workplace violation and the Court can protect the record, if necessary, with a limiting instruction and certainly by ensuring that improper arguments are not made and we do not intend to make improper arguments.

This case is not about Mr. Craigue's responsibility for the death of Kenneth McKenna.  The -- the fact that he died is simply a fact and the jury -- and juries hear facts about trauma and terrible things and tragedies, unfortunately, all the time and this case is no different.

This -- this case starts with a death, but the death is essential to the context to understand that

there's an OSHA investigation here, questions are being asked, and there are questions that -- that have to do with money and liability.  And those -- those are -- those are important here.

The -- it's also true that the -- where the death occurred and the site of the accident and death is -- is the site of some of the most probative evidence, which includes the interview being described in Count One and also a prior interview with Nick Ford just before the interview of Mr. Craigue where Mr. Ford lies to OSHA with his employer right there.

And it's also the site where Mr. Craigue, when he arrives on the scene and he gets with his new young employee, Mr. Ford, the one thing he tells him off to the side is, don't forget you're a sub and Skinny's a sub.  McKenna's name is Skinny.

And, also, when Mr. Erickson, who is home and not working, but when he hears about what happens and comes onto the scene, Mr. Craigue goes over to him and says -- said, he's just a subcontractor.

So Mr. Craigue is talking to both of his surviving employees and he's making sure that everyone's got their story straight about -- about the question of who's -- who's a contractor and who's an employee.

That's the most important evidence in the

case.  The jury has got to be able to understand that to
assess whether the defendant knowingly and willfully
lied.  And to present the story without -- without the
central fact that Mr. McKenna did fall and he did die
is -- is impossible.

In addition, as we argued, the fact that he
died explains why there's no witness.  The jury could
well wonder what -- why otherwise.

And, in addition, the fact of the death is
highly relevant to motive and intent to lie because the
fact that Mr. McKenna is gone obviously increases the
stakes when it comes to the liability of the employer or
not the employer as -- as things turn out when that
happens.  And that's the context in which Mr. Craigue is
dealing with OSHA and making the statements he's doing.

So I don't want to -- I don't want to belabor
it again.  You have our pledge that we're not making
this a -- a case about workplace safety and we're not
making it a case about blood and gore about Mr. McKenna.
But there's no way to deal with this story in a sensible
way without admitting to that and I think it can be done
in a way that -- that is still a very fair trial.

THE COURT:  Is it possible, Attorney Davis, to
agree that the defense could at least elicit with
respect to his death the fact that he had felt dizzy,

sat down, and then he got up and continued to work despite being dizzy and he fell to his death?  It makes it sound like he died on the worksite, which is the fact, you know, obviously you need and that you're arguing should be admitted, but it doesn't demonize and blame Mr. Craigue for the death.

Now, obviously there's other evidence that apparently exists in the record, but it seems to me that if there is truth to that, that that helps, I think, soften the blow, so to speak, of what could be prejudicial evidence that -- along the lines Attorney Graham just described.  He had an accident in 2005, he didn't die; 2017, another accident on the job, didn't die; but in 2018, fell to his death.  It seems -- it seems as though that would soften the prejudice to the defense and to Mr. Craigue.

Is that something that you would agree that the defense could elicit from perhaps Erickson or Ford or whomever?

MR. DAVIS:  It would be Mr. Ford, who was with him when that was going on.  So Mr. Ford would be the witness and certainly we'd have no objection to that. That's part of the story.

And, yes, he did -- it was a very hot day and he did feel dizzy and he took a rest and then he went

back up.  So certainly we'd have no objection to --

      THE COURT:  Okay.

      MR. DAVIS:  -- speaking to Mr. --

      THE COURT:  And that won't open --

      MR. DAVIS:  Right.

      THE COURT:  And you'd agree that wouldn't open the door to basically irrelevant evidence; that would go to what could have prevented the accident.

      MR. DAVIS:  Yes, that's correct, it would not open --

      THE COURT:  All right.

      MR. DAVIS:  We would not argue it opened the door, that door.

      THE COURT:  All right.

      Attorney Graham, do you want to say anything else?

      MS. GRAHAM:  Yes, your Honor.

      I think that the case certainly could be tried without the jury hearing about the death.  It is not an essential fact for the jury to consider.

      A jury could easily be instructed that OSHA came on-site because of an accident, which is true, and that the witness is unavailable to each side for trial and that no negative inference can be taken from that fact.  So I -- I disagree that it could not be tried

without that information before the jury.

And whether or not, you know, the jury may hear that it was a hot day and, you know, he fainted, hearing that he was injured on two prior occasions and on this one he died I think really does not soften the blow, you know, to the degree that would be necessary to have a fair trial.

And I think that where the government is saying that we're not -- well, they're not trying this as, you know, an issue about liability, but I think that that's really -- they're saying that my client has a motive and that the motive is liability.  And so I don't think that that will be lost on the jury that -- that the death was somehow caused by him or that he's responsible because that is the theory of the government's case.

THE COURT:  Okay.  I do think that the -- the fact of death is highly relevant to Mr. Craigue's state of mind and his -- what he thinks in terms of what's going to be uncovered when OSHA comes and investigates. The stakes are much higher and he's telling one of his employees on the site, don't forget, you know, you're a contractor -- you're a sub.  I think it is relevant.

Because the government agrees that the evidence of the extent and severity of McKenna's fatal

injuries is more prejudicial than probative and ought to be excluded and they're willing to allow defense to elicit the fact that it was an accident or it appears to have been an accident, I am granting your motion in limine to exclude that evidence pursuant to Rule 403.

As to evidence regarding the fact that McKenna died while working for Craigue, I'm going to deny your motion to exclude that evidence.

Regarding 401, the evidence is relevant because as I just described and also Craigue himself acknowledges that it tends to explain why OSHA initiated its investigation.  The government is required to prove that Mr. Craigue made the charged statements in a manner within the jurisdiction of the federal government. Craigue's death is relevant to explain why OSHA commenced its investigation.

Now, regarding Rule 403, while evidence of McKenna's death is relevant to explain OSHA's investigation, it's not exceedingly probative on that. It seems quite likely the government will have additional evidence proving that Craigue's statements were made in an OSHA investigation.

It also strikes me as unlikely that Craigue will vigorously dispute that his statements were made in a manner within the federal government's jurisdiction

and if he does not do so, this evidence's probative value would be further reduced for that reason.

Nevertheless, while the evidence is not exceedingly probative, its probative value is not substantially outweighed by the danger of unfair prejudice. Without graphic details on the manner of his death, the mere fact that McKenna died while working for Craigue will not invite the jury to render a verdict on an improper emotional basis and without any details of the severity of the injury, without more details about this death, I do not see the evidence as explosive in that way.

The evidence -- evidence's probative value is -- I think it is strong in terms of it provides that context that is highly charged and I think it's important for the jury to hear. That's something that certainly would motivate Mr. Craigue to make statements that he made. With respect to the fact of the government investigation, I think the probative value is lower. But where I think there's -- at least it's close, it's a close call here in terms of unfair prejudice, Rule 403 tilts in favor of admission. So I would resolve this one in favor of admissibility under Rule 403.

Now, regarding 404(b), McKenna's death is

intrinsic to at least one of the charged offenses.  It's intrinsic evidence and I -- I note your citation to the circuit case, I think Fourth Circuit case, *Brizuela,* that you talked about, Attorney Graham, early on.  I agree with you that intrinsic evidence is not just evidence that completes a story, but here this evidence is more than just completing a story.  These are prior acts that are part of the necessary description of the events leading up to the crime.

So McKenna's death on that date in August more -- mere moments before Mr. Craigue made his first allegedly false statement, I believe it is intrinsic and is necessary to describe the events leading up to the alleged crime.  And, again, its probative value is not substantially outweighed by unfair prejudice.

For these reasons, Craigue's motion in limine is denied to the extent it seeks to exclude evidence that McKenna died while working for Craigue on that date and the motion is granted to the extent it seeks to exclude evidence regarding the severity or extent of the injuries causing his death.

All right.  The next argument deals with Erickson's and Ford's respective employment statuses. And this one, you may have already predicted, I am inclined to grant this one in full, but I know that

Attorney Gingrande had warned me that there were these other issues that I needed to keep an open mind about with respect to Erickson and Ford and that may end up being necessary for the government to put on its case.

So let me hear -- go ahead.  Let me -- Attorney Davis, are you arguing this one?

MR. DAVIS:  Yes, your Honor.

And I don't think I --

THE COURT:  Go ahead.

MR. DAVIS:  -- have a lot to add.  I don't -- I know you've thought about this already.

Again, in our view, there is a pattern and practice and plan and scheme here.  This is not just a false statement case.  It's a fraudulent statement case. And this is about a fraud on both the federal government and the state government regarding labor laws.

And -- and so the way that Mr. Craigue deals with both Erickson and Ford, in addition to McKenna, and in a situation where he treats them all exactly the same, that is, he pays them cash, he pays them Fridays, there's no paperwork, there's no insurance, there's no tax forms, and there's certainly no worker's comp, that -- that's what's going on here.  And the best evidence of that, that scheme and plan which are so intentional on the part of Mr. Craigue, is the two other

surviving people who were living the same experience.
So we -- we do -- we continue to view it as highly
probative.

And Erickson -- Erickson is much -- it is --
there is a sense in which Erickson's testimony is -- is
sort of made hollow, and I'm trying to think how he does
this, because much of what he's going to say is about --
or what he'd otherwise say is how he's treated and how
he's treated with McKenna.  And -- and if anything about
his employment relationship with Craigue is out, then he
is limited to his personal observations and personal
knowledge.

So it is what it is, but we -- we continue to
believe that it -- both Erickson and Ford -- and Ford
was around only a short time, Erickson for two years --
but they both have very probative things to say about
exactly what Mr. Craigue was doing here and we do think
it is part of the scheme and part of a fraud.

So I think -- you know, I feel like we've
already argued this and the Court's ruled, so I don't --
I don't really have anything more to add.

I guess one other thing, and I think
Mr. Gingrande already said it, but on Count Two, I think
it's hard to ask the jury to make a finding beyond a
reasonable doubt on someone's intent when they aren't

given the data and the information about half of the
question and half of the answer.  That has -- that's
just kind of a hard thing to do.  You're being asked as
a juror to assess whether someone's lying and -- and an
aspect of the Court's ruling here is that if anything
about Erickson's employment status is off limits, the
jury doesn't know about that and doesn't know if the --
what the answer to the question, whether the -- whether
that part of the answer to the question might have been
true or it might have been confused or it might have
been different or -- so that -- that in particular is an
unfortunate aspect of excluding entirely the information
about Erickson's employment.

        But that -- I don't want to belabor this.  I
know the Court has thought about this.  So that's all I
have on that.

        THE COURT:  Okay.  And with respect to the
last point -- and, again, I know we have -- I've already
queried Attorney Gingrande about this, but Count Two
specifically talks about the materially false,
fictitious, fraudulent statement by stating to an OSHA
person that K.M., who had died as a result of a
workplace accident, was not an employee.  And then it
goes on to describe the context of the statement.

        But it's clear -- and the jury -- just the

fact -- I mean, the jury will hear perhaps some evidence, you know, that he basically treated all his employees the same way.  Craigue may make statements to that effect.  I haven't -- I haven't seen the sum total of his statements.

But the jury knows, looking at Count Two, they've got to figure out whether or not it was false as to McKenna.  And so they may think that, in fact, Erickson was the same, but they know that the count -- and I'm going to tell them the count makes clear that they have to decide whether he lied as to McKenna.

So ultimately what they think about Erickson is not going to necessarily -- is not going to be controlling or dispositive in terms of figuring out whether or not the statement was false as to McKenna as it's charged.

So I -- I think that ultimately I come down on this exactly the same way I've come down on it earlier, which is that this -- this evidence could potentially really confuse the jury and I think I am completely comfortable with *Darden* factors and evidence going to *Darden* factors with respect to McKenna, but not with respect to Erickson and Ford.  And having Erickson and Ford talk a great deal about their own employment relationship, ultimately, I think, is -- is potentially

going to confuse this jury.

So I just do not want to introduce that
because I think it is in some ways even misleading, not
to mention that it would be -- you know, it would cause
some delay, hearing all the evidence and the jury
wondering, why -- why am I hearing all of this evidence
about Ford's, you know, contracts and Ford's -- whether
Ford brings his own -- his own equipment.

These two guys worked with McKenna.  They can
talk about what they saw and what they witnessed.  And
then you've got Craigue's statements.

So ultimately I just -- I do not think that
this evidence should come in.  I'm worried about any
probative value being substantially outweighed by
confusion of the issues.

Attorney Graham, do you want to say anything,
add anything to the record at this point?

MS. GRAHAM:  No, thank you.

THE COURT:  Okay.  The next one is Erickson's
injuries.

I've already ruled on this ultimately, so this
portion of the defendant's second motion in limine is
granted for the same reasons I excluded the evidence in
the 404(b), document number 65, and the same reasons I
stated on the record.

Okay.  Now we're looking at under the table, payments under the table, and I think on this one you may -- I think the fact that McKenna was paid under the table and there's evidence of that is probative.  With respect to Erickson and Ford, again, I feel the same way with respect to confusing the jury.

But, again, tell me why I'm wrong about that. I know you agree with me on McKenna, but do you have anything else to say with respect to payment under the table and why it needs to come in as to all these employees?  Are these the -- are these the three sole employees from the time of the accident forward or --

MR. DAVIS:  Yes.  Yes, certainly at the time of the accident.

THE COURT:  -- or these contractors?

MR. DAVIS:  I don't know the -- the history going back as well, so I'm not going to say they're the only three employees Mr. Craigue had ever.  But certainly at the time of the accident, the two employees were McKenna and Ford, and Erickson was recovering.  He was at home and not working, but recovering from the fall a month before.

So -- and, Judge, I have nothing more to add --

THE COURT:  Okay.

MR. DAVIS:  -- on this.

THE COURT:  Well, I'll give Attorney Graham, obviously, an opportunity to say something here, but I just want to be clear that I'm worried about confusing the jury.  I'm not worried here about unfair prejudice.  I don't think there's unfair prejudice here.  I think ultimately if there is evidence that comes in and Erickson essentially is talking about the two of us always got paid together, he was my roommate and we got paid on Friday in cash, we got paid under the table, and he describes it that way and we're not asking Erickson and Ford for details about their own relationship and workplace relationship, I'm not as concerned about that kind of evidence coming in somewhat incidentally because that's McKenna's -- you know, McKenna remembers that -- I'm sorry -- Erickson will remember that McKenna got paid in the same way he got paid.  He saw it.  He witnessed it.  And I feel like that's incidental and that is not going to -- that is not going to confuse the jury.

So I just want to be clear that my concern is having a lot of testimony about Erickson and Ford that is completely untethered from testimony about McKenna.  If it's essentially in the same sentence, in the same breath, then of course I'm not going to make you have

him sever -- sever it.  That's not what I'm saying.
I -- I hope I'm clear about that.  I'm just concerned
about having the jury get confused about which employee
we're talking about and which factors apply.

So, Attorney Graham, go ahead.

MS. GRAHAM:  Your Honor, I -- I think I
understand the Court's ruling.  I -- I would just add
that I think the context of under the table -- I mean, I
understand the Court is saying on a cash basis or how
they were paid and I understand the Court's ruling and I
don't really have anything in addition to say other than
what was in my motion, but I think the words "under the
table" does present some connotation of unlawfulness and
is really just a -- you know, sends a message to the
jury that he was doing unlawful activities.  And so I
think that I would just ask the Court to have the
witnesses refrain from using that kind of terminology.

THE COURT:  Attorney Davis?

MR. DAVIS:  I don't -- I think we can live
with that unless it's a phrase that someone heard Mr. --
the defendant actually use and say.  If the defendant
used and said it, I think it's probative.  If the -- if
the question is a witness is describing cash payment, I
don't -- I don't have a problem not asking them was it
under the table.

THE COURT:  Let me just say that I appreciate the government's willingness to limit it to, you know, if it's a statement of Mr. Craigue.  I do see -- I could see a witness saying, oh, he paid us under the table.  I can tell you that that is not going to cause me great concern.  I think if you can, you know, limit the way in which you ask this question to accommodate Attorney Graham's concern about this sort of negative connotation of under the table.

But I do think that is a phrase -- most people understand what that means and it means you're paying cash and you're hiding, essentially, the amount you're paying someone and it's such a commonly understood phrase.  Were it to slip out of someone's mouth during the trial, I can tell you that I am -- I'm not going to be too concerned about that.  But, again, I think the government's willing not to certainly use that terminology in asking questions or framing questions and I think that is completely fair.

So with respect to evidence that McKenna, Erickson, and Ford were paid under the table, paid in cash, I am going to grant that evidence -- that motion with respect to Erickson and Ford.  I'm going to deny it with respect to evidence of McKenna being paid in cash only and -- with the qualifications that I've -- that

I've described to you about evidence regarding Erickson
and Ford coming in somehow incidentally as part of a
story.

Okay.  Now, I think the next ones get a little
easier, if I'm not mistaken.

So the next one is evidence that OSHA or
Department of Labor issued violations or judgments
against Mr. Craigue or made a determination that
Mr. McKenna was an employee.  The government agrees, and
so they're not going to be introducing any such
evidence.  So that motion's granted.

Evidence that Mr. Craigue's work equipment or
worksite was unsafe, the government also agrees that
it's not going to elicit any evidence of the sort.  So
to the extent that motion seeks to exclude evidence that
Mr. Craigue's work equipment was unsafe or faulty or
that the worksite was unsafe, that motion is granted.

All right.  And the last one I believe you
were going to meet and confer on and agree on
redactions, if I'm not mistaken.  And I think you all --
both sides agree that portions of Mr. Craigue's recorded
statement on that at the time that he was -- he was
taped, I guess, with an OSHA interview in October,
October 24th of 2018, that portions of that contains
inadmissible evidence and that you were going to sit

down and just go through and redact that evidence.

So I'm going to just say that to the extent you're unable to reach full agreement on that that the defendant can renew and supplement the request to exclude this recorded statement, but otherwise it seems as though I can fairly deny it as moot because the government's going to agree to redact.

Any problem with that, Attorney Graham --

MS. GRAHAM:  No, your Honor.

THE COURT:  -- resolving it that way?  Okay.

All right.  We got through all of them, I believe.  And so anything else left to cover?

MR. DAVIS:  I don't think so, Judge.  We are working on the jury instruction issue and we've had some communication about that, so we should be back to you soon on that.

THE COURT:  Okay.  Good.

All right.  And hopefully -- I mean, we have a trial scheduled for April, isn't that right, mid-April?

MR. MIRHASHEM:  (Shakes head.)

MS. GRAHAM:  (Shakes head.)

THE COURT:  Let's just hope that we will get this trial in in April.  My -- that's my hope.  And I don't have any reason to believe we won't at this point, so I'm -- I'm going to remain hopeful.

So, in any event, everybody, thank you very much for your written submissions, your oral advocacy. I appreciate it.  And I'll have just a summary order out shortly.

Thank you, everybody.

Court is adjourned.

MR. GINGRANDE:  Thank you, your Honor.

(Proceedings concluded at 5:06 p.m.)

C E R T I F I C A T E


        I, Liza W. Dubois, do hereby certify that

the foregoing transcript is a true and accurate

transcription of the within proceedings, to the best of

my knowledge, skill, ability and belief.


Submitted: 2/11/21        */s/  Liza W. Dubois*
                          LIZA W. DUBOIS, RMR, CRR