UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

* * * * * * * * * * * * * * * * * * *
                                    *
UNITED STATES OF AMERICA            *
                                    *   1:19-cr-142-01-LM
              v.                    *   June 8, 2021
                                    *   2:55 p.m.
NATHAN CRAIGUE                       *
                                    *
* * * * * * * * * * * * * * * * * * *


TRANSCRIPT OF JURY TRIAL DAY 2
AFTERNOON SESSION
BEFORE THE HONORABLE LANDYA B. McCAFFERTY


Appearances:


For the Government:         John S. Davis, AUSA
                            Aaron G. Gingrande, AUSA
                            United States Attorney's Office


For the Defendant:          Dorothy E. Graham, Esq.
                            Behzad Mirhashem, Esq.
                            Federal Defender's Office


Court Reporter:             Liza W. Dubois, RMR, CRR
                            Official Court Reporter
                            United States District Court
                            55 Pleasant Street
                            Concord, New Hampshire 03301
                            (603)225-1442

**I N D E X**

| | PAGE |
|---|---|
| **PRELIMINARY INSTRUCTIONS** | 4 |
| **OPENING STATEMENTS** | |
| By Mr. Davis | 15 |
| By Ms. Graham | 25 |

| **WITNESS:** | **Direct** | **Cross** | **Redirect** | **Recross** |
|---|---|---|---|---|
| ROBERT WILKINS | | | | |
| By Mr. Gingrande | 30 | -- | | |

| **EXHIBITS:** | **FOR ID** | **IN EVD** |
|---|---|---|
| (None admitted.) | | |

1          P R O C E E D I N G S

2          MR. MIRHASHEM:  We do move for the witnesses to be

3    excluded so they can't hear each other's testimony.

4          THE COURT:  Yeah.  Sequestration?  Go ahead.  I'm

5    glad you brought that up.

6          Go ahead, Attorney Mirhashem.

7          MR. MIRHASHEM:  Your Honor, Rule 615 provides that

8    at the request of the party, the Court must order witnesses be

9    excluded so they can't hear each other's testimony.  We are

10   making such a request.  And that's our motion.

11         THE COURT:  Okay.  No problem with that.

12         MR. DAVIS:  No objection, only to note that our

13   designated representative is Case Agent Sean Roberts, who's now

14   seated in the courtroom.  He is on our witness list and is also

15   our case agent.  So we do ask that --

16         THE COURT:  Okay.  You don't have any objection to

17   him being in the courtroom through the trial?

18         MR. MIRHASHEM:  We don't.

19         THE COURT:  Okay.

20         MR. DAVIS:  Thank you.

21         THE COURT:  Okay.  And there is going to be another

22   witness that will be listening in to opening statements.  Do

23   you have any objection that that?

24         MR. MIRHASHEM:  He's not in the courtroom.

25         MR. DAVIS:  He's not here, Judge.

1          THE COURT:  Okay.

2          MR. DAVIS:  I mean he's not in the courtroom.

3          THE COURT:  Okay.  All right.

4          I'm just standing because I prefer to stand.  I'm

5   waiting for the jury.

6          THE CLERK:  So we're all set?  I wanted to make sure

7   there are no other issues.

8          THE COURT:  Yes.

9          THE CLERK:  Okay.

10                    WITH THE JURY PRESENT

11          THE CLERK:  The Court has before it for

12   consideration today jury trial in the United States vs. Nathan

13   Craigue.  It is 19-cr-142-01-LM.

14          THE COURT:  Members of the jury, before we begin the

15   trial, I would like to tell you about what will be happening.

16   I want to describe how the trial will be conducted and explain

17   what we will be doing.

18          At the end of the trial, I will give you more

19   detailed guidance in writing on how you're to go about reaching

20   your decision, but now I simply want to explain how the trial

21   will proceed.

22          This criminal case has been brought by the United

23   States Government.  I will sometimes refer to the government as

24   the prosecution.  The United States Government is represented

25   at this trial by Assistant U.S. Attorneys John Davis and Aaron

1  Gingrande.  The defendant, Nathan Craigue, is represented by

2  his lawyers, Dorothy Graham and Behzad Mirhashem.

3          The charge against Mr. Craigue is contained in the

4  indictment.  The indictment is simply the description of the

5  charge made by the government against Mr. Craigue.  It is not

6  evidence of anything.

7          Mr. Craigue pled not guilty to the charge against

8  him and denies committing the crime.  Mr. Craigue is presumed

9  innocent and may not be found guilty by you unless all 12 of

10  you unanimously find that the government has proven

11  Mr. Craigue's guilt beyond a reasonable doubt.

12          Nathan Craigue is charged in an indictment with one

13  count of having violated a federal law by knowingly and

14  willfully making a materially false, fictitious, and fraudulent

15  statement and representation to a federal agent.

16          The first step in the trial will be the opening

17  statements.  The government in its opening statement will tell

18  you about the evidence which it intends to put before you so

19  that you will have an idea of what the government's case is

20  going to be.

21          Just as the indictment is not evidence, neither is

22  the opening statement.  Its purpose is only to help you

23  understand what the evidence will be and what the government

24  will try to prove.

25          After the government's opening statement,

1    Mr. Craigue's attorney will make an opening statement.  At that

2    point in the trial, no evidence will have been offered by

3    either side.

4            Next the government will offer evidence that it says

5    will support the charge against Mr. Craigue.  The government's

6    evidence in this case will consist of the testimony of

7    witnesses as well as documents and exhibits.

8            Some of you have probably heard the terms

9    circumstantial evidence and direct evidence.  Do not be

10    concerned with these terms.  You are to consider all the

11    evidence given in this trial, both circumstantial and direct.

12            After the government's evidence, Mr. Craigue's

13    lawyers may present evidence on Mr. Craigue's behalf but are

14    not required to do so.  I remind you that Mr. Craigue is

15    presumed innocent and the government must prove his guilt

16    beyond a reasonable doubt.  Mr. Craigue does not have to prove

17    his innocence.

18            After you have heard all the evidence on both sides,

19    the government and the defendant will be given time for their

20    final arguments.  I just told you that the opening statements

21    by the lawyers are not evidence.  The same applies to the

22    closing arguments.  They are not evidence either.  In their

23    closing arguments, the lawyers will be attempting to summarize

24    their cases and help you understand the evidence.

25            The final part of the trial occurs when I instruct

1    you about the rules of law which you are to use in reaching

2    your verdict.  I will give each of you a copy of my written --

3    of my instructions and I will read them to you out loud.  After

4    hearing my instructions, you will leave the courtroom together

5    to make your decision.  Your deliberations will be secret.  You

6    will never have to explain your verdict to anyone.

7              Now that I have described the trial itself, let me

8    explain the jobs that you and I are to perform during the

9    trial.

10             I will decide which rules of law apply to this case.

11   I will decide this in response to questions raised by the

12   attorneys as we go along and also in the final instructions

13   given to you after the evidence and arguments are completed.

14   You will decide whether the government has proved beyond a

15   reasonable doubt that Mr. Craigue committed the charged crime.

16             To help you follow the evidence, I will now give you

17   a brief summary of the elements of the crime charged, each of

18   which the government must prove beyond a reasonable doubt to

19   make its case.

20             For you to find Mr. Craigue guilty of having

21   violated federal law by making a materially false, fictitious,

22   and fraudulent statement or representation to a federal agent,

23   you must find beyond a reasonable doubt each of the following

24   five elements:

25             First, on or about the date specified in the

1    indictment, the defendant made a false, fictitious, or

2    fraudulent statement or representation; second, the statement

3    or representation was material; third, the statement or

4    representation was made knowingly; fourth, the statement or

5    representation was made willfully; fifth, the statement or

6    representation was made in a matter -- in a matter within the

7    jurisdiction of the government of the United States.

8              I will explain all of these elements in greater

9    detail at the end of the trial.

10             It bears noting at this point, however, that this is

11   a false statement case.  The statement alleged to be false is a

12   statement that two of Mr. Craigue's workers were contractors

13   and not employees.  In order to prove that this statement is

14   false, the government must prove beyond a reasonable doubt that

15   at least one of these workers was, in fact, Craigue's -- Mr.

16   Craigue's employee.

17             In order to prove that a worker was an employee of

18   Mr. Craigue as opposed to merely a contractor, the government

19   must prove that Mr. Craigue had the power to control the manner

20   and means of the person's work.  This is a -- the key

21   distinction between employees and contractors.  There are many

22   factors to consider when evaluating whether an employer has the

23   power to control the manner and means of a particular person's

24   work.  I will instruct you on these factors at the end of the

25   trial.

1          Again, what I've just given you is only a

2  preliminary outline.  At the end of the trial, I will give you

3  a final and controlling set of instructions on these matters.

4          During the course of the trial, you should not talk

5  with any witness or with Mr. Craigue or with any of the lawyers

6  in the case.  Please don't talk with them about any subject at

7  all.  In addition, during the course of the trial, you should

8  not talk about the trial with anyone else, not your family, not

9  your friends, not the people you work with, or not even your

10  fellow jurors.  You should not discuss this case among

11  yourselves until I have instructed you on the law and you've

12  gone to the jury room to make your decision at the end of the

13  trial.  It is important that you wait until all the evidence is

14  received and you have heard my instructions on the law before

15  you deliberate among yourselves.

16          Further, you should not communicate with anyone else

17  or the outside world about this case during any part of the

18  trial.  This prohibition applies to both receiving information

19  and to giving information.  Do not email about it, text, tweet,

20  or share information about it on any blog or website, including

21  Facebook, Google+, MySpace, LinkedIn, or YouTube.  You may not

22  use any similar technology or social medium, even if I've not

23  specifically mentioned it here.  To disseminate any information

24  about the trial during the trial, whether to your family or a

25  coworker or to the world at large, would violate both my

1    instructions and the court's rules and could lead to a mistrial

2    of this case.

3            Let me add that during the course of the trial, you

4    will receive all the evidence you properly may consider to

5    decide in this case.  Because of this, you should not attempt

6    to gather any information on your own which you think might be

7    helpful.  Do not engage in any outside reading on the case, the

8    matters in the case, or the individuals involved in the case.

9    Not on the Internet, not in the library, not in your own house.

10   Do not attempt to visit any places mentioned in the case and do

11   not in any other way try to learn about the case outside of the

12   courtroom.

13           Now that the trial has begun, you must not read

14   about it in the newspapers or watch or listen to television or

15   radio reports or read Internet news reports, blogs, chat rooms,

16   or anything else about what is happening here.

17           Many people watch television shows and movies about

18   courts or lawyers and the criminal justice system.  Sometimes

19   people are affected by that when they serve as jurors.

20   Television shows and movies can create false expectations about

21   real life; for example, how the trial is going to proceed or

22   what the evidence might look like.  You must decide this case

23   on the evidence before you and the law as I give it to you.  Do

24   not decide this case even in part based on something you saw on

25   television or in a movie.  That is improper and unfair.

1          The reason for these rules, as I'm certain you will

2     understand, is that your decision in this case must be made

3     solely on the evidence presented at this trial.  I expect you

4     will inform me if you become aware of any violation of my

5     instructions.

6          At times during the trial a lawyer may make an

7     objection to a question asked by another lawyer or to an answer

8     by a witness.  This simply means that the lawyer is requesting

9     that I make a decision on a particular rule of law.  Do not

10    draw any conclusions from such objections or from my rulings on

11    the objections.  These only relate to the legal questions that

12    I must determine and should not influence your thinking.

13         If I sustain an objection to a question, the witness

14    may not answer it.  Do not attempt to guess what the answer

15    might have been had I allowed the question to be answered.

16    Similarly, if I tell you not to consider a particular

17    statement, you should put that statement out of your mind and

18    you may not refer to that statement in your later

19    deliberations.

20         Further, a particular item of evidence is sometimes

21    entered for a limited purpose.  That is, it can be used by you

22    for a particular purpose and not for any other reason.  I will

23    tell you when that occurs and instruct you on the purposes for

24    which the item can and cannot be used.

25         During the course of the trial I may ask a question

1    of a witness.  If I do, that does not indicate I have any

2    opinion about the facts in the case.  You should not take

3    anything that I may say or do during the trial as indicating

4    what I think about the evidence or what your verdict should be.

5               Now, let me clarify something ahead of time that may

6    occur in this case.

7               During the course of the trial, I may have to

8    interrupt the proceedings to confer with the attorneys about

9    the rules of law which should apply here.  Sometimes we will

10   talk here in the courtroom using the silent microphone system,

11   but some of these conferences may take time, so as a

12   convenience to you and to make sure you're as comfortable as

13   possible, if a conference is going to take some time or I think

14   it will, I will excuse you from the courtroom.  I will try to

15   avoid such interruptions as much as possible, but please be

16   patient even if the trial seems to be moving slowly because

17   these conferences often end up saving time for all of us.

18              If at any time during the trial you have a problem

19   you'd like to bring to my attention, please inform the

20   courtroom deputy.  This goes for all issues.  If you feel ill

21   or need to take a restroom break, just let the courtroom deputy

22   know.  I want you to be comfortable.  So please do not hesitate

23   to tell us about any issues.

24              Finally, in this trial you'll have the permission to

25   take notes during the evidence.  The fact that you've been

1    given permission to take notes does not in any way require you

2    to do so.  However, if you decide to take notes, you must

3    observe the following limitations with great care.

4              First, do not allow your note-taking to distract you

5    from listening carefully to the testimony that is being

6    presented.  It's important that you observe and listen to the

7    witnesses.  If you would prefer not to take notes at all but

8    simply to listen, please feel free to do that.

9              Please remember also that not everything you write

10   down is necessarily what was said.  Thus, when you begin your

11   deliberations, do not assume simply because something appears

12   in somebody's notes that it necessarily took place in court.

13   Notes are an aid to recollection, nothing more.  The fact that

14   it's written down doesn't mean that it's necessarily accurate.

15   With these limitations, you are granted permission to take

16   notes.

17             At the end of each day and during any breaks during

18   the day, please place your notes in the envelope which has been

19   provided to you.  That envelope will be taken and secured each

20   night.  The envelope will be returned to you at the beginning

21   of each day.  At the conclusion of the case, after you have

22   used your notes in deliberations, they will be collected and

23   they will be destroyed.  Nobody will see them.  No one will

24   violate the secrecy of your deliberations.

25             As you can see, we have a court reporter who is

1    creating a record of everything that happens in this trial.

2    Sometimes jurors think that they will be able to have a

3    transcript of the trial when they go back to the jury room.

4    That is not true.  You will not be given a transcript.  There

5    are a number of reasons for that, but one of the reasons is

6    strictly practical.  Usually there's not enough time to prepare

7    one.  The court reporter has a difficult job and it's a

8    time-consuming task to take a raw record which she is creating

9    and turn it into a final transcript.  So you will not have a

10   transcript and you should, therefore, listen very carefully and

11   take whatever notes you think may be necessary to help you

12   remember the testimony.

13          If you choose not to take notes, remember that it's

14   your own individual responsibility to listen carefully to the

15   evidence.  You cannot give this responsibility to someone who

16   is taking notes.  We depend on the judgment of all members of

17   the jury.  You all must remember the evidence in this case.

18          Finally, do not discuss this case with your fellow

19   jurors until all the evidence is in, you've heard my

20   instructions on the law, and I instruct you to begin your

21   deliberations.  Similarly, do not make up your mind about what

22   the verdict should be until after you and your fellow jurors

23   have discussed the evidence and deliberated.  Keep your mind

24   open and do not ever forget that Mr. Craigue is presumed

25   innocent of this charge now, throughout this trial, and

1    throughout your deliberations until such time as all 12 of you

2    find that the government has proven each element of a charged

3    crime beyond a reasonable doubt.

4              Thank you for your attention.  Now we will begin

5    opening statements.  We will hear first from the government,

6    Attorney John Davis.

7              MR. DAVIS:  Good afternoon.  This is a false

8    statements case.  It's about two men, Kenny McKenna, and the

9    defendant, Mr. Nathan Craigue, and a workplace relationship

10   that lasted more than 20 years.

11             Kenny McKenna was a carpenter and a laborer.  He was

12   noticeably thin and most everyone called him Skinny.  He was

13   loyal and he devoted most of his life to working for Craigue &

14   Sons Home Exteriors, LLC, also called Craigue & Sons for short.

15             Craigue & Sons is a business here in Concord that

16   installs siding and windows on residential and commercial

17   buildings.  And Kenny McKenna was the mainstay.  51 years old

18   in the summer of 2018, Kenny McKenna was still a hard worker,

19   going up and down ladders in the heat.

20             The defendant, Nathan Craigue, was the owner of

21   Craigue & Sons.  He took over the family siding and windows

22   business from his father in about 2002 and he operated the

23   business continuously from then until 2018.

24             Mr. Craigue bid for and got the jobs for Craigue &

25   Sons and he bought the materials, he supplied the heavy tools

1    and equipment, and he directed the work.  As the owner,

2    Mr. Craigue would come and go from the jobsites, but Kenny

3    McKenna was the go-to laborer, leading small crews of one to

4    three workers and sometimes working alone.

5            This case is also about the events of a single day,

6    August 28th of 2018, at a Concord medical office building where

7    Craigue & Sons was nearing the end of a job.  The building was

8    280 Pleasant Street, just down the road from the Concord

9    Hospital.  On that day, Kenny McKenna was injured in an

10   accident on the job and he died shortly afterwards.

11           OSHA, the Occupational Safety and Health

12   Administration, responded to the scene.  An OSHA officer

13   interviewed Mr. Craigue, the owner of the business.

14   Mr. Craigue stated to the officer that he had no employees,

15   only subcontractors, and that Kenny McKenna, the deceased, and

16   █████████, a younger worker who was there on the day of the

17   accident, were subcontractors.  That statement was a deliberate

18   falsehood and it was a falsehood with a purpose.  Because if

19   McKenna was not an employee, Mr. Craigue would have no legal

20   responsibility for the accident that day.

21           The indictment in this case is relatively simple.

22   It has a single charge or count.  That count alleges that on

23   August 28th, 2018, in a matter within the jurisdiction of the

24   U.S. Government -- namely, an OSHA investigation -- Mr. Craigue

25   knowingly and willfully made a materially false statement by

1  stating to an OSHA officer that Kenny McKenna and ▮▮▮▮▮

2  were subcontractors and not employees of Mr. Craigue or his

3  business when, in truth, as the defendant knew, McKenna and

4  ▮▮▮▮ were employees and not subcontractors.

5         That's the whole charge before you in this case.

6  That's what you have to decide.

7         The government expects the evidence will show the

8  following:  August 2018 was a hot and difficult month for Kenny

9  McKenna.  He had been the lead worker for Craigue & Sons

10 installing siding and windows at 280 Pleasant Street for the

11 entire summer.  It was a relatively big job for the company and

12 for the first part of the project, he had his usual coworker on

13 the scene, Mr. Chris Erickson.  Erickson had worked alongside

14 McKenna for Craigue & Sons for a couple of years, but in late

15 July of 2018, Erickson abruptly stopped working and McKenna was

16 the only worker left.

17        Throughout that August, McKenna worked mostly alone,

18 climbing up and down the ladders to reach the sections where he

19 was installing new siding, measuring and cutting materials down

20 in the tent where the saws were set up, and climbing back up.

21        Back in June of 2018, two months earlier,

22 Mr. Craigue had been awarded the 280 Pleasant Street job and

23 signed a contract for it.  Under the contract, Craigue & Sons

24 would be paid $98,500 to remove the existing exterior and

25 install new windows and siding on the building.

1    One of the provisions in the contract required

2    Craigue & Sons to maintain insurance coverage, including

3    worker's comp insurance covering all employees of Craigue &

4    Sons.

5    In the third week in August, with the 280 Pleasant

6    Street job nearing completion and Kenny McKenna still working

7    alone, Mr. Craigue took steps to bring on another worker.  The

8    defendant took out an ad on Craigslist, posting a full-time job

9    for, quote, general labor and listing himself as the contact

10   person.  The ad described the job as installing windows and

11   vinyl siding, will train.  Regarding payment, the ad stated:

12   Paid weekly; hourly rate will depend on experience.

13   ███████  age ██ years old, was looking for work

14   and he saw the Craigslist posting and called up the defendant.

15   The next day, August 24th of 2018, Mr. Craigue met in person

16   with ████ in Concord.  The defendant told ████ that he needs

17   someone who would show up on time and be reliable.  Mr. Craigue

18   said the pay would be $15 per hour, paid weekly and in cash.

19   There was no discussion about ████ being a subcontractor or

20   about ████ having his own company, which ████ did not.

21   Despite ████ lack of experience with siding and

22   windows installation, Mr. Craigue hired ████ on the spot and

23   told him to show up at 280 Pleasant Street Monday at eight

24   o'clock a.m.

25   So ████ started work that Monday.  On the site

1   he met Mr. Craigue, along with Kenny McKenna, also known as

2   Skinny.  The defendant walked ███████ around the jobsite and

3   showed him the Craigue & Sons trailer and supplies, along with

4   a white tent where materials were kept and the equipment was

5   set up.  Mr. Craigue directed ██████ to assist Kenny McKenna.

6   Mr. Craigue stayed around the jobsite for a short time and then

7   he left.

8         That day, ███████ worked as the ground man.

9   McKenna, who was mostly on the ladders, gave him measurements

10  and dimensions from where he was working and █████ would cut the

11  materials with a saw and hand up the cut pieces to McKenna.

12        The pair talked a good bit as they worked that day

13  and ████ discovered that McKenna had gone to school with ██████

14  dad and had mutual friends.  McKenna talked to ████ about

15  Nathan Craigue and Craigue & Sons and about how Craigue

16  operated the business.  Near the end of the workday,

17  Mr. Craigue showed up again at 280 Pleasant Street and he asked

18  Kenny McKenna how many hours he worked the previous week so he

19  could pay him.

20        The next day was Tuesday, August 28th.  On that day,

21  ████████ again reported to 280 Pleasant Street to work with

22  Kenny McKenna.  That day was particularly hot.  They worked as

23  they had on Monday with McKenna on the ladders and ████ on the

24  ground.  At around ten o'clock a.m., Nate Craigue came by to

25  drop off materials, then left again after a few minutes.  At

1   around eleven o'clock, McKenna took a break and then he got

2   back on the roof to continue installing trim.

3           ████ was in the tent momentarily checking his phone

4   when he heard Mr. McKenna fall.  Kenny McKenna was on the

5   ground and obviously injured.  ████ immediately called 911 and

6   within a short time there were nurses and doctors streaming out

7   of the medical building to help Mr. McKenna.

8           ████ next call on his cell phone was to Nate

9   Craigue.  ████ told him that Skinny fell off the roof and that

10  he had called 911.  Mr. Craigue responded:  I'll be right

11  there; take down the ladders.  ████ said okay and the call

12  ended.

13          ████ started to take down the ladders as Craigue had

14  instructed him, but people from the building told him not to

15  touch anything, so ████ left the ladders where they were.

16          ████ was asked to go to the hospital, where he

17  learned that Kenny McKenna had passed.  He went back to the

18  jobsite and there a Scott Kelly, who is a veteran OSHA officer,

19  had responded to the scene wearing his OSHA hardhat and

20  credentials.

21          Now, OSHA is the federal Occupational Safety and

22  Health Administration that's charged with conducting worksite

23  inspections and investigations and enforcing workplace safety

24  regulations.  Officer Kelly was gathering information from

25  Concord Police and others on the scene about the accident and

1  investigating potential workplace safety violations and he

2  wanted to interview ████████ about what happened.

3         After ████ returned to the jobsite, but before

4  meeting with Officer Kelly, ████ again encountered Mr. Craigue

5  and the two privately discussed the shocking news that Kenny

6  McKenna had died.  And then Mr. Craigue added something.  He

7  told ██████, don't forget, Skinny's a sub, you're a sub,

8  meaning a subcontractor.

9         You will hear testimony from Officer Kelly that one

10 of the first things an OSHA officer is required to do in a

11 workplace investigation is to determine who the employers and

12 the employees are on a jobsite.  OSHA regulates at sites where

13 work is performed by an employee of an employer.  It is

14 important to OSHA to determine which workers are employees to

15 assess whether they've been exposed to safety hazards.  Only

16 employees, and not subcontractors, are subject to OSHA's

17 protections and only employers can be held responsible for

18 workplace safety violations or be required to fix them.

19        Officer Kelly met with both ████████ and Nathan

20 Craigue.  In a brief interview with Mr. Craigue's "remember

21 you're a sub" direction in his mind, ████████ falsely told

22 Officer Kelly that he was actually a subcontractor for the

23 company.  ████ told Kelly he was getting paid by the job, not

24 by the hour, and that he expected to receive a check from the

25 owner when the project was over.  You will hear testimony that

1    ███████████ later went back to Officer Kelly and admitted that

2    he'd lied to him.

3            Officer Kelly also interviewed the defendant, Nathan

4    Craigue, sitting down at a picnic table with ████████ nearby.

5    Mr. Craigue introduced himself and described his business and

6    Mr. Craigue told Officer Kelly that he didn't have any

7    employees and that he only used subcontractors.  He said that

8    the two workers on the site, McKenna and ████, were actually

9    subcontractors and that he paid them at the end of the job by

10   the square foot.

11           Regarding Kenny McKenna, Mr. Craigue said that most

12   of the time he worked on jobs for other people and he would

13   come to work with Mr. Craigue for a few weeks when Craigue had

14   a big job.  Mr. Craigue reiterated to Officer Kelly that

15   McKenna was just a subcontractor paid at the end of the job by

16   the square foot.

17           The defendant's statements that day to Officer Kelly

18   were materially false.  It was not true that either ████████

19   or Kenny McKenna was a subcontractor.  The other statements the

20   defendant made to convince Officer Kelly that █████ and McKenna

21   were subcontractors were also not true.  It was not true that

22   McKenna worked with other companies and only worked

23   periodically with Craigue & Sons.  It was not true that the

24   defendant paid his workers at the end of the job.  It was not

25   true that Mr. Craigue paid them by the square foot as opposed

1  to by the hour.  Mr. Craigue made those statements knowingly

2  and willfully.  He did not simply misspeak in referring to his

3  workers as subcontractors.

4           Mr. Craigue told multiple people that day that Kenny

5  McKenna was a subcontractor.  At the accident scene, the

6  defendant told a Concord police officer that Kenny McKenna was

7  a subcontractor who was helping him with this job.  And when

8  Chris Erickson drove up, having heard about the accident, and

9  told Mr. Craigue that he could be in trouble, Mr. Craigue told

10 Erickson he was going to say Kenny McKenna was just a

11 subcontractor.

12          About two weeks after the accident, on

13 September 11th, Mr. Craigue met with an inspector for the

14 New Hampshire Department of Labor, Philip Martineau.  On that

15 occasion, the defendant doubled down on his false statements.

16 He again said that he had independent contractors, not

17 employees, and later in a hearing before the New Hampshire

18 Department of Labor on October 15th Mr. Craigue again claimed

19 that McKenna was a subcontractor.  In fact, both █████ and

20 McKenna were employees fully entitled to the legal protections

21 that employees receive.

22          The Court will instruct you about the various

23 factors that go into determining whether a particular worker is

24 a contractor as opposed to an employee.  A good bit of the

25 evidence you'll hear in this trial will relate directly to

1    those factors.

2          Among other things, you will learn the following:

3    Kenny McKenna worked nearly exclusively for Craigue & Sons for

4    more than 20 years except for one period in 2008 when he went

5    to Texas and was employed by another company before returning

6    to New Hampshire and going right back to work for the

7    defendant; Kenny McKenna and �җ▓▓▓▓▓ did the home

8    exterior and siding work that was part of Craigue & Son's

9    regular business and was not some separate specialty; Kenny

10   McKenna and ▓▓▓▓ believed themselves to be employees of

11   Craigue & Sons and did not have a separate company or use a

12   separate company name or have their own liability insurance

13   while working for the defendant; Kenny McKenna and ▓▓▓▓▓

14   were paid by the hour, mostly in cash, and not by the job or by

15   the square foot; Mr. Craigue bid for and won the jobs for

16   Craigue & Sons and chose the worksites.  Mr. Craigue directed

17   the work, set the hours, and hired the workers while Kenny

18   McKenna and ▓▓▓▓ had no authority or ability to hire an

19   assistant.

20          Mr. Craigue had no contracts with Kenny McKenna or

21   ▓▓▓▓.  Mr. Craigue provided the tools and the equipment,

22   except for hand tools, and parked his Craigue & Sons trailer at

23   each jobsite that they did.

24          Mr. Craigue had accounts at supply companies and he

25   purchased and supplied the materials for the business.

1          Mr. Craigue was aware that he was required to

2    provide worker's compensation insurance for his employees, but

3    after paying for worker's comp for years, he let it lapse in

4    2016 and there was no worker's comp covering the jobsite that

5    day.  And Mr. Craigue was likewise aware that he was required

6    to have unemployment insurance for his employees, but after

7    buying unemployment insurance for a few years, he stopped

8    paying back in 2006 and never resumed.

9          That's a summary of the evidence.  I know you will

10   listen carefully, and I ask you to use your experience and your

11   common sense as you evaluate it.  It will prove beyond any

12   reasonable doubt that both McKenna and ████ were the

13   defendant's employees and not subcontractors and that on

14   August 28th, 2018, the defendant knowingly and willfully made a

15   false statement to an OSHA officer when he claimed that McKenna

16   and ████ were subcontractors and not employees and that the

17   false statement was material in this OSHA investigation.

18          At the close of the evidence, Mr. Gingrande and I

19   will ask you to return a verdict of guilty as charged.

20          Thank you.

21          MS. GRAHAM:  May I just have one moment, your Honor?

22          THE COURT:  Yes.

23          MS. GRAHAM:  Good afternoon.

24          Nate is not guilty of this charge.  This case is

25   about whether Kenny McKenna and ████ were actually

1　employees of Craigue & Sons and, second, whether Nate knowingly

2　and willfully lied to the federal agent.  Nate did not lie to

3　Officer Kelly.  He did not believe that ████████ or Kenny were

4　his employees.

5　　　　　The two men that you will hear about in this case

6　is -- are Kenny McKenna, who Nate knew for many, many years.

7　And he did work with Craigue & Sons for years.  And the other

8　individual you'll hear is ██████, who did work for a day and

9　a half for Craigue & Sons.

10　　　　　Now, the history of Craigue & Sons is that this was

11　a small siding and roofing company owned and operated by Nate's

12　dad here in Concord for many, many years.  And Kenny, after

13　high school, learned the trade through Nate's dad and he did

14　work for him, did work for him for -- for many, many years and

15　he became a very skilled and experienced carpenter.

16　　　　　But he just wasn't there and did jobs.  He played

17　softball with Craigue & Sons, he knew the family, and they all

18　knew each other very well.

19　　　　　Now, at some point, it's roughly about 2001, 2002,

20　Nate took over his father's business.  And he knew little about

21　how to run the business.  Kenny took Nate under his wing and

22　showed him the ropes.  He was an experienced carpenter.  And he

23　did continue to work with Nate and Sons for many years, over

24　20 years, off and on, and it was not continuous.

25　　　　　As you heard, he moved to Texas for a period of

1  time.  He worked in Texas, he had his own projects and his own

2  jobs.  And after a couple of years of living in Texas, he came

3  back and there was work available to him, jobs and projects

4  available to him, through Craigue & Sons.

5         You can, as you hear this case, consider that

6  relationship, their personal relationship, that history, what

7  their understandings were between the two of them, what their

8  intentions were.  You can consider all of that in understanding

9  why Nate would believe that Kenny was not his employee in

10 August of 2018.

11        So, as you heard, in the summer of 2018 Nate Craigue

12 got a contract through 280 Pleasant Street to do the work

13 there.  And Kenny was there on August 28th doing his job,

14 putting up siding, and ▓▓▓▓▓▓ had answered an ad and he had

15 arrived on the site on August 27th.

16        And when ▓▓▓▓▓▓ met with Nate, they talked about

17 and discussed the project, that he would file a 1099, which is

18 a form that subcontractors file, and Nate told him where the

19 project was.  And so ▓▓▓▓▓▓ showed up on August 27th and

20 then he came back the next day.

21        The next day, his second day on the job, Kenny felt

22 dizzy and he felt sick and he fell.  And ▓▓▓▓▓▓ immediately

23 called the police, an ambulance, and called Nate.  And Nate

24 came right over.

25        And when Nate showed up, Kenny was laying on the

1    ground.  There were police there, there was an ambulance there,

2    and ████████ went into the ambulance and went to the hospital

3    with ████████ and Nate stayed at the jobsite.

4            And at some point Officer Kelly arrived and began

5    asking questions and a little while later, ████████ came back

6    from the hospital.  And as Officer Kelly was questioning Nate,

7    Nate learned that Kenny had died.  And this is a person that he

8    had known all of his life, who had known his dad, that he

9    basically grew up around.

10           Nate was very upset.  He was stunned, he was

11   shocked, and he didn't want -- and couldn't answer any

12   questions.  And it's during that exchange between Agent Kelly

13   and Nate that the government contends that Nate lied by saying

14   that Kenny and ████████ were contractors and were not

15   employees.

16           So the government here first has to prove that

17   Kenny and ████████ were actually employees and were not

18   subcontractors and that Nate knew and that he understood that

19   what he said was a lie.

20           So how do you figure out if Kenny and ████████ were

21   actually employees?  Because employee is a legal term, and the

22   Court will give you a jury instruction at the end of this case

23   to help you to understand it, to explain it, and it's a long

24   list of factors to consider.  It's a complicated legal test

25   with many issues to consider, many things to weigh, and many

1    things to think about.

2              At that scene, Nate wasn't given a list of terms or

3    factors to consider.  He wasn't given a list that spelled out

4    this is what you do to balance all these factors to come up

5    with this conclusion.  Nate wasn't given time to consider all

6    of that.  He was stunned.  He was shocked about Kenny.

7              What Nate believed and understood is crucial in this

8    case.  How could Nate possibly know that under a complicated

9    legal test that Kenny and ▆▆▆▆▆▆ might be employees rather

10   than subcontractors?  Nate told Officer Kelly what he believed

11   and what he understood to be the truth.  And that is not a

12   crime.

13             THE COURT:  All right.  Thank you, Counsel.

14             Is the government ready to call its first witness?

15             MR. DAVIS:  Yes, your Honor.

16             THE COURT:  All right.

17             MR. GINGRANDE:  Your Honor, the government calls

18   Robert Wilkins to the stand.

19             THE CLERK:  I just need one moment to move the

20   lectern.

21             THE COURT:  All right.  We just need a moment to

22   move the lectern out of the way.

23             Hello, sir.

24             THE WITNESS:  Hello.

25             THE COURT:  You'll be sworn in in a moment.

```
 1                    THE WITNESS:  Yes, ma'am.

 2                    THE COURT:  Attorney Esposito, can you swear in the

 3     witness?

 4                    THE CLERK:  Yes.

 5                    Thank you, sir.  Please raise your right hand.

 6                    ROBERT WILKINS, having been first duly sworn,

 7     testified as follows:

 8                    THE CLERK:  Thank you.  State your full name, spell

 9     your last name for the record.

10                    THE WITNESS:  Robert Brian Wilkins, W-i-l-k-i-n-s.

11                    THE CLERK:  Thank you very much.  Please be seated.

12                              DIRECT EXAMINATION

13     BY MR. GINGRANDE:

14          Q.   Good afternoon, Mr. Wilkins.

15          A.   Good afternoon.

16          Q.   Do you live in New Hampshire?

17          A.   Yes, sir.

18          Q.   And how long have you lived in New Hampshire?

19          A.   Approximately 27 years, 28 years.

20          Q.   And are you married?

21          A.   Yes.

22          Q.   How far did you go in school?

23          A.   Started college and then stopped and joined the

24     Navy.

25          Q.   Okay.  You said you stopped college and joined the
```

1   Navy?

2          A.    After my first year.

3          Q.    Are you currently working?

4          A.    No.

5          Q.    And why not?

6          A.    I had a stroke in January.  I'm still in recovery.

7          Q.    And that was January of this year?

8          A.    Yes.

9          Q.    Are you doing better now?

10         A.    Mostly.  Some minor issues still going on.  I

11  have -- I'm in what's called AFib and my heart doesn't beat

12  regularly and we're going for a surgical resolution in a month

13  or two.

14         Q.    And has your stroke had any effect on your

15  cognition?

16         A.    Some minor ones.  I have trouble speaking

17  occasionally, typing, things like that, reading a little bit.

18  Short-term memory is kind of a little loose.

19         Q.    Has your stroke negatively affected your long-term

20  memory?

21         A.    No, not at all.

22         Q.    Has your stroke had any affect on your ability to

23  remember the particular event we will be talking about today on

24  August 28th, 2018, and the summer of 2018?

25         A.    None at all.

1     Q.    So prior to your stroke, what did you do for work?

2     A.    I'm a medical assistant.

3     Q.    Okay.  And where did you work directly prior to your

4  stroke?

5     A.    I was working for Granite State -- Granite State

6  Gastroenterology.  Sorry.

7     Q.    Not a problem.  And your role there, you said, was a

8  medical assistant?

9     A.    Yes, sir.

10     Q.    Okay.  And were you a medical assistant prior to

11  that as well?

12     A.    Yes.

13     Q.    And for how long were you a medical assistant prior

14  to that?  You can approximate.

15     A.    '84, since 1984.  So 16, 21 -- 36, 37 years.

16     Q.    Okay.  And how did you first gain medical

17  experience?

18     A.    I was a corpsman in the Navy.  I trained in

19  San Diego, transferred to Philly, was there for a couple years

20  in the naval hospital and then transferred to a ship in the

21  Charleston, South Carolina, shipyards and spent a couple years

22  on a ship.

23     Q.    Got it.  And when you were in the Navy, did you have

24  the opportunity to become an EMT?

25     A.    Yes.  I -- when I transferred to Philly, I was

 1   designated by the captain of the base to take EMT training and

 2   whatever other things they wanted, needed.

 3        Q.   Got it.  So now I want to turn your attention to the

 4   summer of 2018.

 5        A.   Uh-huh.

 6        Q.   Were you working at Pleasant Street Family Medicine

 7   at that time?

 8        A.   Yes, I was.

 9        Q.   And was your office located at 280 Pleasant Street

10   in Concord?

11        A.   Yes.

12        Q.   Okay.  And what was your position there?

13        A.   I was a medical assistant, lab tech.

14        Q.   Okay.  Makes sense.  You said you've been doing it

15   for 40 years.

16             During the year 2018, did you see construction

17   occurring on the building at 280 Pleasant Street in Concord?

18        A.   Yes, sir.

19             MR. GINGRANDE:  I'd now like to show the witness

20   what's been marked for identification as Government Exhibits

21   201 and 202, if you would, Ms. Sheff.

22             THE CLERK:  None of the jury monitors are on.

23             MR. GINGRANDE:  I'm sorry?

24             MS. GRAHAM:  These are for ID only.

25             MR. GINGRANDE:  Yeah.  Is the witness able to see it

1   on his screen?

2           THE WITNESS:  No.

3           THE COURT:  I can't see it on mine, so I'm guessing

4   no.

5           MS. SHEFF:  Do you want me to show --

6           MR. GINGRANDE:  Yes, please, Ms. Sheff, 201 and 202.

7           MS. GRAHAM:  Your Honor, we're going to object to

8   this.

9           THE COURT:  Showing it to the jury.

10          MS. GRAHAM:  Yes.

11          THE COURT:  Is that what you're objecting to?

12          MS. GRAHAM:  Yes.

13          MR. GINGRANDE:  I'm not asking for it to be shown to

14  the jury, just the witness at this time.

15          THE COURT:  Okay.  How do we get this turned on so

16  that I can see it and the witness can see it?  And I thought I

17  also had a hard copy of the exhibits.  No?

18          THE CLERK:  Yes.  I can get those.

19          THE COURT:  Okay.

20          THE CLERK:  Yes.  Let me work on -- I'm going to

21  come up behind you, Judge.

22          THE COURT:  No problem.

23          THE CLERK:  Can counsel see the exhibits?

24          MR. GINGRANDE:  No.

25          MR. DAVIS:  No.  Can you put it up for ID?

 1              MS. SHEFF:  Do you want me to turn it on, put it up

 2      now?  I'm afraid to put it up if it's going to be --

 3              THE COURT:  Right.  I would just wait until we --

 4              MS. SHEFF:  Okay.

 5              THE COURT:  Usually you control this, I thought,

 6      Donna.

 7              THE CLERK:  Well, her station's on and I don't have

 8      any of the jury monitors on.

 9              THE COURT:  Okay.

10              THE CLERK:  The jury monitors are off.

11              MS. SHEFF:  So you want me to call it up?

12              THE CLERK:  Yes.

13              THE COURT:  I can't see it.

14              MS. SHEFF:  Is that good?

15              MR. GINGRANDE:  I can see it now.

16              THE CLERK:  Counsel can see it.

17              Mr. Wilkins, can you?

18              THE WITNESS:  Yes, I can see it.

19              THE CLERK:  Okay.

20              THE COURT:  If I had a hard copy of the exhibits,

21      I'd be okay with that.

22              MR. DAVIS:  What exhibit, number 201?

23              MR. GINGRANDE:  201.

24              MS. SHEFF:  We have an extra copy.

25              THE COURT:  I can be old school and look at things

1    on paper.  Okay.

2            MR. GINGRANDE:  Your Honor, may I proceed?

3            THE COURT:  Is there an objection?

4            MS. GRAHAM:  Yes, your Honor.

5            THE COURT:  Do you want to deal with that now or --

6            MR. GINGRANDE:  We could have a sidebar.

7            THE COURT:  Okay.

8                          AT SIDEBAR

9            THE COURT:  All right.  We're talking about

10   Exhibit 201, a photograph of the building.

11           THE CLERK:  Judge, I'm sorry.

12           THE COURT:  I'm assuming I'm talking to counsel.

13   Can you hear me?

14           MR. GINGRANDE:  I can hear you.

15           THE COURT:  Okay.

16           THE CLERK:  Hold on.

17           THE COURT:  No one else?

18           MR. MIRHASHEM:  I can hear you.

19           MS. GRAHAM:  I cannot.

20           THE COURT:  Can you hear me, Attorney Graham?

21           MS. GRAHAM:  I cannot.  Mine is not acting -- I

22   cannot -- my -- it's not working.  Can you hear --

23           THE COURT:  Can you hear me now?  Can you hear me

24   now?

25           MS. GRAHAM:  And no one can hear me, correct?

```
1                    THE COURT:  I can hear you.

2                    MR. GINGRANDE:  I can hear you.

3                    MS. GRAHAM:  Can any -- okay.  This doesn't work.

4                    THE COURT:  All right.  Can you hear me, Attorney

5       Graham?

6                    MS. GRAHAM:  I can now, yes.

7                    THE COURT:  Okay.  Good.  All right.

8                    And I'm looking at a photo, Government Exhibit 201

9       for ID, and I think Attorney Gingrande was going to ask

10      Mr. Wilkins some questions about it.

11                   MR. GINGRANDE:  Yes.  And 202 as well, your Honor.

12                   THE COURT:  202 as well.

13                   MR. GINGRANDE:  It's just the same version as 201

14      with a slightly different angle.

15                   THE COURT:  Okay.  Go ahead, Attorney Graham.

16                   MS. GRAHAM:  Thank you, your Honor.

17                   I object on the basis of 403.  The photos contain

18      basically police tape, but it also includes ladders on the roof

19      and it shows an unsafe work -- workplace with the ladders.

20      There were multiple pictures in discovery that did not include

21      any of the ladders or the tape if the -- if the reason was to

22      just show the place of employment or where the worksite was.

23      So I think that the -- that it's more prejudicial than

24      probative and I would object to the jury seeing this.

25                   THE COURT:  Attorney Gingrande.
```

1           MR. GINGRANDE:  The government would simply respond

2    that this was the scene on the day of the accident as -- being

3    depicted as it was that day.  We are not introducing it to get

4    into any safety issues.

5           I -- I don't see that safety issues can be inferred

6    from this and will not be talking about workplace safety, but

7    it is necessary to describe the events of the day and to

8    provide context so that the jury can see what is going on and

9    to show, specifically with regards to this witness, his ability

10   to observe the events in question and also to describe the work

11   that was going on on -- on the building.

12           THE COURT:  Okay.  I -- can you hear me?

13           I look at 202 and 2-0 -- 201 and 202 and see the

14   ladders and I -- it looks unsafe to me.  That's the first

15   reaction I have to the photos is that they are showing pictures

16   of a workplace that have ladders that I certainly wouldn't want

17   to be climbing up on and working on.

18           So I don't think it is crucial in any respect for

19   the jury to see these photos.  I do think these photos, because

20   of the ladders and the way that they're placed on the house,

21   suggest that it is unsafe and ultimately the probative value

22   seems minimal to me.  He can describe the scene.  They don't

23   need to see the house.  It doesn't really tell them much.

24           And so I think that the 403 objection is well taken

25   and I find that the probative value is substantially outweighed

1   by the danger of unfair prejudice.  So these two photos are

2   excluded.

3                Go ahead, Attorney Gingrande.

4                      CONCLUSION OF SIDEBAR

5                THE COURT:  Go ahead, Attorney Gingrande.

6                MR. GINGRANDE:  Thank you, your Honor.

7        Q.    I'd like to talk to you about your observations

8   of the -- the construction project that was happening at

9   280 Pleasant Street.

10               So I believe you -- you had said that you saw

11  construction occurring on the building at 280 Pleasant Street

12  over the course of the summer?

13       A.    Yes.

14       Q.    And can you describe how -- what you saw and what

15  work was being done?

16       A.    Various projects, siding, roofing fixes, some

17  painting, window replacements, anything to do with the building

18  that needed to be fixed or adjusted.  There was a lot of repair

19  going on.

20       Q.    Okay.  And specifically did you observe repair being

21  done on the siding of the building?

22       A.    Yes.

23       Q.    Okay.  Did you observe equipment being used to do

24  that siding?

25       A.    Yes, there was --

1          MS. GRAHAM:  Objection, your Honor, as to relevance.

2          THE COURT:  Overruled.

3     Q.    You can answer the question.

4     A.    Every day there would be more equipment, different

5     equipment, everything -- everything you could possibly imagine,

6     cutting, fitting pieces in, the usual construction you would

7     see on any site.

8     Q.    Okay.  And did you observe a worker on the jobsite

9     named Ken McKenna?

10    A.    Yes.

11    Q.    Did -- did you know him to have a nickname?

12    A.    He was known as Skinny.

13    Q.    And was that because he was thin?

14    A.    Very.  Very noticeable.  He was wiry thin.

15    Q.    How often did you see Mr. McKenna --

16    A.    Almost --

17    Q.    -- on the worksite?

18    A.    As far as I can remember, almost every day.

19    Q.    Okay.  And is that true of the entire time you

20    remember the construction being done on the building that

21    summer?

22    A.    With the exception of rainy days, yes.

23    Q.    Okay.  Did you ever see other workers on the jobsite

24    working with Mr. McKenna?

25    A.    Yes.

1    Q.    Okay.  Were there ever days when Mr. McKenna was the
2  only one working there?
3    A.    I believe so, yes.
4    Q.    And the other workers that you saw, were there --
5  there are a couple of other workers who would work with him on
6  occasion?
7    A.    Yeah, varying workers; different days, different
8  workers, but regular faces.
9    Q.    Okay.  And in terms of Mr. McKenna, what did you
10  observe, if anything, about Mr. McKenna's work ethic?
11    A.    He was always at work.  He -- he was -- I never saw
12  him not doing anything.  He -- I never saw him stop.  He worked
13  all day.
14    Q.    Did you ever see him going up and down ladders?
15    A.    Yes, every day.
16    Q.    And did you see him working on hot days?
17    A.    Exceptionally hot days, I couldn't believe he would
18  be working in them.
19    Q.    Okay.  And was he working on the exterior of the
20  building --
21    A.    Yes.
22    Q.    -- did you observe that?
23          Did you see, was -- and I think you said that you
24  saw him doing siding work.
25    A.    Yes, sir.

1      Q.    And he was doing that on the exterior of the

2  building.  Can you describe how you were able to make these

3  observations?

4      A.    There's two windows on my work space.  One is

5  directly in front of me and one was directly to my left in

6  clear view of most of the work they're doing every day.

7      Q.    Okay.  And so you could see him through -- through

8  those windows?

9      A.    Yes.

10     Q.    And they were clear windows?

11     A.    Yes.

12     Q.    Okay.  Now I want to direct your attention to

13  August 28th, 2018.  Were you working at 280 Pleasant Street

14  that day?

15     A.    Yes.

16     Q.    And did something memorable happen that day?

17     A.    There was an accident and Skinny fell off the roof

18  and landed in the courtyard for -- per se, of our work

19  building.

20     Q.    Okay.  And how you were -- how were you aware that

21  this had happened?

22     A.    We had heard some -- I personally had heard

23  something happen and I heard a commotion.  I opened the -- at

24  that time, I had had the shade down.  I looked out and there

25  was Skinny on the ground, and I yelled someone to call 911.

```
 1                  I rushed to the side door, which is behind me, and I
 2      came out and we -- a few of us were meeting together from my
 3      door and another door in the clinic.
 4           Q.    So when you rushed out, did you observe Mr. McKenna?
 5           A.    Yes, sir.  I had rushed up to him, but the -- one of
 6      the physicians had reached him just before me and as a
 7      physician, he's in charge.  So I said, what do you need me to
 8      do, and we let him take -- start looking at Skinny.
 9           Q.    Okay.  And did it appear to you that Mr. McKenna had
10      fallen?
11           A.    Very much so.
12           Q.    Okay.  And fallen from the roof?
13           A.    Yes.
14           Q.    So at that time when you rushed out, were there
15      other doctors or anyone else from the building who also came
16      out with you?
17           A.    A nurse, other medical assistants, the physician,
18      nurse practitioner.  They were all there to render help when
19      necessary.
20           Q.    Did you also see anyone else who was working on the
21      jobsite?
22           A.    A young man who was -- I believe had just started
23      that day.
24           Q.    Okay.  And had you met the young man before?
25           A.    Not personally, no.  I saw him there, but hadn't met
```

1    him.

2         Q.    And that young man, that was ██████████?

3         A.    I think so.  Yes, I believe so.

4         Q.    Can you describe ██████ demeanor when you saw

5    him?

6         A.    He was obviously distressed at having witnessed what

7    happened.

8         Q.    Okay.  And did you -- when you say he was obviously

9    distressed, I mean, you could see it in his face?

10        A.    You could see it in his face, his actions.  He -- he

11   was very distressed, very upset.

12        Q.    Okay.  Did you observe him to be on the phone?

13        A.    At one point, yes, I did.

14             MR. GINGRANDE:  Okay.  Your Honor, with the Court's

15   indulgence, I'd like to ask for a sidebar.

16             THE COURT:  Sure.

17                         AT SIDEBAR

18             MR. GINGRANDE:  Can you hear me?

19             THE COURT:  I can.  Can you hear me?

20             MR. GINGRANDE:  I can.

21             THE COURT:  Okay.  Go ahead.

22             Can you -- can you hear him, Attorney Graham?

23             MS. GRAHAM:  I can.

24             THE COURT:  Okay.

25             MR. GINGRANDE:  Your Honor, at this point I would

1  seek to introduce the statement of ███████ that ██████ made to

2  the witness after that phone call.  And we believe this meets

3  the hearsay exception as an excited utterance based upon ██████

4  statement at the time, but I wanted to confer with counsel

5  first to see if that had their agreement and, if not, to

6  proceed by asking the Court to make a ruling.

7           THE COURT:  All right.  Do you know what the

8  statement is going to be, Attorney Graham?

9           MS. GRAHAM:  I do, and I do object.

10          THE COURT:  Okay.  Tell me what the statement is

11  going to be.

12          MR. GINGRANDE:  The statement is going to be that he

13 had spoken with his boss and that his boss wanted him to -- the

14 statement will either come in as clean things up, which is

15 terminology that Wilkins has used before, or more specifically

16 could be -- I think that's it, clean things up.  I think that's

17 what he said.

18          THE COURT:  Okay.  And you're trying to get it in as

19 an excited utterance, a statement relating to a startling event

20 or condition made while the declarant was under the stress of

21 excitement that it caused.

22          MR. GINGRANDE:  Yes.

23          THE COURT:  Okay.  And the startling event or

24 condition is witnessing the death of McKenna.

25          MR. GINGRANDE:  Yes.

1          THE COURT:  And this statement, after he gets off

2    the phone with Mr. Craigue, allegedly, is relating to that

3    event or condition.

4          MR. GINGRANDE:  That's right.

5          THE COURT:  Okay.  What's your argument, Attorney

6    Graham, that it doesn't fall under excited utterance?

7          MS. GRAHAM:  It is not a statement that was made

8    about the startling event.  So, for example, it wasn't a

9    statement that was really about what he saw or what was told or

10   what he viewed.  This was a telephone conversation after the

11   event and was not about that startling event.  It seems to be

12   that it's a different conversation that has nothing to do with

13   what he had just seen.

14         THE COURT:  Okay.  I'm going to overrule your

15   objection and allow this.  This comes in.

16         He's just witnessed the death of his coworker and

17   he's gotten on the phone almost immediately with his boss,

18   allegedly, and the startling event is the death of his friend.

19   And then it's also startling to him that his boss makes the

20   statement he does.

21         So ultimately, this is an excited utterance and it

22   comes in and so I overrule the objection.

23         Go ahead, Attorney Gingrande.

24         MR. GINGRANDE:  Thank you.

25                          CONCLUSION OF SIDEBAR

1    Q.   So, Mr. Wilkins, I believe I asked just you and you

2    had testified that you observed ▮▮▮▮▮▮ on the phone.

3    A.   Yes.

4    Q.   And did you observe him hang up that phone?

5    A.   Yes.

6    Q.   Okay.  And after his phone call ended, what did

7    ▮▮▮▮▮▮ start to do, if anything?

8    A.   He started to pick up pieces of equipment,

9    straightening out things.  And I -- it -- it looked like he was

10   trying to clean up the site a little bit and I told him he had

11   to stop.

12   Q.   So did you ask him what he was doing?

13   A.   Yes, and he said my boss told me to clean up the

14   area.

15   Q.   Okay.  And so what did you say in response to

16   ▮▮▮▮▮▮

17   A.   I told him he could --

18   MS. GRAHAM:  Objection as to hearsay, your Honor,

19   relevance.

20   THE COURT:  Sustained.

21   Q.   So you -- you -- I believe you testified -- you had

22   testified that he had -- he had started to pick things up --

23   A.   Uh-huh.

24   Q.   -- and at that point, you said something to him.

25   A.   Yes.

1    Q.    Okay.  And as a result of your saying something to

2    him, did          do anything?

3    A.    He stopped picking up the area.  And I told him we

4    needed to --

5              MS. GRAHAM:  Objection, your Honor, hearsay.

6              MR. GINGRANDE:  These are statements -- I'm sorry,

7    your Honor.

8              THE COURT:  Sustained.

9    Q.    Did you -- so just responding to that question about

10   what he did after you spoke to him, he stopped cleaning up the

11   site; is that right?

12   A.    Yes.

13   Q.    Okay.  And, specifically, did he stop putting

14   equipment away?

15   A.    Yes.

16   Q.    Okay.  And what happened next?

17   A.    We made a clear path for the -- the ambulance gurney

18   to come through so they could reach the -- Skinny easier,

19   without having to go the long way around and come straight up

20   the grass.

21   Q.    And when you say we, who are you referring to?

22   A.    Myself, another assistant was watching us, and

23   Mr. -- the young man.  I can --

24   Q.             ?

25   A.             , yes.  We just made sure that the ambulance

1    could get up as close as possible and they'd be able to take

2    the gurney right over to the scene.

3         Q.    And did the ambulance arrive on the scene after

4    that?

5         A.    Yes.

6         Q.    Did anyone else arrive on the scene that you recall?

7         A.    Police, OSHA, various other people got there.  Some

8    I did know, some I -- most of them I didn't know.

9         Q.    Did you interact with any of them?

10        A.    One or two of them; the police officer, the

11   ambulance drivers.

12        Q.    Okay.  And did you tell the police officer what you

13   had done to clear the path?

14        A.    Yeah, I had made sure because it was -- there was

15   going to be an investigation; there'd been an accident and I

16   knew that there would have.  And I told him what we moved, what

17   we did, and why we'd done it.  And that was all --

18        Q.    Okay.

19        A.    -- to the officers.

20              MR. GINGRANDE:  Court's indulgence?

21              THE COURT:  Yes.

22              MR. GINGRANDE:  No further questions here.

23              THE COURT:  Attorney Graham, Attorney Mirhashem?

24              MS. GRAHAM:  I have no questions.  Thank you.

25              THE COURT:  Okay.  The witness may be excused.

1    Thank you, sir.

2              THE WITNESS:  Thank you.

3              THE COURT:  All right.

4                   (Witness excused.)

5              THE COURT:  It's just after four o'clock, so we are

6    going to call it a day today.  And -- but before we do that, I

7    am going to read a stipulation for you.  A stipulation means

8    simply that the government and the defendant accept the truth

9    of something since there's no disagreement, there's no evidence

10   apart from the stipulation.

11             Now I'm going to read you the stipulation.

12             The parties stipulate that there is no evidence and

13   no allegation that Mr. Craigue, the defendant, was responsible

14   in any way for the death of Kenneth McKenna.

15             Now, the parties have stipulated as to that fact.  I

16   instruct you that you must not speculate about the cause of

17   Mr. McKenna's death.

18             So tomorrow you'll come at 9:00 a.m.  We'll start

19   our trial right at 9:00 a.m., so probably come a little before

20   9:00.  I'll meet with the lawyers before 9:00 and hopefully get

21   started right on time.

22             And just keep my instructions in mind about not

23   talking about the case.  And, again, if people ask you, which

24   they no doubt will, just blame it on the judge; the judge has

25   ordered me not to speak to you; I'm sorry, but I have to

1    fulfill my duty and obligation to the court as a juror.  All

2    right?  So blame it on me, but you can't talk about it, you

3    can't research it.  And I'll see you tomorrow morning at 9:00

4    a.m. sharp.

5              Thank you very much.

6              THE CLERK:  All rise for the jury.

7                    (Jury excused.)

8              THE COURT:  Okay.  Well, that was a long day,

9    picking that jury and getting to this point, but the trial has

10   started and bravo to counsel.

11             Let me see if I can check in with you.  You're

12   probably ready to get out and go home and relax.  So am I.  But

13   let me just check in with you about any issues you think I may

14   be able to help you resolve before tomorrow.  And if there are

15   any, we can meet at 8:00 a.m. if you want and go over those

16   issues starting fresh at 8:00.  I just want to make sure that

17   we start the trial on time as soon as the jury gets here.

18             Are there any issues that I need to help you with

19   today?  And do you --

20             MR. DAVIS:  Not --

21             THE COURT:  -- do you want to do this confidentially

22   at sidebar, Attorney Mirhashem, or are you --

23             MR. MIRHASHEM:  No, this is fine.

24             THE COURT:  Okay.  We're just in the habit now of

25   wearing these.

1          MR. MIRHASHEM:  He can go ahead.

2          MR. DAVIS:  We don't have any issues, Judge.

3          THE COURT:  Okay.  All right.

4          MR. DAVIS:  We can start smoothly tomorrow.  We do

5    have to figure out a witness order and we'll notify counsel

6    what it is.

7          THE COURT:  Okay.

8          MR. MIRHASHEM:  I was going to agree with that.  I

9    think there are a number of evidentiary issues that, frankly,

10   are going to have to be decided in the context of the testimony

11   and how it comes in and I think it's going to be difficult.

12   It's going to be like these photographs.  I think you'll

13   probably want to hear the testimony and the context to make

14   your rulings.  So that --

15         THE COURT:  Right.

16         MR. MIRHASHEM:  -- would be my suggestion.

17         THE COURT:  I actually like the hard copies here and

18   so I'll just focus here.  Plus I have my mic here and I need

19   this to work.  So I think I'll focus on the hard copies --

20         THE CLERK:  I'll make sure you have a set.

21         THE COURT:  -- and not worry too much --

22         THE CLERK:  Okay.

23         THE COURT:  -- about the screen because I actually

24   have to whisper straight into the microphone for you for this

25   to work.

1          Go ahead, Attorney Davis.

2          MR. DAVIS:  Judge, the only other thing I'd say is

3    as with the excited utterance issue, we will do our best to

4    anticipate a potential issue and then tee it up and then

5    perhaps -- and it's actually easier and quicker now with the --

6    with these, we can -- so I -- we'll try to keep doing that.  We

7    may miss one or, you know, some, but --

8          THE COURT:  That was excellent, Attorney Gingrande,

9    to handle it that way before the statement came out.  So that

10   was good and I'm happy to try to help you handle those in

11   advance.

12         MR. GINGRANDE:  Happy to do it.

13         THE COURT:  Any -- Attorney Graham?

14         MS. GRAHAM:  May I just have one moment?

15         THE COURT:  You may have as many moments as you

16   need.

17         It does seem a little warm here at the end of the

18   day, so maybe we tell our GSA folks to maybe increase the air

19   as the day goes on, because right now it's a little bit warm.

20         I'm keeping an eye on the $CO_2$ levels.  Don't you

21   worry.

22         MR. DAVIS:  Sorry, Judge.

23         THE COURT:  I think they needed a moment, so I'm

24   just waiting.

25         MR. DAVIS:  Yeah.

1          MS. GRAHAM:  We're good.

2          MR. MIRHASHEM:  Nothing further, your Honor.

3          THE COURT:  You are good.  All right.

4          So I will see counsel at 8:00 a.m. sharp.  If

5     there's nothing you need me for, then just let Attorney

6     Esposito know and I'll see you for trial at 9:00.  But if

7     something comes up, please, let's use that time as needed.

8          I know there's one witness, if you call him, we need

9     to do a voir dire outside the presence of the jury, so I'd love

10    the timing of that to coincide with a lunch break or with, you

11    know, the morning hour or perhaps the end of the day, right

12    now, so that the jury isn't waiting for that to happen.

13         But, otherwise, I will see you at 8:00 unless you

14    notify Attorney Esposito that you do not -- neither one of you

15    needs to meet with me.

16         I'm presuming certain things can come up in the

17    evening that may need my attention at 8:00, so I'm going to

18    keep that eight o'clock appointment on for tomorrow and let you

19    notify Attorney Esposito to cancel that in advance.  Okay?

20         MR. MIRHASHEM:  When should we let -- I just don't

21    want to inconvenience the Court --

22         THE COURT:  I will be here anyway, so you do not

23    need to worry about that.  If you let her know --

24         THE CLERK:  Just email me at any point or I can give

25    you my cell if that's easier.

1          MR. DAVIS:  We'll try to know by 7:30, if that

2   works, 7:30 a.m. --

3          THE CLERK:  Perfect.

4          MR. DAVIS:  -- and let you know, Ms. Esposito.

5          THE CLERK:  Perfect.

6          THE COURT:  Excellent.  Well, thank you, everybody.

7   Court's adjourned.

8          (Proceedings adjourned at 4:14 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


I, Liza W. Dubois, do hereby certify that
the foregoing transcript is a true and accurate transcription
of the within proceedings, to the best of my knowledge, skill,
ability and belief.


Submitted: 7/22/21          */s/  Liza W. Dubois*
                           LIZA W. DUBOIS, RMR, CRR