1                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF NEW HAMPSHIRE
2

3      * * * * * * * * * * * * * * * * *
                                       *
4      UNITED STATES OF AMERICA        *
                                       *
5                                      *  No. 1:19-cr-142-01-LM
                  v.                   *  June 9, 2021
6                                      *  9:04 a.m.
                                       *
7      NATHAN CRAIGUE,                 *
                                       *
8                     Defendant.       *
                                       *
9      * * * * * * * * * * * * * * * * *

10

                   TRANSCRIPT OF DAY THREE OF JURY TRIAL
11
               BEFORE THE HONORABLE LANDYA B. MCCAFFERTY
12

13

       APPEARANCES:
14

15     For the Government:       John S. Davis, AUSA
                                 Aaron G. Gingrande, AUSA
16                               United States Attorney's Office

17

       For the Defendant:       Dorothy E. Graham, Esq.
18                               Behzad Mirhashem, Esq.
                                 Federal Defender's Office
19

20

21     Court Reporter:          Brenda K. Hancock, RMR, CRR
                                 Official Court Reporter
22                               United States District Court
                                 55 Pleasant Street
23                               Concord, NH 03301
                                 (603) 225-1454
24

25

```
 1                        I  N  D  E  X

 2     WITNESSES:          DIRECT      CROSS     REDIRECT    RECROSS

 3     LISA MYERS
       By Mr. Davis          3                      18
 4     By Ms. Graham                     16

 5     WILLIAM BROUILLET
       By Mr. Gingrande     20                      33
 6     By Ms. Graham                     31

 7     ██████████████
       By Mr. Gingrande     35
 8     By Mr. Mirhashem                 106

 9     Voir Dire Examination
       By Mr. Mirhashem     136
10
       JANET SIMON
11     By Mr. Gingrande    153                  185,191
       By Mr. Mirhashem                172                   188
12
       JOSLYN McKENNA
13     By Mr. Gingrande    201

14

15

16

17                      E  X  H  I  B  I  T  S

18     Government's                            In Evd.
19     205                                       56
       200                                       60
20     203                                       62
       500                                      164
21     102                                      226
       101                                      232
22

23

24

25
```

1                    P  R  O  C  E  E  D  I  N  G  S

2          THE CLERK:  All rise for the Honorable Court.

3          THE COURT:  Please be seated.  We're going to wait

4    until everybody's here.  I'm just going to get myself situated

5    on the bench.

6          THE CLERK:  All rise for the jury.

7                (The jury entered the courtroom)

8          THE CLERK:  The Court has before it for consideration

9    today jury trial day three, The United States versus Nathan

10   Craigue.  It is 19-cr-142-01-LM.

11         THE COURT:  Good morning.  We will begin today, right

12   now, with the government's next witness.  Go ahead.

13         MR. DAVIS:  The government calls Lisa Meyers.

14         THE CLERK:  Remain standing and raise your right hand,

15   please.

16         **LISA MYERS**, duly sworn by the Clerk.

17         THE CLERK:  Can you state your full name and spell

18   your last name for the record.

19         THE WITNESS:  Lisa C. Myers, M-y-e-r-s.

20         THE CLERK:  Thank you very much.  Please be seated.

21         THE WITNESS:  Thank you.

22                    DIRECT EXAMINATION

23   BY MR. DAVIS:

24   Q.   Please state your name.

25   A.   I'm sorry?

1   Q.   Please state your name.

2   A.   Oh, sure.  Sorry.  It's Lisa C. Myers.

3   Q.   And spell your last name for the record.

4   A.   M-y-e-r-s.

5   Q.   And how are you employed?

6   A.   I am a medical coder for the University of Missouri.

7   Q.   All right.  And before you worked as a medical coder for

8   the University of Missouri did you live and work in New

9   Hampshire?

10  A.   Yes.  I worked here in Concord.

11  Q.   All right.  And how long did you work in New Hampshire and

12  live in New Hampshire, approximately?

13  A.   Approximately 49 years.  I've lived here, and I worked in

14  Concord Hospital for 10.

15  Q.   All right.  So, directing your attention to August of

16  2018, and really the whole summer of 2018, where did you work

17  then?

18  A.   I was working at Pleasant Street Family Medicine, which is

19  part of Concord Hospital.

20  Q.   And is Pleasant Street Family Medicine located in a

21  building that's called 280 Pleasant Street?

22  A.   Yes, it is.

23  Q.   Let me finish, please, before you answer, just so the

24  court reporter can get it.  Okay?

25       All right.  And what job did you have for Pleasant

1    Street Family Medicine?

2    A.    I was a patient care coordinator.

3    Q.    All right.  And were you a full-time worker?

4    A.    Yes, I was.

5    Q.    And what hours did you work and what days?

6    A.    8:00 to 5:00 Monday through Friday.

7    Q.    And were you always working at 280 Pleasant Street, or did

8    your job require you to travel around?

9    A.    No.  Always at 280.

10   Q.    Okay.  Now, did you take a lunch break?

11   A.    Yes.

12   Q.    Okay.  And remember you always have to say yes or no or

13   something.

14   A.    Yeah, I would take a lunch break.  It depended on what

15   time of the day it was, and I would go outside.

16   Q.    And how long was your lunch break?

17   A.    An hour.

18   Q.    And what were the hours usually that you took it?

19   A.    It depended.  Anywhere from 12:00 to 1:00 or 1:00 to 2:00.

20   Q.    And did you also take any additional breaks during the

21   workday --

22   A.    Yes.

23   Q.    -- typically?

24   A.    Yes, I did, just to take a walk.

25   Q.    And how often did you take short breaks in addition to a

1    lunch break?

2    A.    Maybe twice a day.

3    Q.    Okay.  And you always went outside?

4    A.    You know, weather permitting, of course.

5    Q.    All right.  And did the heat deter you?

6    A.    No.

7    Q.    How is that?

8    A.    I just love the heat.

9    Q.    And would you go out on hot days when no one you worked

10   with would go out?

11   A.    Yes.

12   Q.    So, you like the heat, right?

13   A.    I do.

14   Q.    All right.  Now, at some point do you recall a renovation

15   job beginning at 280 Pleasant Street?

16   A.    Correct.

17   Q.    And do you remember the time frame exactly?

18   A.    I think it was like June to July --

19   Q.    Okay.

20   A.    -- or, you know, early to mid-summer.

21   Q.    Is when it started?

22   A.    It started I believe in June.

23   Q.    Okay.  And that's the year 2018?

24   A.    Mm-hmm.

25   Q.    Okay.  Remember, say yes or no.

1    A.    Sorry.  Yes.  Sorry.

2    Q.    What kind of job was it?  What was happening?

3    A.    It was a siding job, you know, a siding job and then a

4    roof repair.

5    Q.    All right.  And were there also windows installed?

6    A.    Yes.

7    Q.    Okay.  And do you remember the name of the company that

8    was doing that job?

9    A.    No, I don't.

10   Q.    All right.  Do you remember whether the company had a

11   trailer there?

12   A.    Yes, they did.

13   Q.    Okay.  And what do you remember about the trailer?

14   A.    I just remember it was like a white box trailer, and they

15   would keep their supplies in there.

16   Q.    Okay.  And was that parked on the site somewhere?

17   A.    It was parked on the grass, I believe.

18   Q.    Okay.  And you don't remember the name actually on the

19   trailer?

20   A.    No.

21   Q.    Okay.  And do you also recall a tent?

22   A.    Yes.

23   Q.    Describe the tent.  What was that?

24   A.    It was an easy-up tent, and it was white, and I remember

25   it being nearby the picnic tables, and they had their saws and

1   so forth in there.

2   Q.   Okay.  And you said there were picnic tables?

3   A.   Mm-hmm.

4   Q.   Were those part of the grounds of the building?

5   A.   Right.

6   Q.   And was that where you would go to eat lunch?

7   A.   Yes.

8   Q.   And where were the picnic tables, just roughly, in

9   relation to where the white tent was and where the job was

10   going on?

11   A.   It was, like, the white tent was probably maybe 10 to 20

12   feet away.

13   Q.   Okay.  So, fairly close?

14   A.   Fairly close.

15   Q.   All right.  And that's where you would sit when you would

16   have lunch?

17   A.   Yes.

18   Q.   Okay.  Now, over the time that summer did you notice a

19   particular worker whose name you got to know?

20   A.   Yes.

21   Q.   And who was that worker?

22   A.   That was Skinny.

23   Q.   Okay.  And how did you know his name was Skinny?

24   A.   I believe he just told us one day.

25   Q.   All right.  And describe what he looked like, just

1    briefly.

2    A.   I think he had brown, blonde to brown hair, very, very

3    thin, would wear probably blue jeans and sometimes shorts and a

4    T-shirt, sometimes just no shirt.

5    Q.   Okay.  And do you remember that summer whether it was hot?

6    A.   Yes.

7    Q.   Was it hot?

8    A.   Yes.

9    Q.   Okay.  And would he speak to you, Skinny, this guy you

10   knew as Skinny?

11   A.   I'm sorry.  What was that?

12   Q.   Would he talk to you?

13   A.   Yes, occasionally.  Yup.  Just, you know, general stuff,

14   How are you doing today, that type of thing.

15   Q.   Okay.  And did you ever learn his real name?

16   A.   Sadly to say, after he passed away.

17   Q.   All right.  You only knew him as Skinny, correct?

18   A.   Right.

19   Q.   All right.  Now, how frequently did you see this man,

20   Skinny, working at 280 Pleasant Street?

21   A.   Every day.

22   Q.   All right.  Did you see him be absent noticeably during

23   this summer of work?

24   A.   I'm sorry.  What was that?

25   Q.   Did you see him not being there for days at a time?

1    A.   No.  I saw him there just about every day, you know.

2    Q.   Okay.  And did you see him taking breaks?

3    A.   Yes.  Well, occasionally, yeah.

4    Q.   And what would he do on a break?

5    A.   Well, he would come, you know, he would get into the tent

6    area, and he would get himself some water and maybe cut a piece

7    of wood or something and then go back off and do his job.

8    Q.   Okay.  Now, did you actually see what he was doing, and

9    particularly toward the end in August of 2018 what did he seem

10   to be doing each day?

11   A.   At that time he was working on the roof by himself.

12   Q.   Okay.  And with no one working with him?

13   A.   No one.

14   Q.   But when you say "working on the roof," what did he appear

15   to be doing?

16   A.   He was re-putting, putting new shingles on it.

17   Q.   Okay.  So, he would climb up on a ladder up to that roof?

18   A.   Correct.

19   Q.   And was that where you could see him?  Was that near the

20   picnic table?

21   A.   Mm-hmm.  Yes.

22   Q.   Yes?  Okay.  And did you also see him coming down from the

23   roof?

24   A.   Yes, I did.

25   Q.   And what would he do when he came down from the roof?

1    A.    He would grab more tools or, you know, more shingles,

2    whatever he needed to go back up there.

3    Q.    Okay.  And so, would his workday include multiple trips up

4    and then back down and up again?

5    A.    Correct.

6    Q.    Okay.  Now, initially that summer do you remember a second

7    man who worked with Skinny?

8    A.    I do.

9    Q.    All right.

10   A.    He was there for a little bit, and then all of a sudden he

11   left.

12   Q.    Okay.  And can you describe him?  Do you remember what he

13   looked like?

14   A.    No, I'm sorry, I don't.

15   Q.    Okay.  When that guy was there, when that second person

16   was with Skinny, what did the second person do?

17   A.    The second person would be down below helping cut, you

18   know, cut whatever needed to be cut and brought up to the

19   higher level or whatever.

20   Q.    Okay.  And when the second person was there did that seem

21   to reduce the number of times Skinny had to come down from the

22   ladder?

23   A.    Yes, it did.

24   Q.    Sorry?

25   A.    Yes.

1    Q.    Okay.  And would that second person operate the saw there

2    in the tent?

3    A.    Yes.

4    Q.    Okay.  Now, do you remember seeing anyone who appeared to

5    be giving direction at the work site?

6    A.    Occasionally I would see somebody there.

7    Q.    Okay.  And do you remember that person distinctly?

8    A.    No, I don't.

9    Q.    Do you know if it was a man or a woman?

10   A.    It was a man.

11   Q.    All right.  Do you remember how frequently you would see

12   that person?

13   A.    Maybe once or twice a month or week, maybe.  I'm not sure.

14   I'm sorry.

15   Q.    Okay.  And when that person came would he stay long, or

16   would he come and go?

17   A.    I really don't remember.

18   Q.    Okay.  And do you remember hearing that person say

19   anything to Skinny or the second worker?

20   A.    No.

21   Q.    All right.  So, you said at some point the second worker

22   stopped coming; is that right?

23   A.    Correct.

24   Q.    And after that did you ever see that second worker again?

25   A.    No.

1    Q.   All right.  And after that how did that change how Skinny
2    did his job?
3    A.   He had to do his job by himself.
4    Q.   Okay.  And that's what you've described about going up,
5    coming down, going to the saw, cutting pieces, going back up?
6    A.   Correct.
7    Q.   And he did that -- how long did he do that just himself?
8    A.   I think it was like three, maybe three weeks.
9    Q.   Okay.  Now, did you -- so, did Skinny ever stop doing the
10   job?
11   A.   Other than on August 28th he did.
12   Q.   Yeah.  But I mean before then.
13   A.   No.
14   Q.   Okay.  So, just before -- so you remember August 28th was
15   the date of the accident, correct?
16   A.   I sure do.
17   Q.   Okay.  And you were at work that day?
18   A.   I was.
19   Q.   Now, on the day before that do you remember another worker
20   showing up for the first time?
21   A.   Right.  Yes, I do.
22   Q.   And describe that person.
23   A.   He was a young kid.  I don't remember what his name was, I
24   don't remember what he looked like, but I remember him being a
25   young boy, a young kid, probably 18 or 20.

1    Q.   Okay.  And what did you see that young kid doing?

2    A.   He was taking direction from Skinny coming down -- you

3    know, measuring things, cutting things.

4    Q.   All right.  And when he was there was Skinny generally on

5    the roof and the young kid down in the tent?

6    A.   Yes.

7    Q.   Okay.  On the day, August 28th, you said you were there?

8    A.   Yes, I was.

9    Q.   And do you recall learning about the fall?

10   A.   Yes.

11   Q.   And what happened, and what did you do?

12   A.   What had happened, one of my co-workers said, Oh, my

13   goodness, somebody fell off the roof.  911 had been called.  We

14   had a patient in the waiting room at that time, and I ran down

15   to one of the doctor's offices and got a nurse, and a doctor

16   came out.

17   Q.   Okay.  And the doctor actually went out?

18   A.   And they went outside.

19   Q.   Okay.  Now, did you go outside also?

20   A.   No, I did not.

21   Q.   Why not?

22   A.   Because I'm not a nurse, and I felt I'd be in the way.

23   Q.   Okay.  And a little later that day did you see that young

24   worker again?

25   A.   I did.

1    Q.   And what did you see him doing?

2    A.   He came into the building to tell us -- he had also gone

3    over to the hospital to see Kenny, and he was telling us that

4    he had been over there, but, of course, they couldn't --

5              MS. GRAHAM:  Objection.

6              THE COURT:  Sustained.

7    Q.   Don't say what he said.

8    A.   Okay.

9    Q.   Okay.  Can you just describe his mood and manner?

10   A.   He was shook up.

11   Q.   All right.

12   A.   Yeah, he was shook up.

13   Q.   Okay.  After August 28th did the job get finished?

14   A.   It did at some point in time.

15   Q.   All right.  And did you watch it being finished?

16   A.   No.

17   Q.   Did you not go out there?

18   A.   I did not go out there.

19   Q.   All right.  And were you interviewed by an OSHA officer at

20   some point?

21   A.   Yes, I was.

22   Q.   And did you tell him what you had seen?

23   A.   Yes, I did.

24             MR. DAVIS:  If I can have just a moment, your Honor.

25                      (Pause)

```
 1              MR. DAVIS:  No further questions.  Thank you.

 2              THE COURT:  Attorney Graham.

 3              MS. GRAHAM:  Thank you.

 4                        CROSS-EXAMINATION

 5   BY MS. GRAHAM:

 6   Q.   Good morning.

 7   A.   Good morning.

 8   Q.   How long had you been working in that building as a

 9   coordinator?

10   A.   10 1/2 years.

11   Q.   Okay.  Did you have any dealings with the building manager

12   there?

13   A.   I met him a couple of times.  He would come into the

14   office.

15   Q.   Was his name Allen Clark?

16   A.   What was that?

17   Q.   Was his name Allen Clark?

18   A.   No.

19   Q.   Was his name Shane?

20   A.   Yes.

21   Q.   And he worked for the building management company?

22   A.   Yes.

23   Q.   So, you're familiar with what Shane looks like, correct?

24   A.   Yes.

25   Q.   And Shane was often at 280 Pleasant Street during the
```

1    summer months, is that right --

2    A.    Correct.

3    Q.    -- because he had another business?  Was it a landscaping

4    business?

5    A.    Right.

6    Q.    And do you remember the name of that business?

7    A.    No, I don't.

8    Q.    Okay.  Does SKS sound familiar?

9    A.    Perhaps.

10   Q.    Okay.  So, Shane worked for the property manager, as we

11   just established, correct?

12   A.    Correct.

13   Q.    And he also had another business, a side business of

14   landscaping, right?

15   A.    I guess, yeah.

16   Q.    Okay.  Well, you saw him there?

17   A.    I saw him there, yeah.

18   Q.    Okay.  Thank you.  And would he have his own truck, like a

19   dump truck, and lawn mowers there?

20   A.    They did, yes.

21   Q.    Okay.  And Shane had other workers there with him; is that

22   right?

23   A.    Yes.

24   Q.    Okay.  And during this summer months that we're talking

25   about they were assisting putting windows in, correct?

1   A.   Correct.

2   Q.   So, Shane was there, and his workers were assisting doing

3   the windows, right?

4   A.   I don't know if it was his workers doing the windows or

5   not.  I don't remember that.

6   Q.   But you would see Shane there directing people; is that

7   right?

8   A.   Yes, I did.

9   Q.   Thank you.  I have no further questions.

10  A.   Okay.

11                      <u>REDIRECT EXAMINATION</u>

12  <u>BY MR. DAVIS</u>:

13  Q.   So, you do remember Shane LaLiberte; is that right?

14  A.   Yes.

15  Q.   And what did you know of Shane LaLiberte when you were

16  working there that summer in terms of what he did?

17  A.   All I knew is that he was the practice -- not the practice

18  manager, but he was the manager of the property, and I would

19  see him come in and talk with my practice manager.

20  Q.   All right.  And so, he would talk with your bosses about

21  how the lease was going for the property?

22  A.   Right.  Yes.

23  Q.   All right.  Did you know that he also had a landscape

24  company?

25  A.   No, I didn't.  I didn't realize that.

1   Q.   Okay.  And most of the time did you see Shane indoors, or

2   did you see him outdoors?

3   A.   I just saw him outdoors.

4   Q.   Okay.  And you said that you saw workers who at one point

5   were installing windows?

6   A.   Yes.

7   Q.   And that was not Skinny?

8   A.   I don't really remember.

9   Q.   Okay.  But when the siding is being installed up on the

10  roof, who is doing that work?

11  A.   The siding and the roof was being done by Skinny.

12  Q.   All right.  And for August of 2018 was anyone helping him

13  do that?

14  A.   No.

15          MR. DAVIS:  Nothing further.  Thank you.

16          THE COURT:  Anything further, Attorney Graham?

17          MS. GRAHAM:  No.  Thank you.

18          THE COURT:  Okay.  Ms. Myers, thank you.  You're

19  excused.

20          THE WITNESS:  Thank you.

21              (Witness stepped down)

22          THE COURT:  You may call your next witness.

23          MR. GINGRANDE:  Thank you, your Honor.  The government

24  calls Officer Brouillet to the stand.

25              (Pause)

1          THE WITNESS:  Take the witness stand, remain standing

2     and raise your right hand.

3          **WILLIAM BROUILLET,** duly sworn by the Clerk.

4          THE CLERK:  State your full name for the record and

5     spell your last name.

6          THE WITNESS:  William Brouillet, B-r-o-u-i-l-l-e-t.

7          THE CLERK:  Thank you very much.  Please be seated.

8                          DIRECT EXAMINATION

9     BY MR. GINGRANDE:

10    Q.   Good morning, Officer Brouillet.

11    A.   Good morning.

12    Q.   What do you do for work?

13    A.   Currently, I work in retail.

14    Q.   I'm sorry.  I couldn't hear that.  I think there was some

15    microphone feedback there.  Would you mind saying that again?

16    A.   My current occupation?

17    Q.   Yes.

18    A.   I work in retail.

19    Q.   And how long have you been doing that?

20    A.   A couple of years.

21    Q.   Were you in law enforcement prior to that?

22    A.   I was.

23    Q.   And how long were you in law enforcement?

24    A.   I was in law enforcement from 1999 to 2019.

25    Q.   And what was your title when you were in law enforcement?

1   A.   I was a patrol officer for the City of Concord.

2   Q.   And did you eventually become the Concord Police

3   Department's master police officer?

4   A.   Yes.

5   Q.   You were with the Concord Police Department for that full

6   time, for the full roughly 20 years?

7   A.   Right, for 20 years.

8   Q.   And, roughly, how long were you a master officer, master

9   patrolman?

10   A.   Nine to ten years.

11   Q.   What training do you have in investigations?

12   A.   I had several forms of in-house and external training, to

13   include photography, DNA, fingerprints, crime scene

14   investigations.

15   Q.   When you mentioned crime scene investigations, did that

16   have to do with evidence and evidence gathering as well?

17   A.   Correct.

18   Q.   And conducting interviews of people on the crime scenes?

19   A.   Correct.

20   Q.   Okay.  And if you had to estimate, roughly how many

21   investigations are we talking, over a thousand, or hundreds or

22   less than that?

23   A.   Over 20 years well over a thousand.

24   Q.   Okay.  And were you also an evidence technician --

25   A.   I was.

1    Q.    -- during that time?  And for how many years was that?

2    A.    Approximately 15 years of my tenure.

3    Q.    And were you also a field training officer during that

4    time?

5    A.    I was for approximately 11 years.

6    Q.    Great.  So, now I'd like to direct your attention to

7    August 28th of 2018.  Were you on duty that day?

8    A.    I was.

9    Q.    And did you respond to the scene of an accident?

10   A.    I did.

11   Q.    Was that from a dispatch report?

12   A.    Yes.  It was a 911 call that we responded to.

13   Q.    Okay.  And what did the dispatch report inform you of?

14   A.    To the best of their knowledge, they could tell at that

15   time they dispatched it it was possibly a fall from a roof.

16   Q.    Where was the potential fall from the roof?

17   A.    280 Pleasant Street in Concord.

18   Q.    Can you describe the scene when you arrived there?

19   A.    Upon my arrival, Concord Fire was on scene.  I observed an

20   office building with various ladders and staging in front of

21   it, in front of that I call it an "easy-up" or a "pop-up" tent

22   with some construction equipment underneath it.

23         MS. GRAHAM:  I'm sorry, your Honor.  May I interrupt?

24   Could we have a sidebar?

25         THE COURT:  Yes.

1    (SIDEBAR CONFERENCE AS FOLLOWS):

2          MS. GRAHAM:  I'm sorry to interrupt, but I just

3    realized he's not wearing a clear mask.  I don't know if that's

4    a requirement by the Court, but in many of the juror

5    questionnaires many of them were concerned that they would not

6    be able to see facial expressions, and so I'm asking that

7    witnesses do wear a clear mask.

8          THE COURT:  Can you get a clear mask for him?

9          MR. GINGRANDE:  Donna is hearing, I think.  Yeah,

10   she's responding.  I think that would be great.

11   (END OF SIDEBAR CONFERENCE)

12         THE COURT:  We're going to give you a clear mask

13   that's clear so that the jury can see your whole face.

14   Hopefully, it's not too hard to get on.

15         There we go.  Thank you, sir.

16         THE WITNESS:  All right.

17         THE COURT:  I think that's fine.

18         MR. GINGRANDE:  Great.  Thank you.

19   (END OF SIDEBAR CONFERENCE)

20   Q.   You were hiding a beard under that mask.  So, I believe,

21   Officer Brouillet, when we left off you were describing the

22   scene when you arrived.

23   A.   Correct.

24   Q.   If you could just get back to that.

25   A.   Sure.  Upon my arrival, Concord Fire Paramedics were on

1  scene.  I observed an office building that had various ladders

2  and staging in front of it, and then in front of that I call it

3  like an easy-up or a pop-up tent with some equipment underneath

4  that.

5  Q.   And can you describe -- when you said there was a pop-up

6  tent, was that in front of the building as you arrived, or

7  where was that located?

8  A.   Yeah.  It was I don't know how far from the building, but

9  it was in front of it.

10  Q.   Okay.  And you said there was equipment under there?

11  A.   Yes.

12  Q.   What type of equipment, if you recall?

13  A.   Just construction equipment.  I can't remember specifics

14  what was there.

15  Q.   Okay.  And when you arrived on the scene did you see

16  anything being done to the building?

17  A.   It was being sided, if I remember correctly.  Vinyl siding

18  or some sort of siding was being put on the building.

19  Q.   Okay.  And just to be clear, you could see that from the

20  equipment, not necessarily people doing work at the time; is

21  that correct?

22  A.   Correct.

23  Q.   Okay.  Did you do anything to secure the scene when you

24  arrived at the building?

25  A.   Yes.

1    Q.   And what did you do?

2    A.   At one point I took what we call "crime scene tape," which

3    is yellow tape, you've probably seen it on TV, and wrapped it

4    around the best perimeter I could get around that area.

5    Q.   And why did you do that?

6    A.   Common practice.

7          MS. GRAHAM:  Objection, your Honor.  Sidebar, please?

8          THE COURT:  Sure.

9    (SIDEBAR CONFERENCE AS FOLLOWS):

10         MS. GRAHAM:  Your Honor, I just wanted to -- I don't

11    know if he was going to say, We were investigating a negligent

12    homicide, because a medical examiner came on scene, so I just

13    wanted to make sure that that wasn't blurted out.

14         THE COURT:  Yeah.  Hopefully, you're not going to get

15    into anything about that.

16         MR. GINGRANDE:  No, not at all, not at all.  He's been

17    instructed not to talk about it.

18         THE COURT:  All right.  Good.  Okay, then.

19    (END OF SIDEBAR CONFERENCE)

20         THE COURT:  Go ahead and continue, Attorney Gingrande.

21         MR. GINGRANDE:  Yes.  Thank you, your Honor.

22    Q.   So, I believe the last question I asked you was just why

23    did you secure the scene?

24    A.   At that point it was unknown what exactly happened,

25    whether it was an actual crime or an accident.

1          MS. GRAHAM:  Objection.

2          THE COURT:  Yes.  Sustained.

3   Q.   Without getting into whether or not this was a crime, in

4   investigations do you typically secure a scene when you arrive?

5   A.   Yes.

6   Q.   And is it because you just don't know what has happened

7   yet?  Is that the reason?

8   A.   For the most part we need to investigate when we get

9   there, and everything's not known immediately.

10  Q.   And you have to collect information?

11  A.   Information --

12         MS. GRAHAM:  Object, your Honor, on leading grounds.

13         THE COURT:  I'm sorry?

14         MS. GRAHAM:  On leading grounds.

15         THE COURT:  I think he's leading for reasons we just

16  discussed.  I'll allow it --

17         MR. GINGRANDE:  Thank you, your Honor.

18         THE COURT:  -- for some limited amount of time.

19         Go ahead.

20         MR. GINGRANDE:  Thank you, your Honor.

21  Q.   And it's just to collect information while you figure out

22  what's happening or what has happened?

23  A.   Right.  It gives us time to do that, yes.

24  Q.   Now, getting back to this particular day, after securing

25  the scene did you speak to witnesses there?

1    A.    I did.

2    Q.    And who do you recall speaking to?

3    A.    I initially spoke with Scott Marcotte from the Concord

4    Fire Department in regards to the status of the victim who had

5    fallen off the roof.

6    Q.    And who else do you recall speaking to?

7    A.    I spoke to a gentleman, Mr. Morrissey.  He had observed --

8           MS. GRAHAM:  Objection.

9           THE COURT:  Sustained.

10   Q.    You don't have to say what he observed, but Mr. Morrissey?

11   A.    I spoke to Mr. Morrissey, yes.

12   Q.    Okay.  Anyone else you spoke to?

13   A.    ▮▮▮▮▮▮▮▮▮▮ or ▮▮▮▮▮▮▮

14   Q.    Okay.  And who was ▮▮▮▮▮▮▮

15   A.    ▮▮▮▮▮▮▮▮ was a coworker of the victim's.

16   Q.    And what observations did you make of ▮▮▮▮▮▮▮ demeanor

17   when you speak to him?

18   A.    He was very upset.

19   Q.    Do you recall anything else in your interaction with ▮▮▮

20   ▮▮▮?

21   A.    I don't recall, no.

22   Q.    Okay.  Well, without going into specifically what he said,

23   did you discuss the accident?

24   A.    Yes, I did speak with him briefly about what he observed.

25   Q.    Okay.  And he shared his observations with you?

1    A.   He did, yes.

2    Q.   Okay.  And did you speak with a Robert Wilkins that day as

3    well?

4    A.   I did.

5    Q.   And, again, without going into specifically what he said,

6    did Mr. Wilkins point out anything to you on the scene?

7    A.   He did.

8    Q.   Okay.  And what did he point out to you?

9    A.   Mr. Wilkins told me that prior to my arrival --

10              MS. GRAHAM:  Objection.  Hearsay.

11              THE COURT:  Sustained.

12   Q.   I'm sorry, Officer, but, yeah, just without saying what

13   Mr. Wilkins said, can you just explain what he pointed out to

14   you?

15   A.   Some materials.

16   Q.   Okay.  Materials.  And when you say "materials," what type

17   of materials are you referring to?

18   A.   Building materials.

19   Q.   Okay.  Now, you also said that you spoke to -- I'm sorry.

20   You haven't said that yet.  Was there anyone else you spoke to?

21   A.   I spoke with Mr. Craigue as well.

22   Q.   Okay.  And when you say "Mr. Craigue," are you referring

23   to the defendant, Nate Craigue?

24   A.   Yes.

25   Q.   And in that conversation did Mr. Craigue identify the

1    victim?

2    A.   He did.

3    Q.   And who did he identify the victim as?

4    A.   Mr. Kenny McKenna.

5    Q.   Did he say anything about Kenny McKenna -- well, actually,

6    before we get into that, did Mr. Craigue also identify the

7    victim's vehicle?

8    A.   He did.

9    Q.   And what did he identify as being the victim's vehicle?

10            MS. GRAHAM:  Your Honor, may I have a sidebar?

11            THE COURT:  Yes.

12   (SIDEBAR CONFERENCE AS FOLLOWS):

13            MS. GRAHAM:  Your Honor, I object to them continuously

14   calling Mr. McKenna "the victim."

15            THE COURT:  Over and over again, repetitively calling

16   Mr. McKenna a "victim."  So, I think --

17            MR. GINGRANDE:  I apologize.

18            THE COURT:  Okay.  If you can correct that from here

19   on.

20            MS. GRAHAM:  Your Honor, can I ask for a curative

21   instruction, which is that he is merely a subject in this case

22   and not a victim, because he is not the victim in this case and

23   the jury should understand that?

24            THE COURT:  Yes.

25            MR. GINGRANDE:  I would not oppose that.

1    (END OF SIDEBAR CONFERENCE)

2         THE COURT:  Members of the jury, you've heard

3    testimony about Mr. McKenna.  You've heard him referred to as a

4    "victim."  Mr. McKenna fell and had an accident that day, and

5    you've heard testimony about that.  Mr. McKenna is not a victim

6    of the charged crime, and so you are not to consider him a

7    victim of the charged crime.

8         Go ahead, Attorney Gingrande.

9         MR. GINGRANDE:  Thank you, your Honor, and I apologize

10   for referring to him that way.

11   Q.   So, what we were discussing last was whether or not Mr.

12   Craigue had identified the subject of the accident, and you had

13   said he identified the subject, the person who had had the

14   accident, as Mr. McKenna; is that correct?

15   A.   Correct.

16   Q.   Okay.  And did Mr. Craigue identify the vehicle of the

17   person who had had the accident?

18   A.   Yes, he did.

19   Q.   And was that vehicle, was that parked at the job site at

20   280 Pleasant Street?

21   A.   Yes, it was.

22   Q.   And did you confirm that that Volvo -- and you had said it

23   was a Volvo; is that right?

24   A.   It was a dark-colored Volvo, yes.

25   Q.   And did you confirm that that Volvo belonged to the person

1   who had had the accident, Mr. McKenna?

2   A.   I did.

3   Q.   Okay.  And how did you confirm that?

4   A.   I ran the license plate through our dispatch.

5   Q.   Did Mr. Craigue tell you who Mr. McKenna was?

6   A.   Yes.  He said that he was a subcontractor who was helping

7   him with this particular job.

8   Q.   Okay.  And did Mr. Craigue say anything else that you

9   recall?

10   A.   That Mr. McKenna suffered from diabetes, and that he,

11   meaning, Mr. Craigue, was the owner of the business.

12   Q.   Did you also interact with an agent from OSHA that day?

13   A.   Yes.  A Scott Kelly.

14   Q.   I'm sorry.  You said -- what was his name?

15   A.   Scott Kelly.

16   Q.   Scott Kelly.  Okay.

17         MR. GINGRANDE:  With the Court's indulgence?

18         THE COURT:  Sure.

19                    (Pause)

20         MR. GINGRANDE:  No further questions.

21         THE COURT:  Thank you.

22         Attorney Graham.

23                    CROSS-EXAMINATION

24   BY MS. GRAHAM:

25   Q.   Good morning, sir.

1    A.    Good morning.

2    Q.    I would just like to try to get a timeline of your

3    involvement on August 28th.  Okay?

4    A.    Sure.

5    Q.    You arrived on site at approximately 11:36 a.m.; is that

6    correct?

7    A.    Correct.

8    Q.    And Concord Fire Department was already there, correct?

9    A.    Correct.

10   Q.    And you met or you saw ▆▆▆▆▆ there, correct?

11   A.    I'm sorry?

12   Q.    You saw ▆▆▆▆▆?

13   A.    Yes.

14   Q.    And you saw Nate Craigue there?

15   A.    Correct.

16   Q.    And Scott Kelly didn't arrive until approximately 12:12

17   a.m., is that correct?

18   A.    That's correct.  Yeah.

19   Q.    And at that time, prior to Mr. Kelly arriving, ▆▆▆▆▆

20   had left to go to the hospital; is that right?

21   A.    That's correct.

22   Q.    Now, you talked a little bit about your experience.  You

23   have over 20 years of experience in law enforcement, correct?

24   A.    Correct.

25   Q.    And you've received training on conducting interviews,

1   right?

2   A.   Correct.

3   Q.   And you know the importance of when you arrive to a scene

4   to separate individuals if you're going to talk with them?

5   A.   Correct.

6   Q.   Correct?  You don't want to talk to multiple people all at

7   the same time, correct?

8   A.   Correct.

9   Q.   You want to speak to them individually so you can get

10  their statement; is that right?

11  A.   Correct.  Yes.  Correct.

12          MS. GRAHAM:  Thank you very much.

13          MR. GINGRANDE:  Briefly, your Honor, if I may?

14          THE COURT:  Sure.  Go ahead.

15                  REDIRECT EXAMINATION

16  BY MR. GINGRANDE:

17  Q.   Officer Brouillet, do you happen to recall if Mr. McKenna

18  was still on the scene when you arrived?

19  A.   I don't.  Concord Fire was still there with him when I

20  arrived.  I don't know when they left and how long I was there,

21  if that answers your question.

22  Q.   Okay.  Well, you said that you believe that Concord Fire

23  was there?

24  A.   Correct.

25  Q.   But you didn't personally observe -- are you saying you

1   didn't personally observe whether they were with Mr. McKenna or

2   not?

3   A.   I did not see Mr. McKenna, myself, upon my arrival.  The

4   ambulance was still there, but I don't know if Mr. McKenna was

5   in the ambulance or just out of my view initially.

6             MR. GINGRANDE:  Okay.  No further questions.  Thank

7   you.

8             THE COURT:  Anything else, Attorney Graham?

9             MS. GRAHAM:  No, thank you.

10            THE COURT:  All right.  Officer Brouillet, thank you

11  very much.  You may be excused.

12            THE WITNESS:  All right.  Thank you very much.

13                      (Witness stepped down)

14            THE COURT:  You may call your next witness.

15            MR. GINGRANDE:  Thank you, your Honor.  The government

16  calls ▓▓▓▓▓▓▓▓▓▓ to the stand.

17                      (Pause)

18            THE CLERK:  You can take the stand.  Please remain

19  standing and raise your right hand.

20            ▓▓▓▓▓▓▓▓▓▓▓ duly sworn by the Clerk.

21            THE CLERK:  Thank you.  Please state your full name,

22  spell your last name for the record.

23            THE WITNESS:  ▓▓▓▓▓▓▓▓▓ .

24            THE CLERK:  Thank you very much.  Please be seated.

25                      DIRECT EXAMINATION

 1    BY MR. GINGRANDE:

 2    Q.    Good morning, ███████.

 3    A.    Good morning.

 4    Q.    How old are you?

 5    A.    ████

 6    Q.    And where are you from?

 7    A.    ██████

 8    Q.    How long have you lived in New Hampshire?

 9    A.    My entire life.

10    Q.    And how far did you go in school?

11    A.    Some college.

12    Q.    Did you graduate from ██████████████████?

13    A.    I did.

14    Q.    And do you have any children?

15    A.    I do.

16    Q.    How many children?

17    A.    ████

18    Q.    Okay.   What do you currently do for work?

19    A.    I'm a ███████████

20    Q.    And how long have you been doing that?

21    A.    About eight months.

22    Q.    Prior to your current job were you employed by a company

23    called █████████████?

24    A.    I was.

25    Q.    And what type of company are they?

```
 1    A.    They do glass installation.

 2    Q.    And what work were you doing for them?

 3    A.    I ███████████████████████████.

 4    Q.    And just prior to working for ████████████where

 5    were you employed?

 6    A.    I was employed at a rehab.

 7    Q.    And you said a rehab --

 8    A.    Yes.

 9    Q.    -- facility?

10    A.    Yup.

11    Q.    And what did you do for them?

12    A.    I was ██████.

13    Q.    What does that mean?

14    A.    ████████████████████████████████████

15    ██████████████████████████████████████████

16    ████████████████████████████████████

17    Q.    And just prior to that were you employed at ████

18    ██████████?

19    A.    I was.

20          MR. MIRHASHEM:  Objection.  Leading.

21          MR. GINGRANDE:  I can rephrase, your Honor.

22          THE COURT:  Good.

23    Q.    Just prior to that where were you employed?

24    A.    ████████████████████

25    Q.    And what type of company is ████████████?
```

```
 1    A.   They build homes.

 2    Q.   And what work did you do for them?

 3    A.   I ██████████████████████

 4    Q.   Okay.  And you say ████████████████████

 5    A.   Yup.

 6    Q.   What does that mean?

 7    A.   ████████████████████████████████████

 8    Q.   Now I want to talk to you about a job you had before ████

 9    ████████████████  in 2018.  So, I would like to direct your

10    attention to August of 2018.  Did you get a new job that month?

11    A.   I did.

12    Q.   And what was the job?

13    A.   A laborer.

14    Q.   What caused you to apply for the job?

15    A.   I was currently jobless and needed work.

16    Q.   Did you go on Craigslist to find the job?

17    A.   I did.

18         MR. GINGRANDE:  And, Ms. Sheff, if we could show the

19    witness what has been marked for identification as Government

20    Exhibit 401, please.

21    Q.   ████████, are you able to see a document right now on your

22    screen?

23    A.   I am.

24    Q.   Okay.  And do you recognize the information on this

25    document?
```

1   A.   I do.

2   Q.   And what is it?

3   A.   It is the Craigslist ad for the job, for Craigue & Sons.

4   Q.   Does it appear to be a complete and accurate record of the

5   information in the Craigslist post that you had saw when you

6   applied for the job?

7   A.   Yes.

8          MR. GINGRANDE:  Your Honor, at this time I would move

9   to strike the identification and admit this document into

10  evidence as Government Exhibit 401.

11         THE COURT:  Any objections?

12         MR. MIRHASHEM:  I would like to briefly voir dire the

13  witness.  I object and ask for voir dire.  I can explain, your

14  Honor.

15         THE COURT:  Sidebar.

16  (SIDEBAR CONFERENCE AS FOLLOWS):

17         MR. MIRHASHEM:  Your Honor, this exhibit is a computer

18  printout, it's not the actual ad that the witness saw, and he

19  was led to say the information in there is accurate.  Fine, he

20  can describe the information, but there's no reason for a

21  document that's not the ad he actually saw to be introduced

22  into evidence.

23         THE COURT:  Attorney Gingrande?

24         MR. GINGRANDE:  This is the information that was

25  posted, he said it was the information that was posted, and

1    this is a retrieval of that document.  Obviously, on Craigslist

2    from a post that's three years old the only way to obtain such

3    a document printout is to print out the document, and so I

4    would strongly ask that this be admitted.  And he has personal

5    knowledge of it.

6              THE COURT:  Go ahead.

7              MR. GINGRANDE:  And we also do have a certification,

8    your Honor.  For what it's worth, we do have a certification

9    that it is a business record, it is a self-authenticated

10   business record, and that is Government Exhibit 402.

11             MR. MIRHASHEM:  Your Honor, the fact that they

12   couldn't obtain the original doesn't mean this comes in.  This

13   witness, if I voir dire him, I think I could easily establish

14   this is not a fair and accurate representation of what he

15   actually saw.  The content of it are words that he can testify

16   to, but there's no reason for a document that's not the one

17   that he saw to go to the jury deliberation.

18             THE COURT:  Attorney Gingrande, Attorney Mirhashem

19   appears to be correct.  This is not the ad he placed, this is a

20   different document, and this witness can't establish that this

21   is a business record of Craigslist.  Attorney Mirhashem does

22   not object to the evidence, the contents of the ad, which

23   appears to be admissible, but the document is excluded.

24   Objection sustained.  Go ahead.

25   (END OF SIDEBAR CONFERENCE)

1    Q.    So, _____, I believe where we left off you said that

2    you had responded to an ad on Craigslist for a job at Craigue &

3    Sons; is that correct?

4    A.    It is.

5    Q.    And when you saw that ad how did you see it?

6    A.    I believe my mother actually sent it to me.

7    Q.    Okay.  And do you recall was that around August 21st of

8    2018?

9    A.    Yes.

10           MR. MIRHASHEM:  Objection.  Leading.

11           THE COURT:  Sustained.

12   Q.    Do you recall the time when you saw the document?

13   A.    Yes.  It was, I'd say, the same day that I actually called

14   Nate.

15   Q.    Okay.  And approximately when was that?

16   A.    I believe it was a Thursday prior to me starting work on

17   the 28th.

18   Q.    And when you said you started work, that was on August

19   28th?  Is that what you said?

20   A.    27th, I'm sorry.

21   Q.    August 27th?

22   A.    Yes.

23   Q.    You said that you saw this on the Thursday directly prior

24   to that?

25   A.    Yes.

```
 1    Q.    Okay.  So, a few days before August 27th is fair to say?
 2    A.    Yes.
 3    Q.    And the job posting that you saw, do you recall the
 4    description of the work?
 5    A.    Yes.
 6    Q.    And what was the description?
 7    A.    It was installing windows and siding.
 8    Q.    And do you recall where it was listed as being or what
 9    city?
10    A.    Concord.
11    Q.    Concord, New Hampshire?
12    A.    Yeah.
13    Q.    Okay.  And were you living in Concord at the time?
14    A.    I was.
15    Q.    And do you recall whether the job posting said that any
16    training would be provided?
17    A.    Yes.
18    Q.    What did the job posting say about that?
19    A.    "Will train."
20    Q.    Do you recall if the job posting said anything about
21    compensation?
22    A.    Yes.  It said depending on experience.
23    Q.    And do you recall whether it said that an hourly rate
24    would be paid?
25    A.    Yes.
```

1   Q.   And what did it say about whether or not there would be an

2   hourly rate?

3   A.   It would be depending on experience.

4   Q.   And so, it would be paid by the hour?  Is that what the

5   posting said?

6   A.   Yes.

7   Q.   Do you recall if it said whether you'd be paid weekly or

8   monthly or yearly?

9   A.   Weekly.

10   Q.   Weekly.  Okay.  Do you recall whether it said whether the

11   employment would be full time or part time?

12   A.   Full time.

13   Q.   And did it say employment in the post?

14   A.   Yes, full time.

15   Q.   Okay.  Did it say who the contact person was?

16   A.   Yes.

17   Q.   And who was the contact person?

18   A.   Nate Craigue.

19   Q.   And was there any information provided for Mr. Craigue?

20   A.   A phone number.

21   Q.   Did you call that phone number?

22   A.   I did.

23   Q.   And what happened when you called that number?

24   A.   We spoke briefly.

25   Q.   And what did you -- well, did someone pick up?  Let's

1    start there.

2    A.   Yes, yes.  Nate picked up.

3    Q.   Nate picked up, you said?

4    A.   Yes.

5    Q.   Okay.  And he confirmed that it was Nate?

6    A.   Yes.

7    Q.   And when Nate picked up, had you known Mr. Craigue

8    previously?

9    A.   I did not.

10   Q.   What was the conversation that you had with Mr. Craigue

11   when he picked up the phone?

12   A.   I called, said I came across the Craigslist ad, and that I

13   was interested in the job.

14   Q.   Okay.  And did he tell you that he was looking for someone

15   to replace a worker who had previously stopped working?

16            MR. MIRHASHEM:  Objection.  Leading.

17            MR. GINGRANDE:  Sidebar, your Honor?

18            THE COURT:  Okay.

19   (SIDEBAR CONFERENCE AS FOLLOWS):

20            MR. GINGRANDE:  Can you hear me?

21            THE COURT:  Yes, I can.

22            MR. GINGRANDE:  Your Honor, I am leading for a purpose

23   here.  What he had actually said was that he was -- what Mr.

24   Craigue had actually said was that a worker had been injured

25   and that he was replacing an injured worker.  I do not want to

1   get into the injury at all.  That's why I'm leading him in

2   saying, Were you replacing a worker who had suddenly stopped

3   working?

4           MR. MIRHASHEM:  What is the relevance of why he's

5   replacing someone to the Darden factor or anything else in this

6   case?

7           MR. GINGRANDE:  Because the relevance is that there

8   was no one else doing the work, and that he needed someone to

9   replace someone who had been assisting Mr. McKenna.

10          THE COURT:  I'm going to allow it.  Go ahead.

11          MR. GINGRANDE:  Thank you, your Honor.

12  (END OF SIDEBAR CONFERENCE)

13  Q.   So, I believe the last question I asked was did

14  Mr. Craigue tell you he was looking for someone to replace a

15  worker who had recently stopped working?

16  A.   Yes.

17  Q.   And did he say any particular qualities he was looking for

18  in the person that he hired for the job?

19  A.   He said he wanted someone to be dependable and show up.

20  Q.   Did you arrange a time to meet in person with Mr. Craigue?

21  A.   I did.

22  Q.   And what was that arrangement?

23  A.   We arranged to meet at Milano's in Concord.

24  Q.   What is Milano's?

25  A.   A pizza place.

1    Q.   Did you agree on a time to meet?

2    A.   Yes.

3    Q.   And I think you had testified this earlier.  Did you say

4    that you arranged to meet on the same date that you called him?

5    A.   Yes.

6    Q.   And you said that was a Thursday, I believe?

7    A.   Yes.

8    Q.   Was it your understanding that you already had the job at

9    the point before you met Mr. Craigue?

10   A.   No.

11   Q.   So, did you view this in-person meeting as a job interview

12   of sorts?

13            MR. MIRHASHEM:  Objection.  Leading.

14            THE COURT:  It is leading.  I'll allow it.  Go ahead.

15   A.   Yes.

16   Q.   All right.  So, what happened at that meeting?

17   A.   We spoke for about 10 to 15 minutes.  He reiterated that

18   he was looking for someone dependable and reliable.  I told him

19   I had very little experience with siding, but some.  And I also

20   mentioned that I wanted to make sure that I was on the books,

21   because I needed to prove income to have the state qualify me

22   getting help for child care.

23   Q.   So, we can stop there for a second, and then I just want

24   to back up.

25   A.   All right.

1    Q.    Was this a one-on-one meeting with Mr. Craigue?

2    A.    Yes.

3    Q.    And do you recognize Mr. Craigue in the courtroom today?

4    A.    I do.

5    Q.    And can you identify him by an article of clothing that

6    he's wearing?

7    A.    A pink shirt.

8              MR. GINGRANDE:  Your Honor, may the record reflect

9    that the witness has identified the defendant, Mr. Craigue?

10             THE COURT:  Yes.

11             MR. GINGRANDE:  Thank you.

12   Q.    So, you said just now that you discussed your experience

13   and you told him you had little experience; is that right?

14   A.    Yes.

15   Q.    Did he tell you what type of work he -- well, did he say

16   what type of work he would be doing?

17   A.    Yeah.  Basically, it's a labor person, would be helping

18   another guy side a building in Concord.

19   Q.    So, that's typically referred to as "siding work;" is that

20   right?

21   A.    Yes.

22   Q.    What is siding work?

23   A.    So, it's basically the last step of waterproofing a home

24   on the outside.  So, there's vinyl siding.  There's different

25   kinds of siding, basically, that you can put up.

```
1    Q.   And so, that's on the exterior of the home?

2    A.   It is.

3    Q.   And had the job posting said that that would be part of

4    the job?

5    A.   It only said windows and siding installation.

6    Q.   Right.

7    A.   Yeah.

8    Q.   So, those two things.  So, it did mention siding, okay?

9    A.   Yup.

10   Q.   Were you a specialist in siding work?

11   A.   No.

12   Q.   Did you have any experience with siding at the time?

13   A.   Very little.

14   Q.   Did you have any experience with window installation?

15   A.   Very little.

16   Q.   Did you make any representation to Mr. Craigue that you

17   had your own company to do siding work or window installation?

18   A.   No.

19   Q.   Did you make any representation to Mr. Craigue that you

20   had your own company to do any type of work?

21   A.   No.

22   Q.   Did you have your own company at that time?

23   A.   I did not.

24   Q.   Did you have your own business card at that time?

25   A.   I did not.
```

1  Q.   Did you have your own equipment for doing construction

2  work at that time?

3  A.   I did not.

4  Q.   Did you tell Mr. Craigue that you had very little

5  experience in siding work?

6  A.   Yes.

7  Q.   And was he okay with your lack of experience?

8  A.   Yes.

9  Q.   Did Mr. Craigue tell you how frequently you would be paid

10  if you took the job at that meeting?

11  A.   Weekly.

12  Q.   That, again, that confirmed what was in the job post?

13  A.   Right.

14  Q.   Okay.  Did Mr. Craigue tell you in that meeting that if

15  you took the job you'd be paid by the hour?

16  A.   Yes.

17  Q.   And were you under the impression that you would be an

18  employee if you took the job?

19  A.   Yes.

20        MR. MIRHASHEM:  Objection.  Leading.

21        THE COURT:  Sustained.

22        MR. MIRHASHEM:  Move to strike the response.  He had

23  already responded, your Honor.  I move to strike the response.

24        THE COURT:  All right.  That motion is granted, and

25  his testimony regarding the answer to the leading question is

1    stricken.

2         MR. GINGRANDE:  Okay.

3    Q.   Returning to the job interview, did Mr. Craigue ever tell

4    you that you were going to be a subcontractor?

5    A.   No.

6    Q.   Did you tell him that you wanted -- I think before you

7    said you told him that you wanted your payments to be

8    documented; is that right?

9    A.   Correct.

10   Q.   And can you say -- I had missed it.  Could you say again

11   why that was?

12   A.   Because I needed to prove my income to the state in order

13   to get the child care I needed for my son at the time.

14   Q.   Okay.  And did you say that to Mr. Craigue?

15   A.   I did.

16   Q.   And what was his response?

17   A.   It was not a problem.

18   Q.   And did you discuss tax forms in that context?

19   A.   No.

20   Q.   Well, let me ask a separate question.  Did you discuss

21   what's known as a 1099 form?

22   A.   I don't recall then.

23   Q.   You don't recall.  Okay.  Well, I'll ask you a question.

24   Maybe this will help refresh your recollection.

25         MR. MIRHASHEM:  Objection, your Honor.  The witness

1    has not testified that he needs something to refresh his

2    recollection.

3              MR. GINGRANDE:  I could ask the question, your Honor.

4              THE COURT:  All right.  Move along.

5    Q.   At that time had you ever seen or submitted a 1099 form

6    before?

7              MR. MIRHASHEM:  Objection.  Relevance.

8              THE COURT:  Sustained.

9    Q.   Did Mr. Craigue ever provide you with any tax forms at

10   that meeting?

11   A.   He did not.

12   Q.   Did you discuss with Mr. Craigue providing information --

13   did you discuss providing information to Mr. Craigue for the

14   purposes of a tax form?

15   A.   I don't recall.

16   Q.   Did you discuss with Mr. Craigue the fact that the job was

17   meant to be full time?

18   A.   Yes.

19   Q.   And did Mr. Craigue say what the hours of the job were?

20   A.   Yes.

21   Q.   What did he say they were?

22   A.   8:00 to 4:00 Monday through Friday.

23   Q.   At the end of the interview with Mr. Craigue did Mr.

24   Craigue say whether you got the job?

25   A.   Yes.

1    Q.   And how did you respond?

2    A.   Excuse me?

3    Q.   How did you respond when he said you got the job?

4    A.   I was excited.

5    Q.   Okay.  Did Mr. Craigue tell you where to report to work?

6    A.   Yes.

7    Q.   And where was that?

8    A.   280 Pleasant Street, on Monday.

9    Q.   And so, on Monday -- I believe you said earlier that would

10   have been August 27th?

11   A.   Yes.

12   Q.   Did he say what time to report to work on Monday?

13   A.   For 8:00.

14   Q.   8:00.  Okay.  Did he tell you to bring any equipment?

15   A.   Any hand tools I might have.

16   Q.   Okay.  And did you have hand tools at the time?

17   A.   Not really.  I had to borrow some from my father.

18   Q.   Okay.  Other than the hand tools did he say whether you

19   had to bring anything else, any other equipment?

20   A.   No.

21   Q.   Was it your understanding at the time that you would show

22   up and the equipment would be there?

23   A.   Yes.

24   Q.   Did you expect Mr. Craigue to provide you with training?

25   A.   Yes.

1   Q.   And why was that?

2   A.   Well, the post says, "Will train," and we also discussed

3   that I had very little experience.

4   Q.   Okay.  And did he provide you with any contract to sign

5   for the work that he wanted you to do?

6   A.   No.

7   Q.   Did you provide him with any contract to sign for the

8   work?

9   A.   I did not.

10  Q.   Did he say, Mr. Craigue that is, did Mr. Craigue say you

11  would have the ability to hire people to perform the work?

12  A.   No.

13  Q.   So, did you, in fact, go to 280 Pleasant Street the

14  following Monday, on August 27th?

15  A.   I did.

16  Q.   How did you get there?

17  A.   My vehicle.

18  Q.   And were you the first to arrive?

19  A.   I was.

20  Q.   Did you meet anyone on site?

21  A.   Yes.  Skinny showed up.

22  Q.   And when you say "Skinny," do you know Skinny's full name?

23  A.   Kenny McKenna.

24  Q.   Okay.  Had he introduced himself as Skinny?  What's the

25  reason you were referring to him as Skinny?

1    A.    Nate said his name was, introduced us together as Skinny.

2    Yes.

3    Q.    So, Nate was the one who introduced you to Skinny?

4    A.    Yes.

5    Q.    And so, does that mean that you also met with Mr. Craigue

6    on the job site?

7    A.    Yes.

8    Q.    And what do you remember from your interactions with Mr.

9    Craigue that day?

10   A.    When he showed up I walked over.  He introduced us, and

11   then he showed me around the property, showed me what had

12   already been done, showed me the equipment trailer out back,

13   and we went back out front, showed me the materials, and he

14   uncovered the saw, showed me the saw they were using to cut the

15   siding.

16            MR. GINGRANDE:  Okay.  So, actually, I'm sorry, brief

17   sidebar, your Honor?

18            THE COURT:  Sure.

19   (SIDEBAR CONFERENCE AS FOLLOWS):

20            MR. GINGRANDE:  Your Honor, at this time we would like

21   to introduce an exhibit that the Court does not have a hard

22   copy of, so I was wondering if I could approach and show you a

23   copy.  This has been shown to defense counsel.

24            THE COURT:  Sure.

25            MR. GINGRANDE:  And then, you know, we can take it

1    from there.  I'm not sure if there's an objection.  Maybe we

2    should discuss it now.

3            THE COURT:  Let's go ahead and discuss it now.  Is

4    there an objection to it?

5            MR. GINGRANDE:  And just to say what it is, this is

6    the one we provided you with today.  This is the picture of the

7    site that doesn't have any of the ladders or anything like

8    that.

9            MR. MIRHASHEM:  We have no objection.

10            MR. GINGRANDE:  No objection?

11            MR. MIRHASHEM:  We have no objection to what is marked

12    in my copy as Government's Exhibit 204 For Identification as a

13    Concord Hospital, Pleasant Street Family Medicine sign up front

14    marked as a full exhibit.

15            MR. GINGRANDE:  Yes, that's the one.  Okay, very good.

16    I'll provide a hard copy to your Honor.

17    (END OF SIDEBAR CONFERENCE)

18            THE COURT:  Thank you, Attorney Gingrande.  Go ahead.

19            MR. GINGRANDE:  Thank you, your Honor.

20    Q.   At this time I would like to show you a copy of what's

21    been marked for identification as Government Exhibit 205, and

22    if you can just tell me when you see it on the screen.

23            MR. DAVIS:  205 or 204?  I'm sorry.

24            MR. GINGRANDE:  I'm actually just introducing 205.

25    Q.   Can you see that on your screen, ▉▉▉▉▉▉?

1    A.    I cannot.

2    Q.    Okay.  We'll wait.

3          MR. DAVIS:  I think 204 was handed up, and 204 was the

4    subject of a non-objection by defense.

5          MR. MIRHASHEM:  We also do not object to 205.

6          MR. GINGRANDE:  I apologize.  Does your copy, your

7    Honor, say --

8          THE COURT:  It says 205.

9          MR. GINGRANDE:  It does say 205.  Okay.  Thank you.

10   Q.    And, ████████, can you see that on your screen now?

11   A.    I cannot.

12   Q.    Still cannot see it.  Okay.

13         MR. GINGRANDE:  Is there a way to show that to the

14   witness?

15   Q.    You can see that now, ████████?

16   A.    Yes.

17   Q.    Do you recognize this picture?

18   A.    I do.

19   Q.    What is it depicting?

20   A.    It's part of Concord Hospital at 280 Pleasant Street.

21   Q.    And this is the job site that you reported to work on that

22   day?

23   A.    Yes.

24   Q.    And does this appear to be an accurate representation of

25   that location?

1    A.    Yes.

2          MR. GINGRANDE:  At this time, your Honor, I'd move to

3    strike the identification and admit this as Government Exhibit

4    205.

5          MR. MIRHASHEM:  No objection.

6          THE COURT:  Full exhibit, 205.

7    (Government's Exhibit No. 205 admitted into evidence)

8          MR. GINGRANDE:  Thank you, your Honor.

9    Q.    So, turning your attention to this picture, can you

10   explain where you were instructed to work that day using this

11   picture?

12         MR. GINGRANDE:  Oh, and if this could be published to

13   the jury.  I apologize if it hasn't already.

14         THE COURT:  All right.  It may.

15         MR. GINGRANDE:  Thank you.

16   Q.    So, perhaps by describing in the picture as best you can,

17   can you explain where the work was being done that day?

18   A.    Yes.  So, the work on the building was, if you see the

19   four windows on the front in that bump-out, we were siding the

20   sides in the front of that, and below on the ground where we

21   had set up, you know, the saws and stuff, you can't quite, you

22   wouldn't be able to see it in this photo, but it's a little bit

23   further back there was a tent set up with a saw and the

24   materials underneath it.

25   Q.    Got it.  And this tent with the saws and materials

1    underneath it, approximately how far back from that sign that

2    says Concord Hospital, Pleasant Street Family Medicine was that

3    tent?

4    A.    I'm not good with feet, but not very far.

5    Q.    Not too far?

6    A.    No.

7    Q.    Were there any picnic tables near that tent as well?

8    A.    To the left of that sign there is a couple of round

9    tables.

10   Q.    Okay.  And, again, this is a zoomed-in picture, but were

11   those picnic tables and the tent, is that in the foreground of

12   the job site?

13   A.    Yes.

14   Q.    So, you can't see it in this picture; is that right?

15   A.    You cannot.

16   Q.    Okay.  So, when you arrived at the job site, and I believe

17   you testified that Mr. Craigue was showing you around, what

18   equipment did Mr. Craigue show you on that first day of work?

19   A.    So, he showed me the saw, and when it comes to equipment

20   that was about the only thing.  He showed me there were some

21   pump jacks set up around the building that we were not using

22   and then miscellaneous stuff that was in the trailer.

23   Q.    Okay.  And when you saw "pump jacks," what does that mean?

24   A.    Pump jacks are, it's a type of staging you can use where

25   there are two long poles that you separate to each side of the

building and that you set a pick on them, a long pick that you

can walk on, and then each of them pump up and down so you can

pump them up and rise yourself up higher on the building to

continue work.

Q.   Got it.  And was there any other equipment?  Were there

ladders?

A.   Ladders.  Ladders in the front where we were working,

ladders on the trailer out back.

Q.   Okay.  And when you were working on the front was the use

of those -- well, what was the purpose of having ladders?  What

did you need them for?

A.   So, there was a ladder -- if you look at the entryway to

the building, that front door right there, there was a ladder

to the right of that door to get up and down onto that first

roof.

Q.   Okay.

A.   And then there were planks staged on that roof to support

another ladder that was up there.

Q.   Okay, got it.  And, again, what was the purpose of getting

up there?  Was there work being done up there?

A.   Yes.  To reach the siding and the cedar impressions.

Q.   When you say "cedar impressions," what are you referring

to?

A.   The whole front of that is cedar impressions.

Q.   Unfortunately, I can't see what you're pointing to when

1    you do that when you try to describe it.  I apologize.

2    A.    I'm sorry.

3    Q.    Yeah, you can point on the screen.

4    A.    So, those four front windows, above them and below them

5    are cedar impressions.  There's real cedar shakes made out of

6    cedar, and then there are, you know, vinyl impressions.

7    Q.    Got it.  Okay.  And were those cedar impressions in the

8    siding, the materials for the siding, was that already on the

9    site when you arrived?

10   A.    Some of it, yes.

11   Q.    And do you know who provided those materials?

12   A.    Nate.

13   Q.    That's Mr. Craigue, Nate Craigue?

14   A.    Yes.

15   Q.    Okay.  Now, I'd like to turn your attention to what's been

16   marked for identification as Government Exhibit 200, and if we

17   could just show that to the witness, not to the jury.  And,

18   ▓▓▓▓, if you can tell me once you can see that on your screen.

19   A.    I can see it.

20   Q.    Okay.  Do you recognize what's depicted here?

21   A.    I do.

22   Q.    And what is it?

23   A.    It is Mr. Craigue's trailer for job sites that has the

24   equipment in it.

25   Q.    And does this appear to be an accurate representation of

1    that trailer?

2    A.   It does.

3          MR. GINGRANDE:  Your Honor, at this time I would move

4    to admit what's been previously marked for identification 200

5    as a full exhibit.

6          THE COURT:  Any objection?

7          MR. MIRHASHEM:  No objection.

8          THE COURT:  All right.  200 is a full exhibit.

9    Granted.

10          MR. GINGRANDE:  Thank you, your Honor.

11       (Government's Exhibit No. 200 admitted into evidence)

12          MR. GINGRANDE:  And if we could please publish that to

13    the jury?

14          THE COURT:  Yes.

15          MR. GINGRANDE:  Thank you.

16    Q.   So, now that the jury can see this too, ████████, can you

17    please describe what this is.

18    A.   This is the trailer that Mr. Craigue used to bring to job

19    sites that he kept his equipment in and carried his ladders.

20    Q.   Okay.  And can you see a Craigue & Sons logo on that

21    anywhere?

22    A.   Yes.

23    Q.   Okay.  And where is that?  If you could point to the big

24    screen, maybe.

25    A.   (Indicating).

1   Q.   Okay.  And is there a business phone number there

2   anywhere?  Can you see that?

3   A.   Right here (indicating).

4   Q.   Okay, great.  And so, you said Mr. Craigue brought

5   equipment in this trailer?

6   A.   Yes.

7   Q.   And so, those ladders on top, that would be some of the

8   equipment that Mr. Craigue brought?

9   A.   Yes.

10  Q.   And some of the other equipment that you discussed today,

11  do you know if that was also equipment that was brought in this

12  trailer?

13  A.   I don't know if it was in the trailer, but it was already

14  there when I first started.

15  Q.   Sure.  But this trailer was used to transport equipment?

16  A.   Yes.

17  Q.   Okay.  Now I'd like to show you what's been marked for

18  identification as Government Exhibit 204.

19       MR. GINGRANDE:  And, again, if we could just show this

20  to the witness at this time, please.  Oh, I apologize.  Let me

21  see if I got my numbering wrong.

22       MR. DAVIS:  205 is in.

23       MR. GINGRANDE:  Oh, I know 205 is in.  I apologize.  I

24  misspoke.  I'm sorry.  It's 203.

25  Q.   ████████    are you able to see that picture?

1    A.    Yes.

2    Q.    And do you recognize the people in that picture?

3    A.    I do.

4    Q.    And who are those people?

5    A.    That is myself and Mr. Craigue.

6    Q.    And does this appear to be an accurate representation of

7    the two of you?

8    A.    It does.

9          MR. GINGRANDE:  And if I could -- I would then move,

10   your Honor, to admit this as a full exhibit.

11         THE COURT:  Any objection?

12         MR. MIRHASHEM:  No objection.

13         THE COURT:  All right.  203 is a full exhibit.

14   Granted.

15         (Government's Exhibit No. 203 admitted into evidence)

16         MR. GINGRANDE:  Thank you, your Honor.  And if we

17   could please publish that to the jury.

18   Q.    And,          , again, now that the jury can see it, can

19   you point out who the people in that picture are?

20   A.    Yes.  I'm on the left, and Mr. Craigue is on the right

21   (indicating).

22   Q.    Okay.  And he appears to be pointing at something?

23   A.    Yeah.

24   Q.    And is this on the job site?

25   A.    Yes.  I believe this is the right side of the building.

1   Q.   Okay.  Do you happen to recall one way or another what

2   he's pointing out to you?

3   A.   I believe it was a section that wasn't completely done

4   yet.  It was on the right side.  There was a little bit of a

5   job that was not completed yet.

6   Q.   Okay.  But he was pointing out something that might need

7   to be completed; is that right?

8   A.   Right.

9   Q.   Okay.  So, did you and Mr. Craigue discuss what work you

10  would be doing that day?

11  A.   Yes.

12  Q.   And what did you discuss?  What type of work would you be

13  doing?

14  A.   I would basically be helping Skinny with what he needed.

15  It would basically be cutting the material for him so he didn't

16  have to get up and down the ladder.  So, he would tell me

17  measurements, I would measure it, cut it and then give it to

18  him, and he would install it.

19  Q.   And was Skinny the only -- or Mr. McKenna the only other

20  worker on the job site?

21  A.   Yes.

22  Q.   And you had been introduced to him by Mr. Craigue earlier

23  that day?

24  A.   Correct.

25  Q.   So, he told you who Mr. McKenna was.  Okay.  So, after

1    showing you the equipment and supplies did Mr. Craigue show you

2    how to use any of the equipment?

3    A.   He briefly just kind of showed me the saw, kind of how it

4    slid back and forth, you know.  It turned on, basically.  It

5    wasn't much more than that, though.

6    Q.   So, Mr. Craigue, did he provide any other instruction?

7    A.   Not that I can recall, no.

8    Q.   So, this was your first day of work now.  Did Mr. Craigue

9    tell you on your first day of work that you would be a

10   subcontractor?

11   A.   No.

12   Q.   And did you sign a contract of any kind for the work that

13   you were to perform for Mr. Craigue on the job site?

14   A.   I did not.

15   Q.   And just to be clear, did you sign a contract with Mr.

16   Craigue to perform work at any time?

17   A.   I have never.

18   Q.   So, where did Mr. Craigue go after he finished showing you

19   the job site and the equipment?

20   A.   I believe he went to go get materials.

21   Q.   And when you say, "He went to go get materials," did he

22   just leave?

23   A.   Yeah, he just left.

24   Q.   Okay.  I'd like to talk now with you about your

25   interactions with Mr. McKenna.  So, what were your observations

1    of Mr. McKenna that first day?

2    A.    A very nice guy, very hard worker.  He was very -- he had

3    a lot of patience with me with very little experience, and, you

4    know, there can be some difficult cuts, you know, I was

5    confused about, but, unlike other people I've worked for, with,

6    he was very patient, very nice, hard worker.

7    Q.    And when you say there were difficult cuts that you could

8    be confused about, what do you mean by "difficult cuts"?

9    A.    Sometimes there's angle cuts, or you've got to measure

10   from two different sections of the piece of siding to get, you

11   know, your angle, whatever it may be, and -- yeah.

12   Q.    Got it.  Okay.  And he was patient, and he helped you with

13   that?  Is that what you're saying?

14   A.    Absolutely.

15   Q.    Okay.  So, can you describe the work that you ended up

16   actually doing with Mr. McKenna that day?

17   A.    I measured and cut material for him and handed it to him.

18   Q.    Okay.  And I believe you testified earlier that you were

19   on the ground --

20   A.    Yes, I was only on the ground.

21   Q.    -- is that right?  And so, would you pass things up to

22   Kenny McKenna?

23   A.    Yes.

24   Q.    And Kenny McKenna was doing -- well, I'll ask you where

25   was he when you were passing these things up?

1    A.    He was on that first roof.

2    Q.    Okay.  And maybe if we could, please, put Government

3    Exhibit 205 back on the screen.

4           THE CLERK:  For everyone?

5           MR. GINGRANDE:  Oh, yes, please, for the jury.

6           THE CLERK:  Just making sure.

7           MR. GINGRANDE:  Yeah.  Thank you.

8    Q.    When you say the "first roof," could you just point out

9    with your --

10   A.    There was a ladder here, and he was up here (indicating),

11   and I would cut a piece, bring it over and hand it to him.

12   Q.    Okay.  And were you doing roofing work that day?

13   A.    No.

14   Q.    Okay.  But Mr. McKenna or Kenny McKenna, he was working on

15   the roof?  He was working on the roof, he was physically

16   located on the roof?

17   A.    Right.

18   Q.    But he was doing siding work; is that right?

19   A.    Right.

20   Q.    Okay.  And why was it that you had this arrangement where

21   you were on the ground and he was up there?

22   A.    I got very little, you know, skills or training with this,

23   so he knew what he was doing up there.  I can cut things, you

24   know, so it was better off that way.  He had the experience, he

25   knew what he was doing.  That's the way he wanted it.

1    Q.    Okay.  And were you making his job easier, too?

2    A.    Absolutely.

3    Q.    Okay.  He didn't have to come down from that first roof

4    down to the ladder to grab materials and things?

5    A.    Right.

6              MR. MIRHASHEM:  Objection to the attorney testifying,

7    your Honor.

8              THE COURT:  Overruled.

9    Q.    You can answer.

10   A.    Yeah, it made it easier.  He didn't have to come down each

11   time, cut something, grab it and go back up.

12   Q.    Now, did you find that you and Mr. McKenna or Kenny

13   McKenna had a connection that day?

14   A.    Yeah, we bonded.  We talked a lot about, you know, our

15   lives and who we knew.  I ended up knowing some people he went

16   to school with, friends of my dad that he's friends with.  And

17   so, we just learned a lot about each other.

18   Q.    When you say people you went to school with, what school

19   is that?

20   A.    He went to ▮▮▮▮▮▮▮▮▮▮.

21   Q.    That's Kenny McKenna did?

22   A.    Yes.

23   Q.    Okay.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24   A.    ▮▮▮▮▮

25   Q.    Did you talk with Kenny McKenna about how long he had

1  worked for Craigue & Sons?

2  A.    I did.

3           MR. MIRHASHEM:  Objection.

4           THE COURT:  Sustained.

5  Q.    So, you had conversations with Kenny McKenna about other

6  topics that day?

7  A.    Yeah.

8  Q.    Not just your mutual connections but other things?

9  A.    Right.

10  Q.    Okay.  And over the course of those discussions at any

11  point did Ken McKenna ever discuss that he was a subcontractor?

12           MR. MIRHASHEM:  Objection.

13           THE COURT:  Sustained.

14  Q.    Do you know whether Kenny McKenna owned his own business?

15           MR. MIRHASHEM:  Objection.  Basis of knowledge and

16  maybe based on hearsay.

17           MR. GINGRANDE:  Your Honor, I'd ask for a sidebar.

18           THE COURT:  Yeah, sidebar.

19  (SIDEBAR CONFERENCE AS FOLLOWS):

20           MR. GINGRANDE:  So, your Honor, I'm happy to ask the

21  questions to establish his knowledge.

22           MR. MIRHASHEM:  I can't hear, your Honor.  I can't

23  hear the government.

24           MR. GINGRANDE:  Can you hear me now?  I'll try and

25  speak up a little.  Can you hear me?

1            MR. MIRHASHEM:  I can hear you now.

2            MR. GINGRANDE:  Okay.  I was just saying that I'm

3    happy to ask the questions establishing his basis of knowledge

4    other than hearsay.

5            MR. MIRHASHEM:  I can't hear the government.

6            MR. GINGRANDE:  Other than hearsay.  Can you hear me

7    now?

8            MR. MIRHASHEM:  Yes.

9            MR. GINGRANDE:  Okay.

10           THE COURT:  Did he learn this from Kenny McKenna?

11           MR. GINGRANDE:  Well, I think he made some

12    observations that I think would establish that Mr. McKenna

13    didn't have his own business.  I would seek to ask him about

14    his observations and things that Mr. McKenna said.

15           MR. MIRHASHEM:  Your Honor --

16           THE COURT:  Can you give me an example of what he

17    would observe that would tell him that McKenna did not own his

18    own business?

19           MR. GINGRANDE:  Yes.  Yes, your Honor, and I'd ask if

20    he ever saw Mr. McKenna with his own company car, and I would

21    ask if he ever saw a logo.  I would ask him how he ran it to

22    work, and his answer -- and I can tell you what his answer

23    would be, which is that Mr. McKenna showed up in a Volvo, and

24    ask him if he had any way of transporting equipment, and he

25    would say that that Volvo does not have -- it's a small Volvo,

1    you can't transport equipment in that, ask him if he ever saw a

2    business card of Mr. McKenna's, those types of questions.

3            THE COURT:  Attorney Mirhashem.

4            MR. MIRHASHEM:  Your Honor, I couldn't hear half of

5    the government's proffer, and maybe we could come up to sidebar

6    or go in chambers, because I couldn't hear half of it, so I'm

7    not sure exactly what the proffer is.

8    (END OF SIDEBAR CONFERENCE)

9            THE COURT:  We're having a few technical issues, so I

10   don't want to make you wait.  I think this is a good time for a

11   morning break.  It's early in the morning.  We all drink coffee

12   and water and other things.  So, I think it's a good time to

13   give the jury 10 or 15 minutes just to stretch their legs and

14   go to the restroom.  So, why don't we take a break right now

15   for about 10 or 15 minutes.

16           THE CLERK:  All rise for the issue.

17              (The jury exited the courtroom)

18           THE COURT:  All right.  Why don't we see if we can

19   deal with that issue.

20           ████████, if you need to go to the restroom -- sorry

21   about that.  You can take a break and come right back.

22           THE WITNESS:  Thank you.

23           THE COURT:  All right.  Okay.

24           MR. MIRHASHEM:  Can we ask him not to discuss his

25   testimony?

1            THE COURT:  Yes.  ████████, if you're going to go to

2    the restroom, just make sure you don't speak to anyone at all.

3    In fact, it would be safest if you didn't speak to anybody, but

4    definitely don't talk to anybody about your testimony in any

5    way.

6            THE WITNESS:  Okay.

7            THE COURT:  Thank you.

8            Okay.  Here's the issue:  You're going to ask him

9    about a conclusion that he might have had with respect to

10   whether Mr. McKenna owned his own business, and the concern

11   that I just -- that I have is that he may have learned that

12   from Mr. McKenna, which would be a hearsay-based conclusion.

13   He certainly can talk about observations that he made, but his

14   conclusion from those observations, I don't see that as

15   admissible.  But the fact that he never saw a business card, he

16   drove a Volvo, not a truck with a logo on it, et cetera, Did

17   you ever see him with a company car of any sort, those kinds of

18   questions would have to be I think in the nature of leading

19   questions, potentially, to get at certain evidence.  I'd

20   obviously start with direct, you know, questions.

21           But, Attorney Mirhashem?

22           MR. MIRHASHEM:  Your Honor, I strongly object to

23   leading in this area.  The witness I have no problem with being

24   asked what he observed, and then the government in closing can

25   argue he didn't say he observed the business card, but he saw

1   Mr. McKenna for a day and then a couple of hours the next day.

2   I have no problem with him describing everything that he saw

3   and then the government arguing, He didn't see this, he didn't

4   say that, but it should be the witness's testimony.  For the

5   government to lead him to say, You didn't see a business card,

6   that's improper leading.  This is a key issue.  That this

7   person had a business or not is material to our defense, and

8   allowing the government to lead in this key area would deprive

9   our client of a fair trial.  They can get in all observations,

10  but they should not be allowed to lead in an area that bears on

11  a critical issue in this case.  He worked for a day.  He didn't

12  see a business card.  I mean, if he says that, fine.

13          THE COURT:  Why would he say that if he asks him, What

14  did you observe?  I didn't observe a business card?  He's not

15  going to say that.  So, I think it's fair for the government to

16  be able to ask, Did you see a business card?  Did you see a

17  truck with a logo?  What did he drive?  What did you see?

18          I think the government can lead in this area, because

19  these are things he did not observe.  It can't be excessive,

20  obviously, but I think a little bit of leading with respect to,

21  Did you see a business card?  No, I did not.  Did you ever see

22  a truck with his logo on it?  No, I did not.  The conclusion

23  that he draws from that I don't think is admissible, but

24  ultimately his observations are admissible, and I think some

25  amount of leading with respect to things he did not see is fair

1   in this circumstance.

2           MR. MIRHASHEM:  I understand the Court's ruling.

3           THE COURT:  All right.  So, we'll take our morning

4   break as well.  Be back at maybe 5 of.

5           MR. GINGRANDE:  Thank you, your Honor.

6           THE CLERK:  All rise.

7           (Recess taken from 10:43 a.m. to 11:00 a.m.)

8           THE CLERK:  All rise.

9           THE COURT:  I just want to go over a minor issue with

10  counsel.  Okay.  It looks like a number of jurors cannot see

11  Mr. Craigue, and I wonder if they can all see -- you're sitting

12  together.  I know you're going to want to sit next to your

13  client.  I wonder if we can move -- I bet they can see Attorney

14  Mirhashem.

15          MR. MIRHASHEM:  I think that TV is kind of in an

16  inconvenient location.

17          THE COURT:  I can't hear you.  Say that again.

18          MR. MIRHASHEM:  That large TV set, which I don't think

19  was actually projecting anything while exhibits were up

20  there --

21          THE CLERK:  It was.  It publishes for the jury.

22          MR. MIRHASHEM:  It's not working today.  I went and

23  checked three times.  It wasn't publishing anything.  But, in

24  any case, whether or not it publishes does directly block the

25  jury's view of our client, our view of the jury.  So, I would

1    ask that perhaps that TV can be moved someplace else in the

2    courtroom.  That way the jury would have a view of our client,

3    we would be able to see the jury.  So, I would suggest --

4              THE COURT:  How does the jury see an exhibit if not

5    through that screen?

6              MR. CHIAVARAS:  There are monitors in the well.

7              THE COURT:  What about the jurors in the front?

8              MR. CHIAVARAS:  That's where they would see if from

9    over there or --

10             THE CLERK:  And that TV over there.

11             MR. CHIAVARAS:  Yeah, or the witness monitor or the

12    gallery.

13             MR. MIRHASHEM:  If they were looking at the witness

14    monitor and the gallery monitor, I checked a few times, that

15    was off, but whether or not it's off, I'm wondering whether it

16    can be moved so that the jury can see our client.

17             THE COURT:  Right.  And you need to be able to see the

18    jury as well.

19             MR. MIRHASHEM:  Right.

20             THE COURT:  So, your motion is granted.  We're going

21    to move that TV screen somewhere.  Maybe it goes against that

22    first wall there, short wall.

23             MR. CHIAVARAS:  At the lectern or the --

24             THE COURT:  Well, there's a juror sitting right there,

25    right?

1          MR. CHIAVARAS:  Right.

2          THE COURT:  So, that juror would not be able to see

3    it, because it would be to their right.

4          MR. CHIAVARAS:  It would just take some time for me to

5    change the feed to that monitor.

6          THE COURT:  The issue for me is it's not that it's not

7    working right now -- if it's not working we definitely want to

8    move it -- but I just want to figure out where to put it so

9    that it's not blocking their view of the jury and the jury can

10   see the defendant.  So, I'm not exactly sure where to put it.

11         MR. MIRHASHEM:  I mean, if they moved that, the other

12   thing we could consider doing is we could all slide over, the

13   three of us on this side, and we could switch sides so the jury

14   can see Mr. Craigue more easily and all that.  We could do

15   that.

16         THE COURT:  Would you be able to see the jury at that

17   point if you moved over?

18         MR. MIRHASHEM:  If the TV was moved I think that would

19   make a big difference.

20         THE COURT:  If that is moved?

21         MR. MIRHASHEM:  Yes.

22         THE COURT:  I think if that is moved then they're

23   going to be able to see your client.

24         MR. MIRHASHEM:  Right.  Okay.

25         THE COURT:  So, I don't think you need to move.

1          MR. MIRHASHEM:  Okay.

2          THE COURT:  So, we need to figure out whether or not

3     the jurors sitting there can actually see the screen or we

4     simply move that out and we maybe move them closer together,

5     ultimately.

6          THE CLERK:  They would have to sit here and there

7     (indicating).

8          MR. MIRHASHEM:  Putting it here?  Whatever the Court

9     prefers, but if you would move it, it shouldn't block the

10    jury's view of --

11               (The Court conferred with the Clerk and Mr. Chiavaras)

12                         (Pause)

13         THE COURT:  Attorney Mirhashem, did we get your

14    microphone system settled?

15         MR. MIRHASHEM:  Yes.  That was my fault, your Honor.

16    The reason was I had the volume too low.

17         THE COURT:  Well, that will fix it.  Good.  All right.

18         We are going to remove the screen for now, and he is

19    going to tape the cables against the desk so people aren't

20    tripping on them, but we're going to move it, because no one's

21    complained about not being able to see an exhibit yet.

22         MS. GRAHAM:  Your Honor?

23         THE COURT:  Yes.

24         MS. GRAHAM:  May I have permission to walk around so I

25    can see the jurors?

1          THE COURT:  Yes.

2                      (Pause)

3          THE COURT:  Counsel needs to speak to me at sidebar

4     or --

5          MR. GINGRANDE:  Yes, your Honor, if we could, on the

6     record, yeah.

7          THE COURT:  Sure.  Go ahead.

8     (SIDEBAR CONFERENCE AS FOLLOWS):

9          MR. GINGRANDE:  Thank you, your Honor.  So, I just

10    wanted to raise, because I figured we might as well do this now

11    while the jury is not in, and it's going to come up pretty

12    soon, that I do intend to elicit a response to the following

13    question from ▮▮▮▮▮▮    "Did you consider yourself to be a

14    subcontractor of Craigue & Sons?", and I would submit that that

15    question is permissible because of the Darden factor, which is

16    the understanding of each of the parties he is now directly

17    named in the indictment as one of the people pertinent to this

18    false statement, and his understanding of what he was is

19    relevant and admissible.  So, I just wanted to front that,

20    because I thought, if there was an objection, we could get that

21    resolved now.

22         THE COURT:  Thank you.

23         Attorney Mirhashem, are you going to object to that?

24         MR. MIRHASHEM:  I object only to the leading manner in

25    which the government proposes to ask the question.  I have no

1    objection to the government asking, What was your understanding

2    of your work status, what was your understanding of your

3    employment status, and have the witness testify, rather than

4    the government lead him.  Was it your understanding you were an

5    independent contractor, I mean, that suggests his answer as

6    asked by the prosecutor in the context of this trial.

7              THE COURT:  All right.  Do you have any problem

8    framing the question in a non-leading manner?

9              MR. GINGRANDE:  Yeah.  I think I would be comfortable

10   asking the question, What was your understanding of your

11   employment status?  My only concern is, if he doesn't

12   understand what that means when I phrase it that way, that it

13   might require me to be a little more specific, and then I would

14   submit that I could ask him, Well, did you consider yourself to

15   be either an employee or a subcontractor, which I think is an

16   open-ended question.

17             THE COURT:  Do you have any problem with that sequence

18   of events?

19             MR. MIRHASHEM:  I don't, your Honor.

20             THE COURT:  Okay.  I don't either.  That should be

21   fine, then.

22             MR. GINGRANDE:  Thank you.

23             THE COURT:  All right.

24   (END OF SIDEBAR CONFERENCE)

25             THE CLERK:  All rise for the jury.

1          (The jury entered the courtroom)

2          THE CLERK:  Please be seated.

3          THE COURT:  Before you start, Attorney Gingrande, I

4    just want to explain to the jury we wanted to move that screen,

5    the exhibit screen, out of your sight line so that you could

6    see Mr. Craigue and so that defense counsel and government's

7    counsel can see you as well.  So, we spent some time moving

8    that, unhooking it.  People need to be careful as you come

9    around, because there are still some little cables sticking up.

10   I just want you to be careful.  But, hopefully, that will not

11   -- you won't have an obstructed view.

12          And I want to make sure that our jurors see any

13   exhibits go up.  There's that big screen here (indicating), and

14   then there's the screen over there (indicating).  If you have

15   any problem with that, let me know, because I want to make sure

16   you can see the exhibits.  I know there are some screens that

17   are there for our jury.  But normally, when we're not in a

18   pandemic, all the jurors sit in the box together, so we don't

19   have this issue normally.  Thank you for your patience.

20          All right.  Attorney Gingrande.

21          MR. GINGRANDE:  Thank you, your Honor.

22   Q.   So,              when we left off I believe we were

23   discussing Mr. Kenny McKenna, and my next question is did Kenny

24   McKenna have his own car that day?

25   A.   Yes.

1    Q.   And when I say "that day," I'm referring to the first day

2    of work.

3    A.   Yes.

4    Q.   Okay.  And did you observe that car?

5    A.   Yes.

6    Q.   And what was his car?

7    A.   It's a black Volvo wagon.

8    Q.   Did you see whether Ken McKenna had his own truck with a

9    logo on it?

10   A.   No.

11   Q.   And when you say, "No," do you mean you didn't see, or he

12   did not?

13   A.   He did not.

14   Q.   He did not have his own car with a logo.  Okay.  And did

15   Ken McKenna have any sign with a name of a business of his own

16   on it?

17   A.   He did not.

18   Q.   Did Ken McKenna have a company card that you saw, like a

19   business card?

20   A.   No.

21   Q.   Did he have any clothing or was he wearing any clothing

22   that had a company logo on it?

23   A.   No.

24   Q.   And aside from the Craigue & Sons trailer, which we had

25   seen the picture of earlier, did you see the name of a separate

1   business associated with Mr. McKenna anywhere on the job site?

2   A.   I did not.

3   Q.   Okay.  Did Mr. McKenna, did you see him bring the ladders

4   to the job site?

5   A.   I did not.

6   Q.   And did he have a means of bringing the ladders to the job

7   site of his own, that is, did he have his own vehicle big

8   enough to bring those ladders?

9   A.   No.

10   Q.   Okay.  Now, did you at any time make any observations, and

11   I just want to focus on your observations and not anything you

12   heard, did you have any -- make any observations about Mr.

13   McKenna getting paid for the work that he had done for Mr.

14   Craigue?

15   A.   Yes.

16   Q.   And based on those -- well, can you say what those

17   observations were?

18   A.   Yes.  The first day on Monday at the end of the day, when

19   Mr. Craigue returned to the job site, he asked Kenny, How many

20   hours did you have last week?  And Kenny told him, and then

21   Nate handed him some cash.

22   Q.   Okay.  Now, did Mr. Craigue ever tell you how much you

23   would be paid?

24   A.   Yes.

25   Q.   And how much were you to be paid for your work?

1    A.    $15 an hour.

2    Q.    Okay.  What was your understanding of your employment

3    status with Craigue & Sons?

4    A.    I was a full-time employee that got paid hourly and every

5    week.

6    Q.    Okay.  I'd now like to talk about the work that Mr.

7    McKenna was doing.  While you worked with Mr. McKenna did you

8    observe him doing siding work?

9    A.    I did.

10   Q.    Did you observe Mr. McKenna installing windows?

11   A.    No.

12   Q.    Did you observe Mr. McKenna do roofing work?

13   A.    No.

14   Q.    Did you see Mr. McKenna do other work that you would not

15   classify as siding work?

16   A.    No.

17   Q.    So, how did your first day at that job site end?

18   A.    How did it end?

19   Q.    Yeah.  How did your first day of work for Craigue & Sons

20   end?

21   A.    Like I said, Nate returned, I watched that payment

22   exchange, and then we were cleaning up, and we just kind of

23   took off and said, you know, See you in the morning at 8:00,

24   and that was about it.

25   Q.    Okay.  And did Mr. Craigue tell you what time to be there?

1    A.    Yeah.  For 8:00 again.

2    Q.    And that's because he told you earlier, right, that your

3    hours were 8:00 a.m. to 4:00 p.m.?

4    A.    Yes.

5    Q.    Okay.  So, I'd now like to focus your attention on the

6    next day, August 28th, 2018.  How did that day begin?

7    A.    I showed up.  Kenny McKenna was actually a little bit late

8    that day, so I waited.  He showed up, and we began work like

9    the day before.

10   Q.    Okay.  And when you say you "began work like the day

11   before," what do you mean?  What was he doing, and what were

12   you doing?

13   A.    Uncovering materials, basically him getting his tool belt

14   on, me making sure I had my tape measure, pencil, and then from

15   there just started installing siding or whatever we were doing.

16   Q.    Okay.  Were you waiting on any materials that day?

17   A.    I'm not sure.  I don't recall if it was the first day or

18   the second day that -- I believe it was the first day that Nate

19   brought material.

20   Q.    Okay.

21   A.    I'm not too sure between the two days what day he showed

22   up.

23   Q.    Okay.  But one of those two days what was your

24   recollection as to whether Mr. Craigue brought material?

25   A.    Yeah, he did bring material.  I believe it was some fascia

1    and J-channel.

2    Q.   Okay.  Sorry.  I don't know what "fascia" and "J-channel"

3    means.  Would you mind describing that?

4    A.   So, fascia is, it's like a metal wrap that you put on the

5    corner of the trim of the building, so basically just to make

6    it look clean, nice.

7    Q.   Okay.  And did Mr. Craigue, in fact, deliver those

8    materials?

9    A.   He did.

10   Q.   Okay.  So, now I want to get back to August 28th, so the

11   second day.  So, that day, aside from you and Ken McKenna and

12   Craigue, Mr. Craigue, when he was there, did anyone else work

13   on the job site with you?

14   A.   No.

15   Q.   So, did you see Mr. Craigue in the morning of that second

16   day?  When I say the "morning," I know that that's a wide

17   range.

18   A.   Right.

19   Q.   But did you see him at approximately 10:00 a.m. that day?

20   A.   See, I don't recall if that was the time he dropped off

21   the material, if it was then or the day before, but I believe,

22   yeah, he dropped off material and then that was it.

23   Q.   Okay.  So, let's just focus, then, around the time period

24   at around, let's say, 11:00 or 11:30 of that morning.

25   A.   Okay.

1    Q.    Okay?  So, can you explain what happened that morning of

2    August 28th --

3    A.    Sure.

4    Q.    -- 2018?

5    A.    So, it was pretty hot, so I was on the ground cutting

6    things per usual, and Kenny McKenna was up on the ladder, and

7    he came down for a break.  He said he was getting dizzy, he was

8    really hot.  He wasn't wearing a shirt.  I said, you know,

9    Drink some water, drink some water, you know, take a break.  He

10   told me he had diabetes.  So, I was just like, Why don't you

11   take 15 minutes and relax.  We took a break, talked about 10

12   minutes.

13          After that, he proceeded to go back up on the roof,

14   and now he's on that first overhang roof that we discussed, and

15   he's moving the ladder, a blue ladder, from the right side of

16   the bump-out where the four windows were, he's moving it from

17   the right side to the left side.  He was struggling a little

18   bit, so I offered to help.  I said, Would you like my help in

19   moving this ladder?  And he said, Nope, I got it.  I said, All

20   right.  So, he moved it to the left side of that four-window

21   area and leaned it against the building and began climbing the

22   ladder.  I sat -- he was going to measure a piece of fascia, I

23   believe, up in the corner.

24          So, I sat down on a sawhorse that was right underneath

25   the tent, and I was sitting for maybe a few seconds, enough

1    time to pull my phone out, and he fell, and I heard him fall,

2    and his speed square from his tool belt was dinging on the

3    ground, so I stood up and I ran over to him, yelled his name.

4    At the same time somebody from the dentist's office saw it

5    happen and started running over.  So, I kind of touched his

6    back, tried to see if he was okay.  Obviously, I called 911

7    right then and there.  And then doctors and nurses started

8    coming out from the Concord Hospital building we were working

9    on.

10   Q.    So, there were doctors and nurses, you said, that were in

11   the building?  They came out?

12   A.    Yes.

13   Q.    And did they render assistance?

14   A.    Yes.  There was a doctor that was checking his pulse, had

15   a stethoscope on, checking, you know, breathing.

16   Q.    Okay.  And what happened after you called 911?

17   A.    I stayed on the phone with 911 until they showed up.  Once

18   they showed up, I hung up and --

19   Q.    I don't mean to interrupt, but did it take a long time for

20   them to show up or was it --

21   A.    No, it was pretty quick.  I mean, they were right down the

22   street.

23   Q.    So, you say, "They're right down the street," and so

24   you're referring to --

25   A.    There's a department that's only a couple of miles away.

1   Q.   Okay.

2   A.   So, yeah, it wasn't long before they showed up.  Once they

3   showed up, I called Nate, and he didn't answer.  So, very soon

4   after I called Nate again -- I mean called me.  So, I answered,

5   and I said, Hey, Skinny fell, and I don't remember what his

6   first response was, but it wasn't, it wasn't like he understood

7   the severity of the fall.  So, I said, No, it's really bad.  I

8   had to call 911.  You need to come here.  And the next thing he

9   said was, Take down the ladders, and all I said was, Okay, hung

10  up.  I repeated what he said to me to the nurses.  The nurses

11  said, You're not touching anything.  We have your back.  I

12  said, I ain't touching nothing.  I said, Nope.  I'm leaving it

13  alone.

14  Q.   So, you were surprised to be given that direction?

15  A.   Yeah.

16  Q.   And you responded when you said that, and you just gave

17  the response from the nurses, you responded by, you know, kind

18  of saying, Okay, I'm not going to do anything?

19  A.   Right.  I left it alone.

20  Q.   Is there anything that you did move with the help of the

21  nurses?

22  A.   Yeah.  There was the material and stuff laying out on the

23  lawn, and it was in the way of the ambulance being able to get

24  a stretcher over to Kenny McKenna, so me and someone else kind

25  of moved stuff away so they could access him.

 1   Q.   Okay.  After you moved things away, what's the next thing

 2   that you remember?

 3   A.   I stood with the nurses while the doctors were checking

 4   out Kenny.  And the ambulance was there.  They came over, and

 5   they put him on a stretcher and put him in the ambulance and --

 6   Q.   Okay.  And -- oh, I'm sorry.

 7   A.   Put him in the ambulance, and then I was told I would have

 8   to go to the hospital.

 9   Q.   And I just wanted to go back and clarify for a second.

10   A.   Sure.

11   Q.   When you were moving things, when you were saying things

12   were in the way and you did move a few things --

13   A.   Right.

14   Q.   -- what was the purpose of that?

15   A.   The purpose of moving the stuff --

16   Q.   The few things that you moved.

17   A.   Yes.  Was to clear a path for the paramedics to get a

18   stretcher over to Kenny McKenna.

19   Q.   Okay.  And so, I'm sorry.  You said that you were

20   requested to go to the hospital?

21   A.   Yes.

22   Q.   And did you, in fact, go to the hospital?

23   A.   I did.

24   Q.   And how far away was the hospital?

25   A.   Oh, a quarter mile.

1    Q.   So, very close?

2    A.   Yeah.  Yes.  It's right down the road.

3    Q.   What happened at the hospital?

4    A.   I went in, and my mom was actually working, so I was kind

5    of freaking out explaining what was happening.  She was a

6    patient registrar there, so she was right at the front office.

7    So, after that they had me go to the family room within the

8    first five, ten minutes I was there, and I sat in the family

9    room for a few minutes, and a doctor came in and told me that

10   Kenny McKenna had passed.

11   Q.   And what's the next thing you remember after that?

12   A.   I went back to the job site.

13   Q.   And why did you do that?

14   A.   I went back to see Nate and let him know that Skinny had

15   passed away.

16   Q.   And Nate was there when you went back?

17   A.   He was.

18   Q.   So, what happened during that first interaction that you

19   had with Mr. Craigue back at the job site?

20   A.   I got out of my car, and I said, you know, I said, I'm

21   sorry, man.  Skinny's gone.  And he's like, he responded with

22   like, No way, like he couldn't believe it.  I said, No, he

23   really is.  I'm sorry.

24   Q.   And did Mr. Craigue seem pretty upset at that?

25   A.   Yes, he seemed upset about it.

1   Q.   Did you also see anyone from OSHA on the scene that day?

2   A.   Yes.

3   Q.   And was that OSHA Officer Scott Kelly?

4   A.   Yes.

5   Q.   Was he wearing a helmet?

6   A.   Yes.

7   Q.   And did the helmet identify --

8   A.   It said "OSHA" on it.

9   Q.   It said "OSHA" on it?  Okay.  Did he ask to speak with

10  you?

11  A.   He did.

12  Q.   Okay.  Just before having a conversation with OSHA,

13  Officer Kelly, did you have a conversation with Mr. Craigue?

14  A.   Yes, a short one.

15  Q.   And what did Mr. Craigue say to you?

16  A.   We were standing next to each other, and softly he said,

17  Don't forget you and Skinny are subs.

18  Q.   And what did you interpret his saying that to mean?

19        MR. MIRHASHEM:  Objection.

20        THE COURT:  Overruled.

21  A.   That, if anyone asks, we are subcontractors.

22  Q.   You said he said it softly?

23  A.   Right.

24  Q.   But were you able to hear it clearly?

25  A.   Yes.  I was very close to him.

1    Q.    And how far away from Mr. Craigue were you at that point?

2    A.    Six inches, a foot.  We were very close to each other.

3    Q.    So, what happened next?

4    A.    After that Scott Kelly sat me down to speak with me.

5    Q.    Okay.  And where were you sitting when that happened, or

6    generally where were you when that happened?

7    A.    The conversation?

8    Q.    Yes, yes.

9    A.    The conversation was --

10   Q.    And I am referring to your conversation now with the --

11   A.    Yes.  So, there is where the parking lot is, and it's kind

12   of hard to explain.  More to the right where the tent was and

13   stuff.  So, without a picture it's kind of hard.

14   Q.    So, yeah, maybe I will put up -- so if we could please put

15   on the screen Government Exhibit 205.  And, again, this will

16   hopefully serve as a frame of reference.

17            Now, if you look in the bottom left-hand corner of the

18   picture, and I know it's hard to see, but do you see that kind

19   of curved thing near the -- at the very bottom left-hand

20   corner?  Are you able to see it on your screen,        ?

21   A.    Yes.

22   Q.    Okay.  And you see that little curved thing next to that

23   tree?

24   A.    Yes.

25   Q.    What is that?

1    A.    It's like a picnic, round picnic table.

2    Q.    And is it that picnic table or another --

3    A.    No.  I believe it was the one -- there was one further

4    away from the building a few feet from that one that we sat at.

5    Q.    Okay.  And so, can you kind of point out --

6    A.    Well, the other picnic table is a little bit this way,

7    further from the building (indicating).

8    Q.    Okay.

9    A.    And our conversation took place right about here

10   (indicating), a little bit further this way, more towards the

11   parking lot (indicating).

12   Q.    Which conversation was that?

13   A.    The conversation where he said, Don't forget you and

14   Skinny are subs.

15   Q.    Okay.  So, that was a conversation with Mr. Craigue,

16   that's where that took place.  The conversation with OSHA

17   Officer Kelly, again, that was at one of the picnic tables on

18   the left-hand side of the screen?

19   A.    Yes.

20   Q.    Okay.  And so, what happened next in that conversation

21   with Mr. Kelly?  Officer Kelly, excuse me.

22   A.    He asked me some questions.

23   Q.    How long was the conversation between you and OSHA Officer

24   Kelly?

25   A.    It wasn't too long.  Maybe, you know, around, you know,

1    20, 40 minutes, somewhere in there.  Our conversation wasn't
2    too long, though.
3    Q.    Your conversation wasn't too long?  Okay.  So, what do you
4    recall from the conversation?
5    A.    He asked me basically my position with Nate, when I
6    started working, how I was paid and stuff like that.
7    Q.    Okay.  And what did you tell him?
8    A.    In reference to?
9    Q.    Well, what did you tell him about how you were --
10   A.    I told him I was paid by the job.  I told him I was a
11   subcontractor.
12   Q.    Why did you say that?
13   A.    Because of the conversation I had just minutes ago had
14   with Nate and because Nate was only, you know -- he wasn't very
15   far away from our conversation; he could definitely hear what I
16   was saying.  I wasn't comfortable saying anything else.
17   Q.    And when you say he was pretty close by to you, how did
18   that make you feel?
19   A.    I was uncomfortable.  You know, I felt a pressure in a
20   sense, because, you know, it's my second day on the job.  At
21   the time I was getting along with Nate, and he seemed like a
22   nice guy, and we had just had this -- you know, he tells me,
23   Hey, you know, don't forget you're a sub, and so all of a
24   sudden I feel there's a right and a wrong answer to these
25   questions.  And so, as I'm sitting and he asked me these I

1   didn't want to upset him, and so I told him that, you know, I

2   continued with that and said, Yes, I'm a subcontractor.

3   Q.   And is that also the reason that you told Mr. Kelly that

4   you were paid at the end of the job?

5          MR. MIRHASHEM:  Objection.  Leading.

6          THE COURT:  Sustained.

7   Q.   I believe you had testified earlier, ▓▓▓▓▓▓▓ that you

8   told Officer Kelly that you were paid at the end of the job; is

9   that right?

10  A.   Yes.

11  Q.   And why did you say that?

12  A.   Because that's how potentially a subcontractor would have

13  been paid, so I was trying to keep with the idea that I was a

14  subcontractor.

15  Q.   Okay.  Now, when it comes to how you were actually paid --

16  A.   Yes.

17  Q.   -- how were you actually paid?

18  A.   I was actually only paid once, of course.  I only worked a

19  day and a half.  I was paid for the hours I worked that week in

20  cash once.

21  Q.   And so, it was for the hours of the work -- it was not for

22  the -- it wasn't for the completion of a job; is that right?

23  A.   No.

24  Q.   Do you know whether after you had that brief conversation

25  with OSHA Officer Kelly whether or not OSHA Officer Kelly had a

1   conversation with Mr. Craigue?

2   A.   He did.

3   Q.   And how did you know that?

4   A.   I was right there.  I heard their conversation.

5   Q.   And so, you listened to the conversation?

6   A.   I did.

7   Q.   Okay.  What do you recall from the conversation?

8   A.   Scott Kelly asked Nate some similar questions, asked

9   questions about Skinny and how he was paid, and Nate told him

10  that he was paid by the square foot, that he only worked for

11  him on big jobs, but has been working for him for a long time,

12  just only periodically, depending on the job size.  So, either

13  paid by the square foot or the job.

14  Q.   Did you hear whether or not Officer Kelly asked Mr.

15  Craigue whether he had any employees?

16  A.   Yes.

17  Q.   And what did Mr. Craigue say about that?

18  A.   He had no employees, only subcontractors.

19  Q.   Is there anything else that you recall that Mr. Craigue

20  said to Officer Kelly in that conversation?

21  A.   I don't recall now.

22  Q.   When you heard Mr. Craigue give those responses that you

23  just mentioned about Mr. McKenna only working periodically for

24  him on big jobs, Mr. McKenna being a subcontractor, Mr. Craigue

25  only having subcontractors and not employees, and that Mr.

1    McKenna was paid by the square foot, did you believe those

2    statements to be false?

3    A.    Yes.

4    Q.    Did you correct Mr. Craigue when you heard him say that?

5    A.    I did not.

6    Q.    Why not?

7    A.    Again, very uncomfortable.  He's my boss.  I wasn't about

8    to just jump out and say, That's not true.

9    Q.    Okay.  Now, after the interview with Officer Kelly did you

10   have further contact with Mr. Craigue on the day of the

11   accident?  Let's focus on that for now.

12   A.    I believe maybe later in the day, you know, towards

13   evening time, just checking in on each other.

14   Q.    Okay.  And are you clear on that timing, or could it have

15   been the next day that you --

16          MR. MIRHASHEM:  Objection, your Honor.  The witness

17   did not say he was unclear.  The government is leading to say

18   that the conversation was the next day.

19          THE COURT:  Sustained.  Can you rephrase?

20          MR. GINGRANDE:  Yes, your Honor.

21   Q.    You say you checked in with Mr. Craigue.  So, putting the

22   day of the accident aside, did you have follow-up conversations

23   with Mr. Craigue after the accident?

24   A.    Yes.  We talked, you know, two or three times, maybe.

25   Q.    Okay.  What were the conversations about?

1    A.   Like, the first one was, you know, just checking in on

2    each other.  You know, it was kind of a big thing that happened

3    so we were just making sure, you know, he was okay.  He checked

4    in on me, asking how I was feeling.  And then one of the

5    conversations was letting me know that Kenny's funeral was on a

6    Wednesday and we would be returning to work on Thursday, and

7    that there was a job in Bow we would be starting.  And I

8    originally said -- well, originally I said, Okay, that's fine,

9    and then I heard back from him again saying, Never mind, we're

10   going to start work on Wednesday, the day of the funeral, which

11   I responded and told him I was no longer going to work for him.

12   Q.   And why did you respond differently that time?

13   A.   After talking with family and just, you know,

14   conversations I had with Skinny while I worked with him, I

15   didn't want to work with him anymore, especially after that

16   incident.

17   Q.   Did you get paid for the work that you had done for Mr.

18   Craigue?

19   A.   I did.

20   Q.   And how did Mr. Craigue pay you?

21   A.   Cash.

22   Q.   And do you recall how much he paid you and when?

23   A.   Yeah.  $200, and it was a Friday, I believe.  It was the

24   Friday that week that he paid me.

25   Q.   And that was after the funeral?

1    A.    No.  The funeral was, I believe, the following week.

2    Q.    Okay.

3    A.    So, it was the Friday of the week I worked.

4    Q.    Okay.  And was that the last money that Mr. Craigue ever

5    paid you?

6    A.    Yes.

7    Q.    Was that the last work that you ever did for Mr. Craigue?

8    A.    Yes.

9    Q.    And then you parted ways?

10   A.    Yes.

11   Q.    So, now I'd like to ask you some questions about your

12   further communications with Officer Kelly from OSHA.  After the

13   day of the accident did OSHA Officer Kelly try to get in touch

14   with you to set up a second interview?

15   A.    Yes.

16   Q.    And did you have that second interview with him?

17   A.    Yes.

18   Q.    When was that interview, if you recall?  And you can

19   approximate.

20   A.    Sometime in September, October, I think.

21   Q.    And so, that would have been a couple of months after the

22   accident?

23   A.    Yeah.

24   Q.    During that interview did you talk with Officer Kelly

25   about what happened during that accident?

1    A.    Excuse me?

2    Q.    During that interview with Officer Kelly did you speak

3    with him about what had happened during the accident?

4    A.    Yes.

5    Q.    Or did you speak with him about the accident, I should

6    say?

7    A.    Yes.

8    Q.    Okay.  Did you provide some additional information to Mr.

9    Kelly about Mr. Craigue's business?

10   A.    I did.

11   Q.    What information did you provide to Mr. Kelly?

12         MR. MIRHASHEM:  Objection.  Hearsay.  May I be heard

13   on that?

14         THE COURT:  Yes.

15   (SIDEBAR CONFERENCE AS FOLLOWS):

16         MR. MIRHASHEM:  Your Honor, can you hear me okay?

17         THE COURT:  I can.

18         MR. GINGRANDE:  I can too.

19         MR. MIRHASHEM:  This is total hearsay.  If he gets

20   impeached on cross it may be appropriate to go into it, but at

21   this point he's just flat out asking for out-of-court

22   statements that Mr. Kelly made and he himself made.  Prior

23   statements of a witness are hearsay unless they fall into Rule

24   801(d), and there's no claim that they do here, so he can't

25   testify to his own or Mr. Kelly's prior statements.

1          THE COURT:  Attorney Gingrande.

2          MR. GINGRANDE:  So, your Honor, these are statements

3    that the witness was making to OSHA Officer Kelly about, this

4    is in the second interview now, where he essentially comes

5    clean, and he explains why -- what it was that the actual

6    situation was, and in this instance it's very important for the

7    effect that it has on OSHA Officer Kelly and the investigation,

8    and so the effect on the listener.  The statements are also

9    things that he will inevitably be subject to examination on.

10   Defense counsel has the ability to cross-examine him about the

11   statements that he made.  And so, we would argue that this

12   either is not hearsay or, if the Court were to find that it

13   were, that it meets an exception.

14         THE COURT:  It is hearsay, and it's excluded.  Motion

15   is sustained.

16   (END OF SIDEBAR CONFERENCE)

17   Q.             during that second interview with Officer Kelly,

18   without testifying to what you said during that conversation --

19   I want to ask you a question that's just more of a yes-or-no

20   question in this context, okay?  Did you give a different

21   account of your employment status --

22         MR. MIRHASHEM:  Objection.  Hearsay.

23         MR. GINGRANDE:  If I could finish the question, your

24   Honor.

25         THE COURT:  Go ahead, finish your question.

1    Q.   Did you give a different account of your employment status

2    to Mr. Kelly during that second interview?

3              THE COURT:  I'm going to allow it.

4              MR. MIRHASHEM:  Your Honor, may I be heard on that?

5              THE COURT:  Yes.

6    (SIDEBAR CONFERENCE AS FOLLOWS):

7              MR. MIRHASHEM:  I have two objections, your Honor.

8    One is I think the hearsay issue, and I understand the Court's

9    ruling.  The other issue is this witness has not been

10   cross-examined yet.  He hasn't been impeached.  It's improper

11   to bolster the testimony of an unimpeached witness.  At this

12   point there's only been a direct examination.  He's testified

13   to his recollection of events.  For him to now be rehabilitated

14   before he's been impeached is improper bolstering.

15             THE COURT:  Attorney Gingrande.

16             MR. GINGRANDE:  Your Honor, first of all, it's not

17   hearsay, because I'm simply asking him not something about what

18   he said but a direct yes-or-no question about whether there was

19   a change.  And as to improper bolstering, that's not the

20   purpose of this.  The purpose is not to bolster his credibility

21   in some way; this is part of an accounting of what happened and

22   the effects it had on the OSHA investigation, so that is not

23   the purpose for which it's being introduced.

24             MR. MIRHASHEM:  Your Honor --

25             THE COURT:  Go ahead.

1          MR. MIRHASHEM:  -- why is the effect on the OSHA

2     investigation relevant to this point in this case?  The

3     elements of the false statement case do not involve the effect

4     on the OSHA investigation.

5          And I also wanted to cite for my improper bolstering

6     argument, your Honor, if I could just have a moment, United

7     States versus Bolick, 917 F.2d 135, Fourth Circuit, 1990,

8     affirms the general principle that impeachment must precede

9     rehabilitation, and the Fourth Circuit in that case explained

10    that you can't put up a witness and try to bolster their

11    testimony.  This is pure bolstering.  The OSHA investigation is

12    not an issue, given the testimony that we've heard so far.  If

13    an OSHA agent testifies and it becomes an issue why their

14    investigation took a certain path, that's something else, but

15    at this point that's not even part of the case.

16          THE COURT:  Okay.  I think I've heard enough.  I think

17    if you limit it to the single question, Was your account

18    different, that is not hearsay, and my understanding of

19    bolstering refers to a character for truthfulness, and this is,

20    arguably, not evidence of his character for truthfulness.  I

21    don't see it as bolstering.  I'm going to allow it but limit it

22    to simply introducing that he gave a different account.

23          MR. GINGRANDE:  Okay.  I can't ask the question why?

24          THE COURT:  That comes ultimately, I think, when you

25    do any sort of redirect.

1            MR. GINGRANDE:  Okay.

2            THE COURT:  All right?

3            MR. GINGRANDE:  Yes.  Thank you, your Honor.

4            THE COURT:  All right.

5    (END OF SIDEBAR CONFERENCE)

6            THE COURT:  Go ahead, Attorney Gingrande.

7            MR. GINGRANDE:  Thank you, your Honor.

8    Q.   So, ██████, I believe the question that I had just asked

9    you was in that second interview with OSHA Officer Kelly did

10   you give -- and, again, just a yes-or-no question -- did you

11   give a different account of your employment status?

12   A.   Yes.

13           MR. GINGRANDE:  Okay.  Court's indulgence?

14           THE COURT:  Yes.

15                       (Pause)

16           MR. GINGRANDE:  Thank you, your Honor.  No further

17   questions.

18           THE COURT:  All right.  Attorney Mirhashem.

19           MR. MIRHASHEM:  Your Honor, I have a motion before I

20   begin my cross-examination.

21           THE COURT:  All right.

22   (SIDEBAR CONFERENCE AS FOLLOWS):

23           MR. MIRHASHEM:  There's a couple of issues, your

24   Honor.  First, under Federal Rule of Criminal Procedure 26.2

25   and the Jencks Act, 18, United States Code, 3500, I do ask for

1   production of all of this witness's statements.  Some of the

2   stuff that he said on his direct examination is not stuff that

3   was in prior reports, and I want to make sure that, as required

4   by court rule, we are provided with every single document that

5   contains a statement made by this witness as defined in that

6   rule.  That's my first request.

7          THE COURT:  Okay.  And has the government provided all

8   of this witness's statements?

9          MR. DAVIS:  Yes, your Honor.

10          THE COURT:  Are there any that you have not provided?

11          MR. DAVIS:  Not to my knowledge.

12          THE COURT:  Okay.  All right.  They can't provide

13   something they don't have, Attorney Mirhashem, but I note your

14   objection.  What's your second?

15          MR. MIRHASHEM:  The second point is I want to make

16   sure that we've been provided with all _Giglio_ material with

17   respect to this witness and also ask if the Court would allow

18   me to voir dire him on a particular credibility issue outside

19   the presence of the jury.  I believe that he has at some

20   periods of time during the frame leading up to today, between

21   the incident and today, used drugs, and I can make a proffer

22   about that.  He testified that, you know, suddenly he was a

23   tech at a rehab, and you would think the government would ask

24   like, Oh, you were ████████████████.  How did you become a

25   ████████████? So, I want all _Giglio_ materials about his

1    drug use in the possession of the government, if they knew it

2    and when they knew it, and then I'd like to either be allowed

3    to inquire in the presence of the jury to develop that

4    testimony or voir dire him outside the presence of the jury.

5            MR. GINGRANDE:  This is literally the first time I'm

6    hearing of this.  I'm not aware of any drug use by &#9608;&#9608;&#9608;&#9608;&#9608;.

7    As for the voir dire, I mean, I could confer with Attorney

8    Davis on that just for a second.

9            MR. DAVIS:  I think our position is that

10   cross-examination should begin.  If there's some reason during

11   it that it appears that a voir dire outside the presence of the

12   jury is appropriate, we could take it up, but --

13           THE COURT:  Well, let me ask the defense, Attorney

14   Mirhashem, your cross-examination of him perhaps would take us

15   into the lunch break, and I'm wondering if we could save the

16   voir dire issue for the lunch break.  Is that possible?

17           MR. MIRHASHEM:  That would be fine, your Honor.  I was

18   planning on starting a little bit about his employment history

19   and asking him how he ended up becoming a tech at a rehab

20   place.  If the Court doesn't want me to start with that, I

21   won't start with that.

22           THE COURT:  Well, I think that way we can keep the

23   trial moving and ultimately take a break, and then the jury is

24   not twiddling its thumbs while we do it.  It seems as though

25   that's a possible alternative, so I'd like to do that if you

1    think you can hold off.  Now, if we get to a point 30 minutes

2    -- it's now 12:00 noon -- at 12:30 you're ready and raring to

3    go into this line of cross, then ask for a sidebar, and maybe I

4    can just let the jury go early for lunch.  I was thinking about

5    12:45.

6           MR. MIRHASHEM:  All right.  Thank you.

7           THE COURT:  What was your third point?  I think you

8    said you had three things.  No?

9           MR. MIRHASHEM:  No.  It was just <u>Jencks</u> and <u>Giglio</u>.

10          THE COURT:  Just two.

11          MR. MIRHASHEM:  And the voir dire.

12          THE COURT:  All right.  Anything else?

13   (END OF SIDEBAR CONFERENCE)

14          THE COURT:  Attorney Mirhashem.

15          MR. MIRHASHEM:  Thank you, your Honor.

16                    CROSS-EXAMINATION

17   BY MR. MIRHASHEM:

18   Q.   Good morning.

19   A.   Good morning.

20   Q.   So, the bottom line is you worked on August 27th, correct?

21   A.   Yes.

22   Q.   And you worked the morning of August 28th?

23   A.   Yes.

24   Q.   And those were the only times that you had any work

25   relationship with Nathan Craigue or Craigue & Sons?

1    A.   Yes.

2    Q.   And all of your testimony about your understanding of

3    whether or not you were an employee or not is limited to that

4    day and a half; is that right?

5             MR. GINGRANDE:  Objection, your Honor.  Misstates the

6    prior testimony.

7             THE COURT:  Overruled.

8             Can you move your mic just a little closer, Attorney

9    Mirhashem?  There you go.

10   Q.   Is that right?

11            THE COURT:  You can answer the question.

12   A.   Including the meeting as well, yes.

13   Q.   Which meeting are we talking about?

14   A.   The one at Milano's.

15   Q.   So, while you were at Milano's you were his employee?  Is

16   that what you're saying?

17   A.   It was confirmed I was going to be his employee.

18   Q.   But you did some work for Craigue & Sons, right?

19   A.   Yes.

20   Q.   You operated a saw August 27th, and you operated a saw the

21   morning of August 28th, right?

22   A.   Yes.

23   Q.   That's all the work that you did?

24   A.   Correct.

25   Q.   Your opining about employee versus independent contractor

1   is limited to that sawing for a day and a half; is that right?

2   A.   Yes.

3   Q.   You didn't do any other work for Nathan Craigue, right?

4   A.   Correct.

5   Q.   Now, this is not the first time that you're describing

6   your involvement with what happened at 280 Pleasant Street and

7   your interactions with Mr. Craigue, right?

8   A.   Correct.

9   Q.   You spoke to Agent Kelly on August 28th, 2018, right?

10  A.   Yes.

11  Q.   He was a federal officer, right?

12  A.   Yes.

13  Q.   Wearing a hard hat, identifying himself as OSHA, right?

14  A.   Yes.

15  Q.   And then you spoke with him again on October 31st of 2018,

16  right?

17  A.   If that was the date, yes.

18  Q.   Does it sound right that you met with him and gave him a

19  recorded statement on October 31st, 2018?

20  A.   Yes.

21  Q.   And he actually wrote out a statement for you that you

22  signed your name at the end of it to that date, correct?

23  A.   I don't recall if I signed anything.

24  Q.   Okay.

25           MR. MIRHASHEM:  Your Honor, this is something that's

1    not been marked as an exhibit, but since the witness doesn't

2    remember I'd like to have it marked as a defendant's exhibit

3    for identification to show him.

4           I'm sorry, your Honor.  So, with the Court's

5    permission I'm going to show the witness what's been marked as

6    Defendant's Exhibit B-14 for identification.

7           THE COURT:  Sure.  Go ahead.

8    Q.   I'm showing you what's been marked as Defendant's Exhibit

9    B-14 for identification.  Isn't that a statement that Agent

10    Kelly wrote out when you two met together on August 31st, and

11    isn't that your name on the very last page?

12    A.   It is.

13    Q.   And that's your handwriting?

14    A.   It is.

15    Q.   Okay.  So, you reviewed a statement on October 31st, 2018

16    that Sean Kelly wrote out for you, and you reviewed it and then

17    signed your name to it, right?

18    A.   I do not recall reading this whole thing, no.

19    Q.   Okay.  But you remember signing it?

20    A.   I did.  I guess I did sign for it, yes.

21    Q.   And you remember at the end it said, "I have read and had

22    the opportunity to correct this statement.  These facts are

23    true and accurate to the best of my knowledge and belief.

24    Public Law 91 at 596, Paragraph 17(g) makes it a criminal

25    offense to knowingly make a false statement or

1    misrepresentation in this statement."

2          Do you remember that?

3    A.   I don't recall.

4    Q.   Why don't you look and see if I read it correctly that the

5    statement that you say you didn't read on the bottom of it says

6    you'd be committing a federal crime if it contains any false

7    statements.

8    A.   What is your question?

9    Q.   Did I read correctly the warning at the end there?

10   A.   Oh, yes.

11   Q.   You read it for the jury.

12   A.   "I have read and had the opportunity to correct this

13   statement consisting of blank handwritten pages, and these

14   facts are true and correct to the best of my knowledge and

15   belief."

16   Q.   And it does have a warning about committing the crime?

17   A.   "Public Law 91-596, Paragraph 17 makes it a criminal

18   offense to knowingly make a false statement or

19   misrepresentation in this statement."  Yes.

20   Q.   So, you had the August 28th conversation, you had the

21   meeting October 31st, but, in fact, between August 28th and

22   October 31st that's more than two months, right?

23   A.   Yeah.

24   Q.   And there were further attempts to contact you.  Are you

25   aware of that?

1    A.    From Scott Kelly?

2    Q.    Scott Kelly or the Concord Police Department?

3    A.    Yes.  Yeah, other people --

4    Q.    In fact, you had a meeting in September with some Concord

5    police officers and Scott Kelly, late September?

6    A.    Excuse me?

7    Q.    Late September, before you went in, didn't you have a

8    meeting with Officer Carroll from the Concord Police Department

9    and --

10   A.    I did.

11   Q.    That was between the two meetings?

12   A.    I don't recall exact dates.

13   Q.    Okay.  But you did have a meeting at some point --

14   A.    I did.

15   Q.    -- with them?  And then on March 19th, 2019 you were

16   interviewed by Sean Roberts of the Department of Labor?

17   A.    Yes.

18   Q.    And you see Mr. Roberts is the person sitting in the

19   corner there (indicating)?

20   A.    Yes.

21   Q.    You met with him on March 19th and answered some of his

22   questions?

23   A.    Okay.  Yes.

24   Q.    Is that true?  I wasn't there, so I'm asking you.

25   A.    Yeah, yeah.  I mean, again, I don't know the dates, but,

1    yes, we've met.

2    Q.    And you've had a chance to, like, review the report that

3    he prepared in connection with that meeting he had with you?

4    A.    Yes.

5    Q.    And then you testified at a proceeding on May 15th of

6    2019.  Correct?

7    A.    Yes.

8    Q.    And you were asked questions by Attorney Davis, who's

9    sitting there, during that proceeding?

10   A.    Yes.

11   Q.    And so, today is not the first time that you're testifying

12   about this matter?

13   A.    Correct.

14   Q.    And you're under oath today.  You were under oath when you

15   testified at a proceeding in May of 2019, correct?

16   A.    Yes.

17   Q.    And when you had your interview with OSHA in October of

18   2018, you were asked some questions about your initial meeting

19   with Mr. Craigue, correct?

20   A.    Yes.

21   Q.    And when you testified under oath at a proceeding in May

22   of 2019, you were asked about your meeting and understanding

23   with Mr. Craigue?

24   A.    Yes.

25   Q.    And when you were asked by Sean Roberts in March of 2019

1    there was some questioning about that matter, right?

2    A.   Yes.  Maybe.  I don't know.

3    Q.   And you also on these different occasions have talked

4    about the conversations that you had with Nathan Craigue at the

5    job site after Skinny's accident, right?

6    A.   Yes.

7    Q.   Okay.  So, now you testified today that, when you met with

8    Mr. Craigue at Milano's, you told him you really want the job

9    on the books because of some state benefits; is that right?  Is

10   that what you said?  Did I understand you correctly?

11   A.   Not like that.

12   Q.   What did you say?

13   A.   I confirmed with Mr. Craigue that said, "I'm going to be

14   on the books, right?  Because I need to prove my income to the

15   state to get the benefits for my son for day care."

16   Q.   In that very first meeting you told Mr. Craigue that?

17   A.   Yes.

18   Q.   Now, when you spoke to the OSHA agent on October 31st,

19   didn't you tell him that Mr. Craigue said he could I-9 you but

20   it wouldn't be beneficial for you?

21   A.   I believe I was -- because I understand now what an I-9

22   is, so I don't believe I understood what an I-9 was at the

23   time.

24   Q.   Oh.  So, you told Sean Kelly that it would be -- that he

25   could I-9 you, but, as you were telling Mr. Kelly that, you

1    didn't know that an I-9 is a form required for determining a

2    person's citizenship or immigration status to make sure they

3    could work?

4    A.   Correct.

5              MR. GINGRANDE:  Objection, your Honor.

6              THE COURT:  Overruled.  Overruled.

7              Go ahead.

8    Q.   So, you're saying that you said you wanted to be on the

9    books, right --

10   A.   Correct.

11   Q.   -- in that first meeting, and you heard that you weren't

12   going to be I-9'd, correct?

13   A.   I don't recall on the conversation.

14   Q.   You don't recall the conversation with Mr. Craigue that

15   you just testified about?

16   A.   No.  That specific question of the I-9; I don't recall,

17   you know, that conversation specifically with Nate about the

18   I-9.

19   Q.   What do you recall about an I-9?

20   A.   It's been so long.  The only thing I remember or I know

21   about is the testimony I gave to Scott Kelly.

22   Q.   You know that it could be a crime to lie to a federal

23   agent in a matter within his jurisdiction.  You know that?

24   A.   I did not know that.

25   Q.   You didn't know that that day?

1    A.    I did not know that.

2    Q.    Did you know, the form that you just read, that it would

3    be a crime if you lied?

4    A.    Now, yes, I do know that.

5    Q.    Okay.  But at the time you signed it you didn't know.  All

6    right.

7          Now, what's your best memory of the I-9 conversation

8    that you had with Mr. Craigue?

9    A.    I honestly do not recall.  I don't.

10   Q.    Is it true or not that you told the OSHA agent, He could

11   I-9 me, but it wouldn't be beneficial on my part; as far as I'm

12   concerned or he's concerned, it doesn't really matter?  Did you

13   say those words or no?

14   A.    I must have, yeah.

15   Q.    I mean, would you like to review the transcript to see if,

16   in fact, you said those words?

17   A.    No.

18   Q.    You said, I was told I was going to get paid $15 under the

19   table, right?

20   A.    I don't recall saying that.

21   Q.    Okay.  So, is it fair to say that you're as sure that that

22   didn't happen as to anything else that you've testified about

23   today, that that didn't happen, nothing about getting paid

24   under the table?

25   A.    Excuse me?

1      MR. GINGRANDE:  Objection, your Honor.  It misstates

2   his testimony.

3      THE COURT:  I think rephrase the question.

4   Q.   Are you saying that you don't remember being told that you

5   were going to get paid under the table?

6   A.   Yeah.  I do not recall that.

7   Q.   Okay.  Do you recall talking about that to OSHA Agent

8   Kelly on October 31st, 2018?

9   A.   I do not.

10      MR. MIRHASHEM:  So, if I could have that exhibit

11   brought up.  What's the number?  That's the interview, is

12   Defendant's Exhibit C-1 for identification.  If you could bring

13   up page 20.

14   Q.   Now, do you see that page?

15   A.   I cannot.

16      MR. MIRHASHEM:  For the witness and the parties only.

17   Q.   Can you see that transcript, page 20?

18   A.   A little, yeah.

19   Q.   Okay.  It's coming up.  Do you see it?

20   A.   I can.  It's just -- it's poor quality.

21   Q.   Oh, do you mind if I come and just look if you can see the

22   right thing?

23   A.   Yeah, go for it.  I can read it.

24   Q.   You can read it?

25   A.   Yeah.

```
1    Q.    So, I want you to just read to yourself lines 17 and 18 of

2    page 20.

3    A.    What was that?  Sorry.

4    Q.    Read to yourself -- would it help you if I gave you a

5    paper copy?  It would be a little easier.  You're having a hard

6    time with the screen, right?

7    A.    He's highlighting it.

8    Q.    Oh, so do you see those lines have been highlighted for

9    you?  Do you see that now?

10   A.    Yeah.  I've read it.

11   Q.    It says question and answer.  Questions were asked by a

12   federal agent investigating a matter, right?

13   A.    Correct.

14   Q.    And your answers -- you knew you're talking about a

15   serious matter to him, right?

16   A.    Yes.

17   Q.    And you said, "I was told I was getting $15 under the

18   table."

19   A.    Yes.

20   Q.    That's what you told Agent Kelly?

21   A.    Yes.

22   Q.    Were you lying to him then?

23   A.    I don't recall mentioning it.

24   Q.    You don't recall mentioning what to whom?

25   A.    The $15 under the table.
```

1    Q.   You don't recall mentioning that to Agent Kelly?

2    A.   I do not.

3    Q.   Okay.  I'm going to show you an entire transcript of that.

4             MR. MIRHASHEM:  If I could have -- what exhibit is

5    this?

6    Q.   I'm showing you what's been marked as Defendant's Exhibit

7    For Identification C-1, and why don't you take a minute and

8    look at that and see if you agree that that's a transcript of

9    your interview with Sean Kelly on the same day that you signed

10   that form about testifying and making truthful statements.

11   With the Court's permission, take the time you need to make

12   sure that that's the transcript.  We have a recording of it

13   that we could play for you, if you would --

14   A.   I understand.  Are you asking if this is my statement?

15   Q.   Yes.

16   A.   Yes, it is.

17   Q.   So, when you say that you don't remember saying you were

18   told, I was getting paid $15 under the table, those were your

19   words to the agent, you don't deny that?

20   A.   No.

21   Q.   Would you like to hear your own --

22   A.   No, no, I do not deny that.  Correct.

23   Q.   You don't deny that you told the agent you were going to

24   be paid $15 under the table, and now you're saying you said, I

25   really need this to be on the books?

1        MR. GINGRANDE:  Objection, your Honor.  Asked and

2    answered.

3        THE COURT:  Overruled.

4    A.    No.  So, the conversation from the start was I needed to

5    prove my income.

6    Q.    Okay.  And how are you going to prove your income when

7    you're getting $15 under the table?

8    A.    Well, exactly.  That's why I don't ever recall having a

9    conversation with Mr. Craigue about being paid under the table.

10   Q.    So, when you met with Sean Kelly you knew that OSHA was

11   investigating it, right?

12   A.    Correct.

13   Q.    And you're telling him this person has said that he's

14   going to pay me under the table, right?

15   A.    Correct.

16   Q.    You know you're saying this to a federal agent --

17   A.    Correct.

18   Q.    -- about this matter?

19   A.    Yes.

20   Q.    And was it true?

21   A.    I do not recall having that conversation.

22   Q.    You don't recall having that conversation with Nathan?

23   A.    With Nate Craigue, right.

24   Q.    So, even though you didn't recall having the conversation,

25   you told the agent that he had said you were going to get paid

1    under the table?

2    A.    Right.

3    Q.    Okay.  So, that's just something you told the agent

4    without having an actual memory of him saying that?

5    A.    Right now I do not.  I do not remember.

6    Q.    Now, you've had a number of jobs, right?

7    A.    Yes.

8    Q.    And you have some basic -- you file taxes on the income

9    that you've earned?

10   A.    Yes.

11   Q.    So, you have some familiarity with various forms, right?

12   I-9 for establishing legal ability to work?

13   A.    Okay.

14   Q.    Is that right?

15   A.    What's the question?

16   Q.    You're familiar now with how an I-9 is a document that --

17   A.    Yes, I understand what an I-9 is now.

18   Q.    You didn't fill that out with Mr. Craigue?

19   A.    No.

20   Q.    And you're familiar with you have to fill out a W-4 if

21   you're an employee so that taxes get withheld, and then at the

22   end of the year you get a W-2, right?  You're familiar with

23   that?

24   A.    Correct.

25   Q.    And you're also familiar that, if you're an independent

1    contractor, earn over a certain amount of money, you get a

2    1099, right?

3    A.   I did not know about a certain amount of money.  I did not

4    understand that.

5    Q.   Okay.  But you knew that 1099 means independent

6    contractor?

7    A.   No.

8    Q.   You didn't know that?

9    A.   No.

10   Q.   Had you heard -- when did you first hear the term 1099?

11   A.   I couldn't tell you.

12   Q.   Did you know the term in May of 2019 when you testified at

13   proceedings under oath?

14   A.   I knew the term, yes.  I've heard of a 1099 at the time,

15   yes.

16   Q.   So, back in May of 2019, you testified under oath, being

17   questioned by John Davis, the individual sitting next to the

18   attorney who was questioning you (indicating).  You remember

19   him, right?

20   A.   Excuse me?

21   Q.   You remember Attorney Davis?

22   A.   No.

23   Q.   Okay.  But you appeared at this courthouse and testified

24   in a proceeding.  Do you remember that?

25   A.   Yes.

1    Q.    Right?  And you didn't know what a 1099 was then; is that

2    your testimony?

3    A.    I did not completely, I guess.  Yeah, I did not understand

4    completely what a 1099 was.

5    Q.    Did you testify that, It was probably under the table.  We

6    talked about a 1099, talked about me filling out a 1099

7    eventually with him?  Is that your testimony in May of 2019?

8    A.    Yes.

9    Q.    So, you do remember that you said that you talked to him

10   about it was probably under the table, and you talked about a

11   1099?

12   A.    Yes.

13   Q.    So, now you do remember that you talked about it being

14   under the table?

15   A.    Not with Nate.  In the testimony.

16   Q.    Oh, you remember testifying that it was probably under the

17   table?

18   A.    Correct.

19   Q.    So, you remember your testimony but not the actual

20   conversation?

21   A.    Correct.  Right now, yes.

22   Q.    So, did the conversation happen or didn't happen about the

23   under the table?

24   A.    That I do not recall.  I do not remember.

25   Q.    So, again, you don't remember that conversation -- now,

1    you're not someone whose memory of past events changes over

2    time, are you?

3    A.    No.

4    Q.    You seem to be testifying very clearly as to a memory you

5    have of a conversation at Milano's with Nathan Craigue more

6    than three years ago.

7    A.    I remember most of it.

8    Q.    But then you don't remember the part that you said under

9    the table, even though you testified to it under oath, right?

10   A.    I'd say, I guess, yeah.

11   Q.    You don't remember the part about how you talked about a

12   1099, even though you testified about it under oath?

13   A.    Correct.

14   Q.    You don't remember saying, We talked about me filling out

15   a 1099 eventually with him, even though you testified about

16   that under oath?

17   A.    I do not remember right now, no.

18   Q.    As you sit here today, though, you know 1099s are for

19   independent contractors, not employees?

20   A.    Correct.  Yes.

21   Q.    And so, you know that if you remembered talking about a

22   1099 you would remember that you had agreed to be an

23   independent contractor?

24   A.    I did not know at the time that that meant independent

25   contractor.

1   Q.   Well, you're saying you don't even remember talking about

2   a 1099?

3   A.   Right.

4   Q.   But if you talked about it you didn't know what it means,

5   right?

6   A.   Correct.

7   Q.   So, you're saying, We didn't talk about it; if I talked

8   about it I didn't know what it meant; I have on multiple

9   occasions afterwards said that we talked about it, but I didn't

10   know what it meant.  Is that your testimony?

11         MR. GINGRANDE:  Objection, your Honor.

12         THE COURT:  Overruled.

13   A.   I do not -- sorry.  You said so much.

14   Q.   Yeah, sure.  On direct examination you were very clear you

15   were an employee, right?

16   A.   As I considered myself, yes, working for Nathan Craigue,

17   yes.

18   Q.   And you know, as you sit here today, that if you agreed to

19   get a 1099 that would not mean you're an employee?

20         MR. GINGRANDE:  Objection, your Honor.  A legal

21   conclusion.

22         THE COURT:  Overruled.

23   Q.   Right?

24   A.   Today?

25   Q.   Today.

1   A.   Today, yes.

2   Q.   So, it would not help your claim that you thought you were

3   an employee if it turned out, in fact, that you had talked

4   about a 1099?

5   A.   Say that again?

6   Q.   It would not help your claim that you were an employee if

7   you had, in fact, talked to Nathan Craigue about a 1099.

8   A.   Okay.

9   Q.   Right?

10   A.   I suppose.  Yes.

11   Q.   And yet you've seen how on multiple occasions you've

12   already told people you talked about a 1099, right?

13   A.   Yes.

14   Q.   And so, now you're saying, I can't remember that

15   conversation, right?

16   A.   Yeah, I do not remember that conversation.

17   Q.   Now, you eventually got paid $200 for 1 1/2 days of work,

18   right?

19   A.   Correct.

20   Q.   And you know that you have to earn at least $600 to get a

21   1099?

22   A.   I --

23            MR. GINGRANDE:  Objection.  Counsel is testifying as

24   to the law.

25            THE COURT:  Sustained.

1  Q.   Do you know about the minimum before a 1099 has to be

2  issued?

3  A.   No.

4  Q.   Now, you testified that when you met with Nathan Craigue

5  about this job where you were going to saw under the tent, you

6  did not sign a written contract?

7  A.   Correct.

8  Q.   Now, you've done a lot of work in the construction field

9  these past years?

10  A.   Correct.

11  Q.   If somebody is going to do a subcontracting job they don't

12  have to have a written contract, right?

13  A.   I suppose you do not have to.

14  Q.   There's no requirement.  A contract is an agreement

15  between two people, right?

16  A.   Correct.

17  Q.   Certain agreements like, say, sale of a house, has to be

18  in writing.  Are you familiar with that?

19  A.   I have never bought a house.

20  Q.   But other than that you're not aware of a requirement that

21  agreements be in writing, are you?

22  A.   Say that again?

23  Q.   You could have agreed to get a 1099 and be a

24  subcontractor, even though there was no written contract,

25  right?

1          MR. GINGRANDE:  Objection.  Calls for speculation.

2          THE COURT:  Sustained.

3   Q.   You could have agreed -- well, is it your understanding

4   that, because there was no written contract, you could not have

5   been a subcontractor?  Is that your testimony?

6   A.   No.

7   Q.   Okay.  So, the absence of a written contract is now what

8   you're basing your belief on?

9   A.   Correct.

10  Q.   Okay.  Now, let's talk about your actual work on August

11  27th and August 28th.  You and Skinny were working together?

12  A.   Correct.

13  Q.   And you were under the tent cutting pieces of siding that

14  he was putting up?

15  A.   Correct.

16  Q.   He wasn't doing any windows work?

17  A.   Correct.

18  Q.   He wasn't doing shingles on the roof?

19  A.   Correct.

20  Q.   He was doing siding?

21  A.   Correct.

22  Q.   And your job was to cut the siding with a saw, right?

23  A.   Correct.

24  Q.   Did you know -- let me ask you this:  Did you know who

25  owned the saw?

1    A.    Nate.

2    Q.    How do you know that?

3    A.    I believe -- I assumed it was his saw.  It was at the --

4    on the job site.

5    Q.    Well, you showed up at the job site?

6    A.    Yeah.

7    Q.    And before you showed up, your understanding was Kenny was

8    cutting his own siding and putting it up, right?

9    A.    No.

10   Q.    Before you showed up it wasn't your understanding that he

11   was doing it all on his own?

12   A.    Correct.

13   Q.    Okay.  Now, you had some conversations with Kenny the time

14   that you spent together, August 27th and 28th?

15   A.    Yes.

16   Q.    And he was a nice and likable person, and you got to like

17   him, right?

18   A.    Yes.

19   Q.    And you talked about a lot of things, right?

20   A.    Correct.

21   Q.    And one of the things that you talked about was about how

22   he wanted to get paid under the table so he could keep his

23   Medicaid, right?

24              MR. GINGRANDE:  Objection.  Hearsay.

25              MR. MIRHASHEM:  May I be heard on that, your Honor?

1          THE COURT:  Yes.

2     (SIDEBAR CONFERENCE AS FOLLOWS):

3          MR. MIRHASHEM:  Your Honor, this goes -- this is

4     either state of mind under 803(3), or it's circumstantial

5     evidence of state of mind, which is not hearsay, because it's

6     not offered for the truth of the matter asserted.  I proffer

7     that Mr. Craigue told -- I'm sorry -- Mr. McKenna told this

8     witness that his agreement -- he had an agreement with Craigue

9     to protect his health benefits, and the agreement was that he

10    would get paid under the table so he could keep his Medicaid.

11    That's, first of all, not hearsay because his understanding of

12    the relationship is relevant in this case for reasons other

13    than its truth.

14         THE COURT:  His understanding?  Who's?

15         MR. MIRHASHEM:  McKenna's understanding.

16         THE COURT:  The declarant?

17         MR. MIRHASHEM:  Yes.  The declarant's understanding is

18    relevant because it's a Darden factor.  So, when he says he's

19    getting paid under the table so he could get his Medicaid, that

20    is relevant for reasons other than its truth.  But even if it's

21    hearsay, it fits state of mind under 803(3), because it's a

22    statement of his then-existing state of mind, such as motive,

23    intent or plan.  His plan is to work under the table to get

24    Medicaid, and so that's not hearsay.

25         THE COURT:  Attorney Gingrande.

1          MR. GINGRANDE:  Thank you, your Honor.  So, first of

2     all, the question that was asked was a question as to a

3     conversation where Mr. McKenna -- the question was whether Mr.

4     McKenna wanted to be paid under the table, and that absolutely

5     is hearsay, because it's being offered for the truth, an

6     assertion being offered for the truth, which is that he wants

7     to show that McKenna wanted to be paid under the table.  This

8     was not a question about whether he was or anything else like

9     that.  It is about that desire, and so it absolutely is

10    hearsay, and that's why it's being offered.

11         Secondly, it is actually not relevant to the <u>Darden</u>

12    factors, because being paid under the table is very different

13    from whether or not someone is an employee or a subcontractor.

14    He can be a subcontractor paid under the table, he can be an

15    employee paid under the table, but his desire to be paid under

16    the table has nothing to do with that status, and, therefore,

17    it is not relevant.  And I think it has a high degree of

18    likelihood to lead to juror confusion in this case.  It also

19    could negatively influence the jury's view of Mr. McKenna, and,

20    therefore, it is more prejudicial than probative, anyway, on

21    that ground.

22         And under 803(3) I don't understand how the presence

23    of the -- or the present state of mind has to do with the

24    statement.  He's not talking -- there's been no foundation laid

25    for how this was actually about his current status, whether he

1       was talking about the past, anything to that effect.

2               So, for those reasons, your Honor, I would object.

3               THE COURT:  All right.  I'm going to allow it.  It is

4       relevant other than its truth.  It does go to <u>Darden</u>, because

5       being paid under the table shows you're not being given tax

6       forms.  It is a relevant fact and ultimately is coming in other

7       than for its truth, but it goes to Mr. McKenna's state of mind.

8               As to 803(3), as an alternative, it does appear to

9       qualify as a statement of the declarant's then-existing state

10      of mind.

11              So, for both reasons I'm going to allow it.

12              MR. GINGRANDE:  Thank you, your Honor.

13      (END OF SIDEBAR CONFERENCE)

14      Q.   So, Skinny told you that he was getting paid under the

15      table so he could keep his health benefits, right?

16      A.   Correct.

17      Q.   That was an arrangement that he explained to you was his

18      preference?

19      A.   He said that he got paid under the table to keep his

20      Medicare, yes.

21      Q.   So, getting paid under the table was not something he was

22      complaining about?

23      A.   Correct.

24      Q.   Now, you testified -- well, let me ask you this :  You

25      know this individual Shane LaLiberte was involved with this

1   project, right?

2   A.   Who?

3   Q.   Shane?

4   A.   I don't know.

5   Q.   You don't remember any Shane being involved in any way?

6   A.   It's been three years, a lot of people.  No, I don't

7   recall Shane.

8   Q.   Okay.  It's been a long time, and you have a hard time

9   remembering everything that happened that day, correct?

10  A.   Yeah.  Correct.

11  Q.   And so, it would help refresh your recollection if you

12  looked at the transcript of your recorded interview with Agent

13  Kelly to remember whether or not there was somebody named Shane

14  involved?  Is that right?

15  A.   Yes.

16  Q.   Okay.  So, you have the transcript there?

17  A.   Sure.

18  Q.   So, why don't you look at the transcript starting on page

19  19.

20  A.   Okay.

21  Q.   This is the transcript that's -- this is Defendant's

22  Exhibit C-1 for identification.

23  A.   Yeah.

24  Q.   You remember now that there was a guy Shane and his people

25  were putting up the windows?

1    A.    No.  I still don't recall.  I see it, but I don't recall,

2    you know, exactly who Shane is.

3    Q.    Okay.  But you would agree with me that you told Agent

4    Kelly that Shane was --

5    A.    Yes.

6    Q.    -- doing the windows, right?  But, as you sit here today,

7    you have no memory of Shane at all?

8    A.    Yeah.  I can't recall who Shane was.

9    Q.    But Skinny didn't do any work on windows?

10   A.    That I do not know.

11   Q.    You did not observe Skinny do any work on windows?

12   A.    Correct.

13   Q.    While you were there he didn't do any work on windows?

14   A.    Correct.

15   Q.    And you didn't yourself, obviously, do any work on

16   windows?

17   A.    Correct.

18   Q.    Now, you testified on direct examination that on August

19   28th you had conversation or conversations with Nathan Craigue

20   after which you told Agent Kelly that you were a sub, right?

21   A.    Correct.

22   Q.    As you sit here today, do you have an actual memory of

23   telling Agent Kelly that you were a sub?

24   A.    Yes.

25   Q.    You remember that?

1    A.    Mm-hmm.

2    Q.    Today, in 2021, you actually remember that, right?

3    A.    Correct.

4    Q.    Now --

5          THE COURT:  Before you begin this line, I think what

6    I'll do is let us take a lunch break, let the jury break, get

7    something to drink and something to eat, and then we'll come

8    back after lunch and start right in with this line of cross.

9          Let me ask the jury, is it warm in here to you?  Some

10   of you are saying yes and some no.  I can tell our witness is

11   hot.  I'll see what I can do about increasing the air in here

12   in the meantime.

13         Now, you're going to take a lunch break, so follow my

14   instructions.  I won't repeat myself.  I know you know you're

15   not to talk to each other about the case.  We have ordered

16   lunch, it is here, so that you can eat here in the building,

17   and hopefully when you walk out it's a little cooler.  So,

18   we'll take a lunch break now, probably 45 minutes, and I'll see

19   you after lunch.

20         THE CLERK:  All rise for the jury.

21              (The jury exited the courtroom)

22         THE CLERK:  Please be seated.

23         THE COURT:  Let me just go over something with counsel

24   for the moment.

25   (SIDEBAR CONFERENCE AS FOLLOWS):

1          I am thinking that I know Dr. Bromage would allow one

2     person in this courtroom to take a mask off, and he would be

3     fine with that.  I'm wondering if I could do a sealed

4     proceeding, give ▮▮▮▮▮▮ earbuds and just ask him, and he

5     doesn't have to tell me, but just ask him if he would be

6     willing to tell me if he's fully vaccinated, and I would do it

7     as a sealed proceeding, and if he is, just let him take the

8     mask off so that he's not so hot as he's undergoing

9     cross-examination.  Do you guys have any better suggestions?

10         MR. GINGRANDE:  We know the answer to that question,

11    your Honor.  Can I say it?  Yeah, he's not vaccinated.

12         THE COURT:  Okay.  All right.  I wonder if -- it's

13    this plastic mask that I think is causing him some difficulty,

14    and I'm wondering if we shouldn't just allow him to take it

15    off, and I can explain to the jury that our infectious disease

16    expert has said we can have one person, and I will explain it

17    to them so they're not afraid about one person being without a

18    mask.  Weigh in on it with me, if you would.

19         MR. GINGRANDE:  That's fine with us.

20         MR. MIRHASHEM:  We certainly have no objection to him

21    taking off the mask.

22         THE COURT:  He's sweating terribly, and I know the

23    mask is hard for him.

24         MR. GINGRANDE:  He was uncomfortable in a meeting with

25    us wearing a mask, too.

1          THE COURT:  All right.  So, I'll explain to the jury

2    that our infectious disease expert has given me permission to

3    do it, that it's safe because everybody else is in a mask.

4    Okay.  So, I'll do that.

5          Now we're going to do the voir dire issue.  Do you

6    have any objection to him going ahead with the voir dire?  And

7    I'm going to let him take his mask off now, if that's

8    acceptable.

9          MR. MIRHASHEM:  We have no objection to that.

10          MR. GINGRANDE:  No objection to voir dire, your Honor.

11          THE COURT:  Okay.  Well, go ahead and try this, then.

12    (END OF SIDEBAR CONFERENCE)

13          THE COURT:  All right.  Hold on.  I'm going to let you

14    take the mask off, because I think that's going to help you get

15    through some of this questioning.  All right.

16          And now Mr. Mirhashem is going to ask you some

17    questions, and so you're still under oath, and hopefully we'll

18    be able to let you go for a break as well.  But ultimately

19    listen to Attorney Mirhashem's questions.  Go ahead, Attorney

20    Mirhashem.

21          MR. MIRHASHEM:  Thank you.

22                    VOIR DIRE DIRECT EXAMINATION

23    BY MR. MIRHASHEM:

24    Q.   You've testified to the jobs that you've had over the

25    years, right?

1    A.    I have testified?  Oh, yes, yes, yes.

2    Q.    And you described a number of construction jobs that you

3    had, right?

4    A.    Yeah.

5    Q.    And you also testified that you were a tech at a rehab?

6    A.    Correct.

7    Q.    It's kind of an unusual career route from construction.

8    Would you agree with that?

9    A.    I guess it depends on the type of person you are.

10   Q.    So, how did you end up being a tech at the rehab?

11   A.    I wanted to help people.  I was in a car accident, and I

12   had quite a few surgeries.  I broke both my legs, back, face,

13   so --

14   Q.    When was the car accident?

15   A.    In 2018.  2016.  Sorry.  My apologies.  September '16.

16   So, it's not easy doing framing when it comes to the roofs and

17   construction on a 40-, 50-hour week, so I switched it up, tried

18   something new, wanted to help people, and, yeah, that's what

19   the reasoning was for it.

20   Q.    You have your own history of drug use, correct?

21   A.    That is correct.

22   Q.    So, what kinds of drugs have you used from 2016 until now?

23   A.    From 2016 till now?

24   Q.    Yeah.

25   A.    It would probably be, this is no joke, easier to say what

1    I haven't, to be honest with you.

2    Q.   So, you've used pretty much every drug --

3    A.   I had an addiction problem, yes.

4    Q.   Okay.  And your addiction problem started in what year?

5    A.   I don't recall.  '14.

6    Q.   2014?

7    A.   '14, '15, yeah.

8    Q.   And it continued until when?

9    A.   Jeez, I've been sober for a while.

10   Q.   Well, under oath, what is your truthful, best answer to

11   your last use of any illegal drug?  You're under oath.

12   A.   I understand that.

13        MR. GINGRANDE:  Your Honor, I would just, before he

14   answers this question, he doesn't have counsel here

15   representing him today.  I think he would have a Fifth

16   Amendment right as to when his last use of drugs was, and so I

17   don't know if that is a proper question.

18        THE COURT:  Attorney Mirhashem, he does have,

19   obviously, Fifth Amendment --

20        MR. MIRHASHEM:  I don't have a problem with suspending

21   for him to consult with counsel, but I'll say right now that if

22   he ends up invoking --

23        THE COURT:  I'm sorry?

24        MR. MIRHASHEM:  I certainly don't have a problem with

25   him consulting with counsel, but he's already said that he used

1    pretty much every drug, and then we're going to have a problem

2    if he comes back and says he's not going to answer questions

3    about that, but I guess we can cross that bridge later.  I

4    certainly don't disagree that if the witness states that he

5    wishes to consult with counsel he has a right to do that.

6         THE COURT:  Well, we can look into this fairly quickly

7    and see if I can get him counsel immediately to consult with

8    him on these issues.  So -- I'm sorry.

9         Attorney Davis.

10        MR. DAVIS:  It would be helpful, your Honor, just to

11   know where is the defense going with this, and what is the

12   impeachment ground that the defense is trying to establish?  Is

13   it to ask whether he was using on the day of the events in

14   question to see if his memory should be impeached in that way?

15   Is there some other reason?  But I'm hopeful that, if we

16   understand what the impeachment goal here is or suggestion, the

17   Court can get fairly quickly to resolving it.

18        THE COURT:  Well, he's testified he made a statement

19   on August 28th.  He then met with I think the Concord PD at

20   some point.  He met with Officer Kelly on a recorded statement,

21   he met with Sean Roberts of the New Hampshire Department of

22   Labor, there was a report written about that, and then he

23   testified at a hearing here in May of 2019.  There's a long

24   stretch of time, a lot of different statements between the

25   incident and today.  I'm not sure we need to know anything

1    prior to the incident.

2              MR. MIRHASHEM:  Prior to the incident I would agree.

3              THE COURT:  But ultimately it goes ultimately to his

4    ability to remember, and I think it could be relevant.  Did you

5    want to add, respond?

6              MR. MIRHASHEM:  Can we proceed -- I want to let

7    counsel and the Court know my theories.

8              THE COURT:  Sure, sure.  Of course.

9    (SIDEBAR CONFERENCE AS FOLLOWS):

10             MR. MIRHASHEM:  Your Honor, it's very similar to the

11   situation with Mr. Erickson.  On the one hand, it's the ability

12   to remember.  On the other hand, he was avoiding OSHA for

13   weeks.  Some Concord PD officer showed up.  Agent Kelly would

14   say that was for the purpose of, quote, establishing rapport

15   with him.  And then he starts -- over time his statements

16   become more favorable to the government until their culmination

17   today.  You know, he certainly could have concerns about what

18   could happen to him if he's got drug problems; then he makes a

19   false statement to OSHA, and what's next?  So, I think the

20   motive to lie and the ability to remember are both --

21   especially ability to remember.  He looks at a transcript; he

22   says he doesn't remember.

23             I'll proffer that in May of 2019 Attorney Davis

24   elicited that they had a conversation outside the jury room

25   where this individual was saying he doesn't remember telling

1    Sean Kelly that he was a sub, and then he comes into the grand

2    jury room and testifies about that conversation.  So, his

3    memory I think is quite an issue.

4         THE COURT:  All right.  Let me just -- I'm going to

5    just do a very brief colloquy with him about the Fifth

6    Amendment and make sure he wants to speak to a lawyer, and then

7    I will have Attorney Esposito see if we can find someone

8    immediately who the Court can appoint to help him today.  I'll

9    obviously ask him if, you know, he has his own attorney, but

10   the Court would appoint him an attorney for this limited

11   purpose.  Does anybody have a problem with that procedure?

12        MR. GINGRANDE:  No, your Honor.

13        MR. MIRHASHEM:  No objection.

14        THE COURT:  All right.  Now, let me ask you this:

15   He's going to have to meet with somebody, presumably, talk to

16   them.  Can we -- I don't want to have the jury twiddling their

17   thumbs while that's going on.  Is it possible to take a witness

18   out of order and come back to him?

19        MR. GINGRANDE:  Yes, your Honor.  We would just need

20   to confirm that our witness is here, but we could do that very

21   quickly.

22        THE COURT:  Okay.  Attorney Mirhashem?

23        MR. MIRHASHEM:  We have no objection to taking a

24   witness out of turn until this witness consults with counsel.

25        THE COURT:  Okay.  All right.  And, Attorney

1    Mirhashem, just to remind you, this happened during jury

2    selection, too, you're talking and the witness can hear, so

3    just whisper into the mic.  I'll try to remember to tell you.

4            MR. MIRHASHEM:  Thank you, your Honor.

5            THE COURT:  Okay.

6            MR. GINGRANDE:  And, your Honor, could I just ask

7    whether it be some sort of, not an instruction, but some sort

8    of description that you give to the jury as to why all of a

9    sudden the new witness is being placed on the stand?  I would

10   hate for the jury to try and speculate or draw inferences or

11   something.

12           THE COURT:  I'll come up with a way to explain it to

13   them.  I'll run it by you before we reconvene.

14           MR. GINGRANDE:  Okay.  Thank you.

15           THE COURT:  You're just asking so that they're not

16   just sitting there?

17           MR. GINGRANDE:  Yeah.

18           THE COURT:  Yeah, I would do that in any event.

19           MR. GINGRANDE:  Okay.  Thank you.

20           THE COURT:  All right.  Okay.

21   (END OF SIDEBAR CONFERENCE)

22           THE COURT:  ███████, you heard the discussion that I

23   was having with counsel about the Fifth Amendment issues.

24           THE WITNESS:  Correct.

25           THE COURT:  And you've talked about addiction issues.

1        THE WITNESS:  Excuse me?

2        THE COURT:  You've talked about drug-addiction issues.

3        THE WITNESS:  Correct.

4        THE COURT:  He started to ask you questions about when

5   was the last time you used an illegal drug, and we stopped, and

6   I want to make sure you understand that you have a Fifth

7   Amendment right not to answer questions that could incriminate

8   you.  Do you understand that you have a Fifth Amendment right?

9        THE WITNESS:  I understand, but I did not know I have

10  it up here.

11       THE COURT:  Okay.  Let me ask you this:  I am inclined

12  to allow you to speak with a lawyer right now, have a break,

13  discuss this issue with a lawyer --

14       THE WITNESS:  Yeah, I'd like to, please.

15       THE COURT:  -- consult.  Okay.  And I can appoint

16  counsel for you for this limited proceeding so that you can

17  talk to one of the experienced criminal defense lawyers on our

18  court list, or if you have a counsel that you would prefer

19  consulting with.  But my hope would be that we could do this,

20  you could consult with counsel, and then make a decision with

21  respect to the Fifth Amendment and what you're going to do, and

22  then we will get back on track with your testimony.  So, my

23  hope was that I could have you consult with counsel today,

24  right now.  Is that something you would like to do?

25       THE WITNESS:  I would like to take a break and then

1    consult with them.

2            THE COURT:  Okay.  Would you like the Court to appoint

3    counsel for you for this purpose?

4            THE WITNESS:  Can I think about it for a few minutes?

5            THE COURT:  You sure can.

6            THE WITNESS:  And then I'll let -- who would you like

7    me to let know?

8            THE COURT:  I think if you let --

9            THE WITNESS:  Aaron?

10           THE COURT:  Sure, if you let Attorney Gingrande know

11   just that one limited piece, just let Attorney Gingrande know,

12   who can communicate with the Court.

13           THE WITNESS:  Okay.

14           THE COURT:  Now, you're still in the middle of your

15   testimony.  You are under oath, obviously.  Now, when you leave

16   and you leave the witness stand today, you need to understand

17   that, other than your counsel, who would be consulting with you

18   about this, you cannot be talking about your testimony with

19   anyone else.

20           THE WITNESS:  I understand.

21           THE COURT:  You understand that?

22           THE WITNESS:  Yes.

23           THE COURT:  Okay.  Is there anything else I need to

24   say to            before we excuse him?  And then you're going to

25   get back to Attorney Gingrande about the question I've asked,

 1    you want us to appoint counsel for you.

 2              THE WITNESS:  Yeah.

 3              THE COURT:  And is there anything else, Counsel, I

 4    should --

 5              MR. MIRHASHEM:  Not from us, your Honor.

 6              MR. GINGRANDE:  No, your Honor.  And we'll just

 7    confirm that we have a witness available to put on.

 8              THE COURT:  Okay.

 9              MR. GINGRANDE:  We do?  You can confirm that?

10              THE COURT:  Okay, good.

11              MR. GINGRANDE:  Great.

12              THE COURT:  All right.  So, now you can actually get

13    off the stand.  You don't have to, it's up to you when you come

14    back.  You can take that off, if you want to.  It's your

15    decision.  And we'll see you shortly.  Keep in touch with

16    Attorney Gingrande.  Obviously, you're still testifying.

17              THE WITNESS:  I understand.

18              THE COURT:  So, you understand we're waiting to hear

19    back from you?

20              THE WITNESS:  Yes.

21              THE COURT:  Okay.  All right, ██████.  Thank you.

22              THE WITNESS:  Would you like this back?

23              THE COURT:  All right.  Okay.  Anything we need to do

24    before we take our lunch break?

25              MR. GINGRANDE:  No, your Honor.  I'm sorry, I just

1    missed -- I know you said it was a 45-minute break.  I just

2    missed what time we have to be back.

3              THE COURT:  I think it's 1:30.

4              MR. GINGRANDE:  1:30?

5              THE COURT:  I think 1:30, yeah.

6              MR. GINGRANDE:  Great.

7              THE COURT:  And if he comes back in, my hope is that

8    the air is better in here, but if it's not I'm not comfortable,

9    so we've got to fix this for everybody.

10             MR. MIRHASHEM:  It's really hot in here.

11             THE COURT:  I will let him, obviously, take that mask

12   off.  Okay.  Thank you, everybody.  We'll be back.

13             THE CLERK:  All rise.

14             (Lunch recess taken from 12:56 p.m. to 1:40 p.m.)

15             THE CLERK:  All rise for the Honorable Court.  Please

16   be seated.

17             THE COURT:  Before we bring the jury in --

18             MR. GINGRANDE:  Your Honor, I think John is around the

19   corner.

20             THE COURT:  Oh, I'm sorry.  I'll wait for Attorney

21   Davis.

22             MR. GINGRANDE:  If you wouldn't mind, your Honor.

23   Thank you so much.

24             THE COURT:  The air in here is not a lot better.

25             Are these going to be short witnesses, the next

1    couple?  I'm just thinking I don't want anybody who's a

2    witnesses to have to wear that plastic mask.

3            MR. GINGRANDE:  I'm sorry.  I couldn't hear you.

4            THE COURT:  Are the witnesses going to be short, or

5    are they going to be long?

6            MR. GINGRANDE:  The next couple of witnesses -- well,

7    the first one will be fairly short, I would imagine, and then

8    the second one has the potential to run a little longer.  Maybe

9    I would estimate direct of the first witness would be about 20

10   minutes, and direct for the second one will probably be closer

11   to I want to say 45 minutes, maybe, something like that.

12           THE COURT:  All right.  Yes, Attorney Graham.

13           MS. GRAHAM:  I think, based on what the Court has

14   said, do you think it's proper for the witnesses who are going

15   to be testifying, do they have to wear masks?

16           THE COURT:  I am inclined to say no.  I want to

17   explain to you that -- let me let Attorney Gingrande finish.  I

18   just want to make sure one of you is hearing this, Attorney

19   Gingrande.  I've kind of already said this to you, and I want

20   to make sure you weigh in on this, but because the air in here

21   is not great -- I'm not dying yet.  If it reaches a point where

22   you're really uncomfortable, you need to signal to me and ask

23   for a sidebar.  Right now I'm still okay, myself.  How are you

24   doing with this?

25           MS. GRAHAM:  Good.

1          THE COURT:  You're okay?

2          MR. MIRHASHEM:  Yes.

3          THE COURT:  All right.

4          MR. GINGRANDE:  I'll be honest, I'm not quite as

5    comfortable, perhaps, but it also could be because I was

6    walking a little fast to get here.

7          THE COURT:  I'm not feeling any cool air, so I'm a

8    little worried about the afternoon.  But, in any event, because

9    of the heat and because of the fact, frankly, that, even at the

10   height of the pandemic before we had vaccinations, Dr. Bromage

11   was open to the possibility of one person in a courtroom, as

12   long as everybody else is wearing masks and is socially

13   distant, that that would be okay.  So, I can't imagine now,

14   with vaccinations as high as they are, with COVID numbers as

15   low as they are, that we can't allow the witnesses from here

16   out not to have a mask on.  Does anybody have a problem with

17   that?  And I can explain it to the jury, and I will explain

18   that this is the advice that we've been given.  Any issues with

19   that?

20         MS. GRAHAM:  No, Judge.

21         MR. GINGRANDE:  No objection, your Honor.

22         THE COURT:  Okay.  All right.  Well, we will save our

23   witnesses from the plastic shield in the future.

24         MR. GINGRANDE:  Your Honor, if I might just ask, I

25   apologize if I wasn't copied on an email or something.  I

1    didn't see any statement.  I don't know if --

2          THE COURT:  I was going to go over it with you now.

3    But I know I'm waiting for Attorney Davis.  Should I not wait

4    for him?  Let me just run -- I don't think.  This is not one of

5    those major issues.  I'm just simply going to say, Before the

6    break we were hearing testimony from █████████.  Something has

7    come up with █████████, and counsel has decided to move ahead

8    with the trial rather than wait to resolve █████████ s issue.

9    You cannot speculate about what occurred with █████████ or

10   concern yourself with it.  We will simply move to other

11   witnesses so we can keep the trial moving.  How does that

12   sound?

13         MR. GINGRANDE:  I think it all sounds very good to me.

14   The only question I have is, "Something has happened --" could

15   you repeat that part?

16         THE COURT:  Something has come up with █████████

17   They're going to wonder.  I mean, I think it's going to be

18   obvious something has happened.

19         MR. GINGRANDE:  Yeah.

20         MS. GRAHAM:  We are fine with that instruction.

21         THE COURT:  I think they probably, if they speculated,

22   they would think he was about to faint because he was sweating

23   so profusely.

24         MR. GINGRANDE:  Yeah, right, right.

25         THE COURT:  If you think of something better I'm happy

1    to --

2              MR. GINGRANDE:  Yeah.  I'm not thinking of --

3              THE COURT:  Here is Attorney Davis.  Let's see if he

4    has any issues.

5              MR. GINGRANDE:  A situation has arisen?

6              THE COURT:  Before the break the jury was hearing from

7    ███████.  Something has come up with ███████ and counsel has

8    decided to move ahead with the trial rather than wait to

9    resolve ████████s issue.  You cannot speculate about what

10   occurred with ███████ or concern yourself with it.  We will

11   simply move to other witnesses so we can keep the trial moving.

12             MR. GINGRANDE:  Yeah, okay.  All right.

13             THE COURT:  All right.  Good.  I think we're ready to

14   go.  Let me know if it gets too hot in here.

15             MR. DAVIS:  Judge, I apologize.  I did speak with

16   Mr. Lothstein, and he made a request potentially about an

17   immunity letter, and so I have been in touch with Merrimack

18   County Attorney's Office, and so, should it come to that, I

19   hope we'll be able to get that done quickly.

20             THE COURT:  Excellent.  So, it may be resolved with

21   immunity here and immunity from the state.

22             MR. DAVIS:  Yeah.

23             THE COURT:  Okay.  Excellent.

24             THE CLERK:  All rise for the jury.

25                      (The jury entered the courtroom)

1        THE COURT:  All right.  Members of the jury, if it

2   gets hot and you are very uncomfortable, I want you to somehow

3   draw my attention, and I will try to deal with that.  Right now

4   I'm not feeling any air in this room, and my hope is that

5   something will happen and we will have some fresh air in here

6   soon, but I'm just not sure.  So, I want to make sure you are

7   comfortable with the temperature in here as we continue this

8   afternoon.  Apparently, it's very hot outside.  So, that's part

9   of the reason I think there are issues.

10        Now, before the break you were hearing testimony from

11   ████████.  Something has come up with ███████, and counsel has

12   decided to move ahead with the trial rather than wait to

13   resolve ██████ s issue.  So, you are not to speculate about

14   what occurred with ████████ or concern yourself with it.  We

15   will simply move to other witnesses so we can keep the trial

16   moving.  Okay?

17        All right.  Call your next witness.

18        MR. GINGRANDE:  Thank you, your Honor.  The government

19   would call Janet Simon to the stand.

20        THE CLERK:  Ms. Simon, you can take the witness stand

21   and remain standing and raise your right hand.

22        **JANET SIMON**, duly sworn by the Clerk.

23        THE CLERK:  Thank you.  Please state your full name

24   and spell your last name for the record.

25        THE WITNESS:  Okay.  Janet Ann Simon, S-i-m-o-n.

1          THE CLERK:  Thank you very much.  Please be seated.

2          MR. GINGRANDE:  And, your Honor, would now be a good

3     time to discuss the mask situation?

4          THE COURT:  I was wondering how long a witness she

5     would be.  If it was short it wouldn't be as worrisome.

6          Let me explain something to the jury and make sure you

7     understand this and are comfortable with this.  Our infectious

8     disease expert that we've consulted throughout the pandemic has

9     advised the Court that we can permit, during the pandemic we

10    can permit one person in the courtroom to take the mask off,

11    and I am inclined to allow our witness to take the mask off.

12    It allows you to see the witness's face entirely, but it allows

13    them to breathe much more easily and more comfortably with this

14    heat.  So, ultimately it is safe, as long as our jurors are all

15    masked and we have social distance, and I will tell you it's

16    even more safe now that the numbers are down and many people

17    are fully vaccinated.  We don't know who, obviously, in here,

18    but many of us are probably fully vaccinated, so it's even more

19    safe than it was at the height of the pandemic when Dr. Bromage

20    had advised us that it was something that we could do.  So, I

21    am going to do that for the witnesses and for our jury so you

22    can see the witness's face, and that way, assuming you're

23    comfortable, the witness is comfortable with that.

24          THE WITNESS:  I am.

25          THE COURT:  You are?

1          THE WITNESS:  I would appreciate that.  Thank you.

2          THE COURT:  All right.  So, that's what we're going to

3     do for the rest of the trial, okay?  So, you can remove your

4     mask.

5          THE WITNESS:  Thank you.

6          THE COURT:  Thank you very much.

7          Go ahead, Attorney Gingrande.

8          MR. GINGRANDE:  Thank you, your Honor

9                    DIRECT EXAMINATION

10    BY MR. GINGRANDE:

11    Q.   Good afternoon, Ms. Simon.

12    A.   Hi.

13    Q.   Where do you work?

14    A.   I work at the U.S. Department of Labor, Office of

15    Inspector General.

16    Q.   And what is your title?

17    A.   I'm an Investigative Analyst.

18    Q.   And how long have you worked for the U.S. Department of

19    Labor, Office of Inspector General?

20    A.   I started as an analyst in 2001, right out of college, and

21    I've been in this job since then.

22    Q.   So, approximately 20 years?

23    A.   Yeah.

24    Q.   What type of work do you do for the U.S. Department of

25    Labor?

1    A.    I help our criminal investigators by supporting their

2    cases, sometimes by doing financial analysis or assisting them

3    with identifying where people live, what their businesses are

4    and more information to help them.

5    Q.    And what training do you have, if any, related to

6    conducting investigations?

7    A.    I've taken -- I've been there for 20 years.  I've been

8    taking courses every year but dealing specifically with

9    financial records examination, also financial analysis as a

10   whole, and then also Microsoft Excel analysis courses through

11   the National White Collar Crime Center and the Federal Law

12   Enforcement Training Center and on the job from the other great

13   analysts that I work with.

14   Q.    And is there any training that you've had that relates to

15   inputting information in spreadsheets?

16   A.    Yes.  So, the federal -- excuse me -- financial records

17   examination courses that I've taken have gone through all the

18   steps that are required.

19   Q.    And that includes putting information in Excel and Excel

20   training; is that right?

21   A.    Yes, all of those.

22   Q.    What about reviewing financial documents more generally?

23   Can you discuss your experience with that?

24   A.    Well, with bank statements specifically?  Is that what you

25   mean?

1    Q.    Sure.

2    A.    You know, just from, you know, all of the classes cover,

3    you know, how to read checks, how to read statements.  I mean,

4    and all of us have all of those things as well.  But, yeah,

5    just being -- paying attention, you know, noting details and

6    making sure that that's reflected in the spreadsheet.

7    Q.    And have you done investigations of bank accounts

8    specifically?

9    A.    Yes.  Since 2012 I've been doing financial analysis.

10   Q.    And could you ballpark how many of these investigations of

11   bank accounts you've done?

12   A.    COVID has kind of changed things a little bit with our

13   workload, but usually during the course of a year I would do 15

14   to 20 bank accounts, and one account may be five or six years'

15   worth of data.  So, several.

16   Q.    So, now I'd like to talk about the events of this case.

17   Were you asked to analyze bank accounts belonging to Mr. Nathan

18   Craigue in this matter?

19   A.    Yes.

20   Q.    And which accounts did you analyze?

21   A.    I analyzed the Craigue & Sons business account, plus

22   Nathan Craigue's personal account, and there was also a savings

23   account that I didn't analyze because there wasn't activity

24   during the time period.

25   Q.    And what was the purpose of your analysis?

1    A.    The purpose of the analysis was just to show the flow of

2    funds into and out of the account; to, yeah, just identify

3    where the money came from and where the money went, just what

4    the bank statements and information said.

5    Q.    And you anticipated my next question.  How did you conduct

6    the analysis?

7    A.    Well, I'm not going to be too technical, but, yeah, we

8    received electronic versions of the bank statements along with

9    the grand jury subpoena, which requested deposit slips,

10   withdrawal slips and all the debited checks from the account.

11   So, I took the statements themselves that were in Adobe PDF and

12   used a program called OmniPage and a program called BankScan to

13   convert it to Excel.  It's a lot faster than the old days, when

14   we'd just sit there and copy and paste and type it ourselves.

15   And then I'd just verify that the information from the bank

16   statements next to the spreadsheet matches, that the numbers

17   are the same, that the dates are the same, and then I would go

18   to the additional information from the bank to enter additional

19   check information or deposit slip information.

20   Q.    What time period were you analyzing?

21   A.    So, it was February of 2018 until, I believe -- I'm sorry,

22   there was a lot of -- until August of 2018, I believe.

23   Q.    I'd like to show you at this point what's been marked for

24   identification as Government Exhibit 403.

25            MR. GINGRANDE:  If we could just show that to the

1    witness at this point.

2    Q.    Are you able to see that on your screen, Ms. Simon?

3    A.    Yes, I am.

4          MR. GINGRANDE:  And, Ms. Sheff, if you would not mind

5    just clicking through the document a bit, just a little slowly,

6    yeah, just to let the witness familiarize herself with the

7    document.

8    Q.    Ms. Simon, have you had a prior chance to review these

9    records?

10   A.    Yes.

11   Q.    And do you recognize these records?

12   A.    Yes, I do.

13   Q.    What are they?

14   A.    They're the bank response to the subpoena, so it includes

15   the, you know, signature cards, statements, deposits,

16   withdrawals for the three accounts that were held at this

17   particular bank.

18   Q.    Okay.  And is this, to the best of your knowledge, the

19   complete set of the records that you analyzed?  I know we were

20   clicking through fairly quickly, but you've had a prior chance

21   to review them, and this Government Exhibit 403 is a complete

22   set of the records?

23   A.    Yes.  Thank you.

24   Q.    Now, turning your attention to the Craique & Sons Home

25   Exteriors account you testified you had analyzed --

1    A.    Yes.

2          MR. GINGRANDE:  We can take that document down.  Thank

3    you, Ms. Sheff.

4    Q.    I'd like to discuss the money deposited into that account.

5    Approximately how much money was deposited into that account

6    during the time period that you analyzed from, I believe you

7    said it was -- I'm sorry.  You said it was from February 2018

8    to August 2018.

9    A.    Yes.

10   Q.    So, during that time frame how much money was deposited?

11   A.    The total across all of the credits?

12   Q.    Just the Craigue & Sons account.

13   A.    Okay.  It's been a little while since I've looked at it.

14   I would approximate, and I could review, that it was

15   approximately $80,000.

16   Q.    Okay.  And did you see payments made to Craigue & Sons

17   Home Exteriors by 280 Pleasant Street, LLC?

18   A.    Yes, I did.

19   Q.    And how was that deposited?

20   A.    There were three separate checks that were deposited I

21   believe in June, July and August of 2018, and I don't know the

22   numbers of each check off the top of my head, but the total

23   across all three was $56,450.  So, a large portion of the

24   total.

25   Q.    Got it.  And so, I hate to make you do math on the spot,

1    but could you approximate what percentage of the money

2    deposited into the account came from 280 Pleasant Street, LLC?

3    A.   It's probably between 75 and 78 percent, 80 percent.  It

4    was the largest amount during that time period.

5    Q.   Okay.  And was there some amount in payments that were

6    deposited that came from other companies to Craigue & Sons?

7    A.   There were.  It's my recollection, I believe there were

8    two, possibly two other businesses that had checks that were

9    deposited to this account but not anywhere near that same total

10   as was for the other.

11   Q.   And in terms of the amount of money, can you approximate

12   just what the amount of money was?

13   A.   I believe it was -- I'm sorry.  I don't recall, but I

14   think it was around 5,000, but I don't remember.

15   Q.   Well, let me ask you, you're saying that you don't recall,

16   and that's fine that you don't recall sitting there.  Now, is

17   there any document in this matter that would refresh your

18   recollection?

19   A.   Yes.  So, whenever I do a financial analysis I have the

20   spreadsheets themselves, and then I write a memo that kind of

21   summarizes some of my findings, and obviously it was all

22   written in there, and all of those numbers are there.

23           MR. GINGRANDE:  Okay.  The Court's indulgence for one

24   moment?

25           THE COURT:  Sure.

1    MR. GINGRANDE:  Your Honor, may I approach the

2    witness?

3         THE COURT:  Yes.

4         MR. GINGRANDE:  Thank you.

5    Q.    If you can just take a look at that document and review

6    it.  My question was, was there an amount of money from other

7    companies that was deposited into --

8    A.    Right.

9    Q.    And I'm sorry, but before you testify I would take the

10   document back from you.

11   A.    Yes.

12   Q.    Just let me know when you're done with it.

13   A.    Okay.  Okay.  Thank you.

14   Q.    Thank you.  This was a report that you had prepared

15   previously in this matter?

16   A.    Yes.

17   Q.    So, Ms. Simon, could you please answer what was the amount

18   in payments from other companies?

19   A.    Okay.  Payments from other companies, I misspoke, totalled

20   $2,650.

21   Q.    Great.  So, now I'd like to discuss withdrawals from the

22   business account still.

23   A.    Yes.

24   Q.    Did Mr. Craigue pay individuals from this business

25   account?

1   A.   There were two debited checks from this business account.

2   Q.   Okay.  And what was the total amount in payments to

3   individuals that he made from the business account?  We can go

4   through it again, if you need, if you can't recall.

5   A.   I'm sorry.  I would just need to look at it again.

6   Q.   No, not a problem.  Okay.  The same report.

7   A.   I just want to make sure that I have the correct number.

8   Q.   No.  Absolutely.

9   A.   Thank you very much.

10   Q.   It's important.  And just let me know when you're done

11   with the document.  I'll come get it, and then you can answer

12   the question.

13   A.   Okay.  Let me make sure I get all of the numbers so you

14   don't have to keep walking.  Thank you.

15   Q.   So, Ms. Simon, so now that you've had a chance to review

16   the document, is your recollection refreshed?

17   A.   Yes.

18   Q.   Okay.  And what was the total amount in payments to

19   individuals that were made from -- that Mr. Craigue made from

20   the business account?

21   A.   Okay.  It was $1,484 in total.

22   Q.   Thank you.  And did he make a payment to a Ken McKenna?

23   A.   Yes, one check.

24   Q.   And was that, do you know, the majority of that $1,484?

25   A.   Yes.  It was $1,184 for that check.

1    Q.   And so, that would mean that there was only a total of

2    $300 to any other individuals?

3    A.   There was one check for $300 to another individual.

4    Q.   Okay.  At this point I would like to direct your attention

5    to what has been marked for identification as Government

6    Exhibit 500.  That will appear on that same screen again.

7    A.   Okay.

8    Q.   Do you recognize this document?

9    A.   I do.

10   Q.   And what is it?

11   A.   It is a summary of the cash withdrawals from both the

12   Craigue & Sons business account -- thank you -- and Nathan

13   Craigue's personal account.

14   Q.   And is this summary based on the records that I had

15   previously shown you and you had testified to that were marked

16   for identification as Government Exhibit 403?

17   A.   Yes, from the bank records.

18   Q.   Did you compare the bank records in Government Exhibit

19   403, what was marked for identification as Government Exhibit

20   403, to this document and confirm that the amounts in this

21   document are accurate?

22   A.   Yes.

23        MR. GINGRANDE:  Your Honor, at this time I would move

24   to admit as a summary of records this exhibit marked Government

25   Exhibit 500.

1          THE COURT:  Any objection?  You want a sidebar?

2          MR. MIRHASHEM:  Yes.

3    (SIDEBAR CONFERENCE AS FOLLOWS):

4          MR. MIRHASHEM:  Should I begin?

5          THE COURT:  Go ahead.  Just make sure you whisper.

6          MR. MIRHASHEM:  Okay.  I have no objection to this

7    witness --

8          MR. GINGRANDE:  I'm having trouble hearing.  I'm

9    sorry.

10          THE COURT:  Just get very close to the mic.  Maybe if

11    you move the mic closer to yourself.

12          MR. MIRHASHEM:  How's that?

13          THE COURT:  That's much better.

14          MR. MIRHASHEM:  Okay.

15          THE COURT:  Go ahead.

16          Can you hear him now?

17          MR. GINGRANDE:  Yes.

18          MR. MIRHASHEM:  Okay.  So, I have no objection to this

19    witness testifying to the contents of this document, and I

20    understand that in some circumstances a summary may be offered

21    in evidence when there are voluminous records.  However, I

22    object to this particular document under Rule 403.  There's

23    really no reason for this to go in as a full exhibit with a

24    focus on cash payments with no development of where this cash

25    was going.  People take cash out of their accounts to buy

1    coffee, they pay cash out of their accounts for groceries.

2    There's all sorts of reason why cash is spent, and so just the

3    fact that there were a certain amount of cash payments or

4    withdrawals, I don't think that that should go as a full

5    exhibit to the jury.  That's my objection.

6            THE COURT:  That objection is overruled.  Rule 403

7    requires that the prejudice substantially outweigh the

8    probative, and here any prejudice from this document does not

9    substantially outweigh its probative value, and it is relevant,

10   has any tendency to make a fact more probable than not, that

11   being that he withdrew cash to pay some of his employees or

12   workers.  So, the objection is overruled, and it can come in as

13   a full exhibit.

14           MR. GINGRANDE:  Thank you, your Honor.

15   (END OF SIDEBAR CONFERENCE)

16           MR. GINGRANDE:  So, at this time I ask that this be

17   admitted as a full exhibit, your Honor.

18           THE COURT:  Exhibit 500 is admitted as a full exhibit.

19           (Government's Exhibit No. 500 admitted into evidence)

20           MR. GINGRANDE:  Thank you, your Honor.  And if that

21   could please be published to the jury.

22           THE COURT:  Yes.

23   Q.   So, Ms. Simon, I'd like you to walk us through this

24   document, if you could, starting with the top of the document.

25   What account are those months and amounts relating to?

1    A.    Okay.  The first chart is showing the total of the cash

2    withdrawals over the course of one month, and so each month has

3    in red how much was taken from the Craigue & Sons Home

4    Exteriors, LLC account at Santander.  I'm not from New

5    Hampshire.  I'm assuming that's a bank.  The account ending in

6    1990.  So, it shows a summary of the cash withdrawals taken

7    each month.

8    Q.    Okay.  And so, if you could just walk us through.  So, in

9    February 2018 can you kind of just go from left to right there?

10   A.    Oh, okay.  So, in February of 2018, $90 in cash was

11   removed from this account; in March 2018 there was no cash

12   removed from this account; April 2018 there was $400 in cash

13   removed from this account; in May of 2018 there was no cash

14   removed from this account; in June 2018 there was $1,400; in

15   July 2018 there was $2,800; and then in August of 2018 there

16   was $240 in cash removed, for a total of $4,930 cash from that

17   account.

18   Q.    Thank you.  And could you now -- well, let me ask you were

19   these large cash withdrawals significant in your analysis of

20   this account in any way?

21          MR. MIRHASHEM:  Objection, your Honor.  May I be

22   heard?

23          THE COURT:  Yes.

24   (SIDEBAR CONFERENCE AS FOLLOWS):

25          MR. MIRHASHEM:  Your Honor, the government did not

1   disclose this individual as an expert witness, and I don't have

2   a problem with her testifying.  She used a computer program to

3   generate these numbers, but if she's going to talk about

4   significance of things, now we're getting into expert

5   testimony.  She can testify to what she did, what numbers she

6   generated, but she wasn't disclosed as an expert and should not

7   offer opinion testimony as to the significance of anything.

8               THE COURT:  Go ahead.

9               MR. GINGRANDE:  Would you like me to be heard on this,

10  your Honor?

11              THE COURT:  Yes.

12              MR. GINGRANDE:  So, your Honor, that's true we are not

13  offering her as an expert.  However, this is someone who does

14  have experience.  She certainly has been in the position and

15  established that she has done investigations before, and we are

16  simply asking the significance of these numbers to the analysis

17  and going no further in the questioning, that is, simply the

18  question is just were these significant or not.  So, I don't

19  think there's any reason that she needs to be qualified as an

20  expert in order to give that very basic testimony.

21              THE COURT:  All right.  We were not going to have any

22  sort of testimony about the law on subcontractor or employee.

23              MR. GINGRANDE:  And it wouldn't go to this, your

24  Honor.

25              THE COURT:  Well, what is she going to say about

1    significance?

2           MR. GINGRANDE:  She's just going to say that it's not

3    something that she sees every day, these large amounts of cash

4    withdrawals in business accounts.

5           MR. MIRHASHEM:  I strongly object to that, your Honor.

6    That's a witness qualifying based on training and experience,

7    fits Rule 702.  No disclosure was made.  The jury can take for

8    itself the significance of a few thousand dollars of

9    withdrawals.  This claim that, oh, it's unusual to have such

10   withdrawals, if we were on notice we could bring somebody in to

11   say there's nothing unusual about that.

12          THE COURT:  Right.  I agree.  Objection sustained.

13          MR. GINGRANDE:  Okay.  Thank you, your Honor.

14   (END OF SIDEBAR CONFERENCE)

15          THE COURT:  All right.  Sidebar very, very briefly.

16   (SIDEBAR CONFERENCE AS FOLLOWS):

17          THE COURT:  Attorney Mirhashem, people in the

18   courtroom, including I think some jurors, can hear you.

19          MR. MIRHASHEM:  Sorry.

20          THE COURT:  So, I'll just try to help you remember to

21   whisper.  I think it's the whispering.  As long as you're close

22   to the mic and you whisper, we should be okay.

23          MR. MIRHASHEM:  Okay.

24          THE COURT:  And I'm going to rely on Attorney Esposito

25   to get my attention if I need to remind you to whisper.  Okay?

1          MR. MIRHASHEM:  I'm sorry.

2          THE COURT:  That's all right.

3   (END OF SIDEBAR CONFERENCE)

4          THE COURT:  Go ahead.

5          MR. GINGRANDE:  Thank you, your Honor.

6   Q.    Now, moving away from this exhibit for a second, and still

7   talking about the business account --

8   A.    All right.

9   Q.    -- did the Craigue & Sons business account also reflect a

10  transfer to Nathan Craigue's personal account?

11  A.    Yes.

12  Q.    And do you remember that amount?

13  A.    I believe the total across all the months was $10,950, I

14  believe.

15  Q.    Now I'd like to turn your attention to Mr. Craigue's

16  personal account, and I'd like to discuss the deposits that

17  were made into his personal account now.  So, were there

18  payments from individuals that were deposited into Mr.

19  Craigue's personal account?

20  A.    Yes.

21  Q.    And what was the approximate amount of payments from

22  individuals deposited into Mr. Craigue's personal account, if

23  you recall?

24  A.    There were several, and honestly I don't recall the grand

25  total of all of those.

1   Q.   Okay.  And is that same document that I showed you before,

2   would that be helpful in refreshing your recollection?

3   A.   Yes.

4   Q.   Okay.

5   A.   Thank you.

6   Q.   Same process as the last time.

7   A.   Yes.  Okay.

8   Q.   Okay, great.

9   A.   Thank you very much.

10  Q.   Thank you.  So, is your recollection refreshed now?

11  A.   Yes.

12  Q.   Okay.  And so, what was the approximate amount of payments

13  from individuals deposited into Mr. Craigue's personal account?

14  A.   So, it was $11,943.75.

15  Q.   And was this the largest source of deposits to this

16  account?

17  A.   Yes.

18  Q.   Now, you had testified to the $10,950 transfer from the

19  Craigue & Sons account to Mr. Craigue's personal account?

20  A.   Yes.

21  Q.   And was that the next largest source of deposits into Mr.

22  Craigue's personal account?

23  A.   I believe that it was, yes.

24  Q.   Did Mr. Craigue also make cash deposits into his personal

25  account?

1   A.   Yes, some.

2   Q.   And when you say "some," does that mean not as much as

3   these other numbers that we're talking about?

4   A.   Not nearly as much as those others.

5   Q.   Okay.  Do you have an approximate --

6   A.   Without making you walk back and forth.

7   Q.   If you don't recall, if you don't have a good

8   approximation --

9   A.   Yeah, if you would, I would prefer to give the correct

10  numbers.

11  Q.   Sure.  No, absolutely, absolutely.

12  A.   Thank you.

13       THE COURT:  I don't have any problem with her keeping

14  the document, just referring to it when she needs to, if that's

15  all right with defense counsel.

16       MR. MIRHASHEM:  I have no objection to that at all.

17       THE WITNESS:  Thank you.

18  Q.   And then maybe if you can just put it aside, then, instead

19  of giving it back to me.

20  A.   Yes, yes.

21  Q.   It will save me the walk as well.  I appreciate it.

22  A.   So, the total amount of cash deposits was $2,955.

23  Q.   Okay.  Thank you.  And now I'd like to focus on

24  withdrawals from the account.  Did Mr. Craigue withdraw cash

25  from his personal account?

1    A.    Yes, he did.

2    Q.    And what was the total amount of these withdrawals over

3    the time period that you analyzed?

4    A.    Okay.

5    Q.    Just talking about the cash withdrawals from the personal

6    account.

7    A.    Right.  So, it was $9,780.50.

8    Q.    And now I'd like to direct your attention back to Exhibit

9    500.  That one I actually didn't need you to refer to the

10   document, because we have the exhibit here.  Could you just,

11   could you walk us through the personal account?

12         MR. GINGRANDE:  Oh, I'm sorry.  Yes, the jury as well,

13   please.  Thank you.

14         And can you maybe start by pointing out where the

15   personal account is?

16   A.    Okay.  So, the second chart down is Nathan Craigue's

17   personal account at Santander Bank ending in the last four

18   numbers of 0745, and so this chart summarizes the amount of

19   cash withdrawals per month with a total.  Would you like me to

20   go through each?

21   Q.    You know, I think the jury can probably see it, but if you

22   could maybe go through the amounts for -- well, how about the

23   total?

24   A.    So, from February of 2018 to August 2018 the total cash

25   withdrawals from the personal account were $9,780.50.

1    Q.   Okay.  And if you could, and, again, sorry to make you do

2    the math, but what was the total amount of cash withdrawals

3    from both the Craigue & Sons business account and Craigue's

4    personal account during the time period that you analyzed?

5    A.   You gave me the grand total.  $14,710.50.

6    Q.   Oh, there it is.  You're right, it was there in the

7    document.

8         MR. GINGRANDE:  All right.  Just the Court's

9    indulgence, your Honor?

10        THE COURT:  Yes.

11                       (Pause)

12        MR. GINGRANDE:  No further questions, your Honor.

13        THE COURT:  Attorney Mirhashem.

14                   CROSS-EXAMINATION

15   BY MR. MIRHASHEM:

16   Q.   Good afternoon.

17   A.   Hello.

18   Q.   So, you analyzed a series of Santander Bank records for

19   Nathan Craigue, correct?

20   A.   Yes.

21   Q.   And these were records that were obtained pursuant to a

22   subpoena?

23   A.   Yes.

24   Q.   And you obtained records of the business checking account,

25   correct?

1    A.    Yes.

2    Q.    And you also obtained records of personal checking and

3    savings, correct?

4    A.    Yes.

5    Q.    In the savings account basically there was, like, very

6    little money in it the whole time, there was no money in

7    savings, and so then you focused on his personal checking

8    account and the business checking account limited to this

9    six-month period between February and August of 2018, correct?

10   A.    Yes, that's correct.

11   Q.    And during this period you noticed or noted that $56,450

12   came into the business account from 280 Pleasant Street, LLC,

13   is that right?

14   A.    That's correct.

15   Q.    And that was three checks in the months of June, July and

16   August; is that right?

17   A.    That's correct.

18   Q.    And then during that same period of time $48,450 went out

19   to SKS Maintenance?

20   A.    Yes.

21   Q.    Are you familiar with the fact that an individual named

22   Shane LaLiberte owns SKS, or you didn't come across that in

23   your work in this case?

24   A.    That wasn't in the bank records.

25   Q.    You only looked at the bank records?

1    A.    I was examining the bank records.

2    Q.    So, you seem to be better than most on doing percentages

3    on the spot, so how much of $56,450 is $48,450, approximately?

4    A.    Perhaps 80 percent.

5    Q.    Let's see.  80 percent of 56.  So, at least 80 percent; is

6    that fair?

7    A.    That's my estimation.

8    Q.    80 percent of 56 would be 44,800, right?

9    A.    Okay.

10   Q.    So, that's pretty close, actually.  You're right.  Your

11   math is better than mine.

12   A.    Okay.  Thank you.

13   Q.    So, around 80 percent of the money that 280 Pleasant

14   Street deposited into this account went out to SKS, correct?

15   A.    Yes.

16   Q.    And, in fact, do you recall that as checks were being

17   deposited a very short time after that deposit a check was

18   going out to SKS?

19   A.    I don't recall.

20   Q.    Okay.  So, the records that you obtained by subpoena have

21   been marked as Government's Exhibit 403 For Identification.

22   You don't have the bank records there with you, do you?

23   A.    No, I just saw the screen.

24   Q.    Okay.  So, if we could just put the government's exhibit

25   just for the witness to see the records, I'm going to ask you

1    some questions about that.  So, let's start with pages 65 and

2    66.

3             THE CLERK:  Is this for everybody?

4             MR. MIRHASHEM:  No, this is just for the witness.

5             THE CLERK:  Just for the witness.  Okay.

6    Q.   So, looking at page 65, would you agree with me that on

7    June 27th of 2018 a check was deposited for $20,900?

8    A.   I'm sorry.  I don't have anything on my screen.

9    Q.   Oh.  Sometimes that's really faint.  Do you mind if I

10   approach and see if there's anything on your screen at all?

11   A.   Sure.

12            THE CLERK:  I'm sorry.  Who's displaying it, the

13   defense?

14            MR. MIRHASHEM:  The exhibit is a government's exhibit.

15            THE CLERK:  I thought you were asking the government

16   to do it for you.  I apologize.

17            MR. MIRHASHEM:  Oh.  He's going to do it.

18            THE CLERK:  Got it.

19   Q.   All right.  So, now we're looking at page 65, and do you

20   see that this is the June 2018 statement that shows a deposit

21   on June 27th in the amount of $20,900?

22   A.   Yes.

23   Q.   And then, if we go to page 131, that's the actual check,

24   $20,900 that was deposited, correct?

25   A.   It appears so, yes.

1   Q.   And then, if you look at the withdrawal, a check goes out

2   June 29th in the amount of $16,900 on page 65 again.

3   A.   Okay.  Right now all I still see is the deposited check.

4   Okay.

5   Q.   So, page 65.

6   A.   Yeah.

7   Q.   $20,900 comes in on the 27th; $16,900 goes out on the

8   29th --

9   A.   Yes, I see that.

10   Q.   -- correct?  And looking at your report, which you have,

11   and if you need to refer to it, feel free to do so, you know

12   that must have been to SKS, because there's no other such large

13   withdrawal that was made in the entire time?

14   A.   That is accurate, I believe.

15   Q.   So, on the 27th, 280 Pleasant Street pays the Craigue &

16   Sons $20,900.  Two days later $16,900 of that goes out to SKS,

17   correct?

18   A.   I believe so.  I'm not reviewing the check that was

19   written.

20   Q.   But your chart showed that the total that went to SKS was

21   $48,450.

22   A.   Okay.

23   Q.   Is that right?

24   A.   Yes.

25   Q.   And nobody that's listed individually got more than

1    $10,000, so that must have been to SKS?

2    A.    Yes, that's accurate.

3    Q.    Do you agree on that?

4    A.    Yes.

5    Q.    Do you have any doubt about that?

6    A.    No.

7    Q.    So, two days after the money came in from 280 Pleasant

8    Street the bulk of it went to SKS, correct?

9    A.    Yes.

10   Q.    So, that's about $17,000 out of $21,000 of the money.  So,

11   all but $4,000 of that first check went to SKS; isn't that

12   right?

13   A.    Yes.

14   Q.    Then, in July, if we look at page 73 -- so, July is page

15   68 of the records -- on July 26th $12,875 came in?

16   A.    Yes.

17   Q.    And on July 30th $9,875 went out?

18   A.    Yes.

19   Q.    So, again, four days after this deposit from 280 Pleasant

20   Street the bulk of the money goes out, correct?

21   A.    Yes.

22   Q.    And then in August, if we go to page 72, August 15th

23   there's a deposit of $22,675 from 280 Pleasant Street, right?

24   A.    Yes.

25   Q.    And August 17th, $21,675 goes to SKS?

1    A.   Yes.

2    Q.   So, this last check comes in; all but $1,000 of it goes to

3    SKS?

4    A.   Yes.

5    Q.   Okay.  And that's how, even though 280 Pleasant paid

6    $56,450, $48,450 of it went to this different entity, SKS

7    Maintenance, correct?

8    A.   Yes.

9    Q.   Now, you also testified that there was a check made out to

10   Kenny McKenna on the business account, correct?

11   A.   Yes.

12   Q.   And there were only two checks on the account, for a total

13   of $1,484, as far as payments to individuals, right?

14   A.   Yes.

15   Q.   And the bulk of that was a check to Kenny McKenna, over

16   $300 of it, I think you testified?

17   A.   Yes.

18   Q.   Now, over this time period the other significant amount of

19   money that came into the account was an insurance payment that

20   was about $8,400; is that right?

21   A.   To my recollection, there were premiums, and then there

22   was a larger check that looked like it was for a claim.

23   Q.   So, the claim and premiums totalled $800?

24   A.   Right.  So, the check and then the premiums reduced the

25   total.

1    Q.   But during this entire six-month period there was no other

2    significant amount of money coming in at all comparable to what

3    came in from 280 Pleasant Street?

4    A.   No.

5    Q.   Now, you testified to these cash withdrawals that are on

6    Government's Exhibit 500, and I just want to make sure that

7    we're clear on how this information was generated.  So, let's

8    look at -- there's a business account and a personal account

9    that are, the cash withdrawals are indicated on Government's

10   Exhibit 500, correct?

11   A.   Yes.

12   Q.   And those numbers you obtained from these records here --

13   A.   Yes.

14   Q.   -- the bank records that we were looking at.  So, for

15   example, if we look specifically -- let's look at the month

16   that has the lowest amount from the personal account, April of

17   2018.  Your conclusion was that there was $643.50 in cash

18   withdrawals that were made from this account, right?

19   A.   You said in April of 2018?

20   Q.   April of 2018.

21   A.   Yes.

22   Q.   Is that right?  And so, this is information that would

23   have been extracted from the bank statement that's on page 331

24   of the bank statements, because that's the April 2018

25   statement, right?

1   A.   Yes.

2   Q.   So, I just want to try to figure out how you arrived at

3   this number and work through it with you to make sure that I

4   understand how this works.  So, this shows every transaction in

5   this account for the month of April, correct?

6   A.   This chart?

7   Q.   No, no.  This statement that you're looking at, page 331.

8   A.   Right now I see Exhibit 500.

9        MR. MIRHASHEM:  If we could have the witness look at

10   Santander 331.

11   A.   Okay.

12   Q.   I just want to go through that with you to understand

13   what's going on here.

14   A.   Okay.

15   Q.   So, it starts with April 1st the account has a beginning

16   balance of $534.64, right?

17   A.   Yes.

18   Q.   And his savings account at the top of that page is zero

19   dollars?

20   A.   Yes.

21   Q.   So, in April of 2018 Nathan Craigue has $261 in his

22   checking account and nothing in his savings account; is that

23   right?

24   A.   Yes.

25   Q.   And then we go through the month of April and see what

1    money came in and went out, correct?

2    A.    Yes.

3    Q.    And we've got date by date here?

4    A.    Mm-hmm.

5    Q.    So, there is a cash withdrawal on April 2nd in the amount

6    of $43.50; is that right?

7    A.    Yes, that's correct.

8    Q.    And if you look right below it there is a $3 Citizens Bank

9    fee, right?

10   A.    Yes.

11   Q.    So, what happened is that Citizens Bank charged him $3 for

12   using a Citizens ATM machine because he has a Santander card,

13   correct?

14   A.    Right.

15   Q.    And Santander likely charged him $3.50 because he was

16   withdrawing $40 from some other bank's machine, correct?

17   A.    I would presume so.

18   Q.    So, what we've got here is that on April 2nd Nathan

19   Craigue went to an ATM machine and withdrew $40.  Can we agree

20   on that?

21   A.    I would guess so.

22   Q.    So, $40 on that day.  So, where is the next cash

23   withdrawal on here?

24   A.    On this page specifically?

25   Q.    Feel free.  Whatever you want.  We can switch to page 332.

1   A.   It doesn't appear that there's any other cash withdrawals

2   on this page.  Can we go to the next page?  Is that what you

3   would like to --

4   Q.   That's page 332.

5   A.   Okay.

6   Q.   So, where is the next cash withdrawal?

7   A.   It appears that the next cash withdrawal is on April 16th.

8   Q.   Okay.  And that's for how much?

9   A.   For $400.

10  Q.   So, we're up to $440 based on those two withdrawals,

11  correct, plus the 3.50 now we understand comes from the bank

12  fee?

13  A.   Right.

14  Q.   Okay.  So, we're up to 450.  So, then, where is the next

15  cash withdrawal?

16  A.   It appears to be on April 17th.

17  Q.   So, he withdraws another $40 on April 17th, so we have two

18  $40 withdrawals and a $400 withdrawal, and we're up to $480?

19  A.   Okay.

20  Q.   And where is the next cash withdrawal?

21  A.   Okay.  April 23rd.

22  Q.   So, April 23rd he withdraws how much?

23  A.   $60.

24  Q.   And so, our total is 40, plus 40, plus 400, plus 60 is

25  $540?

1    A.    Okay.

2    Q.    Okay.  And plus the 3.50 that is the fee that we talked

3    about?

4    A.    Right.

5    Q.    So, what's the next withdrawal after that $60 withdrawal?

6    A.    April 30th.

7    Q.    That's $40?

8    A.    Yes.

9    Q.    And so, if my math is right, that brings us to $580?

10    A.    Okay.

11    Q.    So, we had a $400, then we had one, two, three, four $40s,

12    which is 120, and then we had a 60, so that's a total of 580,

13    and then you might have the 3.50, so that's 583.50?

14    A.    I guess the one thing I was going to say --

15    Q.    Yeah, I just want to make sure -- and I can give you a

16    piece of paper.  I just want to understand how these numbers

17    were generated.

18    A.    Okay.

19    Q.    So, can I give you a piece of paper and a pen, and you can

20    help me?

21    A.    Sure.

22    Q.    I'm sure your system is right, but I'm not getting it, so

23    I just want to make sure.

24    A.    Well, one thing I can't say for sure, because I haven't

25    looked at this month specifically, is if there was a withdrawal

1  that was from the account during that month that had a cash

2  withdrawal as part of a deposit, because in some cases that

3  happens.  I can't speak to this month specifically, but in some

4  cases an individual will deposit a check and then take a cash

5  withdrawal.  So, that could be the discrepancy in this case.

6  Q.   Oh, I see.

7  A.   It may not have been an -- but I can't speak to this month

8  specifically.  I can see the cash withdrawals from the ATMs

9  here, but I can't see all of the withdrawals from this month.

10  Q.   So, some of the withdrawals may have been when he

11  deposited a check and got some cash back?

12  A.   It is possible.

13  Q.   And where would that show up in these records?

14  A.   Well, if you went and looked at each statement, and,

15  again, I can't speak to this month specifically, if there was a

16  deposit slip where the bank provided a deposited check or

17  something or there may have been a detail in there about cash

18  withdrawn as well.

19  Q.   Okay.

20  A.   But I can't speak to that with this information here.

21  Q.   Regardless, focusing on this month, which has the smallest

22  numbers, there were several $40 and $60 withdrawals and one

23  $400 withdrawal from Mr. Craigue's personal account, correct?

24  A.   Yes.

25           MR. MIRHASHEM:  I have no further questions.

1        THE COURT:  Anything further, Attorney Gingrande?

2        MR. GINGRANDE:  Just briefly, your Honor, if I

3    might.

4                    REDIRECT EXAMINATION

5    BY MR. GINGRANDE:

6    Q.   So, Ms. Simon, earlier you were asked questions about

7    payments that were made to an SKS Management?

8    A.   Yes.

9    Q.   And if I heard your testimony correctly, you went through

10   some of those payments with counsel.  He would show that there

11   was money that would come into -- that would be deposited to

12   the account for Mr. Craigue and then certain payments were made

13   to SKS Management; is that right?

14   A.   Yes.

15   Q.   And those payments made to SKS Management, do you know

16   what they were for?

17   A.   I do not.  I just saw the checks.

18   Q.   I'm sorry.  Can you say that again?  I couldn't hear you.

19   A.   Sorry.  I just saw the checks.

20   Q.   You just saw the checks.  Okay.

21   A.   I'm not sure what they were for.

22   Q.   You're not sure what they were for.  Okay.  And in

23   reviewing the checks, did you also see any checks that were

24   made out to Harvey Building Materials?

25   A.   I believe that those may not have been -- I think those

1    were in the personal account, I believe.

2    Q.   Okay.  Well, if there's anything -- are you having a hard

3    time recalling right now?  And it's okay.

4    A.   Yeah.  I mean, there weren't checks -- there were checks

5    to individuals from the business account, but reviewing my

6    analysis there was no category in the business account for

7    payments to companies aside from SKS.

8    Q.   Okay.  I was just going to ask if you needed the document

9    again.

10   A.   So, I didn't see Harvey Building in the business account.

11   Q.   But you saw it in the personal account?

12   A.   I saw it in the personal account.

13   Q.   Okay.  And there were certain amounts made out to Harvey

14   Building Materials?

15   A.   Yes.

16   Q.   And, again, do you know what Harvey Building Materials is?

17   A.   To my recollection, they were debit card transactions, so

18   I can't speak to the total of those.

19   Q.   Understood, understood.  And counsel was asking you about

20   a check that was made out to Mr. McKenna?

21   A.   Yes.

22        MR. GINGRANDE:  If we could please show the witness

23   Government Exhibit 403, page 66.

24   Q.   Do you see there the check that was made out to Mr.

25   McKenna?

1    A.    Yes.

2    Q.    And could you read what the date on that check was?

3    A.    It was June 28th, 2018.

4    Q.    And the amount there again was?

5    A.    $1,184.

6    Q.    And, again, there were no other checks that you saw to

7    Mr. McKenna; is that right?

8    A.    No.  There were only checks to two individuals.

9          MR. GINGRANDE:  Okay.  Just one moment, your Honor?

10               (Pause)

11   Q.    Just a couple more questions.  Ms. Simon, when we were

12   speaking earlier about the amounts paid to Harvey Building

13   Materials --

14   A.    Okay.

15   Q.    -- do you have -- do you know what those amounts were?

16   A.    I do not.  They weren't summarized in my report

17   specifically.

18   Q.    Okay.  They're not in your report?

19   A.    No.  I didn't include, you know -- there wasn't a large

20   amount, so it wasn't reflected in my report.

21   Q.    Okay.  Do you recall approximately how large they were?

22   A.    I would say, again, I would estimate that it was less than

23   $300, I believe.

24   Q.    Okay.  So, a small --

25   A.    It was a smaller amount.

1    Q.   Okay.  No further questions.  Thank you.

2    A.   Okay.

3         THE COURT:  Go ahead, Attorney Mirhashem.

4                     RECROSS-EXAMINATION

5    BY MR. MIRHASHEM:

6    Q.   So, again, on page 66 of those, the bank records that you

7    were looking at, do you still have them?

8    A.   There's nothing on my screen right now.

9    Q.   66.  Those are the checks that were paid out in June,

10   correct?

11   A.   It appears, yes, that these were the June checks.

12   Q.   And so, on June 27th, $16,900 gets paid to SKS?

13   A.   Yes.

14   Q.   And on June 28th, $1,184 gets paid to McKenna?

15   A.   Yes.

16   Q.   The day after SKS gets paid?

17   A.   Yes.

18   Q.   And as far as Harvey, you work for the Department of

19   Labor, right?

20   A.   Yes.

21   Q.   And you do their financial investigations, right?

22   A.   For cases, yes.

23   Q.   For cases.  And they tell you what they want you to look

24   for; you have some understanding of what you should be doing on

25   a case when you're handed a case, right?

1          MR. GINGRANDE:  Objection as to vagueness.  Who is the

2     "they" in that sentence?

3     Q.    The Department of Labor, somebody in the agency explains

4     to you what information you should focus on and generate in

5     your report?

6     A.    No.  The bank records are the basis of my analysis.

7     Q.    As you sit here today, you are not certain about how much

8     was paid to Harvey, correct?

9     A.    No, there was months of records, and I didn't --

10    Q.    If somebody in the Department of Labor wanted you to,

11    like, find that information for them, you would do it, right,

12    in the records, or you would say, No, I'm not going to look?

13          MR. GINGRANDE:  Objection.  Calls for speculation.

14    A.    In the spreadsheet --

15          THE COURT:  Hold on one second.  Hold on one second.

16    Overruled.  Go ahead.

17    Q.    If the Department of Labor asked you to include in your

18    report how much money went to Harvey Industries, you would

19    include that in your report, right?

20    A.    If it supported the -- I'm not really sure -- rephrase

21    that, please?

22    Q.    What I'm saying is in your report you have categories, 280

23    Pleasant Street, insurance, payments from companies, payments

24    from individuals, correct?

25    A.    Yes.

1    Q.   You have a lot of categories in there for the business

2    account, and then you have categories in the personal account

3    as well, correct?

4    A.   Yes.

5    Q.   You have Venmo payments, and you have business expenses,

6    you have utilities, right?

7    A.   Yes.

8    Q.   It would have been an easy matter for you to figure out

9    how much money was paid to Harvey Industries if somebody was

10   interested in that and asked you in the Department of Labor?

11             MR. GINGRANDE:  Same objection, your Honor.

12             THE COURT:  Overruled.

13   Q.   Right?

14   A.   If -- I was not to --

15   Q.   Right.  But, if you were asked, you would not have

16   difficulty taking these records, and just like you documented

17   how much went to SKS by check, document how much went to

18   Harvey?

19   A.   Generally, my categories are based on large amounts.  If

20   something was a large payor or payee to an account I would

21   usually create a category for it, but I don't recall the total

22   for that company and if that would have --

23   Q.   You only include large amounts in your categories?

24   A.   Generally, it is a summary, because it's a lot of

25   information to pull out every single --

1    Q.    Sure.

2    A.    -- thing.

3    Q.    You included a category of interest in an amount of $1.43,

4    right?

5    A.    Well, it is a credit to the account, that it wasn't a

6    deposit by, you know, the individual, so I felt like that was

7    an accurate way of --

8    Q.    In the personal account you included Venmo payments,

9    $731.50, right?

10   A.    That's another bank account, so I felt like that was --

11   Q.    So, is it your testimony that the Federal Government would

12   not have been able to get to the bottom of how much went to

13   Harvey Industries?

14   A.    That's not my position to say.

15              MR. MIRHASHEM:  I have no further questions.

16              THE COURT:  All right.  Do you have anything further?

17              MR. GINGRANDE:  Brief recross, your Honor?

18              THE COURT:  Briefly.  Go ahead.

19              MR. GINGRANDE:  Very brief.

20                    FURTHER REDIRECT EXAMINATION

21   BY MR. GINGRANDE:

22   Q.    Ms. Simon, if you were asked to go through the exhibit,

23   Government Exhibit 403, could you identify what the precise

24   amounts were in Harvey Building?  I mean, it's a big document.

25   A.    Yes.

1    Q.   I get it.

2    A.   I could, if I needed to go through it.

3          MR. GINGRANDE:  Okay.  Well, maybe the simpler way is

4    I guess I would ask to move into evidence Government Exhibit

5    403.  She's already testified to her knowledge.

6          MR. MIRHASHEM:  Your Honor, that's 400 pages of our

7    client's bank records.

8          THE COURT:  That is denied.  I'm not going to allow

9    the entirety of 403.

10         MR. GINGRANDE:  Okay.  Fair enough, then.

11   Q.   And, Ms. Simon, I won't ask you to go through those

12   documents right now, so I'll take a seat.  Thanks.

13   A.   Okay.

14         THE COURT:  All right.  I think Ms. Simon is done.  Am

15   I right?

16         MR. MIRHASHEM:  No further cross-examination.

17         THE COURT:  All right.  You may be excused.  Thank

18   you.

19         THE WITNESS:  Thank you.

20                   (Witness stepped down)

21         THE COURT:  The government can call the next witness.

22         MR. DAVIS:  Judge, it may be helpful if we could

23   speak to Mr. Lothstein.

24         THE COURT:  Just take a break, 10 minutes, 15?  What

25   do you need?

1          MR. DAVIS:  I think 15 is fine.

2          THE COURT:  15?  This will be the last break for the

3     afternoon before we go at 4:00.

4          Is the jury, are you feeling better in here?  It seems

5     as though the air has improved slightly.  Let's hope.  Okay.

6     All right.  We will be back, then, in 15 minutes, so 10 minutes

7     after 3:00.

8          THE CLERK:  All rise for the jury.

9              (The jury exited the courtroom)

10         THE CLERK:  Please be seated.

11         THE COURT:  Do you think that you will be finished

12    with ▓▓▓▓▓▓ today, or should we do ▓▓▓▓▓▓ tomorrow?

13         MR. DAVIS:  We're thinking tomorrow.  I think that's

14    Mr. Lothstein's request.

15         THE COURT:  Okay.

16         MR. DAVIS:  But I believe he's outside and available.

17         THE COURT:  Okay.  But the next witness that goes on

18    today will be your next witness.  It won't be ▓▓▓▓▓▓.  We'll

19    deal with ▓▓▓▓▓▓ later.  And we can talk about it at 4:00,

20    when we break.  Does that make sense?

21         MR. MIRHASHEM:  Your Honor, we didn't object to taking

22    witnesses out of turn, but for a witness like ▓▓▓▓▓▓, I do

23    have concerns about overnight.  He's had multiple contacts.

24    I'm just concerned about what's going to happen with him

25    between today and tomorrow, who he's going to talk to.  We're

1    in the middle of his cross-examination.  If there is need for

2    it I would certainly understand, but if he's been given

3    immunity, I mean, we could start his cross or address that

4    issue.  That's just my concern, that, you know, overnight

5    people have contact with a lot of other people and there's --

6            THE COURT:  I understand that, but that could happen

7    anyway; we would break in the middle of his testimony, he'd go

8    home.  I would give him an instruction, and I will give him an

9    instruction before he leaves.  So, if you can let Attorney

10   Lothstein know that I would like to instruct him obviously not

11   to talk to anybody, that he'll be back on the witness stand in

12   the morning.  So, I will do that to cover that issue.

13           MR. DAVIS:  Would you like the witness and Mr.

14   Lothstein, Judge?

15           THE COURT:  That would be good.  I can get that over

16   with now.  Yeah.

17           MR. DAVIS:  I think they're here.  Can they both come

18   in?  Judge, it is also possible -- according to Mr. Lothstein,

19   he hasn't decided yet whether he wants to ask for immunity, so

20   that he may not even ask for it, but he can explain.

21           THE COURT:  Okay.  Thank you, Attorney Lothstein, for

22   coming in for the Court and helping us out here.  I appreciate

23   that.

24           MR. LOTHSTEIN:  Of course.  Good afternoon, your

25   Honor.

1           THE COURT:  Good afternoon.

2           MR. LOTHSTEIN:  So, I have spoken to the lawyers on

3    both sides, and basically it's my understanding that there

4    might be questions, there were an attempt to ask questions

5    about drug use, and, after speaking to ███████, our position

6    is that, if there are going to be questions from either party

7    about drug use that's pertinent to the proceeding, for example,

8    on the day of the industrial accident or during any interview

9    by a law enforcement investigator or during his former

10   testimony at a pretrial hearing or today, for that matter, that

11   he would just answer the questions without any further need for

12   anything.

13          If the Court is going to allow questioning about what

14   I would view to be irrelevant drug use, just, you know, When is

15   the last time you used drugs, or when is the first time or how

16   often, or when in your life have you used it generally,

17   detached from the relevance of this case, then he would plead

18   the Fifth.

19          THE COURT:  Okay.  Let me just be clear.  The incident

20   here occurred on August 28th, 2018.  So, between that time and

21   today's testimony would be the relevant time frame, if I am not

22   mistaken.  Attorney Mirhashem, correct me on that, but I

23   believe that any drug use during that time frame could be

24   relevant in the voir dire to figure out whether or not anything

25   is admissible in front of the jury.  So, that's the time frame

1    that is relevant and that I would permit voir dire questions to

2    be asked.

3              MR. LOTHSTEIN:  Okay.  Well, then, he would assert his

4    Fifth Amendment privilege, then, your Honor.

5              THE COURT:  Okay.

6              MR. LOTHSTEIN:  The government did obtain an immunity

7    letter that I don't regard to be sufficient, because it doesn't

8    include derivative use immunity, it only includes direct use,

9    and that does not satisfy the requirements of Kastigar.  This

10   is not a cooperating witness, this is just a person subpoenaed

11   off the street, and he can't be compelled to just, you know,

12   answer questions about drug use generally without derivative

13   use immunity, because a local prosecuting authority could pick

14   up the transcript and use it to conduct an investigation and to

15   interview other people and to try to prosecute him.

16             THE COURT:  Okay.  Well, those are issues ultimately

17   that we can deal with.  What I need to do now, because ▮▮▮▮▮▮

18   is not going to testify this afternoon, the jury goes home at

19   4:00, he is going to leave the courthouse today, and I want to

20   instruct him, and I need you to help me explain to him as his

21   counsel that he is not to talk to anybody but yourself about

22   this trial and the testimony.  He can't speak to anybody,

23   because ultimately he's coming back on the stand I think

24   tomorrow, depending upon what happens with respect to the

25   issues you're raising and his immunity.

1          MR. LOTHSTEIN:  The other thing, your Honor, is that

2      I'd ask that the voir dire be a closed courtroom.  This is

3      almost like a grand jury proceeding, just asking him generally

4      without any idea what the answer is going to be questions about

5      drug use for the last 2 1/2 years.  I mean, his answers could

6      hurt his reputation, his truthful answers could harm his public

7      reputation, and there's no public interest in knowing the

8      answers to his voir dire questions if you ultimately decide

9      that certain things are not admissible, not relevant, there's

10     no public interest in hearing his testimony about that, and

11     that would be harmful to him, prejudicial to him.

12          THE COURT:  What is the position of defense counsel

13     and the government on that?

14          MR. MIRHASHEM:  We would object to that, your Honor.

15     Our client has a Sixth Amendment right to a public trial.

16     Certain proceedings during that trial may be conducted outside

17     the presence of a jury, but our client's family members need to

18     see this individual, the members of the public have the right

19     to see this individual.  I don't think the test is is there a

20     public interest.  There's a Constitutional right to a public

21     trial.  There may be an overriding interest in some very

22     limited circumstances, but that has been far from established

23     here.  Drug use, I mean, he was very casual about, he started

24     out by saying, Maybe it would be easier if I say which ones I

25     haven't used.  So, I don't think that we're talking about top

1   secret information about him.  This would be information that I

2   would suspect he has widely shared with other individuals.  So,

3   we would object to closing the courtroom.  This is a public

4   trial.

5          MR. LOTHSTEIN:  But, your Honor, that's exactly --

6   what was just said is exactly the prejudice I'm talking about.

7   My understanding from Attorney Davis is there was no advanced

8   notice about this line questioning, no request for the Court to

9   make determinations of relevance or admissibility before we're

10  in the middle of a jury trial.  And I've never been in a jury

11  trial where a witness is just asked, In the last 2 1/2 years

12  when have you used drugs, you know?  So, if he smoked marijuana

13  last 4th of July there's no reason for that to be public

14  testimony in this proceeding.  It has no relevance to this

15  case.

16         THE COURT:  All right.  Well, ultimately, I don't have

17  to decide the issue of a sealed courtroom right now, but I can

18  tell you that my inclination is to have a public trial, and it

19  will not be sealed.  However, ultimately I can make that

20  decision closer in time, but right now I am inclined to keep

21  the courtroom open, so I am not persuaded that I should seal

22  the courtroom for that voir dire.

23         MR. LOTHSTEIN:  In that case, your Honor, in order to

24  do my job properly in advising him, and also to protect his

25  reputational interest, I haven't heard anything about what is

1    the good-faith basis for these questions, you know?  If it's

2    just that, well, maybe he's used drugs, so we'll ask questions

3    about that, I think there should be more said by the defense

4    about what is their good-faith basis to ask these questions.

5            THE COURT:  Well, ultimately --

6            MR. MIRHASHEM:  I object.

7            THE COURT:  Let me just stop this, okay?

8            Mr. Lothstein, you have been appointed to represent

9    him and advise him with respect to his Fifth Amendment issues.

10   I am the judge in the case, and I have ruled that I'm going to

11   allow the voir dire because this is relevant to his ability to

12   remember.  It is also relevant to any motive or bias,

13   potentially.  I have already ruled that that is relevant, and

14   we are having a voir dire on that.  So, there is no good-faith

15   basis showing that you need to hear.  I am telling you, as the

16   judge, we are having a voir dire, it will be tomorrow morning,

17   and ultimately I am hopeful that the government can work with

18   you and work out the immunity issues so that we do not keep the

19   jury waiting while that issue is being determined.

20           MR. LOTHSTEIN:  Understood, your Honor.  And also

21   please keep in mind I was not here for the ruling, so I was

22   just told that by Attorney Davis.  I didn't know about any

23   ruling.

24           THE COURT:  I understand you're doing your job.  You

25   go right ahead.

1          MR. LOTHSTEIN:  Thank you, your Honor.

2          THE COURT:  All right.  Thank you, sir.  Thank you

3    very much.  And just if you would help me, Attorney Lothstein,

4    in explaining to him the importance of the sequestration order.

5          MR. LOTHSTEIN:  Of course.  We will have that

6    conversation.  Thank you.

7          THE COURT:  Thank you.  Thank you, ███████.

8                    ██████████     Thank you.

9          THE COURT:  Mr. Lothstein, and, ████████, we are not

10   going to require you to wear a mask for any further testimony,

11   just so you know that.  He got very heated and hot while

12   testifying.

13         MR. LOTHSTEIN:  Okay.  That's great.  Thank you for

14   that, your Honor.  We are excused; is that correct?

15         THE COURT:  You are excused, although the government

16   does need to speak to you, I think.  Is that right?

17         MR. DAVIS:  If I could just have a brief word about

18   the immunity issue with Merrimack.  If I could speak with Mr.

19   Lothstein outside.

20         THE COURT:  And we don't have to be back till -- we've

21   got seven minutes, so if you need to run to the restroom,

22   you've got seven minutes.

23         Thank you, Attorney Lothstein.

24         THE CLERK:  All rise.

25         (Recess taken from 3:01 p.m. to 3:12 p.m.)

1          THE CLERK:  All rise for the jury.

2               (The jury entered the courtroom)

3          THE CLERK:  Please be seated.

4          THE COURT:  All right.  The government may call its

5     next witness.

6          MR. GINGRANDE:  Thank you, your Honor.  The government

7     calls Joslyn McKenna to the stand.

8          THE CLERK:  When you get to the witness stand, remain

9     standing and raise your right hand.

10         **JOSLYN MCKENNA,** duly sworn by the Clerk.

11         THE CLERK:  Thank you.  State your full name and spell

12    your last name for the record.

13         THE WITNESS:  Joslyn Kate McKenna, and it's

14    M-c-K-e-n-n-a.

15         THE CLERK:  Thank you very much.  Please be seated.

16                          DIRECT EXAMINATION

17    BY MR. GINGRANDE:

18    Q.   Good afternoon, Ms. McKenna.

19    A.   Hi.

20    Q.   Ms. McKenna, what do you do for work?

21    A.   I'm a surgical coordinator.

22    Q.   And how long have you been a surgical coordinator?

23    A.   At my current practice over three years.

24    Q.   And where is your current practice?

25    A.   New Hampshire Neurospine Institute in Bedford, New

1   Hampshire.

2   Q.   Do you hold any educational degrees?

3   A.   Yes.

4   Q.   And what degrees are those?

5   A.   I have a bachelor's of science, and I'm in the process of

6   getting my associate's in nursing.

7   Q.   And you said that's an associate's in nursing?

8   A.   Yes.

9   Q.   And are you close to completion of that program?

10  A.   About nine more months.

11  Q.   Nice.  Congratulations.  Do you live in New Hampshire?

12  A.   Yes, I do.

13  Q.   And how long have you lived in New Hampshire?

14  A.   My entire life.

15  Q.   Do you have a family?

16  A.   Yes.

17  Q.   And who are the members of your family?  You don't have to

18  say their names.

19  A.   I have two sons who are seven and six.

20  Q.   Are you the daughter of Ken McKenna?

21  A.   Yes.

22  Q.   And are you his only child?

23  A.   Yes.

24  Q.   And is your mother, is she Katherine Joslin?

25  A.   Yes.

1    Q.   Did your parents raise you together?

2    A.   Yes, in a sense.  Divorced but co-parenting.

3    Q.   And so, they continued to co-parent you after they got

4    divorced?

5    A.   Yes.

6    Q.   And how would you describe the relationship they had?

7    A.   It's always been great.  Friends.

8    Q.   What was your relationship with them like?

9    A.   With both my parents?

10   Q.   Yeah, sure.

11   A.   It's always been good.  I was close with both my parents.

12   Q.   Okay.  And when you were growing up, let's say before you

13   went to college, would you see your dad often?

14   A.   Every other weekend --

15   Q.   Okay.

16   A.   -- until about high school, and then it was a little bit

17   more sporadic, depending on sports.

18   Q.   You had a busy schedule?

19   A.   Yes.

20   Q.   Okay, got it.  But up until that point every other

21   weekend, roughly?

22   A.   Yes, roughly.

23   Q.   And when you were in high school how frequently would you

24   see your dad, if you had to approximate?

25   A.   Probably about once a month.

1   Q.   Okay.  So, after you graduated college did you still have

2   a good relationship with your dad?

3   A.   Yes.

4   Q.   And you would visit with him and talk with him on the

5   phone?

6   A.   Mm-hmm.  Yes.  Sorry.

7   Q.   And did that remain true from the time period 2016 to

8   2018, the two years prior to your father's death?

9   A.   Yes.

10  Q.   And you would talk on the phone with him?

11  A.   Yes, and he would come over and visit at my house.

12  Q.   Got it.  So, did you ever see your dad working on job

13  sites?

14  A.   Yes.

15  Q.   Okay.  And how would that happen that you came to see him

16  working on job sites?

17  A.   I would call or he would call me, and if he was somewhere

18  working that was close, for instance, in Concord, I would stop

19  by, if I happened to be in the area.

20  Q.   Okay.  And did you see him actually work when you were on

21  the job sites?

22  A.   Yes and no.  I mean, usually he would stop working when I

23  got there.

24  Q.   Okay.  And you say that because you would be there and

25  he'd be talking with you?

1    A.   Correct.

2    Q.   But when you first showed up you would sometimes see him

3    working; is that it?

4    A.   Yes.

5    Q.   And you also had conversations with your dad about his

6    work?

7    A.   Yes.

8    Q.   Did you know what your dad did for work?

9    A.   Yes.

10   Q.   What did he do?

11   A.   He was a roofer or, like, external construction with

12   Craigue & Sons.

13   Q.   What other types of work did he do aside from working on

14   the roof?  Did he work on other parts?

15   A.   The siding and some windows.  I'm not 100 percent sure.

16   Q.   Okay.  But it was on the exterior?

17   A.   It was on the exterior of the house, yeah.

18   Q.   Okay.  He was never a plumber or an electrician?

19   A.   Not that I'm aware of.

20   Q.   Okay.  And did he continue to do that type of work, that

21   is, siding work and working on home exteriors up until the time

22   that he died?

23   A.   Yes.

24   Q.   Do you know who Mr. McKenna worked for?

25   A.   Yes.

1    Q.   I'm sorry.  I'm switching off between calling him Mr.

2    McKenna and your dad, but how long did your dad work for

3    Craigue & Sons, in total, if you know?

4            MS. GRAHAM:  Objection.

5            MR. GINGRANDE:  I apologize.  I apologize.

6    Q.   Who did he work for?

7            MS. GRAHAM:  Objection as to foundation, your Honor.

8            THE COURT:  I believe she already said that he worked

9    for Craigue & Sons.  But go ahead and lay a little more

10   foundation for that and then ask the question.

11           MR. GINGRANDE:  Sure.

12   Q.   So, you said that you had observed your dad working

13   before; is that right?

14   A.   Yes.

15   Q.   And you would go to work sites?

16   A.   Yes.

17   Q.   And at these work sites did you see indications of who the

18   work site was for in terms of a company?

19   A.   Not when I was older, no.

20   Q.   Not when you were older?

21   A.   No.

22   Q.   Okay.  But were there any times when you saw --

23   A.   When I was younger they usually had like the little picket

24   signs that you put in, but not in my adult life.

25   Q.   Okay.  And you also said that you had knowledge of

1    conversations with your dad about work; is that right?

2    A.    Yes.

3    Q.    And when you saw picket signs, were there names on the

4    signs?

5    A.    Craigue & Sons.

6    Q.    Now, so, how long, if you know, did your dad work for

7    Craigue & Sons?

8    A.    I mean, to the best of my knowledge, my entire life,

9    except for when he was not in New Hampshire.

10   Q.    And when you say your entire life that you remember, could

11   you put an approximate -- I don't want to ask you your age or

12   whatever, but can you give an proximate amount of time?

13   A.    I'm 30, so, I mean, I know when I was younger my mom would

14   drop me off at work sites when it was Kenny Craigue, when I

15   would go to my dad on the weekends, so I would say probably my

16   earliest memory would be seven-ish.

17   Q.    And you just mentioned Kenny Craigue.  Who is he?

18   A.    The prior owner of Craigue & Sons, Nate Craigue's dad.

19   Q.    Nate Craigue's dad?

20   A.    Yes.

21   Q.    And so, when Kenny Craigue was the owner of Craigue & Sons

22   was your father working for him at that time?

23   A.    Yes.

24   Q.    And was there a time at which the ownership changed from

25   Kenny Craigue to Nate Craigue?

1          MS. GRAHAM:  Objection as to foundation to her

2    knowledge and hearsay.

3          THE COURT:  Okay.  Lay a foundation for that.  Go

4    ahead.

5          MR. GINGRANDE:  Certainly, your Honor.

6    Q.   Let me back up and ask, did you know -- well, I'm going to

7    ask a different line of questioning, and we'll get back to that

8    concept in a bit.  So, in terms of your dad's work for Craigue

9    & Sons did you ever see your dad wearing clothing that said

10   "Craigue & Sons"?

11   A.   Yes.

12   Q.   And what was that clothing?

13   A.   Hats or sweatshirts.

14   Q.   Okay.  And did he play on the Craigue & Sons softball

15   team?

16   A.   They played together.  I do not remember the name of the

17   softball team.  I just know it was, you know, when I was young

18   Kenny Craigue and my dad and a lot of their other friends.  So,

19   I associate the two, but I'm not sure if that was the name of

20   the baseball team, or softball, excuse me.

21   Q.   Got it.  When they played together on those teams did they

22   have like a team jersey or something, or was it --

23   A.   They had, like, the T-shirts with the numbers on the back,

24   but it wasn't like they have nowadays with, like, the names all

25   over them.

1    Q.   Okay.

2    A.   So, I'm not -- I can't fairly say that I'm 100 percent

3    sure.

4    Q.   Got it, got it.  But it was clear that it was --

5              MS. GRAHAM:  Objection.  Leading, your Honor.

6              THE COURT:  I'll let him go ahead and finish your

7    question first.

8              MR. GINGRANDE:  Sure.  I can rephrase those first few

9    words of my sentence.

10             THE COURT:  Okay.

11   Q.   When you observed your dad playing softball was he playing

12   softball with people who you knew --

13   A.   Yes.

14   Q.   -- to be from Craigue & Sons?

15   A.   Oh.  I mean, really only Kenny Craigue.  It was -- well,

16   yeah.  At the time because the other -- another member of there

17   worked later on but not at that time.

18   Q.   Okay.  And who was that other member, if you recall?

19   A.   Justin.

20   Q.   Okay.  Someone named Justin?

21   A.   Yes.

22   Q.   Okay, fair enough.  So, we were talking earlier about

23   Kenny Craigue.  You described that he was Nathan Craigue's

24   father.  Do you know Nathan Craigue?

25   A.   Yes.

1   Q.   And how do you know him?

2   A.   I grew up kind of with them.  Kenny was my dad's boss when

3   I was younger, so I spent a lot of time at their house, at job

4   sites.  We're fairly close-ish in age that I'm aware of.

5   Q.   Okay.

6   A.   So, I've known them since I was a kid.

7   Q.   Got it.  And so, your families were close?

8   A.   My dad, yes.

9   Q.   Your dad?

10  A.   Yeah.

11  Q.   Okay.  I'm sorry, not your mom.  Do you know just how long

12  your parents were married?

13  A.   I believe they were divorced when I was two.

14  Q.   Okay.  So, when you were fairly young?

15  A.   Yes.

16  Q.   Okay, got it.  But your dad was friends with the Craigues?

17  A.   Yes.

18  Q.   And so, how long have you known Nate Craigue, then?

19  A.   Since I was little, I mean, since I can recall.

20  Q.   Okay.  Do you see him in the courtroom today?  I can move

21  out of the way.

22  A.   Yes.

23  Q.   Okay.  And can you identify him by an article of clothing

24  that he's wearing?

25  A.   The pink-ish shirt.

1        MR. GINGRANDE:  Your Honor, I'd ask that the witness

2    has identified the defendant, Nate Craigue.

3        THE COURT:  It will.

4        MR. GINGRANDE:  Thank you.

5    Q.   During the time that your father worked for Craigue &

6    Sons, would you see your father interact with Nate Craigue?

7    A.   What?  Sorry.

8    Q.   During the time that your dad worked for Craigue & Sons

9    would you see your dad interact with Nate Craigue?

10   A.   Yes, if I was over at their house.  I don't ever recall at

11   the job site when I was younger, but, like, if we were at their

12   house, yes.

13   Q.   Okay.  And how would you describe your dad's interactions

14   with Nate Craigue or their relationship?

15   A.   Like a family friend.

16   Q.   Okay.

17   A.   I'm not really sure how to describe that.

18   Q.   And when you say he was like a family friend, I understand

19   that that's kind of difficult to describe, but are you talking

20   about a specific time period when he was like a family friend?

21   A.   Probably more when I was younger, like, if we were over

22   there and we were kids.

23   Q.   Okay.  And at some point did you notice a change in the

24   relationship between your dad and Mr. Craigue?

25   A.   I mean, I didn't see it, but obviously I was aware of the

1    change of ownership of the company, and it seemed like things

2    kind of changed at that point, at some point or another.

3    Q.    Okay, got it.  So, there was a change of ownership of the

4    company at some point?

5    A.    As far as I'm aware of, yes.

6    Q.    Uh-huh.  And when you say there was a change of ownership,

7    what was the change in ownership?  Who were the individuals?

8    A.    When Nate took over the company from his dad.

9    Q.    Okay, got it.  And just to talk about their relationship

10   when there was a change in the ownership, how, if at all, did

11   that affect the observations you made of their interactions of

12   their relationship?

13   A.    I mean, I was never really around the two of them much in

14   my adult life, but, you know, from conversations it would --

15          MS. GRAHAM:  Objection, your Honor.

16          THE COURT:  Sustained.

17   Q.    If you could answer that question without referring to

18   conversations or saying specific statements that they made and

19   just kind of focus on your own experience or your own

20   observations.

21          MS. GRAHAM:  Objection as to foundation.  She said

22   that she didn't really witness there were interactions.

23          THE COURT:  She did say that she learned about it

24   through conversations.  So, maybe if there's a foundation you

25   can lay other than that, go ahead.

1      MR. GINGRANDE:  Okay.

2  Q.   So, Ms. McKenna, you do know that your dad did have a --

3  he had a relationship with Nate Craigue?

4  A.   Yes.

5  Q.   Okay.  And how did you know that he had a relationship

6  with Nate Craigue other than specific statements that your dad

7  made?  For instance, did you ever hear any statements that Mr.

8  Craigue might have made to your dad or see the two of them --

9  A.   No.  I was never around them in my adult life together at

10  the same time or probably Nate in general.  You know, when I

11  was at the job site, like if I stopped and visited my dad Nate

12  wasn't present.

13  Q.   So, I'm sorry, when you would come to the job sites?  Is

14  that what you're referring to?  Did you go to the job sites

15  during a time when Nate --

16  A.   Yes.  In my adult life I did visit him at one of his job

17  sites in Concord with my son.

18  Q.   Was that a job site for Craigue & Sons?

19  A.   Yes.

20  Q.   And would your dad ever -- when he would talk about work

21  did Nate Craigue's name ever come up?

22  A.   Yes.

23  Q.   Okay.  And was that true toward the end of his life as

24  well?

25  A.   Yes.

1    Q.    Okay.  During the time that your dad worked for Nate

2    Craigue did you ever know your dad to have different jobs?

3    A.    Not in New Hampshire, no.  He moved to Texas for a short

4    period, and that's the only time I'm aware of him having a

5    different job.

6    Q.    Okay.  And during -- aside from that time in Texas,

7    though, when he worked for Craigue & Sons did you know him to

8    have different jobs?

9    A.    No.

10   Q.    So, let's talk about that time your dad was in Texas.  So,

11   approximately when, if you know, was your dad in Texas?

12   A.    My high school years, the later portion, like my junior

13   year.

14   Q.    Okay.  And do you know the reason your dad moved to Texas

15   during your junior year?

16   A.    He does not like the cold.

17   Q.    He doesn't like the cold?  Is that what you said?

18   A.    Yeah.

19   Q.    Okay.  Did he have any friends that moved, a friend or

20   friends that moved to Texas as well?

21   A.    Yes.  The friend that he stayed with a lot of the time in

22   Concord had moved to Texas, so he went there and I believe

23   stayed with them for a little while.

24   Q.    Okay.  Do you know one way or another what he did for work

25   there?

1   A.   I did not at the time.  I do now.

2   Q.   Okay.  So, you didn't know at the time, and what is your

3   knowledge based on now?

4   A.   That he worked at Kroger while he was there.

5   Q.   Okay.  And how do you know that?

6   A.   Because he had W-2 from there.

7   Q.   So, do you know when he moved back to New Hampshire?

8   A.   Sometime in 2008, because that's when I graduated, and he

9   was there.

10  Q.   And when you say, "He was there," you're referring to New

11  Hampshire?

12  A.   Yes.

13  Q.   And he was there at your graduation?

14  A.   He was physically present at my graduation, yes.

15  Q.   Okay, got it.  And that was sometime in 2008?

16  A.   2008.

17  Q.   Got it.  Now, at some point if you had to -- and do you

18  know how long your dad was in Texas for?  I'm sorry.  I think

19  you said your junior year of high school; is that right?

20  A.   Yeah.

21  Q.   Sometime within that time frame was when he was there?

22  A.   Yeah.  The years kind of blend together, but it wasn't

23  much longer than, I don't believe, more than a year.

24  Q.   Okay, got it.  And so, now I'd like to focus on the time

25  after your dad came back from Texas and still during the time

1    that he was working for Nate Craigue.  During that time did you

2    ever know your father to own his own business?

3    A.    No.

4    Q.    And how do you know he didn't own his own business?

5    A.    I mean, he didn't have the means to do so.

6    Q.    Okay.

7    A.    He didn't have a license for a lot of his life or for a

8    lot of my life, I suppose I should say, and I had never seen

9    him with a debit card or own a car until my later adult life.

10   Q.    Okay.  Did you ever see any business cards with his name

11   on it?

12   A.    No.

13   Q.    To your knowledge, did your dad have any vehicle with a

14   business name on it?

15   A.    No.

16   Q.    And did your dad ever hire any other workers that you knew

17   of?

18   A.    No.

19   Q.    You said your dad didn't have a license.  Are you

20   referring to a driver's license?

21   A.    Correct.  Yes.

22   Q.    Did your dad need rides to go to and from work at various

23   times?

24   A.    Yes, most of the time.

25   Q.    Okay.  And most of the time, are you talking about most of

1    his life, or are you talking about just --

2    A.    Most of my life, yes.

3    Q.    Most of your life?

4    A.    Yeah.  Up until, like, probably the last couple of years,

5    I think.  Maybe a little bit more than a year before he passed

6    away he finally had his license back.

7    Q.    Got it.  Okay.  And he got his license back, and in those

8    last couple of years, then, do you know if he had his own car?

9    A.    Yes.

10   Q.    Okay.

11   A.    It was -- I'm not sure if it was his car.  It was my

12   grandparents who I assume gave it to him, and then he had a

13   Jeep in between at some point --

14   Q.    Okay.

15   A.    -- that he bought.

16   Q.    Got it, got it.  But you do know that he had a way of

17   getting around --

18   A.    Yes.

19   Q.    -- later?

20   A.    Yes.

21   Q.    Ms. McKenna, you are your father's only heir; is that

22   right?

23   A.    Yes.

24   Q.    So, you're the sole heir to your father's estate, right?

25   A.    Correct.

1    Q.   Are you familiar with his possessions?

2    A.   Yes.

3    Q.   Okay.  And are you familiar generally with the things that

4    your dad owned as a result of being his heir?

5    A.   Yes.

6    Q.   So, are you familiar with tools and equipment that your

7    dad owned?

8    A.   Yes.

9    Q.   Did your dad own a lot of equipment for his jobs?

10   A.   No.  I mean, basic tools, I mean, what I would consider

11   basic tools to be able to go and do things but not like a truck

12   full of equipment.

13   Q.   Okay.  And when you say "basic tools," are you -- well,

14   what type of tools are you referring to?

15   A.   Like a handyman thing, like drills, little mini saws that

16   he would bring over when I made him do projects at my house.

17   Q.   When you're talking about mini saws, are we talking about,

18   like, the handsaws?

19   A.   Like the circle ones.

20   Q.   Okay, okay.  Got it.  But did he own any ladders?

21   A.   Not that I had ever seen, no.

22   Q.   And not that you inherited either?

23   A.   No.

24   Q.   And no industrial saws or anything?

25   A.   No.

1    Q.   And no siding equipment?

2         MS. GRAHAM:  Objection as leading, your Honor.

3         THE COURT:  I'm going to allow it.  Go ahead.

4    Q.   You can answer that question.

5    A.   No, no siding equipment or staging or --

6    Q.   Any of that stuff.

7    A.   -- anything along those lines.

8    Q.   Okay.  During the time, again, just focusing on the time

9    that your dad worked for Nathan Craigue, do you have knowledge

10   one way or another as to how he got paid?

11   A.   From his word, yes.  Obviously, not physically knowing or

12   seeing anything.  Or from comments, yes.

13   Q.   I think you testified earlier he never had a bank card; is

14   that right?

15   A.   Correct until -- I couldn't tell you the year, but he did

16   move into an apartment.  My timeline's not great, but it was

17   not too long before he passed away, maybe a little over a year.

18   I could be a little off.  And that was the first time I had

19   ever seen him with a bank card, because he had to get one.  So,

20   when I was -- yeah.

21   Q.   Okay.  Well, let me ask you this:  Were there ever times

22   that you knew that your dad was kind of waiting for money to

23   make a payment?

24   A.   Yes.

25   Q.   And what generally were those times?

1    A.    I mean, I'm not really sure how to answer that, like --

2    what were the times?

3    Q.    Was there any specific time or any specific instance in

4    which your dad would be waiting to receive payments?

5    A.    I mean, for me, like, the only time he would ever say to

6    me is if he would come over in my adult life, which was

7    probably the last two years before he passed away, you know,

8    and he would do something, and he'd say, I'll give you some

9    money next week; I'm just waiting to get money from Nate.

10   Q.    He would say, I was waiting to get money from Nate?

11   A.    Yes.

12   Q.    And did he ever mention other people that he was waiting

13   to get money from, other businesses?

14   A.    No.

15   Q.    During the time that your dad worked for Nate Craigue do

16   you know whether your dad simply kind of came and went from job

17   sites as he pleased?

18   A.    I mean, not that I'm aware of.

19   Q.    And why not?

20   A.    First of all, he didn't have a license for most of it, and

21   then I assume, I don't know, in my adult --

22        MS. GRAHAM:  Objection, your Honor.  Foundation.

23        THE COURT:  Sustained.

24   Q.    So, please don't assume.

25   A.    Oh, correct.

1    Q.   I don't want any assumptions, but let me ask you some

2    specific questions.  So, I think you testified earlier that

3    your dad was dependent on rides from other people?

4    A.   Correct.  Yeah.  So, my grandparents would drop him off,

5    or I'm not sure about Nate, but I know Tristan would and Chris

6    Erickson, who worked with my dad.

7    Q.   I was just going to ask that.  So, Chris Erickson, he was

8    someone who worked with your dad?

9    A.   Yes, and he was his roommate as well.

10   Q.   And he would give him rides to and from work sites?

11   A.   Yes.  I'm not sure who else.

12   Q.   Got it.  But I believe you just mentioned someone named

13   Tristan as well?

14   A.   Yes, and that's more from my dad saying, you know, if Nate

15   or Tristan would pick him up or would wait and go home.

16   Q.   Got it.  And you mentioned Nate as well, right?

17   A.   Yes.

18   Q.   Okay.  And are you familiar with how hard your dad worked?

19   A.   I mean, yes.

20   Q.   And how would you describe your dad's work ethic?

21   A.   He was a great worker.  He never complained, you know,

22   doesn't like to complain about anything, gets it done, you

23   know, does what he has to do to get it done.

24   Q.   Are you familiar with the hours that he worked?

25   A.   Not necessarily.  I mean, I know he worked a lot.

1    Q.   Uh-huh.  Well, let me ask this:  Did you ever observe any

2    records of your dad's hours?

3    A.   I did.

4         MS. GRAHAM:  Objection.

5         THE COURT:  Overruled.  Go ahead.

6    Q.   You've observed records of your dad's hours before?

7    A.   Yes.

8    Q.   And what are those records?

9    A.   His own personal records in a notebook.

10   Q.   In a notebook?

11   A.   Yes.

12   Q.   How did you come into possession of that notebook?

13   A.   When I was getting all of his things from his apartment.

14   Q.   Okay.  And how did you know that they were your dad's --

15   that they belonged to your dad?

16   A.   It's his writing all over it.

17   Q.   So, you recognize his writing?

18   A.   And in his room, yes.

19   Q.   In his room, okay.  And did these notebooks, when you saw

20   them, did they come in, like, a box or something?

21   A.   Yes.  I'm not sure what, like, how you would call it a

22   box, but a little like a lockbox almost.

23   Q.   Got it.  Have you had a chance to look at them, at the

24   notebooks?

25   A.   Yes.  Not recently, but, yes.  I had gone through all of

1   his things.

2   Q.   And did you, in fact, give anyone else consent to look at

3   those notebooks?

4   A.   Yes.

5   Q.   And were those documents, were they ever submitted as

6   evidence and turned over to the U.S. Attorney's Office?

7   A.   I believe so.

8   Q.   And you've reviewed those notebooks before?

9   A.   Before today?

10   Q.   Yeah.

11   A.   Yes.

12   Q.   Before today, yeah.

13        MR. GINGRANDE:  Okay.  I'd like to show just the

14   witness, please, what's been marked for identification as

15   Government Exhibit 102, and if we can please kind of scroll

16   through some of the pages of Government Exhibit 102.

17   Q.   Can you see this, Ms. McKenna?

18   A.   Oh, I didn't realize there was even a screen here.

19   Q.   My apologies.  Well, maybe if we can go back to the top,

20   then, and show some of the earlier pages.  But my question is

21   whether you recognize this document.

22   A.   Yes.

23   Q.   And how do you recognize it?

24   A.   Because I looked through it before I gave it to the Police

25   Department.

1    Q.   And does it appear to be a true and correct copy of the

2    notebook, one of the notebooks that we were just discussing?

3    A.   Yes.

4         MR. GINGRANDE:  Your Honor, at this time I move to

5    strike the identification and admit it as Government Exhibit

6    102.

7         MS. GRAHAM:  Objection.

8         THE COURT:  All right.  Sidebar.

9    (SIDEBAR CONFERENCE AS FOLLOWS):

10        MS. GRAHAM:  Your Honor, I object, as the contents of

11   this notebook are hearsay and not an exception under the

12   hearsay rule.

13        THE COURT:  What's the purpose of the evidence?  What

14   are you introducing it for?

15        MR. GINGRANDE:  So, your Honor, this is not being

16   asserted for the truth in some way.  These are his recordings,

17   for the most part.  The pages are -- they have numbers, they

18   have hours, they have dates, and so they're not being asserted

19   for the truth but, rather, as recordings of Mr. McKenna's, just

20   his time and the fact that he recorded his hours and time --

21   hours of time, excuse me -- and so that is the purpose, and

22   this witness has knowledge of these documents and has laid a

23   foundation showing the knowledge that she has that they are

24   his.

25        THE COURT:  Go ahead.

1          MS. GRAHAM:  Thank you.  Your Honor, I think they are

2     being offered for the truth.  The government is relying on that

3     this gentleman worked hourly wages and that he was working

4     basically full time for Mr. Craigue.  Also, it does not meet

5     the requirements for a business record.  In order for it to be

6     admitted under that exception, the record has to be made at or

7     near a time by or from information transmitted by someone with

8     knowledge, the record was kept in the course of regularly

9     conducted business, making the record was regular practices,

10    activity, and when all of these conditions are shown by the

11    testimony of a custodian or another qualified witness or by

12    certification, and this witness is not qualified.  She has not

13    testified to seeing her dad record this on a regular basis.

14         THE COURT:  All right.  I agree with Attorney Graham

15    this is not a business record, but I agree with Attorney

16    Gingrande it's not being introduced for the truth.  The

17    government is not trying to prove on July 16th, Monday, he

18    worked 8:00 to 4:00, eight hours.  The government's not

19    asserting this document for its truth.  It's not hearsay, so

20    your objection is overruled.

21         MS. GRAHAM:  Your Honor, I'm sorry, may I add one

22    further objection?

23         THE COURT:  Yes.

24         MS. GRAHAM:  It's under 403, that the prejudice

25    outweighs any relevant probative value.

1          THE COURT:  Okay.  And I find that the prejudice does

2     not substantially outweigh the probative value with respect to

3     this exhibit, so this Exhibit 102 is coming in.

4          MR. GINGRANDE:  Thank you, your Honor.

5     (END OF SIDEBAR CONFERENCE)

6          MR. GINGRANDE:  So, your Honor, I would just move on

7     the record to strike the identification and admit Government

8     Exhibit 102 as a full exhibit.

9          THE COURT:  It is admitted as a full exhibit, 102.

10         (Government's Exhibit No. 102 admitted into evidence)

11         MR. GINGRANDE:  Thank you, your Honor.  And could we

12    please publish that to the jury?

13         THE COURT:  Yes.

14         MR. GINGRANDE:  So, if we could move to, let's go to

15    the third page of the document.  After that.  I'm sorry, three

16    pages beyond where we were.  Let's go to the next page.  Sorry.

17    I apologize.

18    Q.   So, Ms. McKenna, do you recognize this to be your dad's

19    handwriting?

20    A.   Yes.

21    Q.   Okay.  And how do you recognize it to be his handwriting?

22    A.   He writes with a slant, and I recognize his writing.  He

23    gives me a card for every holiday since I was a little kid.

24    Q.   Got it.  Okay.  Now, can you just look at this page and

25    just maybe read, if you can -- if you could read what this

1    says, just starting from the first line and going on down.

2    A.    Owes 88, 11/20 Monday 8:30 to 3:30, 7 1/2 hours, 11/21,

3    Tuesday 8 to 4, which is eight hours.

4    Q.    And there is some math on the right hand side?

5    A.    On the right-hand side there's 11/23, which is Wednesday,

6    nothing, 11/24 -- oh, that's 22, sorry.  11/23, Thursday,

7    Thanksgiving, 11/24, Friday - off.

8    Q.    Got it.  Thank you.  And you can stop there.  And so,

9    these recordings to you indicate, they're dates.  What you read

10   as Mon, Tue, Wed, these are days; is that right?

11   A.    Yes.

12        MS. GRAHAM:  Objection, your Honor.  Basis of her

13   knowledge.

14        THE COURT:  Sustained.

15        MR. GINGRANDE:  Okay.  I don't need to ask that

16   question.

17   Q.    So, now I'd like to turn your attention to the following

18   page, and if you could just read the first part of that page.

19   A.    Owe 675.  12/18 Mon-8:30 to 3:30, 7 hours, 12/19 Tue -

20   8:30 to 4, 7 1/2 hours, paid 600, 12/20 Wed-9 to 4:15, 7 hours,

21   some math on the side, 12/21 Thu-8 to 3:30, 7 1/2 hours, again,

22   some numbers on the side, 684 circled, 12/22 Friday off, paid

23   $100, owes 573, owes 75.

24   Q.    And then below that does it say 12/25?  What does it say

25   on that line?

1    A.    Yeah.  12/25, Monday-Christmas, 12/26, Tue, and then the

2    following day is 12/27, Wednesday, and 12/28 Thursday, marked

3    as off.

4    Q.    Thank you.  If I could please direct your attention to

5    what's been marked for identification as Government Exhibit

6    103.

7              MR. GINGRANDE:  And just to the witness this time, not

8    to the jury.

9              THE CLERK:  I took it off the jury monitors.

10             MR. GINGRANDE:  What's that?

11             THE CLERK:  103.

12             MR. GINGRANDE:  Oh, great.  Thank you.  This is 103?

13   I apologize.  I'm sorry.  I think it's 101.  I apologize.  I

14   must have written down the wrong thing.  That's it, that's it.

15   Thank you.

16   Q.    So, Ms. McKenna, I'm showing you this document, it's been

17   marked for identification as Government Exhibit 103, and do you

18   recognize this document?

19             THE COURT:  Do you mean 101?

20             MR. GINGRANDE:  101.  Gosh, I keep misspeaking.  I

21   apologize.

22             THE COURT:  It's all right.

23   Q.    101.  Do you recognize this document?

24   A.    What you just -- like what just scrolled through?

25   Q.    I'm sorry.  Yeah.  If we could just scroll slowly through

1    each page.

2    A.    I did see.

3    Q.    Okay.

4    A.    Yes.

5    Q.    Okay.  And you recognize it?

6    A.    Yes.

7    Q.    And how do you recognize it?  What is it?

8    A.    It's a page from a notebook, from my dad's box.

9    Q.    And this is another one of the notebooks that we were

10   discussing earlier?

11   A.    Yes.

12   Q.    Okay.  And to you does it appear to be a true and correct

13   copy of your dad's notebook that we were just discussing?

14   A.    Yes.

15   Q.    Okay.

16         MR. GINGRANDE:  Your Honor, at this time I would move

17   to strike the identification and admit this as Government

18   Exhibit 101.

19         MS. GRAHAM:  I object, but may I be heard?

20         THE COURT:  Yes, you may.

21   (SIDEBAR CONFERENCE AS FOLLOWS):

22         THE COURT:  While I have Donna, this is starting to go

23   out on the brink, but I can hold it and get through the

24   remainder.

25         Go ahead, Attorney Graham.

1          MS. GRAHAM:  Thank you, your Honor.  I would object

2     under the same argument as hearsay but also under 403.  What I

3     would ask is, if the Court does admit it, that I would ask for

4     the item or the exhibit to speak for itself rather than to have

5     the witness read it, since she has no independent knowledge

6     about it.

7          Additionally, I'd ask the Court to give a limiting

8     instruction that the information is not to be used for the

9     truth of the matter asserted.  There is a concern I have that

10    they will take those dates and numbers and total amount due as

11    for its truth in looking at and assessing the exhibit.

12         MR. GINGRANDE:  So, your Honor, as for her reading the

13    document, again, this is just -- it doesn't take any

14    independent knowledge of the content for her to simply read

15    what's on the page.  She's doing what any juror would be doing.

16    As for the limiting instruction, we have no objection; and,

17    frankly, I don't intend to spend very long asking her to read

18    from the document, anyway, for what it's worth.

19         THE COURT:  All right.  Let me just say that I am

20    allowing 101 for the same reasons I allowed the previous

21    exhibit.  Is it 102?  Yeah, the other half of this notebook.

22    So, for the same reasons I am overruling the objection to the

23    admission of this.  I don't see any forensic value whatsoever

24    in having her read it, though.  It's not as though the

25    handwriting is unclear.  The jury can see it, and you're not

1    introducing it for its truth.  To the extent you want to draw

2    the jury's attention, perhaps, to some specific date or some

3    specific thing in the notebook, then it starts to look like

4    it's something you were interested in for its truth, but that

5    does not seem the reason behind the admission.  So, I'm not

6    understanding why we need her to read anything in it.

7              MR. GINGRANDE:  I was just trying to get it in the

8    record, so that's fine.

9              THE COURT:  All right.  So, I overrule the objection

10   to its admission.  I don't think it's necessary to have her

11   read anything.  You agree not to have her read.

12             With regard to a limiting instruction, I'm happy to

13   give an instruction that tells the jury that they have heard

14   evidence about a notebook and that they are not to consider the

15   material in the notebook for its truth.  Is that sufficient,

16   Attorney Graham?

17             MS. GRAHAM:  Yes.  Thank you.

18             THE COURT:  Any objection to that limiting

19   instruction?

20             MR. GINGRANDE:  No objection.

21             THE COURT:  Okay.  All right.

22   (END OF SIDEBAR CONFERENCE)

23             MR. GINGRANDE:  Thank you.  So, at this time I would

24   just ask that this be admitted as a full exhibit, Government

25   Exhibit 101.

1           THE COURT:  Exhibit 101 is a full exhibit.

2           (Government's Exhibit No. 101 admitted into evidence)

3           MR. GINGRANDE:  Thank you, your Honor.  Was there

4    anything that I need to wait on for the Court?

5           THE COURT:  I'll give the instruction now.  Are you

6    done with this witness?

7           MR. GINGRANDE:  Oh, I'm not done with the witness,

8    your Honor.

9           THE COURT:  Not done yet.  Okay.

10          Members of the jury, you just heard testimony about a

11   notebook, and the testimony that you heard about the notebook

12   is not to be considered by you, the material in the notebook is

13   not to be considered by you for the truth of what is in the

14   notebook.

15          Go ahead, Attorney Gingrande.

16          MR. GINGRANDE:  Thank you, your Honor.  And if we

17   could just, please, publish that notebook to the jury at this

18   time.  That's, again, Government Exhibit 101.  And I just ask

19   that the next page be displayed on the screen.

20          THE COURT:  Let me just clarify for the jury that

21   you're not to consider it for its truth, but you may consider

22   it to the extent it shows that Mr. McKenna or you find that he

23   recorded this information in the notebook.

24          All right.  Go ahead, Attorney Gingrande.

25          MR. GINGRANDE:  Thank you, your Honor.  And if we

1    could just move to the next page there.  Okay, yeah, this is

2    fine.

3    Q.   And I'm not going to ask you to read this whole document

4    out loud.  I take it that the jurors can make out the

5    handwriting themselves, but just to ask, the markings on this

6    page, again, your dad's handwriting, as best you can tell?

7    A.   Yes.

8    Q.   Okay.  All right.  Thank you very much.  Just a couple

9    more questions.

10          During the time that your dad worked for Nathan

11   Craigue do you know one way or another whether your dad got

12   health insurance or other benefits from Craigue & Sons?

13   A.   Not that I'm aware of.

14   Q.   And when you say, "Not that I'm aware of," are you saying

15   that you know that he did not receive those benefits?

16   A.   Yes, from him, my father, saying he didn't have insurance.

17          MR. GINGRANDE:  With the Court's indulgence.

18                         (Pause)

19          MR. GINGRANDE:  No further questions.  Thank you.

20          THE COURT:  Sidebar quickly.

21   (SIDEBAR CONFERENCE AS FOLLOWS):

22          THE COURT:  Attorney Graham, how long would your cross

23   be?

24          MS. GRAHAM:  I mean, I can't imagine it would be more

25   than, like, 20 minutes.

1       THE COURT:  Okay, then, I'm going to let them go.

2   It's 4:00, so she'll have to come back tomorrow.  Okay?

3       MR. GINGRANDE:  Okay.

4   (END OF SIDEBAR CONFERENCE)

5       THE COURT:  All right.  It is 4:00; it is time to end

6   for the day.  So, I am going to -- can you hear me now?  Okay.

7   It is time to go home, and so I give you my usual instruction

8   not to talk to anybody, including your fellow jurors, any of

9   your family members, no research, the same instruction I've

10  given you throughout.  And, again, feel free to blame it on the

11  judge.

12      And we will see the jury at 9:00 a.m. sharp, and we

13  will continue with the witness, Ms. McKenna, at 9:00 a.m.  All

14  right?  Thank you.

15      THE CLERK:  All rise for the jury.

16          (The jury exited the courtroom)

17      THE CLERK:  Please be seated.

18      THE COURT:  All right.  Ms. McKenna, you may be

19  excused.  I do need to tell you, though, because you are going

20  to be back testifying, that you're still under what's called a

21  sequestration order, so you can't speak to anybody about your

22  testimony.  So, follow my instruction, my order in that regard,

23  and we'll see you at 9:00 a.m. in the morning.

24      THE WITNESS:  Okay.

25      THE COURT:  Thank you.  It's 4:00.  I know everybody's

1    tired.  Are there issues that I need to deal with now?  Is the

2    Erickson issue something I can handle now?

3            MR. DAVIS:  Judge, I do need to talk to Merrimack

4    County.  The question is whether they give derivative use

5    immunity in their letter.  I think that's what Mr. Lothstein is

6    asking for.  So, I need a little time, we need some time to

7    negotiate that, and I'm not sure what the answer is going to

8    be, but I'm hopeful we can get an immunity letter that will

9    satisfy Mr. Lothstein.

10           THE COURT:  And you need time to work on that now, at

11   4:00, before they are gone.  I understand what you're saying.

12   So, we should be back here at 8:00 sharp to deal with the voir

13   dire of ███████ and also deal with the issue of Mr. Erickson?

14           MR. DAVIS:  Well, that's kind of a separate voir dire.

15           THE COURT:  Right.  I'm just hoping to do it outside

16   of the presence of the jury and take the morning time, perhaps,

17   to accomplish that so that we don't have to have them wait

18   while we do that.

19           MR. DAVIS:  I wonder if we could do that Friday

20   morning, because I think at this point --

21           THE COURT:  Okay.

22           MR. DAVIS:  -- we're headed there, and my guess is

23   we'll need the time Thursday, tomorrow morning, to deal with

24   all the ████ issues.

25           THE COURT:  Okay.  And are there any other issues that

1    I can help you with now?

2          MR. MIRHASHEM:  Your Honor, the only thing -- I think

3    you already made this clear, but I just want to avoid problems.

4    When we're voir diring that witness, Attorney Lothstein's role

5    was to advise him as to the Fifth Amendment.  I don't want --

6    like, two lawyers I don't think should be objecting to my

7    questions and arguing whether something is relevant or not,

8    because he made a curious statement that he is going to invoke,

9    when it is apparently Attorney Lothstein's judgment it's not a

10   relevant question, and I'm hoping the Court, obviously, is

11   going to determine relevancy, and the government can object,

12   and so Attorney Lothstein's role is to advise the witness

13   whether or not to invoke.  So, I'm just concerned to make sure

14   that his role in this process is clear.

15         MR. DAVIS:  I think he has the right, your Honor, to

16   represent his client as he sees fit and as the Court permits in

17   this courtroom.  So, I mean, I don't know what the issue is,

18   but I've never seen a defense lawyer in a courtroom

19   representing a witness where the defense lawyer is told, You

20   may not say anything.  I think he's here to protect his

21   client's rights in whatever way he can and feels like he

22   should, and so I would just ask the Court not rule on that --

23         THE COURT:  Out of context.

24         MR. DAVIS:  -- as a blanket matter.

25         THE COURT:  My instinct on it is that these are issues

1     that I will decide.  Attorney Lothstein is here to represent

2     him on this Fifth Amendment issue.  With respect to having a

3     third lawyer stand up and make objections, I agree completely

4     with what Attorney Mirhashem is saying, but I also think he's

5     doing his job, and he's just doing it quite zealously, and so I

6     will tell him when I think he needs to step back and let me

7     make the rulings and let the government and defense counsel

8     here argue the relevance.  That is not something that I see as

9     Attorney Mirhashem's role at all -- I'm sorry -- Attorney

10    Lothstein's role at all.  So, I do say that out of context,

11    because that does seem very clear to me, but ultimately we

12    don't know what will happen in the questioning, so I want to

13    give at least Attorney Lothstein the opportunity to object to

14    something that he thinks he has a right to object to.  I'm not

15    going to stand in his way.  But I will make clear to him that

16    with respect to relevance and materiality and those issues,

17    those are argued by you.

18           So, I agree we need probably at least an hour for ███

19    ███ in the morning.  We're going to have the voir dire itself,

20    assuming the immunity issues are ironed out, and I hope they

21    are.  So, if you need me to come in for some reason earlier,

22    7:30, just let Attorney Esposito know.  I will definitely get

23    here so that we don't keep the jury waiting.  I do want to

24    start right at 9:00 a.m. tomorrow, if we can.  Anything else I

25    can help you with, though, before we leave today?

1        MR. DAVIS:  Judge, I assume we will go straight to

2   Ms. McKenna and finish Ms. McKenna.

3        THE COURT:  Yes.  Thank you.

4        MR. DAVIS:  We're not going to start with ███

5        THE COURT:  Yes.  Thank you for reminding me of that.

6        Attorney Graham, you'll be doing your cross of Ms.

7   McKenna starting at 9:00.

8        MS. GRAHAM:  Yes.

9        THE COURT:  But I do want to move right after that,

10  hopefully, right into ███████, and, assuming we do a voir

11  dire, that will happen between 8:00 and 9:00 so that ███████

12  can go on the stand right after Ms. McKenna.

13       Did you have something?

14       MR. MIRHASHEM:  No, I was just going to double check

15  on that 8:00.  As things stand right now, we need to be here at

16  8:00.  I just wanted to confirm that.

17       THE COURT:  All right.  And just let me know if you

18  need me sooner than that, okay?  All right.  Thank you.

19  Court's adjourned.

20       THE CLERK:  All rise.

21       (WHEREUPON, the proceedings adjourned at 4:06 p.m.)

22

23

24

25

1                       C E R T I F I C A T E

2

3

4           I, Brenda K. Hancock, RMR, CRR and Official Court

5    Reporter of the United States District Court, do hereby certify

6    that the foregoing transcript constitutes, to the best of my

7    skill and ability, a true and accurate transcription of the

8    within proceedings.

9

10

11

12

13   Date: ___8/6/21         /s/ Brenda K. Hancock
                             Brenda K. Hancock, RMR, CRR
14                           Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25