```
                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF NEW HAMPSHIRE


* * * * * * * * * * * * * * * * * *
                                   *
UNITED STATES OF AMERICA           *
                                   *  19-cr-142-01-LM
            v.                     *  June 10, 2021
                                   *
       NATHAN CRAIGUE              *
                                   *
* * * * * * * * * * * * * * * * *
```

### **SEALED** TRANSCRIPT OF CHAMBERS CONFERENCE
### BEFORE THE HONORABLE LANDYA B. MCCAFFERTY


APPEARANCES:


For the Government:        John S. Davis, AUSA
                           Aaron G. Gingrande, AUSA
                           U.S. Attorney's Office



For the Defendant:         Behzad Mirhashem, Esq.
                           Dorothy E. Graham, Esq.
                           Federal Defenders Office




Court Reporter:            Susan M. Bateman, RPR, CRR
                           Official Court Reporter
                           United States District Court
                           55 Pleasant Street
                           Concord, NH 03301
                           (603) 225-1453

```
 1                       P R O C E E D I N G S
 2                     (SEALED CHAMBERS CONFERENCE)
 3                THE COURT:  Okay.  Let's go ahead.  We can start.
 4     I've got the court reporter here.  Go ahead.
 5                MR. DAVIS:  Judge, we would ask that the Court send
 6     the jury home and let our office have the afternoon to try to
 7     figure out as much as we can what happened and make a
 8     decision.  It's possible we will dismiss the case.
 9                What the discovery shows is that there was a
10     meeting and at least the Concord police who documented the
11     meeting -- the meeting was -- started the day after the grand
12     jury testimony of         , and that there was an $80 payment
13     made, so one day after he testified in the grand jury, and
14     there's a report written about it.
15                It certainly appears that         was paid $80 for
16     testifying in the grand jury in this case, and that could well
17     be the case, and it could be that we decide if that's the
18     situation, we should dismiss.  I don't know.
19                THE COURT:  Okay.  And whose report is that in?  Is
20     it somebody you had access to?
21                MR. DAVIS:  Yes.
22                MR. MIRHASHEM:  We believe it's William Carroll.
23                MR. DAVIS:  It's William Carroll.
24                MS. GRAHAM:  He was his handler.  He's now a U.S.
25     probation officer.
```

1      MR. MIRHASHEM:  You don't have an objection to the
2  Court seeing the report, do you?
3      MR. DAVIS:  No.
4      THE COURT:  And you'll file your protective order
5  tonight?  You have a template for that?
6      MR. DAVIS:  Yeah.
7      THE COURT:  And the Court will grant that.
8      MR. MIRHASHEM:  There's a case number reference to
9  the payment which is the case number of this case.  This is
10 the case number for this case.  This is the record of the
11 payment with the case number on it.
12     (The Court reviews documents)
13     THE COURT:  This is Concord PD.  "Detective McNutt
14 and I," and who's writing this?
15     MR. DAVIS:  The "I" is William Carroll we think.
16     THE COURT:  Okay.  5-16, that's close in time
17 to the grand jury --
18     MR. MIRHASHEM:  It was the day after the grand jury
19 testimony.
20     MR. DAVIS:  It was the day after the grand jury
21 testimony.
22     THE COURT:  Okay.
23     MR. DAVIS:  The federal indictment was returned in
24 July of '19.
25     THE COURT:  And at this point Officer Carroll was

```
 1  still working for the Concord PD?
 2          MR. DAVIS:  Correct.
 3          MR. MIRHASHEM:  Yes.
 4          THE COURT:  Okay.
 5          MR. MIRHASHEM:  I'll just add one more thing
 6  because of what we said before.
 7          We have reason to believe that ▓▓▓ was initially
 8  not interested in cooperating with the prosecution of this
 9  case but he was pressured into testifying -- or cooperating.
10  That report says he was initially not interested in being a CI
11  but changed his mind recently.
12          THE COURT:  Right.
13          MR. MIRHASHEM:  It doesn't say why he recently
14  changed his mind.  That would be one of the issues that we
15  would want to get into at a hearing with Mr. Carroll.
16          THE COURT:  I haven't finished reading this, but it
17  sounds like the CI arrangement doesn't happen until later,
18  around the grand jury testimony.  Is that right?
19          MR. DAVIS:  Yes.  That's right.
20          It references that he had provided information
21  going back to 2016 but he had not wanted to be a CI and so had
22  not been signed up.
23          MR. GINGRANDE:  And the agreement is signed May
24  16th.
25          MR. MIRHASHEM:  In the May 16th agreement he agrees
```

```
 1   to testify in exchange for monetary rewards and being a good
 2   samaritan.
 3               MR. GINGRANDE:  As a CI.
 4               THE COURT:  Okay.
 5               MR. MIRHASHEM:  I'm sorry.  He agrees to be a CI in
 6   exchange for monetary rewards and being a good samaritan.
 7               THE COURT:  Okay.  "Due to the passing of his
 8   grandmother, ▓▓▓ will not be available."  It sounds like he
 9   had a sequence of --
10               MR. MIRHASHEM:  He did cooperate against ▓▓▓
11   ▓▓▓▓▓▓▓▓▓▓▓▓.  That's in another report.
12               I'll just say one other thing.  When he testified
13   before the grand jury, at the end a grand juror asks him why
14   he's now being cooperative, and at that time -- I think he may
15   be referring to why he, like, cooperated in October, I'm not
16   sure, but he's asked -- I mean, anybody -- so you -- he says
17   that he was upset by the injuries that McKenna and Chris
18   Erickson had suffered.  That caused him to basically have a
19   change of heart and --
20               MR. DAVIS:  Well, that may well have been true.
21               MR. MIRHASHEM:  Yeah, that may well be true but --
22               MR. DAVIS:  I mean, what may have happened here is
23   he woke up on the 16th and said, you know, I just had to
24   testify.  I cooperated.  This actually isn't that bad.  These
25   guys have asked me to be a cooperator and so I want to come in
```

1  and look into that, and he goes in and signs a -- so it could
2  well be that he testified in the grand jury with no agreement,
3  no expectation of an agreement, because the agreement is the
4  next day.
5          MR. MIRHASHEM:  When he testified in May of 2019 --
6  he had had a rapport building meeting with his CI handler in
7  September of 2018.  From the outset Mr. Carroll became
8  involved in this case as a building rapport person.  He
9  already says he had a prior involvement.  Your agent, Sean
10 Roberts --
11         MR. DAVIS:  I mean, since '16 he has helped Billy
12 Carroll.
13         MR. MIRHASHEM:  Then he comes and testifies before
14 the grand jury.  The next day Carroll writes a report saying
15 for his cooperation with the Department of Labor and Concord
16 PD.  That's what the report says.
17         MR. DAVIS:  That's what the report says.  I agree.
18         MR. MIRHASHEM:  So, I mean, he could come in and
19 say, oh, I meant only Concord PD, but the case number on the
20 case that he received a payment on according to Officer
21 Brouillet's report is the case number for this case.
22         THE COURT:  This one?
23         MR. MIRHASHEM:  Yep.  That's just for the sake of
24 seeing the case number.  The case number at the top matches
25 the case number of the payment sheet.

```
 1              MS. GRAHAM:  And Officer Brouillet is the one who
 2   testified here.  That's his report.
 3              THE COURT:  Okay.
 4              MR. MIRHASHEM:  So that's how we know what the
 5   Concord PD case number was.
 6              THE COURT:  Okay.  All right.
 7              Well, I will let the jury go and ask them to return
 8   by 9:00 a.m. tomorrow.
 9              Let's assume the government decides not to dismiss.
10   What's the order of events at 9:00 a.m.?
11              MR. MIRHASHEM:  Our request at that time would be
12   for the Court to conduct a hearing, and we're prepared to do
13   it this afternoon if they bring witnesses, for dismissal of
14   the case for prosecutorial misconduct.
15              This is William Carroll.  He's now working for this
16   court.  He is an employee of the federal government.  We have
17   subpoenaed him in this case.  No word to anybody else that,
18   hey, I paid this guy $80 on the case that's the same as this
19   case?
20              I mean, we had our intern research this.  We're in
21   the middle of this as far as what -- you know, I mean, the
22   standard is highly unfavorable to the defense, but there is
23   some point we would argue where dismissal is appropriate.
24              And I don't disagree with the government that if we
25   go down that path, the Court has to make fact finding.
```

1  William Carroll, I mean, he's under subpoena to testify at
2  this trial.  He's an employee of the federal court.  He's not
3  thinking that I know that a witness in this case was paid $80
4  by me to testify?  So he's going to need to testify.
5            Sean Roberts wrote a report about the rapport
6  building meeting.  We want him to testify.
7            Detective McNutt, who's the other person on this
8  case, we want him to testify.
9            MR. DAVIS:  Who is the husband of a probation
10 officer.
11           MR. MIRHASHEM:  Who's the husband of a probation
12 officer, Jennafer McNutt.
13           THE COURT:  That's why I wondered if it was Officer
14 McNutt.
15           MR. MIRHASHEM:  Yeah.  So we would want -- because
16 the standard is difficult, the Court would need to make
17 appropriate fact finding and we would need to, like, present
18 the appropriate standard, but there are cases that have been
19 dismissed for prosecutorial misconduct.
20           THE COURT:  Oh, I understand.  However, I'm
21 wondering if that is something I could do after the trial.
22 Why couldn't I have a big evidentiary hearing after the trial,
23 assuming he is convicted, right, and then issue a ruling at
24 that point?  I don't see why we need to have a big long
25 hearing before the --

1     MR. MIRHASHEM:  I would agree to that as long as --
2  if this is all fair game before the jury, we're ready to go.
3  But if the government is going to say we first need to make
4  certain findings before we can cross-examine about this stuff,
5  then we're going to need a hearing.  But if the government
6  agrees -- I mean, we're not going to obviously -- there's a
7  bunch of names of people in here of people that he cooperated
8  with drug cases.  We don't need to elicit those names.
9     THE COURT:  Right.
10     MR. MIRHASHEM:  All we need to elicit is have --
11  you know, during the trial he can testify.  Carroll can
12  testify.  Roberts can testify.  We'll ask all the questions.
13  We'll do it all before the jury.  Again, with the
14  understanding that as the trial unfolds -- I mean, this makes
15  me think I'm naive, but how many people in the Department of
16  Labor and the Concord Police Department really knew about
17  this?  I mean, this is a small town.  This guy comes and
18  testifies before the grand jury on May 15th.  The next day he
19  gets paid for this case.  I mean, I don't know.  Like, nobody
20  knew?  I mean, we're going to have to get to the bottom of who
21  knew, but I agree that a lot of that could be done after trial
22  depending on what the verdict is.
23     THE COURT:  And ultimately, wouldn't a motion to
24  dismiss, wouldn't it have something to do with how effective
25  your cross-examination of these witnesses was?

```
 1                MR. MIRHASHEM:  I think that misconduct is a
 2   separate issue from the -- I think there are some situations
 3   very narrow where, you know, the conduct of the government
 4   reaches a level where dismissal is appropriate, you know, just
 5   as a sanction.  I mean --
 6                THE COURT:  Okay.  I would obviously -- we would
 7   need to hear evidence on that, and ultimately, the government
 8   needs to weigh this itself and decide what it wants to do.
 9                With respect to tomorrow, however, assuming the
10   government goes forward, what do we anticipate?  I would I
11   think press folks to make a decision with respect to the
12   motion to dismiss, and my preference would be to do that after
13   the trial is over.  If he's acquitted, there's no need for
14   that.
15                MR. MIRHASHEM:  I mean, I certainly don't have an
16   immediate good argument against that.
17                THE COURT:  Okay.
18                MR. MIRHASHEM:  I mean, I think that -- but again,
19   I didn't hear from the -- do you agree that tomorrow we
20   restart the trial and just have -- other than the names of
21   the, you know, suspects and stuff, the sort of collateral is
22   all fair play?
23                MR. DAVIS:  So you mean for ▓▓▓ or for Kelly or --
24                MR. MIRHASHEM:  For everybody.  We're going to be
25   asking everybody about this; Roberts, Kelly, ▓▓▓, William
```

```
 1   Carroll.
 2              MR. DAVIS:  Carroll is your witness.
 3              MR. MIRHASHEM:  Yeah, we're going to call him and
 4   ask -- well, yeah, he's our witness.  That's true.
 5              MR. DAVIS:  Yeah.  I mean, I don't think we need a
 6   voir dire on it.  I think it's fair cross-examination, sure.
 7              MR. MIRHASHEM:  Then we're ready to go.
 8              THE COURT:  Okay.  And let me ask you this again.
 9   Kelly -- is there any reason -- does Kelly know about this?
10              MR. MIRHASHEM:  We'll find out.
11              MR. DAVIS:  I don't think he knows anything.
12              THE COURT:  I'm guessing -- well, who knows.
13              MR. MIRHASHEM:  Who knows.
14              THE COURT:  But if he knows nothing, right, then --
15              MR. DAVIS:  Then it doesn't go on very long.
16              THE COURT:  Then your argument about I have to do
17   ▆ first is not -- I'm just thinking about who you have here
18   to start the day tomorrow.
19              MR. MIRHASHEM:  Right.  I understand.
20              I mean, what I would ask from Kelly other than sort
21   of the usual stuff is, I would ask about his observation of
22   ▆ possibly being under the influence, and otherwise, I
23   would, like, try to see what if any of this stuff he knew.
24              And I agree that it's quite possible that he didn't
25   know anything about it.  If he didn't know anything about it,
```

```
 1   well, he didn't know anything about it, and so that's not
 2   going to be very long.
 3              THE COURT:  Then      comes on.
 4              MR. MIRHASHEM:  Then      comes on.
 5              THE COURT:  Do we need to do anymore voir dire, I
 6   don't think so, with     ?  I didn't ask the government if you
 7   objected to it, but the evidence was I think fairly
 8   overwhelming that defense counsel would be able to ask him,
 9   cross-examine him on the drug use and the memory issues.
10              MR. GINGRANDE:  Not for the relevant time period,
11   no.  We don't object to that.  I think, you know -- I mean, in
12   terms of things predating that I think we would.
13              MR. DAVIS:  We would.
14              MR. GINGRANDE:  But not for the relevant time
15   period.  No, not at all.
16              THE COURT:  Right.
17              MR. MIRHASHEM:  I mean, we would want to bring out
18   that he provided drug information to Concord PD in 2016 but at
19   the time wasn't interested in cooperating.  Something happened
20   that caused him to become interested in cooperating.
21              So I wouldn't ask about drug use in 2016, but I
22   would certainly ask about his working with Concord PD in 2016.
23              MR. GINGRANDE:  Sure.  The drug use and the CI
24   stuff I'm putting in two separate boxes.
25              THE COURT:  And I'm asking just about the drug use
```

1  right now.  I didn't ask the government do you object.  You
2  didn't object at the time or interject an objection, but
3  ultimately, I ruled -- I think I made it clear I was headed to
4  ruling that that's going to come in.
5              So the drug use you voir dired on, that comes in on
6  cross.
7              The CI information.  Obviously, he is engaged in
8  perhaps trying to impress the Concord PD, the same entity that
9  may be going after your client, so you're going to go into
10 that line of cross, but why would the jury need to hear about
11 each sort of episode of being a CI, if you will?
12             MR. MIRHASHEM:  All I would ask him is -- he
13 started working -- he started providing information to the
14 Concord Police Department I believe in June of 2016, but at
15 the time he wasn't interested in getting paid for it.  He
16 later developed an interest in getting cash in exchange for
17 cooperation with the Concord PD.
18             So there's just the context.  He got the cash the
19 day after he testified before the grand jury in this case.  So
20 it's just, you know, I don't want cash -- again, part of our
21 defense is we think that ultimately through Carroll we'll be
22 able to -- well, we hope we're going to be able to show he was
23 pressured.  He was avoiding Officer Kelly, I think that will
24 come out, and then things happened that we're going to have to
25 try to establish that changed.

1       THE COURT:  Okay.  Well, that makes sense to me,
2  but you really aren't trying to get into the various CI sales
3  or anything?
4       MR. MIRHASHEM:  No, we're not going to say, like,
5  on such and such a day you did a hand-to-hand sale for Concord
6  PD to this person, like, you know, if it was in fact two years
7  before the case.
8       I would ask -- I mean, I think if we could get some
9  agreement on a protective order so that we can walk out of
10 here with a copy of these documents so we can prepare our
11 cross.
12      THE COURT:  If you -- I'm going to give this back
13 to you.
14      If you get me a protective order, I will go ahead
15 and sign it.
16      MR. DAVIS:  We'll get right on it.
17      MR. GINGRANDE:  Yeah, we'll get right on that.
18      THE COURT:  Okay.  All right.
19      So I'll just bring the jury in, let them know
20 something has come up, and rather than keep them here to
21 reconvene later in the day, I'm just going to send them home,
22 okay?
23      And we will start in the morning with Kelly, your
24 cross of Kelly, and you'll have the question for him.  If he
25 says, no, I didn't know that -- I mean, and then we'll bring

```
1    ▇▇▇ back in and start the cross with ▇▇▇
2              Does that make sense?
3              MR. MIRHASHEM:  I mean, I don't want to suggest I'm
4    only going to have one question.  I'll cross-examine him.
5              THE COURT:  No.
6              MR. DAVIS:  We would never think that.
7              THE COURT:  So cross of Kelly, cross of ▇▇▇, and
8    then you continue with your case-in-chief.
9              MR. GINGRANDE:  So no further voir dire of ▇▇▇
10   then?
11             THE COURT:  That's what I'm asking.  I don't think
12   so but --
13             MR. MIRHASHEM:  I mean, I don't have my notes on
14   him, but he basically agreed that, you know, I think from,
15   like, 2017 to 2020 he had periods of sobriety and periods of
16   use.  He can't say exactly what day he was using and wasn't
17   using.  So, you know, I mean, so I'm going to ask about his
18   use the day of interaction with Kelly.  That would affect
19   things.  I'm going to ask about his use in the period that he
20   was avoiding the investigation, his use when he was
21   interviewed in October, his use when he testified before the
22   grand jury, his use before testifying in court, because I
23   think his last use he said was, it's somewhere in my notes,
24   but if it's close enough -- I mean, I can't remember when his
25   last use was, but if his last use is something that was close
```

```
 1   enough --
 2              THE COURT:  And none of the -- Ted Lothstein asked
 3   for a sealed courtroom because of all the reputational harm he
 4   would suffer.  That's not going to happen.  I'm not sealing
 5   the courtroom for that.
 6              He will no doubt, however, ask for a sealed
 7   courtroom on the cooperation piece of this, and I know what
 8   your position on that would be.
 9              Does the government agree not to seal the courtroom
10   for the cooperation piece of the cross?
11              MR. DAVIS:  I don't think we're allowed to ask for
12   it --
13              MR. GINGRANDE:  Yeah.
14              MR. DAVIS:  -- without permission.  So if it's
15   going to be a court proceeding, we're not moving to close the
16   courtroom.
17              MR. GINGRANDE:  And also on defense counsel's
18   representation that he's not going to be naming names.
19              MR. MIRHASHEM:  Right.  We're not going to name
20   names of people involved.
21              THE COURT:  Here's the concern I have.  It's just
22   ▓▓▓▓ safety.  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ and he's going to be
23   disclosing, and it would be presumably in a big motion to
24   dismiss, that he has been cooperating and, you know, engaging
25   in drug deals and paid informant activity for the Concord PD
```

1   against all kinds of ▮▮▮▮▮▮▮▮   It just worries me for
2   his own safety.
3           MR. MIRHASHEM:  I mean, I certainly don't want to
4   be callous about that, you know, but we have to be worried
5   about our client's right to a public trial.
6           And I'm hoping that the government will see that
7   this is such a big mess at this point that maybe they will see
8   fit to terminate this prosecution.
9           But if we go down that -- I mean, honestly, I guess
10  I'll say this seriously, you know, Concord PD made a deal with
11  ▮▮▮▮▮.  They can weigh in on how unhappy they would be to
12  have it come out and the government can consider that in
13  deciding what to do with this case, but certainly as counsel
14  for -- I think we would be remiss if as counsel for our client
15  we thought, oh, you know, poor, you know, ▮▮▮▮▮ who got
16  paid to testify against our client now is going to have some
17  harm come to him.
18          THE COURT:  I wouldn't expect you to have to
19  articulate the argument.
20          MR. GINGRANDE:  We're just trying to determine if
21  he's still an active CI or if he's been terminated.
22          MR. MIRHASHEM:  Right.  I didn't know where to look
23  for that.
24          MR. DAVIS:  I don't see that.
25          MR. GINGRANDE:  We don't see it anywhere in the

```
 1    file.
 2              THE COURT:  I'll let the government think about
 3    that issue and weigh that.  Obviously, he's your witness.
 4              To me it seems fairly obvious.  He could be in
 5    danger whether he stopped being a CI recently or not.  The
 6    fact that he was engaged in a relationship with the Concord PD
 7    and being paid to do drug deals undercover with people he
 8    knew, I would think that could put him in harm's way.
 9              So I'll let you look at that and weigh that and I
10    don't anticipate you making an argument about that, but it
11    obviously would impact you with respect to a sealed courtroom.
12              MR. MIRHASHEM:  Right.  We'll research whether --
13    I've never experienced that.  In the middle of an actual jury
14    trial to exclude the public, I have never had that experience.
15    I'm sure there are cases like some national security crime or
16    something, but I just haven't looked at that.
17              THE COURT:  And I have not studied the issue
18    either.  I just wanted to bring it up as something that might
19    be an issue I would need some help on and guidance, and I'll
20    let you make the arguments.
21              So I think that's it.  I'll just bring the jury in
22    and we'll promptly send them home.
23              I'll stay on the bench for a moment in case you
24    think of any other issue as we walk out there.
25
```

C E R T I F I C A T E

I, Susan M. Bateman, do hereby certify that the foregoing transcript is a true and accurate transcription of the within proceedings, to the best of my knowledge, skill, ability and belief.

Submitted: 7-9-21        /s/   Susan M. Bateman _____
                         SUSAN M. BATEMAN, RPR, CRR