UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * * *
                                 *
UNITED STATES OF AMERICA         *
                                 *   1:19-cr-142-01-LM
            v.                   *   June 10, 2021
                                 *   8:10 a.m.
NATHAN CRAIGUE                   *
                                 *
* * * * * * * * * * * * * * * * * *
```

**SEALED** TRANSCRIPT OF CHAMBERS CONFERENCE
BEFORE THE HONORABLE LANDYA B. McCAFFERTY

Appearances:

For the Government:          John S. Davis, AUSA
                             Aaron G. Gingrande, AUSA
                             United States Attorney's Office

For the Defendant:           Dorothy E. Graham, Esq.
                             Behzad Mirhashem, Esq.
                             Federal Defender's Office

Court Reporter:              Liza W. Dubois, RMR, CRR
                             Official Court Reporter
                             United States District Court
                             55 Pleasant Street
                             Concord, New Hampshire 03301
                             (603)225-1442

```
 1                    P R O C E E D I N G S

 2              THE COURT:  Good morning.

 3              MR. DAVIS:  So we have some interesting news about

 4   ████████.

 5              THE COURT:  Okay.

 6              MR. DAVIS:  Last night the defense emailed us and

 7   noted that the discovery says that there'd been --

 8              THE COURT:  Is this under seal?  Do you want me to

 9   do this under seal?

10              MR. DAVIS:  Yes, actually.

11              MR. MIRHASHEM:  Under seal, but on the record, yes.

12              MR. DAVIS:  With a record.

13              THE COURT:  Under seal, on the record, and I presume

14   it's something very private about ████████.

15              MR. DAVIS:  Yup.

16              THE COURT:  So I will grant that.

17              Go ahead.

18              MR. DAVIS:  And the bottom line is it appears that

19   he was a paid CI for the Concord Police Department in drug

20   cases.  And we did not know this.

21              What happened, the sequence of events is Behzad sent

22   an email saying, we understand there was a prior relationship

23   and we ask you to inquire of Concord PD and William Carroll --

24   who is now a probation officer in this court --

25              THE COURT:  Oh, I recognize the name.  Right.
```

1          MR. DAVIS:  Yes.  So -- but he was, back then, a

2    Concord police officer -- and we assert our rights under

3    Giglio, et cetera.  So I -- I said we'd inquire.

4          We called Billy Carroll and Billy Carroll said,

5    well, actually, he was a CI, and that there is a CI file at

6    Concord Police.

7          So we issued a subpoena last night and the subpoena

8    was served early this morning.  I -- I don't have an update,

9    but we think that the file is being copied and I don't think

10   we'll have any problem with Concord Police.  The agents are on

11   it.

12         So at some point, soon, I hope, we'll have a CI

13   file.  We haven't reviewed it, but Billy Carroll definitely

14   said that he was paid $40 a drug deal and made, you know,

15   multiple CI drug buys and he may have been still a signed up CI

16   as of the dates of this case -- as of August of 2018, although

17   I think the -- he also said he wasn't working on charges, he

18   didn't have a charge, and that his original report appeared to

19   be based on ████████████████████████████████████████

20   ████████████████████ and he reported that drug dealer, as

21   information checked out, and so he got -- he got signed up.

22         So that's where we are.  We've given that short

23   briefing to the defense.  I've notified Ted Lothstein, who I

24   think had no idea, and I expect the defense will need more time

25   before cross-examining -- I mean, and I expect we'll make it --

1    we're at least going to disclose, I'm confident, the payments.

2    I don't know what else is in the file, if there is misconduct

3    of some kind, but we'll make some disclosure.

4              And I guess my proposal -- and we can talk about it,

5    of course.  My proposal is that we proceed with the drug use

6    voir dire in this hour, the witness is here, and then start

7    with the cross of the next witness and hopefully in here we

8    can get the materials, review them, make a disclosure.

9              But that's -- that's where it is.

10             THE COURT:  Okay.  What do you think of that,

11   Attorney Mirhashem?

12             MR. MIRHASHEM:  Your Honor, if I could be heard on

13   this.

14             So the email that I sent to Attorney Davis

15   yesterday, I quoted from *Kyles vs. Whitley* from the United

16   States Supreme Court in 1995:  The individual prosecutor has a

17   duty to learn of any favorable evidence known to the others

18   acting on the government's behalf in the case, including the

19   police.

20             The police in this case were Concord Police.

21   William Carroll was an officer.  In the discovery in this case,

22   I quoted that he had a previous relationship with ███████ and

23   so he was enlisted for a rapport-building session with Agent

24   Roberts.  Okay?

25             Now --

```
1              THE COURT:  He was enlisted?  Carroll was enlisted?

2              MR. MIRHASHEM:  Carroll was enlisted --

3              THE COURT:  Okay.

4              MR. MIRHASHEM:  -- to have a meeting on or about

5    September 26th with Sean Roberts and ███████████ --

6              THE COURT:  September 26th when?

7              MR. MIRHASHEM:  2018.  Because he was avoiding them

8    between August 28th and October 31st.  And I think the evidence

9    will show they were trying to find a way to engage with him.

10   Ultimately he was brought in on a subpoena that was served to

11   his grandmother.

12             During that period, when he was not cooperative,

13   William Carroll of the Concord Police Department, who responded

14   to the scene in this case -- and there is a police report about

15   him because of the prior relationship --

16             MR. DAVIS:  He didn't respond to the scene, but,

17   anyway --

18             MR. MIRHASHEM:  He -- he was one of the -- there's a

19   Concord --

20             MS. GRAHAM:  Lovejoy.

21             MR. MIRHASHEM:  Lovejoy.  I'm sorry.  I retract

22   that.

23             MR. DAVIS:  Yeah.

24             MR. MIRHASHEM:  So at the end of his direct

25   yesterday, I believe it was, I made a Jencks request and I made
```

1    a Giglio request.  The Supreme Court has repeatedly said there

2    is no obligation on the part of the defense to make a request.

3    Congress just passed the Due Process Act of 2020 to say -- now

4    we say it at every arraignment -- the government has a duty to

5    go and ferret out this kind of evidence.

6              We are going to file multiple motions about this,

7    how -- and including prosecutorial misconduct, because they

8    should have told this to us two years ago.  They should have

9    inquired two years ago.

10             I'm not at all suggesting that they personally hid

11   it from us.  I have no doubt that if Attorney Davis knew this,

12   he would have told us.  He told us like when Erickson recently

13   changed his testimony.  I have no doubt they would have told

14   us.

15             The difficulty in these cases is they have an

16   obligation to go and look.  They have to ask the Concord Police

17   Department; this is our key witness, is there exculpatory

18   evidence on him.  All they did, I believe, is they ran a record

19   check on him and he had ███████████████████████████████

20   ██████████.  That's his entire police record.  So we have no

21   access to CI files or anything like that.

22             So how we proceed, whether we -- I don't have any

23   objection to doing the drug voir dire, eventually getting this

24   file, but we're going to be litigating this issue.  This case

25   we're going to ask to be dismissed for prosecutorial misconduct

```
1    and -- because we would have had two years to investigate this
2    guy.  Now he's testified like a Boy Scout.
3    .  The guy was a CI and he says, oh, I had an
4    accident and then I -- he just, you know, out of the blue.
5              I mean, we're going to establish in court that he's
6    a liar, but that doesn't negate the fact that the government of
7    the United States should have disclosed this information to us
8    two years ago under their obligations under Kyles, Brady,
9    Giglio, the Due Process Act of 2020.  You know, the Stevens
10   case was dismissed with prejudice.  How many times does the
11   Department of Justice have to be told you've got to find
12   exculpatory evidence and turn it over to the defense.
13             So that's my position on this.
14             THE COURT:  Okay.  All right.  So we're going to go
15   out, we're going to do a voir dire on just the drug use.  He's
16   probably, I -- unless he's going to hide the CI stuff, he's
17   probably -- it could come up.
18             MR. MIRHASHEM:  Well, I thought you just -- did you
19   just inform Attorney --
20             MR. DAVIS:  Yes.
21             THE COURT:  The government just informed his
22   attorney, so now he knows.
23             THE COURT:  Okay.  All right.
24             MR. MIRHASHEM:  So I'm -- we're going to like --
25             THE COURT:  Right.
```

1          MR. MIRHASHEM:  I mean, now he's going to know

2    that -- I don't know the dates of the -- we don't know what

3    dates he was a CI.

4          I mean, we -- we're going to be cross-examining on

5    how he was told at some point, we have a good faith belief,

6    that we're going to charge our client with manslaughter and if

7    you don't cooperate with us, you're going to get charged, too.

8          Nothing about any of this has been turned over to

9    us.  People in the Concord Police Department, I'm convinced --

10   this case was initially in the county attorney's office.  They

11   investigated for manslaughter and concluded there wasn't enough

12   evidence, so the feds picked it up for a false statement.

13         There is more exculpatory evidence out there and the

14   government needs to disclose all of it to us.

15         THE COURT:  Okay.  Let me just think through next

16   steps.  Obviously you can respond to that.  They haven't filed

17   a formal motion for mistrial.  I'll let you absorb that and

18   then respond.

19         Go out, we'll do the voir dire, see what happens.

20   And ultimately, if he's a CI, that's clearly something you get

21   to cross on and you'll obviously do an effective cross on that

22   and ultimately the jury will hear all about that.

23         So if -- if we allow that to happen, if I allow that

24   to happen, why do I have to at that point grant a mistrial?

25         MR. MIRHASHEM:  Well, as I told -- I mean, we can't

1   envision how this is going to play out.  As I said, I mean, I

2   don't know -- you know, I sent one email where I -- I made this

3   one disclosure:  Before this trial is over, we're going to have

4   Agent Roberts testify about when he learned about this, did he

5   know when he -- his -- his report said they bring in William

6   Carroll for a rapport-building session.

7               THE COURT:  And, Roberts, you're going to have to

8   help me, because I don't know the names.

9               MR. MIRHASHEM:  He's the case agent who's been

10  sitting in the courtroom.

11              THE COURT:  Right.  Okay.  So where is he from?

12              MR. MIRHASHEM:  The Department of Labor.

13              MR. DAVIS:  Department of Labor, special agent, OIG.

14              THE COURT:  Okay.

15              MR. MIRHASHEM:  How does he come up with let's get

16  William Carroll involved in this case?

17              THE COURT:  Okay.

18              MR. MIRHASHEM:  Okay?

19              THE COURT:  All right.

20              MR. MIRHASHEM:  So there's -- there's going to be

21  more that's going to need to be developed about this.  When --

22  what did Sean Roberts know and when did he know it that caused

23  him to enlist William Carroll to help with this investigation.

24  This all goes -- he's the case agent.  This goes to the entire

25  credibility of this false statement prosecution.

1          THE COURT:  All right.  And ultimately, though, you

2     will have a lot of free rein to cross on this, obviously, and

3     so I'm still wondering if I -- if you get the opportunity to

4     cross him, impeach the heck out of him with all of this, I'm

5     still not clear on why I dismiss the case.  But --

6          MR. MIRHASHEM:  And I'm saying I -- I haven't made

7     that motion right now because we literally found out about

8     this --

9          THE COURT:  I hear you.

10          MR. MIRHASHEM:  -- 20 minutes ago.  Once we have

11     Carroll on the stand, once we have Roberts on the stand, I

12     predict more will -- I don't predict.  My expectation is these

13     people have been talking for years about this case.  This was a

14     Concord Police Department manslaughter investigation.  Concord

15     officers responded to the scene.  Then the Department of Labor

16     got involved.  They worked together on this case.  And I would

17     not be surprised if there's more exculpatory evidence unknown

18     to the two attorneys in this case that agents and police

19     officers in this case know about.

20          I mean, once somebody's a CI -- I mean, there's a

21     lot of other things.  It's not just like, oh, one day the

22     Concord Police Department approach a man with no record and

23     say, oh, why don't you, like, take cash from us to do a drug

24     deal.  I mean, there's a history there.  And when that history

25     comes out, you know, who knows which other Concord Police

1    Department officers knew it and when they knew it and who did

2    they tell and --

3              THE COURT:  All right.

4              MR. MIRHASHEM:  And keep in mind this is one of the

5    government's two key witnesses in the case.  And we've been

6    openly -- the other one had a criminal record.  So we knew he

7    had a felony conviction.  We knew he had a DWI.  This one, we

8    were stymied because, oh, he just had a misdemeanor that was

9    dismissed.

10             The Court rules say they make Giglio disclosure

11   three weeks before trial.  *Kyles* says he has a duty to inquire.

12   The case agent is so intimately involved that he's here every

13   day and he did a rapport-building session and, you know, the

14   agent never spoke -- never brought to Attorney Davis's

15   attention that, hey, this guy is a CI?  He's been sitting here

16   while he's been testifying about --

17             MR. DAVIS:  The agent doesn't know he's a CI.  I

18   mean, he didn't know that.

19             MR. MIRHASHEM:  How did he know to involve William

20   Carroll then?

21             MR. DAVIS:  Well, I guess you're going to

22   investigate all this, so --

23             MR. MIRHASHEM:  Yeah.

24             MR. DAVIS:  So it -- it was actually serendipitous,

25   but we'll see.  So ...

1          THE COURT:  Well, it sounds like we might have some

2     other voir dire moments, perhaps, in this case.

3          Let me -- I know we've got to go out and do the voir

4     dire and I'm guessing we're going to have to limit it right

5     now, obviously with the understanding that there will be more

6     because you'll a get more information, presumably, from

7     Attorney Davis once we hit 9:00 a.m.

8          MR. MIRHASHEM:  Right.

9          THE COURT:  You're prepared to end at 9:00 and

10    then bring him back on --

11         MR. MIRHASHEM:  I will stop at 9:00 and then we'll

12    bring him back.  That's fine.

13         THE COURT:  Okay.  All right.

14         And let me just bring up one issue that is a

15    question I have for counsel.

16         In Attorney -- I've been assuming this is a tactical

17    decision, so I -- but I want to raise it, only because it

18    concerns me a little.

19         In Attorney Davis's opening statement, he referenced

20    statements of Department of Labor and --

21         MR. MIRHASHEM:  Martineau.

22         THE COURT:  -- OSHA.  And I had excluded them under

23    404(b).

24         MR. MIRHASHEM:  That was on our list, actually, to

25    bring up later today.  We made a strategic decision not to --

1              THE COURT:  Okay.

2              MR. MIRHASHEM:  -- object in opening, but we are not

3    agreeing that that evidence is admissible.  He said -- he said

4    our client doubled down and told Martineau --

5              THE COURT:  I just assumed you had made --

6              MR. MIRHASHEM:  -- that he's a --

7              THE COURT:  -- some agreement.  I'm sorry to

8    interrupt you, but I --

9              MR. MIRHASHEM:  No.  That's in the Court's in limine

10   order, that that's not admissible.

11             MR. DAVIS:  So, Judge, the -- as I understand it,

12   the statements that -- the only thing that's not admissible

13   about the Department of Labor hearing and the interview with

14   Martineau is a statement about being a contractor.  I think

15   that's -- was -- and, of course, any findings or conclusions by

16   Department of Labor, which we're not going to go into.  But --

17             THE COURT:  I thought you might have forgotten that

18   ultimately with regard to the uncharged crimes, Department of

19   Labor statement that he was a subcontractor, that would be

20   lying to the Department of Labor.  He testifies, I guess, at an

21   OSHA thing, also says the same thing.  I kept those out under

22   404(b).  And I can find in the transcript, my language was very

23   clear, these are out, they're uncharged crimes, they're very

24   prejudicial, and then at the end I said, however, the defendant

25   could open the door to them if the defense argues X.  But I

1    said I can't decide this without context, but I'm keeping them

2    out of the government's case in chief.

3              I had a sense that that might have happened, that

4    you would have perhaps confused that or forgotten about that.

5    I didn't think you got up and just deliberately --

6              MR. DAVIS:  No, of course not.

7              THE COURT:  -- violated the order.  But I did wonder

8    why --

9              MR. MIRHASHEM:  Yeah.

10             THE COURT:  -- counsel didn't object at the time so

11   that I could cure any --

12             MR. MIRHASHEM:  We --

13             THE COURT:  -- issues with a limiting instruction.

14   And I'm not going to --

15             MR. MIRHASHEM:  Right.  I mean, we certainly didn't

16   waive an objection to the evidence coming in.  The -- the

17   opening statements are not evidence, as the Court stated.  I

18   can tell you that we heard that and, you know, I mean, the --

19   the Court made a lot of in limine rulings.

20             THE COURT:  I know.

21             MR. MIRHASHEM:  And the government very definitively

22   said he doubled down by saying this to Martineau.  And we were

23   looking at each other like the judge said that's not admissible

24   and, you know, so --

25             THE COURT:  When -- when the officer testified

1    yesterday, though, to -- you didn't object when he -- I don't

2    remember which one of you asked -- the officer said he came up

3    and told me they were subcontractors, he only worked with

4    subcontractors.

5                And I waited for an objection.  There was no

6    objection to that.  I had never ruled on that particular --

7                MR. MIRHASHEM:  Right.

8                THE COURT:  -- witness before, but I expected some

9    sort of objection.  There was no objection.

10               So, again, I've been presuming it's all tactical --

11               MR. MIRHASHEM:  Yeah.

12               THE COURT:  -- and that maybe even there was an

13   agreement between the two of you.

14               But in any event, I just wanted to raise that

15   because I was concerned if I -- it could be plain error, for

16   instance, to have opened, allowed that to pass, no objection,

17   and I want to raise it because if -- if it can be cured with a

18   very strong limiting instruction, then I give that limiting

19   instruction, then obviously you can argue whatever you argue in

20   your closing about what the government promised they would show

21   you and they didn't.

22               MR. MIRHASHEM:  That's --

23               THE COURT:  But the officer did testify yesterday.

24   There was no objection to his testimony.

25               MR. MIRHASHEM:  The officer -- our -- I mean, you

1    hadn't addressed this, your Honor, in your order.

2              Our view was the officer was listening to what our

3    client said on August 28, 2008, right, the same day that he's

4    talked to --

5              THE COURT:  I --

6              MR. MIRHASHEM:  -- the OSHA agent.

7              THE COURT:  Right.

8              MR. MIRHASHEM:  So we weren't taking the position

9    that repeating that statement moments before or after --

10             THE COURT:  Okay.

11             MR. MIRHASHEM:  -- allegedly would be something we

12   could exclude.

13             The Martineau statement is a month later and we

14   looked at your order and you say that the fact that our client

15   said they were independent contractors is not admissible, but

16   something different about that, like -- I have to look at

17   your -- you actually have a written order on this --

18             THE COURT:  Opening the door.

19             MR. MIRHASHEM:  No, no, it's not opening the door.

20   You said but something else, like that he -- that he said

21   McKenna understood himself to be an independent contractor or

22   something like that.  We -- we can look at the order.

23             So the -- so we were aware of that.  The context I

24   wanted to bring it up was actually a little bit different,

25   which is we had went -- gone back and forth many times about

1    what is or is not admissible about the October interview

2    with -- recorded interview that our client made --

3              THE COURT:  Right.

4              MR. MIRHASHEM:  -- and eventually the government

5    told us that they're not going to bring that in, so we don't

6    have any kind of rulings on what part of that is admissible or

7    not beyond the prior ruling.

8              So I just wanted to make sure that, you know, when

9    Officer Kelly testifies -- because, frankly, there -- I mean, I

10   don't mind telling the government there's -- there's a very

11   good chance that I may cross-examine on portions of that

12   statement, the October statement, and so then the issue

13   becomes, okay, now we've brought it in, what other parts of

14   that statement the government can bring in and there's

15   certainly plenty in there that's still inadmissible.

16             So I wanted to just make sure that we all sort of

17   are aware that there's a bunch of in limine rulings about what

18   stuff does and doesn't come in as far as those prior

19   statements.

20             MR. DAVIS:  We, of course, have hearsay objections

21   to your own -- your admitting your own client's recorded

22   statements.

23             MR. MIRHASHEM:  We have an argument against that,

24   but we can take that up with the Court.

25             MR. DAVIS:  Judge, and just to be clear, my belief

1    has been, and I think the order says, that the -- so there's --

2    Inspector Martineau is a state labor inspector.  He met with

3    Mr. Craigue on September 11th and asked him questions directly

4    related to *Darden* factors and asked him to produce paperwork

5    and I prepared him as a witness and thought that that was

6    entirely allowed.

7            On October 15th, the Department of Labor had a

8    hearing that Martineau attended and at that hearing Mr. Craigue

9    testified and made various statements about his business and --

10   and my understanding was that -- and I -- I guess I've got it

11   wrong -- was that the Department of Labor's findings and

12   rulings of course are off limits -- we're not asking about any

13   of that --

14           THE COURT:  All of that's correct.

15           MR. DAVIS:  -- but that the defendant's actual

16   statements to Martineau and the -- the statements he gave that

17   Martineau overheard that are recorded -- we're not going to

18   play the recording -- but that facts in those statements are

19   admissions by the defendant that are admissible and directly

20   relevant and as long as we don't go to did you find that he's

21   an independent contractor or did you find he's an employee, are

22   you applying state, you know -- that that -- that was a -- that

23   was my thought on --

24           THE COURT:  Right.  With respect, though, to his

25   statement that he's a subcontractor, right, he's making that

1  statement, which you allege is false.  He's making it in venues

2  where it would be the same crime that he's charged with.

3         And so with respect to that specific assertion,

4  because ultimately, you know, the defense is going to argue he

5  didn't know -- he didn't know, right?  But here, a month later,

6  he's saying -- you know, he's essentially lying --

7         MR. DAVIS:  I only have subcontractors.

8         THE COURT:  -- right?

9         MR. DAVIS:  That's right.

10         THE COURT:  And so ultimately that was one of the

11  first issues in the case.  And I ruled and I can find exactly

12  in the hearing transcript where I ruled in favor of excluding

13  the statements because it's exactly the same crime and it's --

14  it -- it's propensity evidence.  It's uncharged criminal

15  conduct.  He's lying; he's making false statements.  And

16  ultimately it was a 404(b) motion and I believe counsel argued

17  the motion and I ruled orally.

18         MR. MIRHASHEM:  No, there's a written order.  I'm

19  sorry to interrupt.

20         MR. DAVIS:  There's a written --

21         MR. MIRHASHEM:  There's a written order on the --

22         THE COURT:  Do you have the written order?

23         MR. MIRHASHEM:  -- in limine --

24         MS. GRAHAM:  It's on Document 70.

25         THE LAW CLERK:  This is the October 15th and there's

1    also the interview with Martineau.

2              THE COURT:  Okay.  And so you're right, though;

3    there are different aspects of each hearing and testimony.  But

4    with regard to the statement he's a subcontractor, which is

5    identical to the August 28th charged conduct, I had excluded it

6    under 404(b).

7              I did suggest it -- the door could be opened and, in

8    fact, I think in Attorney Graham's opening, you argued he was

9    stunned; he was under the --

10             MS. GRAHAM:  Uh-huh.

11             THE COURT:  And so ultimately the question would

12   become whether or not that somehow could open the door to those

13   statements.

14             So, again, we can argue this, but I just wanted to

15   bring it to your attention, inquire about it, and I just

16   presumed there was some sort of agreement between counsel.

17             MR. MIRHASHEM:  I just hope I didn't misremember and

18   misstate that you had excluded the September statement, too.  I

19   mean, we had looked at the order and it was our -- our

20   impression was the same as your impression, but from what your

21   clerk is now saying, maybe it was limited just to the October

22   hearing.  I mean, if I misspoke about that --

23             THE LAW CLERK:  The statement of the investigator

24   was also excluded.

25             MR. MIRHASHEM:  Okay.

1          THE COURT:  I remember it being both of them, yeah.

2    Okay.

3          Give counsel before we get up so you have it the

4    exact page in that transcript, the document number, and -- I

5    know I have it because I looked at it after opening.

6          MS. GRAHAM:  Your Honor, I -- I would ask at this

7    point for a curative instruction to the jury, given that how

8    the government phrased it in their opening was doubled down.

9    So I would request a curative instruction at this point.

10         THE COURT:  Okay.  Can you draft a curative

11   instruction for me?

12         MS. GRAHAM:  Yes.

13         THE COURT:  We'll discuss it with our headsets and

14   then I will consider it.  And what's your -- obviously Attorney

15   Davis needs to look at the instruction and weigh in.  So we'll

16   do that with the headsets that are -- that you're so good with,

17   Attorney Mirhashem.

18         MR. MIRHASHEM:  I'm so bad at.

19         THE COURT:  All right.  Well, let's get in for at

20   least the beginning of the voir dire.

21         THE LAW CLERK:  Judge, the ruling is document number

22   74 at page 60.

23         THE COURT:  Yeah.  Document number 74 at page 60 is

24   where the 404(b) ruling comes from.

25         THE LAW CLERK:  That's the transcript of the ruling.

1          (Chambers conference concluded at 8:35 a.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


        I, Liza W. Dubois, do hereby certify that

the foregoing transcript is a true and accurate transcription

of the within proceedings, to the best of my knowledge, skill,

ability and belief.


Submitted: 7/22/2021          */s/  Liza W. Dubois*
                              LIZA W. DUBOIS, RMR, CRR