```
                    UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF NEW HAMPSHIRE


*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
                                    *
UNITED STATES OF AMERICA            *
                                    *   1:19-cr-142-01-LM
            v.                      *   June 10, 2021
                                    *   9:10 a.m.
NATHAN CRAIGUE                      *
                                    *
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

### **SEALED** TRANSCRIPT OF JURY TRIAL DAY 4
### MORNING SESSION
### BEFORE THE HONORABLE LANDYA B. McCAFFERTY


Appearances:



For the Government:        John S. Davis, AUSA
                           Aaron G. Gingrande, AUSA
                           United States Attorney's Office



For the Defendant:         Dorothy E. Graham, Esq.
                           Behzad Mirhashem, Esq.
                           Federal Defender's Office



Court Reporter:            Liza W. Dubois, RMR, CRR
                           Official Court Reporter
                           United States District Court
                           55 Pleasant Street
                           Concord, New Hampshire 03301
                           (603)225-1442

```
 1                      I N D E X

 2

 3    WITNESS:              Direct   Cross   Redirect   Recross

 4    ████████████
      Voir Dire Examination
 5    By Mr. Mirhashem          9

 6

 7    JOSLYN MCKENNA
      By Ms. Graham                    20
 8    By Mr. Gingrande                          28        --

 9

10    ALLEN CLARK
      By Mr. Davis             34                91
11    By Mr. Mirhashem                 79                 95

12    SCOTT KELLY
      By Mr. Davis            100

13

14

15

16    EXHIBITS:                     FOR ID             IN EVD

17    Government's Exhibit 400                           45

18    Government's Exhibit 405                           66

19

20

21

22

23

24

25
```

<pre>
 1                    P R O C E E D I N G S

 2                  (Sealed proceeding held.)

 3                     IN OPEN COURT

 4          THE CLERK:  The Court has before it for

 5  consideration today day four in the jury trial of the United

 6  States vs. Nathan Craigue.  It is 19-cr-142-01-LM.

 7          THE COURT:  All right.  Let's begin with Attorney

 8  Lothstein.  If you could just make a record and tell me where

 9  we are.

10          MR. LOTHSTEIN:  Good morning, your Honor.

11          So where we are is that the state of New Hampshire

12  has issued a letter of immunity that satisfies requirements of

13  *Kastigar* and so at this point in time we're ready to proceed

14  with questioning about drug use or drug abuse during the

15  relevant time period and ███████ is prepared to answer all

16  questions truthfully and completely.

17          Now, with respect to that last word, I have a

18  disclosure to make to the Court under New Hampshire Rules of

19  Professional Conduct 3.3 -- and this is to his credit.

20  Mr. Collier explained to me that -- and I wasn't here, so I

21  can't tell you exactly what the testimony is, but Mr. Collier

22  explained to me that --

23          THE COURT:  When you say Collier --

24          MR. LOTHSTEIN:  I'm sorry.  I have a -- I'm actually

25  missing another hearing right now with a client named Collier.
</pre>

```
1   I apologize, your Honor.
2            THE COURT:  All right.
3            MR. LOTHSTEIN:  ████████
4            THE COURT:  There are a lot of names, so it could
5   have been somebody I'm not aware of.
6            MR. LOTHSTEIN:  ████████.
7            To his credit, ████████ explained to me that --
8   after our hearings yesterday at my office that during
9   cross-examination he was asked a question of why he became
10  interested in becoming a substance abuse counselor or something
11  to that effect when he's a carpenter.
12           At that point in time, he didn't understand anything
13  about his drug use to be relevant to this proceeding and he
14  gave a truthful but incomplete answer.  The answer he gave
15  was -- as I understand it -- was that he was still hurting from
16  a car accident and was trying to find a line of work that would
17  not be physical labor like carpentry.  And that is a truthful
18  answer that he stands by, but he acknowledges it's not
19  complete.  But like so many other people that work in the
20  substance abuse treatment field, that that was part of his
21  motivation also in wanting to -- basically wanting to help
22  others.
23           So he would like an opportunity to correct -- I'm
24  not even sure if correct is the right word, but he would like
25  an opportunity to -- to complete that testimony, I guess, if
```

1    the parties give him the opportunity to.

2           THE COURT:  Oh, I think there'll be an opportunity.

3           MR. LOTHSTEIN:  Yes.  And he has only a high school

4    education, your Honor, and I think reasonably believed that his

5    struggles with addiction were none of anybody else's business.

6    But he's wrong.  He's under oath and he has to give a complete

7    answer to the question.  He acknowledges that and he will.

8           THE COURT:  Excellent.  Thank you for informing the

9    Court of that and putting it on the record.

10          Let me tell you that I am going to do the voir dire.

11   We're doing it now.  There are going to be 15 minutes of voir

12   dire and then we're going to bring the jury in and continue

13   where we left off yesterday, which is with a different witness.

14   There are issues -- we're waiting to get certain info as well.

15   So I think ███████ might go back on the stand -- in fact, I'm

16   quite sure he will at some point today, perhaps tomorrow.  I

17   don't know the specifics there in terms of timing.  And I will

18   obviously keep -- we will keep you informed, Attorney

19   Lothstein, so you can inform him.

20          I want to just put on the record he's being

21   questioned this morning.  We're going to do 15 minutes of voir

22   dire.  He has decided he has Fifth Amendment issues after

23   consultation with you, Attorney Lothstein, and has been granted

24   immunity that satisfies you, derivative immunity, and

25   ultimately agrees now with that immunity to be compelled to

1    testify.

2              Is there anything else I need to put on the record

3    with respect to ▓▓▓▓▓ before he -- we begin voir dire?

4              MR. DAVIS:  Could we submit, Judge, the letter from

5    the Merrimack County Attorney as a -- just to have it marked?

6              THE COURT:  And that's the letter --

7              MR. DAVIS:  The immunity letter.

8              THE COURT:  -- giving him derivative immunity?

9              MR. DAVIS:  Yes.

10             THE COURT:  Yes.

11             Okay.  Is there anything else we need to do to make

12   that -- to close the book on that issue, his immunity?

13             MR. DAVIS:  No.

14             MR. MIRHASHEM:  I just wanted to say something about

15   immunity, just to be clear, just before he takes the stand that

16   he's been given immunity with respect to prior drug use.  I

17   understand how Attorney Lothstein characterized it, but I do

18   intend in this case to cross-examine about committing perjury

19   in this court.  He can explain that he just omitted information

20   or misunderstood or used his own understanding of what he

21   needed to talk about and not talk about, but I'm going to

22   cross-examine him on how he -- we would characterize it as

23   lying in court under oath.

24             So if he needs to consult with counsel about

25   invoking as to that issue, I think we should -- we should maybe

```
1   clarify that before he takes the stand.
2             MR. LOTHSTEIN:  Your Honor, I don't think it's
3   perjury if he corrects his testimony is my response to that.
4             THE COURT:  Okay.
5             MR. LOTHSTEIN:  This was not instigated by any of
6   the lawyers in this case.  None of the lawyers from either side
7   came to me and said, hey, your client said that, you know, he
8   wanted to be a substance abuse counselor because of his sore
9   body and maybe there's something more to that that you should
10  know.  This is a hundred percent coming from ████████ himself.
11  And as long as he has an opportunity to correct his testimony,
12  I -- I don't believe that's perjury.
13            THE COURT:  Let me say also that you asked for the
14  voir dire to be sealed.  I'm not going to seal the courtroom
15  for that.  Your request is noted, but I'm overruling that.
16            With respect to a mask, I just want to let ███████
17  know it's his decision if he, you know, wants to wear a mask.
18  We will give him that clear mask that he wore.  It's completely
19  his decision at this point if he goes without a mask and I
20  would give him permission to do that.  I want him to know
21  that's his call.
22            MR. LOTHSTEIN:  Great.  Thank you, your Honor.
23            THE COURT:  Okay.  All right.  So are we ready to
24  proceed with maybe ten minutes of voir dire?
25            MR. DAVIS:  Handing up 105 for ID, which is the
```

1    letter from the Merrimack County Attorney to Mr. Lothstein of

2    yesterday.

3              THE CLERK:  Is this sealed, Judge?

4              THE COURT:  The letter of immunity?

5              THE CLERK:  Is this sealed, Counsel, or --

6              THE COURT:  I don't think so.  I'll be telling the

7    jury about it.  Yeah.

8              THE CLERK:  Okay.  I wasn't sure.

9              THE COURT:  Let me just -- I'm just going to give

10   the standard First Circuit immunity limiting instruction to the

11   jury and you'll just need to ask me to give it at whatever time

12   counsel would like me to give that.  Maybe you can think about

13   that and let me know.

14             All right.  ████████, you may approach and we'll

15   swear you in.

16             MR. LOTHSTEIN:  While he's walking up, your Honor,

17   I'll tell you that the aforementioned Mr. Collier hearing is a

18   9:00 a.m. hearing.  So as soon as he's done with this, I'm

19   going to be racing out of here, but I'll be in the office all

20   day and available to come over at any time for the continuation

21   of this.

22             THE COURT:  Mr. Lothstein, we really appreciate your

23   help.  Thank you very much.

24             MR. LOTHSTEIN:  Thank you.

25             THE CLERK:  ████████, please raise your right hand.

1    ████████████, having been first duly sworn,

2    testified as follows:

3           THE CLERK:  Thank you.  Just restate your full name

4    for the record, please.

5           THE WITNESS:  ████████████.

6           THE CLERK:  Thank you very much.  Please be seated.

7                        CROSS-EXAMINATION

8    BY MR. MIRHASHEM:

9       Q.   Good morning ████████████

10      A.   Good morning.

11      Q.   You just heard your lawyer explain how, you know,

12   you have a limited education, so you may have misunderstood

13   some things yesterday, right?

14      A.   Sure.

15      Q.   So I just want to ask you a couple of questions in

16   the beginning to make sure you understand certain things about

17   your testimony right now.

18           So the first thing is you understand that you're

19   testifying under a grant of immunity from the Merrimack County

20   Superior Court, is that fair -- County Attorney's Office; is

21   that right?

22      A.   Yes.

23      Q.   So you understand that that means that if you

24   truthfully answer and admit drug use, you won't be prosecuted

25   for that?

1        A.    Yes.

2        Q.    But you understand that that gives you no

3   protections against lying; if you falsely deny drug use, you

4   are subject to prosecution for that.  You understand that?

5        A.    Yes.

6        Q.    And you also understand that when I ask questions,

7   if somebody thinks that question is improper, like the

8   prosecutor, they can object to my question.  You understand

9   that?

10        A.    Yes.

11        Q.    But you don't get to decide whether or not your

12   answers can be incomplete because you think that nobody needs

13   to know something.  You understand that?

14        A.    Okay.

15        Q.    Is that clear to you or do you have any questions

16   about that?

17        A.    That's clear.

18        Q.    Okay.  So, now, yesterday you testified that you had

19   used so many different drugs that it would be easier for you to

20   describe the drugs you hadn't used; the list would be shorter.

21   Do you remember that?

22        A.    Yes.

23        Q.    And then I asked you what was the last date that you

24   used any drugs at all, and so let's start with that then.

25              When is the last date, obviously it can be

1    approximate, when you used any sort of illegal drug whatsoever,

2    including marijuana, which is illegal under federal law?

3           A.    Correct, yeah.  I had a short relapse after ████

4    ███████████████████████ passed away in February of 2020.

5           Q.    February of 2020?

6           A.    Yes.

7           Q.    Would that be ██████████████?

8           A.    That would be.

9           Q.    Okay.  He was ████████████████████████████?

10          A.    He was.

11          Q.    And I don't want to upset you, but is it true that

12   you had initially been the person who had introduced him to

13   drugs?

14          A.    No.

15          Q.    Had you done drugs with him?

16          A.    Yes.

17          Q.    When was the last time that you did drugs with ████

18   ████████ before he died?

19          A.    2017.

20          Q.    Okay.  So 2017 -- what month in 2017?

21          A.    I -- that's --

22                MR. GINGRANDE:  Objection as to relevance, your

23   Honor.

24                THE COURT:  Overruled.

25          Q.    What season in 2017 did you do drugs with ████████

1    ████████?

2         A.    I couldn't tell you.

3         Q.    Okay.  But you're sure it was not 2018; is that your

4    testimony?  Could have been 2018?

5         A.    To be honest with you, the period of, you know,

6    sobriety and then, you know, being clean is -- it's sporadic in

7    the sense of --

8         Q.    You were going in and out of sobriety?

9         A.    Of course.  And him -- him as well.  So it's hard to

10   say, you know, I'm clean and he's not.  You know, that's --

11        Q.    Right.  You'd basically been in and out of sobriety

12   for years until February of 2020, right?

13        A.    I relapsed in February of 2020.

14        Q.    Oh, so when did you --

15        A.    It was -- maybe early summer.

16        Q.    Early summer of 2020 is when you stopped drugs?

17        A.    I got clean in --

18        Q.    Okay.

19        A.    -- early -- yeah.

20        Q.    Now, just to be clear about when you relapsed, what

21   drug did you relapse and start using again?

22        A.    Fentanyl.

23        Q.    Fentanyl.  So in February of 2020, you relapsed and

24   started using fentanyl and then you got clean in the summer of

25   2020, right?

1        A.     Correct.

2        Q.     And we've established that in 2017, you were using

3    drugs with ███████████ at some point?

4        A.     Yes.

5        Q.     So -- and between 2017 and 2020, you had periods of

6    use and nonuse?

7        A.     Yes.

8        Q.     Okay.  And you can't be certain between 2017 and

9    February of 2020 what dates you were using and what dates you

10   weren't using?

11       A.     Some I can remember, I can recall.

12       Q.     Okay.

13       A.     Because, I mean, I was in rehab, so I know I didn't

14   use.

15       Q.     So what were the dates you were in rehab?

16       A.     November 29th, 2018, to -- or 2019 -- damn.  2019 --

17   2019.  I was -- yeah.  Wait.  2020.  Yup.  So we just had 2020.

18   Damn.  It was either '18 or '19.  I'm sorry.

19       Q.     Well, let me help you.

20       A.     Yeah.

21       Q.     This case you -- the events of this case that you

22   testified to --

23       A.     Correct.

24       Q.     -- to the extent you remembered them, were in August

25   of 2018.

1      A.    Correct.

2      Q.    You were brought to this court and testified before

3  a federal grand jury in May of 2019.  Okay?

4      A.    Correct.

5      Q.    You -- and you relapsed in February of 2020.  So

6  with those signposts, maybe you can remember whether you went

7  to rehab in November of 2018 or '19 or --

8      A.    I believe it's -- '19, I believe, yeah.

9      Q.    But you're not sure about that?

10     A.    I would know if I checked my Facebook, but I'm

11 pretty confident it was '19.

12     Q.    But as you sit here, it could have been '18?

13     A.    So hold on.  I spent one, two -- his third birthday

14 party -- yeah, I -- I can't -- I can't confirm.

15     Q.    There is no date from 2017 onwards that you can for

16 certain say you were not using drugs except for when you were

17 in rehab, correct?

18     A.    The summer of -- so it would be -- yeah, because

19 beginning of summer of 2018 I was sober.

20     Q.    Beginning of the summer of 2018?

21     A.    Yeah.  In the summer, I was sober, yup.

22     Q.    The entire summer of 2018, you were sober?

23     A.    Because I believe I relapsed after ▆▆▆▆▆▆▆▆▆▆

24 passed away.

25     Q.    Did that friend pass of an overdose?

1      A.   Yes.

2      Q.   Okay.  And what was that friend's name?

3      A.   █████████

4      Q.   ██████?

5      A.   Uh-huh.

6      Q.   And when did ████████ away of an overdose?

7      A.   September of 2018.

8      Q.   So you have testified about the events of August of

9  2018.  In September of 2018, your friend passed away of an

10 overdose?

11     A.   Correct.

12     Q.   And that was a very difficult experience for you?

13     A.   Yeah, my -- so ████████ died in July, then the

14 accident with Skinny in August, and then she died in September.

15     Q.   ████████████ died in July of 2018?

16     A.   Right.  Yeah, so ███████████████████████████████████

17 the first, you know, ten years of my life, and then █████ passed

18 away.

19     Q.   I'm sorry to hear that.

20          So in July of 2018, ██████████████ passed away; in

21 August of 2018, you had the experience with Skinny; in

22 September of 2018, you had another friend pass of an overdose.

23 And so fair to say that after all of those tragedies, you

24 relapsed?

25     A.   (Nods head.)

1      Q.   So after you relapsed in September of 2018, you --

2   would -- it's --

3           MR. GINGRANDE:  May we ask to take a break, your

4   Honor?  The witness is clearly --

5           THE COURT:  This is a good time to take a break,

6   actually.

7   ██████████████, we're going to give you a break here.

8           THE WITNESS:  Yeah, I could use a cigarette.

9           THE COURT:  Let me just say, though, just so you

10  understand -- and I'm sorry, but you are still testifying.

11  When you leave the stand today and walk out of the

12  courthouse -- and Attorney Lothstein can explain this to you as

13  you walk out.  You're still under a sequestration order.  So to

14  the extent you want to check evidence, look at your Facebook or

15  do anything, you cannot do that.

16          If something happens, you need to tell me before you

17  testify so that the lawyers know about it in case you are not

18  back on the stand today.  But you are not to do anything in the

19  meantime in terms of talking to anybody about your testimony

20  other than Attorney Lothstein.  And he will explain that to you

21  more fully.

22          I know he has to run and it's just before 9:00, so

23  I'm going to release you and -- so you can have a moment to

24  gather yourself.  All right?

25          All right.  We have a few minutes before the jury

1   comes in and the voir dire -- did you need to say something,

2   Attorney Lothstein?

3            MR. LOTHSTEIN:  I just want to make sure you know

4   that I do have Kaylee Doty covering the hearing if I can't get

5   back.  So this -- this comes first.

6            THE COURT:  Okay.

7            MR. LOTHSTEIN:  And I don't know --

8            THE COURT:  Thank you.

9            MR. LOTHSTEIN:  -- if the voir dire is going to

10  continue --

11           THE COURT:  It is, I'm sure.

12           MR. LOTHSTEIN:  -- right now --

13           THE COURT:  No, it won't continue right now.  I'm

14  not exactly sure when it will continue, but we will keep you

15  informed.

16           MR. LOTHSTEIN:  All right.  So I will take him to my

17  office and explain his obligations to him.

18           THE COURT:  Okay.  Thank you so much.

19           MR. LOTHSTEIN:  Thank you.

20           THE COURT:  Based on the voir dire I've heard so

21  far, there's no question but that this is going to come in.

22  I'm going to let you argue it, but I don't see how this line of

23  cross-examination does not happen.  And so I want you to be

24  prepared that's what I'm thinking based on the 10, 15 minutes

25  that I just heard.

1          Attorney Mirhashem?

2          MR. MIRHASHEM:  I just want to on the record renew

3     my Giglio motion.  The government has a duty, beyond talking to

4     William Carroll, to ferret out exculpatory evidence in the

5     possession of the Department of Labor, in the possession of the

6     Concord Police Department, and bring it to the attention of the

7     defense.  The Fourteenth Amendment, Fifth Amendment, the

8     Constitution, the Due Process Act, all of that require that.

9          Yesterday for the first time -- this person was

10    basically a -- a drug user ███████████ for years.  I have

11    spent my career defending drug defendants.  The notion that

12    there are not at least 15 police officers in the Concord Police

13    Department who know this person is not credible.  He's been

14    using drugs.  He had a friend pass.  He was a CI.  We need to

15    know exculpatory evidence about him in the possession of the

16    government, including the police.

17          And so I am just renewing that because that's how --

18          THE COURT:  I understand, and your objection is in

19    the record.  And, ultimately, I just would ask counsel to be

20    careful about what they're saying in an open courtroom with

21    respect to the issues thus far.

22          I -- we're going to put Ms. McKenna back on and I

23    think Attorney Graham was going to begin crossing her.  Is

24    there anything anyone needs to do before that happens?

25          Oh, we're waiting for one juror.  Well, maybe I can

1    get some water; if you need to, run to the restroom.  Let's

2    give ourselves five minutes.  I bet the juror will be here.

3    All right.

4              (Recess taken from 9:01 a.m. until 9:10 a.m.)

5              THE COURT:  Attorney Lothstein has asked a very good

6    question, which is do we have enough witnesses to go through

7    today such that we could release ██████ for today and get him

8    back here probably 8:00 a.m., 7:30 a.m. tomorrow, something

9    like that.  We'll let you know, Attorney Lothstein.

10             Is that something we could do?

11             MR. DAVIS:  We think so, Judge.

12             THE COURT:  Okay.  All right.  Well, then, we will

13   release ██████ for today.  If you could give him the

14   sequestration explanation instructions that I gave to him, that

15   would be helpful.  Thank you, Attorney Lothstein.

16             MR. LOTHSTEIN:  Thank you so much, your Honor.  I

17   will do that.

18             THE COURT:  Thank you.

19             And just real quickly, counsel, on the sidebar.

20                          AT SIDEBAR

21             THE COURT:  One issue that we'll have to discuss

22   is the issue, obviously, of confidential informant and the --

23   the -- the public nature of that and the danger that that

24   brings.  So I want to make sure that I flag that for you now so

25   that we can discuss that now, how best to deal with that.

1          All right.  Go ahead now and we'll bring the jury

2     in.

3          THE CLERK:  All rise for the jury.

4                    WITH THE JURY PRESENT

5          THE COURT:  Good morning, members of the jury.

6     We're going to continue with the witness we left off with

7     yesterday afternoon, Ms. McKenna.

8          So go ahead and bring her to the witness stand.

9          THE CLERK:  Ms. McKenna, I'm just going to swear you

10    in again when you take the stand.  Thank you.

11         Raise your right hand.

12         **JOSLYN MCKENNA**, having been first duly sworn,

13    testified as follows:

14         THE CLERK:  And just restate your name.

15         THE WITNESS:  Joslyn Kate McKenna.

16         THE CLERK:  Thank you.  Please be seated.

17         THE WITNESS:  Thank you.

18         THE COURT:  Go ahead, Attorney Graham.

19                    CROSS-EXAMINATION

20    BY MS. GRAHAM:

21         Q.   Good morning.

22         A.   Good morning.

23         Q.   Are you able to hear me okay?

24         A.   Yes.

25         Q.   Okay.  So it sounds like your dad was a very skilled

1   carpenter; is --that would be your opinion?

2       A.   Yes.

3       Q.   Where did he learn his trade?

4       A.   I'm not sure.  As far as I can remember, he --

5   growing up, that's all he did.

6       Q.   Okay.  So you were talking about yesterday some of

7   your memories of being a child and being on a Craigue & Sons

8   jobsite.

9       A.   Uh-huh.

10      Q.   And that -- that is as a child; is that right?

11      A.   Correct.

12      Q.   And is that when Nate's dad was running the

13  business?

14      A.   Yes.

15      Q.   And it sounds like your dad had more than just a

16  work relationship with Nate's dad; is that fair to say?

17      A.   Yes.

18      Q.   They played softball together?

19      A.   Uh-huh.  Yes.

20      Q.   And it sounds like also you said yesterday that your

21  dad didn't have a license for a period of time, so was he

22  reliant on like Nate's dad for -- for drives to jobsites?

23      A.   Yup.  Between -- I'm not sure if Kenny actually

24  brought him.  I don't remember that.  But usually my

25  grandparents would pick him up or like when I was at the

1    jobsite, my grandparents would pick him and I up.

2        Q.    Okay.  And when you said Kenny, you're talking about

3    Kenny Craigue?

4        A.    Correct.

5        Q.    Okay.  And did you also grow up knowing the Craigue

6    family?

7        A.    Yes.

8        Q.    Okay.  And that would be Nate included, right?

9        A.    Yes.

10        Q.    Okay.  So while you were in high school, it sounds

11    like your visits with your dad might have tapered off a bit

12    because of your activities?

13        A.    Uh-huh.

14        Q.    And you saw him, roughly, maybe once a month at that

15    time frame?

16        A.    Yes.

17        Q.    Okay.  And your dad moved to Texas; is that right?

18        A.    Correct.

19        Q.    And your -- did you -- are you sure when he moved?

20        A.    Not the exact date, no.

21        Q.    Okay.  But you were sure that he had at least come

22    back by 2008, is that right --

23        A.    Correct, yup.

24        Q.    -- because you graduated from high school?

25        A.    Yes.

1          Q.    Okay.  Now, when he went to Texas, do you know why

2    he went?

3          A.    He didn't like the cold.

4          Q.    Okay.  And did he -- he went there to go live with a

5    friend; is that right?

6          A.    I'm not sure if he lived with the friend, but it

7    just happened to be an opportunity --

8          Q.    Okay.

9          A.    -- with his -- one of his good friends was moving

10   down there, so ...

11         Q.    And was that good friend in construction as well?

12         A.    No.  No, actually, I don't believe so, but I do not

13   know.

14         Q.    Okay.  And your dad, when he went there, he did

15   construction work as well?

16         A.    I do not know.  I don't believe he did, but I'm not

17   a hundred percent sure on that.

18         Q.    Okay.  And it sounds like you just recently learned

19   that he had worked for a company named Kroger?

20         A.    Correct.

21         Q.    Okay.  It's not something that you knew at the time?

22         A.    No, I didn't know exactly what he was doing for work

23   down there.

24         Q.    Okay.  Were you aware as a child that your dad at

25   one point had registered his own company?

1        A.    No, I was not.

2        Q.    So it sounds like he left because he didn't like

3   cold weather.  So why did he eventually return?

4        A.    I couldn't say for certain, but I know that he

5   wanted to come back for family and I'm not sure why else.

6        Q.    Okay.  When he came back from Texas, he lived with

7   your grandparents; is that right?

8        A.    Correct.

9        Q.    And they were living in Epsom at the time?

10       A.    Correct.

11       Q.    And did your uncle Kevin also live with your dad at

12   that -- at the grandparents' home?

13       A.    I -- he did for a short period at some point.  I do

14   not remember when.

15       Q.    Okay.  How was your dad's health after he came back

16   from Texas?

17       A.    About the same.

18       Q.    Okay.  Had he always had health concerns?  Because

19   he was diabetic; is that right?

20       A.    Yes.  Yup.

21       Q.    So after high school -- it sounds like you graduated

22   in 2008.  Did you -- and you got your bachelor's degree?

23       A.    Uh-huh.

24       Q.    Did you go to school locally or --

25       A.    Yes, I went to Colby-Sawyer College in New London.

1      Q.    Okay.  And did you live on campus or commute?

2      A.    Both.  I lived on campus for the first year and then

3   lived off campus but in New London.

4      Q.    Okay.  And during your college years, how often were

5   you seeing your dad?

6      A.    Probably it completely would depend on the time of

7   year.  Obviously during school, probably a little bit less than

8   once a month, but during the holidays we always still got

9   together and during the summers more often.

10      Q.    Sure.  In 2018, your dad -- do you know where he was

11   living?

12      A.    Yes, in Penacook or on the Concord line.

13      Q.    Okay.  And he was living with Mr. Erickson?

14      A.    Yes.  And I believe they had another roommate, but

15   I'm not sure if it was a full-time thing.

16      Q.    Okay.  And do you know how long your dad lived with

17   Mr. Erickson?

18      A.    In that apartment or in total?

19      Q.    I guess in that apartment.

20      A.    I think they had been there a little over a year.  I

21   can't recall exactly when my grandparents sold their house, but

22   they moved when my grandparents sold their house.

23      Q.    Okay.  And so we just talked about how your dad had

24   some health issues --

25      A.    Uh-huh.

1      Q.    -- he was a diabetic.  So health insurance -- health

2  insurance was a necessity for him to have; is that right?

3      A.    I would assume so, yes.

4      Q.    And I think yesterday you said that Nate did not

5  provide --

6      A.    Not to my knowledge, no.

7      Q.    Okay.  Were you aware that your dad was receiving

8  Medicare?

9      A.    Yes, Med --

10     Q.    Medicaid.

11     A.    Okay.  I was going to say I knew he had Medicaid,

12  not Medicare.

13     Q.    Yes, Medicaid.

14     A.    Yes.

15     Q.    And that is a state-assisted insurance program; is

16  that right?

17     A.    Yes.

18     Q.    Now, your dad wanted to be paid off the books,

19  right, to keep his insurance?

20     A.    I don't know that.

21     Q.    But you knew he was paid in cash?

22     A.    For a portion, yes.

23     Q.    And your dad, he didn't pay any kind of income tax?

24     A.    I do not know.  Now am I aware that he didn't?  I

25  don't believe so.  But that's not something I ever really

1    discussed with him, along those lines.

2         Q.   Okay.  So you I think said yesterday that your dad

3    did only exterior work; is that right?

4         A.   For Craigue & Sons, to my knowledge, yes.  I mean,

5    he has done interior work for me.

6         Q.   Okay.  And did he also do some work for your

7    mother --

8         A.   Yes.

9         Q.   -- for your mom's house?

10        A.   Yes.  I was living there at the time, so --

11        Q.   Okay.

12        A.   -- he did siding and trim and baseboard for me.

13        Q.   Okay.  And so he -- and he did that alone; is that

14   right?

15        A.   Correct.

16        Q.   Okay.  He used his own tools or he had tools to get

17   that accomplished?

18        A.   Yes, we have them.

19             MR. GINGRANDE:  Objection as to -- just a basis of

20   knowledge.  Lay a foundation.

21             THE COURT:  All right.  Ask some foundational

22   questions there.

23        Q.   Were you present when your dad was doing work on

24   your house?

25        A.   Yes.

1    Q.    And was he using tools that he had brought with him?

2    A.    Not all of them, no.

3    Q.    Okay.

4    A.    So some of them were his and like, for instance, we

5  needed a very large ladder because it's a very tall building.

6  That was ours.

7    Q.    That was yours?

8    A.    My mother's or one of our friend's that has it

9  stored in our garage, yes.

10    Q.    Okay.  Thank you.

11         And so your dad would do exterior work only for

12  Craigue & Sons, correct?  That's what your belief is.

13    A.    For work that I'm aware of, yes.

14    Q.    Okay.  And your dad didn't like the cold, so what

15  did he do in the winter months to support himself?

16    A.    He still worked there.  I think the work was just

17  slower, to my knowledge.  There wasn't much of a choice.

18         MS. GRAHAM:  Thank you.  I have no further

19  questions.

20         THE WITNESS:  Thank you.

21         THE COURT:  Anything further, Attorney Gingrande?

22         MR. GINGRANDE:  Briefly, your Honor, if I may.

23         THE COURT:  Go ahead.

24                    REDIRECT EXAMINATION

25  BY MR. GINGRANDE:

1    Q.    Good morning, Ms. McKenna.

2    A.    Good morning.

3    Q.    So you had just testified, I believe, when you were

4    talking about Texas --

5    A.    Yes.

6    Q.    -- that you weren't sure on the exact date that your

7    father moved to Texas; is that right?

8    A.    Correct.

9    Q.    Okay.  But I believe yesterday when you were

10   testifying you had testified it was a short time --

11   A.    Yes.

12   Q.    -- is that right?

13   A.    Short to me.

14   Q.    And short to you would be I think you had said

15   roughly a year?

16   A.    Yeah, possibly a little bit over, but like when I

17   started high school, he was here.  He was here when I got my

18   license, so when I was -- so when I was a -- going into my

19   junior year.  And I believe he left just for that one year.

20   Q.    Got it.  And you were sure on the date that your dad

21   came back, too, because you had said that -- that you had

22   graduated high school and he was there for your graduation --

23   A.    Correct.

24   Q.    -- is that right?

25         And what -- what month was that graduation?

1      A.    That was in June.

2      Q.    Okay.  And June of 2008?

3      A.    Correct.

4      Q.    Okay.  We were talking about the work -- or defense

5  counsel was asking you about the work that Mr. McKenna -- your

6  father had done for you and your mom.

7      A.    Uh-huh.

8      Q.    And you were talking about tools or equipment that

9  he had.  And so was it the case that he had his own hand tools?

10     A.    Yes.

11     Q.    Okay.  But was it also the case that he did not have

12  large equipment; he didn't have his own ladder, I think you

13  said?

14     A.    Correct.  We had stuff at our house for those types

15  of projects.

16     Q.    Okay.  And do you know one way or another whether --

17  whether your father had either purchased from Nate Craigue or

18  borrowed from Nate Craigue materials to do that work?

19     A.    No, they were our materials.

20     Q.    I'm sorry.  Can you say that again?

21     A.    Are you talking about like the materials like the

22  siding and the baseboard and stuff --

23     Q.    So --

24     A.    -- or --

25     Q.    So let's talk about that first.  So the siding,

1    things like that --

2         A.    Yup.

3         Q.    -- whose materials were those?

4         A.    Those were purchased by either myself or my mother.

5         Q.    Okay.  So you were --

6         A.    Siding would be my mother.  Trim and stuff was all

7    by me.

8         Q.    Okay.  Got it.  And for the work on your mom's house

9    at this point, do you know one way or another whether

10   Mr. Craigue had any involvement in providing those materials?

11        A.    No.

12        Q.    Okay.  And no as in --

13        A.    No, as in he did not.  That was like a weekend my

14   dad came over to have dinner and I asked him if he could help

15   me out with a couple things.

16        Q.    Okay.  And what type of -- what type of -- well,

17   actually, just to -- just to ask, you know, briefly again, I

18   think you said that he was doing siding and exterior work

19   for --

20        A.    Yeah.  So at the top of like our garage where --

21   above where I was living, we had a portion that hadn't been

22   finished because it was too high, so he had gotten up to finish

23   that siding for my mom and then installing a bunch of flooring

24   and trim boards in my apartment for me.

25        Q.    Got it.

```
1              Just a brief indulgence, your Honor?

2              THE COURT:  Yes.

3              MR. GINGRANDE:  Thank you, Ms. McKenna.  No further

4    questions.

5              THE COURT:  Anything further, Attorney Graham?

6              MS. GRAHAM:  No, thank you.

7              THE COURT:  All right.  Ms. McKenna, thank you.  You

8    are excused.

9              THE WITNESS:  Thank you.

10                      (Witness excused.)

11             THE COURT:  Government may call its next witness.

12             MS. EPHRAIMSON:  We're waiting.  He's on his way

13   over.  I notified him and he's said he's only a few minutes

14   from the office, so I expect him any second.

15             THE COURT:  Any second.

16             MS. EPHRAIMSON:  Any second.

17             THE COURT:  Okay.  I could let the jury have a

18   really early morning break.  Are you okay to just sit?  All

19   right.

20             Where is our classical music?

21             Counsel, while we're waiting -- quick sidebar while

22   we're waiting.

23                          AT SIDEBAR

24             THE COURT:  Attorney Graham, can you hear me?

25             MS. GRAHAM:  Yes.
```

1             MR. DAVIS:  Yes.

2             THE COURT:  You were going to give me a limiting

3    instruction, run it by Attorney Davis.

4             MS. GRAHAM:  I gave it to them right now.

5             THE COURT:  I'm sorry?

6             MS. GRAHAM:  I'm sorry.  I gave it to them.

7             THE COURT:  Okay.  So it's in the process.  Okay.

8    Good.  I just wanted to ask you about it and make sure you were

9    working on it.  Okay.  Good.  Thank you.

10                      CONCLUSION OF SIDEBAR

11             THE COURT:  Go ahead and call your witness.

12             MR. DAVIS:  Mr. Allen Clark.  Allen Clark,

13   C-l-a-r-k.

14             THE CLERK:  Mr. Clark, you can take the witness

15   stand, raise your right hand, and remain standing.

16             **ALLEN CLARK**, having been first duly sworn, testified

17   as follows:

18             THE CLERK:  Thank you.  Please state your full name,

19   spell your last name for the record.

20             THE WITNESS:  Can I remove my mask?

21             THE CLERK:  I believe you can.

22             THE COURT:  You may.  It's your decision.

23             THE WITNESS:  I'm totally vaccinated.

24             THE COURT:  All right.  Thank you, sir.

25             THE CLERK:  Just state your name for the record,

1    spell your last name.

2              THE WITNESS:  My name is Allen Clark, C-l-a-r-k.

3              THE CLERK:  Thank you very much.  Please be seated.

4                         DIRECT EXAMINATION

5    BY MR. DAVIS:

6         Q.   Good morning, sir.

7         A.   Good morning.

8         Q.   How are you employed, Mr. Clark?

9         A.   I didn't hear the question.

10        Q.   How are you employed?

11        A.   I'm employed by REI Service Corporation.

12        Q.   Very good.  And are you the president of REI Service

13   Corporation?

14        A.   I am.

15        Q.   Are you hearing me okay now?

16        A.   Better.

17        Q.   Very good.  And did you found that company?

18        A.   I did.

19        Q.   And how long ago, roughly?

20        A.   I don't know.  2000 -- sometime -- I don't know.

21   40, 45 years ago, approximately.

22        Q.   Very good.  And as of August of 2018, were you the

23   100 percent owner of REI Service Corporation?

24        A.   I was.

25        Q.   And have you since sold your ownership interest?

1          A.    I have.

2          Q.    But you remain the president of the corporation now?

3          A.    President, yes, and employee.

4          Q.    Okay.  And who is the current owner of the -- REI

5    Service Corporation?

6          A.    One of the employees, Crystal Laliberte.

7          Q.    Okay.  Can you describe the basic business of REI?

8    What -- what roles does REI play?

9          A.    So we're -- we're involved in basically three major

10   areas:  One is what's known as construction loan

11   administration, where we serve as an agent for the bank to do

12   inspections of new construction and recommend disbursements.

13   And prior to that we would -- we would review all of the

14   construction documents, the budget and such, to make certain

15   everything was in order.

16              The second component --

17         Q.    So that -- that was the first, right?

18         A.    That is the first.

19         Q.    Okay.  And the second?

20         A.    The second component is we do commercial property

21   management, predominantly in the southern part of the state.

22   We don't do residential, but we do do, I don't know, a million

23   square feet of commercial property management.

24         Q.    All right.  And what is the -- the basic work of

25   commercial property management?  What does that mean that your

1    company is doing?

2        A.    So our company is -- is designed not to get our

3    hands dirty.   We -- we would hire employee -- we would hire a

4    contractor to do everything that would relate to maintaining a

5    property.   We are -- we are real estate brokers, so we procure

6    tenants, we maintain tenants, we provide all of the financial

7    information to the owner, and we pay all bills.   And our

8    primary function, I think, is to ensure that the tenants are

9    happy and we can maintain them.

10       Q.    Okay.   And is that also called tenant relations?

11       A.    You could call it that, yes.

12       Q.    All right.   So an owner of a commercial building

13   relies on REI to keep the tenants in the building and keep them

14   happy so -- because that's the way that owner makes -- makes

15   money, right?

16       A.    That is correct.

17       Q.    But you aren't doing, say, landscaping outside or

18   HVAC work inside, correct?

19       A.    No.   Our goal is not to get our hands dirty.

20   it's --

21       Q.    Okay.

22       A.    Even the changing of a light bulb, we would hire

23   somebody to do that.

24       Q.    Although you can change a light bulb?

25       A.    Are we capable of changing one?

1    Q.   I'm kidding.

2    A.   I think we're capable, yes.

3    Q.   Very good.  Okay.  The third -- what's the third

4  area?

5    A.   The third area is what we would call project

6  management.  And so we would typically for a -- for an

7  individual or it could be a company, we would take on a major

8  project from inception -- major real estate construction

9  project from inception right through final completion and

10  move-in.

11    Q.   Okay.

12    A.   And our most recent one would be we built the

13  North Conway fire station which is located in -- right in the

14  village of North Conway.

15    Q.   All right.  So, Mr. Clark, are you familiar with

16  Shane Laliberte?

17    A.   I am.

18    Q.   And is Shane Laliberte the husband of Crystal

19  Laliberte, the current owner of REI?

20    A.   She -- he is, yes.

21    Q.   Yes.  And what is Mr. Laliberte's position at REI?

22    A.   He's the director of property management.

23    Q.   And as of August of 2018, what was Mr. Laliberte's

24  position?

25    A.   I believe it was the same, director of property

38

1    management.

2         Q.    Okay.  And can -- so you were the president; Shane

3    Laliberte was director of property management for REI.

4    Correct?

5         A.    That is correct.

6         Q.    And can you describe his job and job function as you

7    directed it?

8         A.    So his -- his role is -- is, again, to meet the

9    obligations of our agreement with an owner as it relates to

10   everything involved with the building with the exception of

11   tenant leases.

12        Q.    Okay.  And was his job an office job or a field job

13   or both?

14        A.    It would be a combination of both.  So, I mean, he

15   was responsible for the budget and making -- and reviewing any

16   invoices that would come in and out, but he also needed to be

17   out in -- on the -- on the ground making certain that the

18   project or the property is -- is being maintained and in good

19   condition.  He would chat with tenants, make certain there were

20   no outstanding issues, and if there was, you know, a

21   significant renovation or tenant improvements required, he

22   would be responsible for overseeing those.

23        Q.    Okay.  And did Shane Laliberte often visit multiple

24   properties in -- in a single workday?

25        A.    Yes.

```
 1          Q.    All right.

 2          A.    Yeah, absolutely.

 3          Q.    Okay.  So let me ask you about 280 Pleasant Street.

 4   Are you familiar with that property?

 5          A.    I am.

 6          Q.    And is that right here in Concord?

 7          A.    It is, up -- just up the street.

 8          Q.    All right.  And as of August 2018, did REI have a

 9   contractual relationship with 280 Pleasant Street?

10          A.    We did.  We had -- the owner was 280 Pleasant

11   Street, LLC.

12          Q.    So that 280 Pleasant Street is an address, right?  A

13   street address?

14          A.    That is correct.

15          Q.    But it's also its own private company, right?

16          A.    It's a limited liability company under New Hampshire

17   law.

18          Q.    And where did the owner -- the actual owner of

19   280 Pleasant Street live?

20          A.    In 2018, he may have split his time, but his legal

21   residence was New Jersey --

22          Q.    All right.

23          A.    -- I'm quite certain.

24          Q.    And was he actually a physician himself?

25          A.    He is.  He's a fertility physician.
```

1      Q.   All right.  So he owns this medical office

2  building here in Concord and he's the owner and the member of

3  280 Pleasant Street, LLC, or was then, correct?

4      A.   He was at that time.  I don't know if his wife was a

5  member at that time, but he certainly was the person we dealt

6  with.

7      Q.   Okay.  And what was your contractual agreement with

8  him, the physician in New Jersey, and 280 Pleasant Street, LLC?

9  What did REI do?

10     A.   Well, we were his agent and we were responsible for

11 maintaining the building, what you described as tenant

12 relations.  We would -- we would keep -- we would renew leases

13 as needed.

14          And in this particular case, he was -- at

15 280 Pleasant Street he was improving the property.  So prior to

16 2018, we had replaced the roof, we had done some insulating,

17 and in 2018 he was upgrading windows and replacing the siding.

18     Q.   Very good.  So -- and just how long had REI been the

19 property manager for 280 Pleasant Street prior to 2018, do you

20 recall?

21     A.   A long time.  It goes back to when Dr. Clark, no

22 relationship, but when Dr. Clark was the managing member of the

23 LLC that owned it at the time.

24     Q.   All right.  So this was an account your company had

25 had for a good while?

1          A.    Oh, yes.  Yes.

2          Q.    Okay.  Now, as -- you mentioned that there was an

3    effort to renovate and replace windows and siding; is that

4    right?

5          A.    That is correct.

6          Q.    And when did that job actually occur?

7          A.    I don't know when the contract was signed without

8    seeing it, but the -- the work was done, I believe, starting in

9    June, July, and finished up in August.

10         Q.    And that's of 2018?

11         A.    Of 2018, yes, sir.

12         Q.    And what role did REI have in the contract for that

13   work?

14         A.    We represent the owner.

15         Q.    Okay.  So the contract itself was not between

16   REI and any contractor business, correct; it was between

17   280 Pleasant and -- and the business?

18         A.    That is correct.

19         Q.    All right.  And -- but you were the agent, REI was

20   the agent, on the contract for the owner and for 280 Pleasant

21   Street, right?

22         A.    That is correct.

23         Q.    Okay.  And did you actually draft a contractor

24   agreement?  Was it a form that you use in your business?

25         A.    It's our standard agreement that we use on

1  commercial properties between a third-party contractor and the

2  owner of the property.

3       Q.    Right.  And who ended up being the business that

4  280 Pleasant Street contracted with to do that siding and

5  windows project?

6       A.    Craigue & Sons, LLC.

7       Q.    Okay.  Now, under -- under the property management

8  agreement, did you have authority to spend money on behalf of

9  the owner?

10      A.    Only if it was within the approved budget.

11      Q.    And what was the -- what was the annual budget for

12  the property, do you know?

13      A.    No, I don't.

14      Q.    Okay.  All right.  So did you, in the course of this

15  case, provide the business records of REI in relation to this

16  particular siding and windows job?

17      A.    I don't understand the question.

18      Q.    That is, did you -- did you furnish copies of your

19  file for this job, REI's file?

20      A.    It was a very limited file, if I remember correctly.

21  We provided the agreement and a certificate of insurance.  And

22  I don't think there was anything else.

23           MR. DAVIS:  All right.  Showing you now Exhibit 400

24  for identification -- just for the witness only --

25           THE CLERK:  You should be all set now.

1        Q.    Can you see that, Mr. Clark, on your screen?

2        A.    I can.

3        Q.    All right.  And is that first page the contractor

4    agreement between 280 Pleasant Street and Craigue & Sons?

5        A.    It says here Craigue & Sons Home Exteriors.

6        Q.    Right.  And can we just scroll through it quickly?

7    Does that have the other pages of the contract?

8        A.    It does, yes.

9        Q.    And we'll go through that in a minute.

10             And does it also have some payment records that were

11    in your file that you also included?

12        A.    Well, not in this particular file, but we did -- we

13    do -- we did pay them on behalf of the owner, yes.

14        Q.    Okay.

15        A.    So there were -- there was records of payment.

16        Q.    All right.  Can I just see the last document -- last

17    page of Exhibit 400 for ID, please.

18        A.    Yes.

19             MR. DAVIS:  All right.  Is there an Exhibit A?  Is

20    that the limit of the document?

21             If I may have just a moment, your Honor.

22             THE COURT:  Yes.

23        Q.    And you see that after the agreement there is an

24    Exhibit A?

25        A.    I do.

1      Q.    All right.  And was that the -- did that serve as a

2   work description for this job?

3      A.    It does.

4      Q.    All right.  So is this a fair and accurate copy of

5   REI's file as it related to the job that Craigue & Sons Home

6   Exteriors did for 280 Pleasant Street?

7      A.    It represents the agreement, yes.

8      Q.    All right.  And these are records that you keep in

9   the regular course of your business, correct?

10      A.    That is correct.

11           MR. DAVIS:  I move to admit 400 and strike the ID.

12           THE COURT:  Sidebar.

13                          AT SIDEBAR

14           THE COURT:  Go ahead.

15           MR. MIRHASHEM:  So 400, there are several pages that

16   is an agreement that was signed that ends on page 855 on the

17   bottom and then there is page 856 that is marked as Exhibit A.

18           That, our understanding is, is the contract.  The

19   rest of these documents, some of them clearly were not part of

20   the contract, especially since they are dated, some of them,

21   two months after the contract.  Just because these were in the

22   file doesn't mean they're not hearsay.  These are documents

23   generated by another business, Harvey Industries, and so they

24   are not subject to any hearsay exception or even authentication

25   by this witness just because they're documents that were in the

1    file.

2              So we don't have an objection to the contract and

3    that one page of Exhibit A.  We do object to the rest of it as

4    lacking foundation and being inadmissible hearsay.  These are

5    not documents that this person generated.  Just because they

6    were in his file doesn't mean that they come in.

7              THE COURT:  Attorney Davis.

8              MR. DAVIS:  So, your Honor, I'll limit this to the

9    contract, which includes Exhibit A, at this point.  So we just

10   move to admit Exhibit 400, which is the contract and Exhibit A.

11   We won't go beyond that.

12             THE COURT:  Okay.  And there's no objection to that?

13             MR. MIRHASHEM:  There isn't --

14             THE COURT:  Okay.

15             MR. MIRHASHEM:  -- as long as we have a common

16   understanding that Exhibit A is that one page that's entitled

17   Exhibit A.

18             THE COURT:  All right.  With that understanding

19   then, Exhibit 400 through page 856 -- it begins on 852 and it

20   goes through to the first page of Exhibit A, 856, that is a

21   full exhibit.

22             MR. DAVIS:  Thank you.

23             THE COURT:  Okay.

24                     CONCLUSION OF SIDEBAR

25                 (Government's Exhibit 400 admitted.)

1   Q.   So we'll get to Exhibit 400 in just a minute.

2        Do you know how Craigue & Sons Home Exteriors was

3   selected as the contractor to do the siding and windows

4   project?

5   A.   I do.

6   Q.   And how was that?

7   A.   They were the only siding contractor that we could

8   locate that could do the job for the price that we thought was

9   a reasonable price.

10  Q.   Okay.  So were they essentially the only bidder for

11  the job?

12  A.   There were inquiries made to others, but they were

13  the only one that submitted a formal bid to the best of my

14  knowledge.

15  Q.   And did Shane Laliberte know Mr. Nate Craigue, the

16  defendant in this case?

17  A.   I believe that -- I believe -- I mean, they both

18  grew up in Concord, so I believe that's correct.

19  Q.   Okay.  And did Shane Laliberte -- again, your

20  property manager -- did he sign the contract as the REI agent

21  on behalf of the owner?

22  A.   He did.

23  Q.   Okay.  All right.  So let's -- let's go to the first

24  page of the contractor agreement, which is Exhibit 400.

25       Do you see that in front of you?

1          And I'd ask that we publish that page to the jury.

2          THE COURT:  That can be published to the jury.

3     Q.   All right.  Can you see that, Mr. Clark?

4     A.   I can see it on my screen, yes.

5     Q.   And that says Contractor Agreement 2018, correct?

6     A.   That is correct.

7     Q.   And the first -- the first section is the parties

8  and who -- who does that identify there, briefly?

9     A.   Well, it -- it identifies 280 Pleasant Street, LLC,

10 as the owner, REI Service Corporation as the agent, and Craigue

11 & Sons Home Exteriors as the contractor.

12    Q.   So when we see contractor in this agreement, that's

13 referring to Craigue & Sons Home Exteriors, right?

14    A.   That is correct.

15    Q.   All right.  So let's look at the preamble, which is

16 the next section.  And that identifies the property and the

17 owner of the property, correct, as 280 Pleasant Street, LLC?

18    A.    It identifies what -- the property name, which

19 happens to be the owner in this particular case.

20    Q.    All right.  And does it also state the engagement of

21 the contractor, again, Craigue & Sons, to perform, quote, the

22 work, all in accordance with the terms and conditions contained

23 herein which the contractor, again, Craigue & Sons,

24 acknowledges that he/she has read and with which agrees to

25 comply, correct?

1          A.    That is correct.

2          Q.    All right.  And, again, this is -- is this a form

3     that you use frequently in your property management work at

4     REI?

5          A.    It is, yes.

6          Q.    All right.  So let's go to the next one, the next

7     paragraph, which is the work.

8                The work states, just to paraphrase, the contractor

9     agrees to furnish all labor the materials and the equipment to

10    perform the following work; and it says it's attached on

11    Exhibit A, correct?  So that's a document in the back?

12         A.    That is correct.

13         Q.    And says the work period is the period beginning

14    June 4th of 2018.  Do you see that?

15         A.    I do.

16         Q.    All right.  So let's go down now to cost of work,

17    which is number 5.  What does that say?

18         A.    It says that it be paid $98,000 five hundred --

19    $98,500.  Final payment would not be issued until a

20    satisfactory inspection of the property is completed with the

21    property manager.

22         Q.    Very good.  Okay.  So next is liability insurance.

23    Do you see that?

24         A.    I do.

25         Q.    And at the bottom of the page, it reads:

1    Contractor, at contractor's expense, shall maintain throughout

2    the entire time of the -- and then we go over to the next page,

3    page 2 -- so it's of the contract, right, the following

4    insurance coverage with companies approved by the owner.

5            Right?  Are you with me so far?

6        A.    So far so good.

7        Q.    All right.  So here, the contractor, Craigue & Sons,

8    is agreeing to maintain, at the contractor's expense, insurance

9    coverage with companies approved by 280 Pleasant Street, LLC,

10   right?

11       A.    That is correct.

12       Q.    And the first subparagraph of that talks about

13   commercial general liability, correct?

14       A.    That is correct.

15       Q.    And that's various amounts in the aggregate for

16   bodily insurance, including death and property damage, correct?

17       A.    That is correct.

18       Q.    And then there is a paragraph about automobile

19   liability is the next one --

20       A.    Yes.

21       Q.    -- right?

22       A.    Yeah.

23       Q.    Is that correct?

24       A.    I'm sorry, yes.

25       Q.    Okay.  And then the third subparagraph starts

1  worker's compensation insurance.  Do you see that?

2      A.    I do.

3      Q.    Could you read that for the jury, please.

4      A.    It says:  Worker's compensation insurance covering

5  all employees of contractor employed in or about the property

6  with statutory limits of employer's liability, $100,000, bodily

7  injury each accident, 500,000, and bodily injury by disease, a

8  hundred thousand.

9      Q.    All right.  And then the paragraph below that states

10 that the owner, that is 280 Pleasant Street, shall be named as

11 an additional insured on items 1 and 2, correct?

12     A.    That is correct.

13     Q.    And then the contractor, again, Craigue & Sons,

14 shall provide the owner with a certificate of insurance as

15 evidence of compliance, correct?

16     A.    That is correct.

17     Q.    And that's prior to commencement of any of the work,

18 right?

19     A.    That is correct.

20     Q.    All right.  And what is a certificate of insurance,

21 just for the jury?  What does that mean?

22     A.    It's just -- it's provided by -- typically it's

23 provided by the insurance agent that would certify to what

24 level of coverage they would have -- they -- the company

25 involved has.

1          Q.    All right.  And so is it common in a job, in a

2     contract for a construction job like this, to require a

3     certificate of insurance from the contractor to show that

4     insurance is in place?

5          A.    That is correct.

6          Q.    All right.  And going back to the -- that paragraph,

7     it says:  The contractor's insurance shall be primary for any

8     claims related to the work.

9                Do you see that?

10         A.    I do.

11         Q.    And what does that mean, just roughly, primary?

12         A.    Their insurance would -- would take precedence.  REI

13    Service Corporation has insurance, as does the property, but as

14    it relates to the work, the -- they would have to provide the

15    primary coverage.

16         Q.    All right.  Now, let's go down to Section 8 at the

17    bottom, responsibility of the contractor.

18               Do you see that paragraph at the bottom of the page?

19         A.    I do.

20         Q.    And that states that the contractor is responsible

21    for all work and all materials of every description, correct?

22         A.    It does.

23         Q.    Whether done or used by the contractor, its

24    employees, subcontractors, or others under the direction of the

25    contractor; is that right?

1      A.    That is correct.

2      Q.    Can you read the next sentence, please, starting "it

3  shall specifically"?

4      A.    It shall specifically and distinctly assume and does

5  so assume all risk of damage or injury from whatever cause to

6  property or person used, employed, or subcontracted to in

7  connection with the work.

8            All damage or injury from any cause to property or

9  person -- and all damage or injury to any person or property,

10  wherever located, resulting from any action or operation under

11  this contract or in connection with the work.

12            Contractor shall protect, defend, and hold harmless.

13      Q.    Okay.  So I think you just missed one part of that

14  in the middle of the paragraph.  In the sentence you were

15  reading, it shall specifically and distinctly assume and does

16  so assume all risks of damage or injury.

17            Are you with me so far?

18      A.    I am.

19      Q.    From whatever cause to property or person -- are you

20  with me so far?

21      A.    Yes.

22      Q.    And then it says, used, employed, or subcontracted

23  to in connection with the work.

24            Do you see that?

25      A.    I do.

1    Q.    Okay.  All right.  So let's go to the third page and

2    briefly there's an assignment paragraph.  Do you see that?

3    A.    I do.

4    Q.    And that's -- and that says what?

5    A.    It says:  The contractor shall not assign this

6    contract or any monies to become due hereunder without the

7    prior written consent of the owner.

8    Q.    Okay.  And what does that mean, briefly, in property

9    manager's terms?

10   A.    So in this particular case, we were doing -- doing

11   business with Craigue & Sons and we didn't want him to then

12   assign that to Harry Jones Home Improvement Company.

13   Q.    All right.  So Craigue & Sons was -- was on the hook

14   to do the work and -- and could not assign it to some other

15   company without approval, correct?

16   A.    That is correct.

17   Q.    All right.  And then there is a termination

18   provision, a payment provision.  Do you see all that?

19   A.    I do.

20   Q.    And then it's signed by Nate Craigue for Craigue &

21   Sons Home Exteriors at the bottom, correct?

22   A.    I don't know if that's his signature, but it -- I

23   assume it is.

24   Q.    Okay.  And then in the next page it's also signed by

25   Shane Laliberte, director of property management for REI

1    Service Corporation, as an agent of the owner, correct?

2        A.    That is correct.

3        Q.    Okay.  And let's look briefly at Exhibit A.

4              Now, remember, back in the contract where we talked

5    about the work, which was paragraph 3?  Paragraph 3 actually

6    referenced Exhibit A directly, right?

7        A.    Paragraph 3 of the agreement did, yes.

8        Q.    Yes.  So Exhibit E -- Exhibit A is basically the

9    work for this job; is that fair?

10       A.    That is correct.

11       Q.    All right.  And Exhibit A appears to be an invoice,

12   right?

13       A.    It says invoice, but it's not an invoice.

14       Q.    Okay.  So what -- what is it?  Just explain why this

15   document is -- and how it's being used as the description of

16   the work.

17       A.    So it identifies the scope of the work and also

18   identifies essentially how payments would be made.

19       Q.    Okay.  And, specifically, what is the scope of the

20   work and how were the payments to be made as spelled out on

21   this document?  Can you explain that?

22       A.    Do you want me to read it or just -- it's for

23   windows and siding.

24       Q.    All right.  So it's windows and siding.  It's also

25   for labor, correct?

1    A.    Well, it would be installing the windows, installing

2  the siding, yes.

3    Q.    Okay.  And there is -- can you see how much of the

4  total of 98-5 is labor cost?

5    A.    It says $26,000.

6    Q.    Okay.  And above that, is it unit price of 17,000?

7  Is that in addition to or is that -- is the 26,000 the total

8  labor?

9    A.    No, the 26,000 related to the siding and the 17,000

10 related to the windows.

11    Q.    Okay.  So the actual total labor for the cost is

12 about $43,000 being billed, right?

13    A.    That is correct.

14    Q.    Okay.  And how much -- how much in this Exhibit A is

15 for materials?

16    A.    That would be the balance.

17    Q.    Okay.  So just doing the math here, about 55,000; is

18 that right?

19    A.    That would be -- yes, that is -- that's a 98,000

20 contract; 43,000 is labor, $55,000 would be materials.

21    Q.    Okay.  And is that normal and usual -- anything

22 unusual about this sort of invoice?

23    A.    No.  Typically, the -- the labor is often 50 percent

24 or thereabouts of the material costs --

25    Q.    Okay.

1       A.      -- as -- as a rule of thumb, yeah.

2       Q.      All right.  Now, did -- we've also talked about this

3  certificate of insurance.

4               That's enough on Exhibit 400.  Thank you, Ms. Sheff.

5               Did you actually get at REI a certificate of

6  liability insurance from Craigue & Sons Home Exterior?

7       A.      We did.

8       Q.      And is that another document that you provided to

9  the government in response to our subpoena?

10      A.      We did.

11      Q.      All right.  Showing you now Exhibit 405 for

12  identification.

13              All right.  So what is 405 for identification?

14      A.      That would be a standard form of certificate of

15  insurance.

16      Q.      And is this the certificate of liability insurance

17  provided in 2018 to your company by Craigue & Sons Home

18  Exteriors?

19      A.      That's my understanding, yes.

20      Q.      And was it part of your business records in this

21  case?

22      A.      It was.

23      Q.      And is it produced by Blossom Insurance Agency in

24  Concord, New Hampshire?

25      A.      I have no knowledge of that, but typically it's

1   provided by the real estate agent which in this case would be

2   Blossom.

3        Q.   All right.  And it says it's Blossom Insurance

4   Agency, correct?

5        A.   That is correct.

6        Q.   And does it spell out the various coverages that

7   Craigue & Sons Home Exteriors was certifying that it had?

8             MR. MIRHASHEM:  Objection.

9             MR. DAVIS:  Sorry?

10            MR. MIRHASHEM:  I object.

11            THE COURT:  Okay.  Sidebar.

12                      AT SIDEBAR

13            MR. MIRHASHEM:  Your Honor, the document has not

14   been admitted into evidence.  The witness is just testifying

15   now from a document that has not been admitted.  If he wants to

16   refresh his recollection, that's one thing.  If the government

17   wants to move to admit it, we can argue about that.  But at

18   this point he's just reading off a document information that is

19   hearsay.

20            THE COURT:  Attorney Davis, go ahead.

21            MR. DAVIS:  It's an admission of the defendant.

22   It's not hearsay.  It's also a business record maintained by

23   REI.  I'm happy to move it in.  It's a regular business record.

24   I won't comment further.

25            THE COURT:  All right.  And I do see that this

1  Craigue & Sons Home Exterior as the insured and he testified

2  that he believed that Mr. Craigue had supplied this and then he

3  testified it was part of his record --

4            MR. DAVIS:  Correct.

5            THE COURT:  -- in the case.

6            All right.  How is this not a -- an admission of

7  Mr. Craigue?

8            MR. MIRHASHEM:  Your Honor, the amount of insurance

9  is an out-of-court statement by the insurance company, not by

10  Mr. Craigue.  Mr. Craigue may have supplied the document, but

11  there's another layer of hearsay, which is the amount of

12  coverage, and the amount of coverage is not information.  If

13  Mr. Craigue says something said X, you still have another layer

14  of hearsay, I believe.

15            And I also think that this witness was very

16  tentative about his belief that this is the policy.  I don't

17  think that it's at all clear that he actually recognizes this

18  to be the policy.

19            So I don't think it fits a business record

20  exception.  He hasn't testified that these are records that are

21  kept in the regular course of his business and it's not the --

22  the person who generated it is the insurance company, which I

23  understand is on the government's witness list, so I don't

24  think it's appropriate through this witness.

25            THE COURT:  Can you lay more of a foundation with

1    respect to the regular practice of the activity of this record

2    so that I can make the appropriate rulings under the business

3    records exception?

4              MR. GINGRANDE:  Yes.

5              MR. DAVIS:  I'm happy to do that, Judge.

6              THE COURT:  Okay.  Go ahead.

7                    CONCLUSION OF SIDEBAR

8         Q.    Mr. Clark, with regard to Exhibit 405 for

9    identification, the certificate of liability insurance --

10        A.    Yes.

11        Q.    -- is that a record that REI would keep in the

12   regular course of its business in the course of managing

13   properties?

14        A.    I don't think I understand the question.

15        Q.    So if you are -- as REI is representing a client for

16   a particular commercial property and you're making a contract

17   with a contractor to do work such as windows and siding work --

18   you with me so far?

19        A.    I am.

20        Q.    Okay.  And you make a -- you make -- as the agent

21   for the owner of the building, you make a contract with that

22   company, the contractor company, that includes a -- an

23   undertaking to -- to supply a certificate of insurance -- okay?

24   You with me so far?

25        A.    I am.

1      Q.   And requiring a certificate of insurance is

2  something that is ordinary and commonplace, is that fair, in

3  this kind of contract?

4      A.   Yes.

5      Q.   Okay.  And once you are provided that certificate of

6  liability insurance, it's actually provided to you as REI as

7  the agent of the owner of the building, correct?

8      A.   I don't -- I'm not -- not necessarily.  I don't --

9  again, I don't understand your question.  I'm sorry.

10      Q.   That's all right.  I don't mean to make it

11  difficult.

12           We talked about the requirement of a certificate of

13  insurance in this case, right?

14      A.   We did.

15      Q.   And that was an undertaking that Craigue & Sons took

16  on in connection with signing this contract, right?

17      A.   They were -- the agreement requires them to provide

18  a certificate of insurance.  That's correct.

19      Q.   Okay.  And the -- the contract itself says that the

20  contractor shall provide the owner with a certificate of

21  insurance, correct?

22      A.   That is correct.

23      Q.   And you are -- you -- when I say you, I mean REI --

24  REI is representing the owner here, right?

25      A.   That is correct.

1        Q.    And that it's required that the certificate of

2   insurance be supplied prior to commencement of any of the work,

3   right?

4        A.    That is correct.

5        Q.    And it's also a condition of any payment to the

6   contractor, correct?

7        A.    That is correct.

8        Q.    All right.  So is it fair to say this certificate of

9   liability insurance is a record, a kind of record, that REI

10   keeps in the regular course of its business managing

11   properties?

12        A.    I'm not trying to be difficult.

13        Q.    Okay.

14        A.    I don't -- I don't know what you're talking about.

15        So if you're asking me if there's an agreement that

16   requires a certificate of insurance, then our -- our employees

17   are supposed to make certain that there is a certificate of

18   insurance.

19        Q.    Okay.  And if that -- if there is a certificate of

20   insurance, is it something that REI would keep in its file for

21   that project?

22        A.    That is correct.

23        Q.    REI maintains files, correct?

24        A.    That is correct.

25        Q.    And you have records of -- of all of your work on

1   behalf of the owner where you're essentially spending the

2   owner's money on a contract, right?

3        A.   With his approval, that's correct.

4        Q.   Correct.  Okay.  So in your file and in connection

5   with a contract like this, it's the usual course of things, if

6   you're provided with a certificate of insurance, to maintain it

7   in your records; is that fair?

8        A.   I don't understand what you mean, is it the usual

9   course of business.

10            So the agreement required a certificate of

11   insurance.  We have a certificate of insurance.  We typically

12   attach that with the -- with the agreement.  If that's your

13   question, the answer is yes.

14       Q.   And did you do that in this case?

15       A.   Yes.

16       Q.   Okay.  Was the record made at or near the time of

17   the contract with Craigue & Sons?

18       A.   I have no knowledge of that.

19       Q.   You're not sure about when it was made?

20       A.   No.

21       Q.   Do you see a date on the top right of it?

22       A.   I believe it says May 25th, 2018.

23       Q.   Okay.  Does that refresh your recollection about the

24   approximate time it's made?

25       A.   That's not the question that you asked before, but I

1    assume that is.  I don't review these.  I'm the president of

2    the company.  I don't -- I don't review certificates of

3    insurance.

4         Q.   I'm not asking you if you reviewed it.  I'm just

5    asking if your -- your company has a file for this job that you

6    maintain.

7         A.   Yes.

8         Q.   Okay.  And you sent me these records, right?

9         A.   We did.

10        Q.   Okay.  Do you have any reason to doubt the date on

11   the top right-hand corner of the document?

12        A.   I have no reason to doubt that, no.

13        Q.   Okay.  And is the record kept in the course of a

14   regularly conducted activity, meaning the activity of your

15   business, REI, to make contracts with contractors to improve

16   commercial properties that you're managing?  That's the regular

17   business or a regular business that REI does; is that correct?

18        A.   We're in the business of maintaining property,

19   commercial property, yes.

20        Q.   Okay.  And is making this record, the certificate of

21   liability insurance, a regular practice of that activity?  That

22   is, you've already talked about it's a customary thing to have

23   a certificate of liability insurance for this kind of contract?

24        A.   Yes.

25        Q.   Okay.  And are you a qualified witness, that is, are

1   you familiar with the contents of the file of REI about this

2   particular project?

3       A.   I told you the file consists of the agreement and

4   the -- and this insurance certificate to the best of my

5   knowledge and, yes, I'm familiar with those.

6       Q.   And that's what you went and got when you provided

7   these items to the government, correct?

8       A.   That is correct.

9            MR. DAVIS:  Okay.  Your Honor, I move to admit

10  Exhibit 405 in evidence and strike the ID.

11           MR. MIRHASHEM:  I still object --

12           THE COURT:  Anything additional, Attorney --

13           MR. MIRHASHEM:  I still --

14           THE COURT:  Sidebar.  Go ahead.

15           Sidebar.

16                         AT SIDEBAR

17           MR. MIRHASHEM:  I object under 803(6).  The first

18  requirement is the record was made at or near the time by or

19  from information transmitted by someone with knowledge.  That

20  would be the insurance company, not REI.  Just because a

21  document generated by somebody else is in their file doesn't

22  make it a business record of REI.  That's my objection.

23           THE COURT:  You're -- you're saying that the

24  business that relies on the record, that the government would

25  need to bring in the individual who actually filled out the

1    document or at least has knowledge of the document?

2            MR. MIRHASHEM:  Blossom Insurance is on their

3    witness list.  They're the people who -- they have a business

4    duty.  I'm not saying it has to be the insurance agent who

5    filled out this form, but the insurance company's agent keeps

6    records.  They have -- the -- the guarantee of reliability here

7    is a business duty to make sure the records are accurate.

8            THE COURT:  I think this -- I think this record

9    meets 803(c).  It -- and I believe that a qualified witness

10   from REI can show that a record was made by somebody else with

11   knowledge of the contents of the record.  And it's clear it was

12   made by the insurance company.  Let me also add that it was

13   required under the contract that Mr. Craigue signed that he

14   supply this document.

15           So number one, it was made at or near the time;

16   number two, it was kept in the course of regularly conducted

17   business.  Those are legal terms and this witness wasn't really

18   understanding those terms, per se, but as a matter of fact,

19   based on what he said, he kept this in the course of regularly

20   conducted business and making the record was a regular practice

21   of that activity as he testified.  And it -- he produced the

22   record and relied on the third-party statements in this record

23   in the regular course of his business.

24           And add to that, again, as I said, there's an

25   element of trustworthiness to the record because Mr. Craigue

1    was required to supply this record as part of the contract.

2                So ultimately I am ruling that 405 is a full exhibit

3    under 803(6).

4                          CONCLUSION OF SIDEBAR

5                MR. DAVIS:  Move to strike the ID of 405, your

6    Honor --

7                THE COURT:  Granted.

8                MR. DAVIS:  -- and publish to the jury.

9                THE COURT:  Yes.

10                (Government's Exhibit 405 admitted.)

11        Q.   Do you see that again, Mr. Clark, in front of you,

12   Exhibit 405?

13        A.   I do.

14        Q.   And that's the certificate of liability insurance

15   we've been talking about?

16        A.   That is correct.

17        Q.   And can you see the date on the top right corner; is

18   that May 25th of 2018?

19        A.   That is correct.

20        Q.   Okay.  Let's go to, just briefly, near the middle

21   of the document there's a paragraph that says, this is to

22   certify -- do you see that paragraph?

23        A.   I do.

24        Q.   Could you read that to the jury, please.

25        A.   It says:  This is to certify that the policies of

1    insurance listed below have been issued to the insured name

2    above, the policy period indicated notwithstanding any

3    requirement, term, or condition of any contract or other

4    document with respect to which this certificate may be issued

5    or may pertain, the insurance afforded by the policies

6    described herein is subject to all the terms, exclusions, and

7    conditions of such policies.  Limits shown may have been

8    reduced by paid claims.

9         Q.   Okay.  Thank you.

10             And do you see in kind of the middle of the page the

11   policy effective date and the policy expiration date?

12        A.   I do.

13        Q.   And what are those dates?

14        A.   March 1st, 2018, is when it was established and

15   March 1st, 2019, is when it expired.

16        Q.   Right.  So of course this policy would have been in

17   effect on August 28th of 2018; is that correct?

18        A.   That is correct.

19        Q.   All right.  Just to look at the types of insurance,

20   the first -- the first general category is commercial general

21   liability.  Do you see that?

22        A.   I do.

23        Q.   And that's -- that's got a letter over in the

24   left-hand side that says A.  Do you see that?

25        A.   I do.

1      Q.    And that indicates that there is a particular policy

2  for general commercial liability in effect; is that right?

3      A.    The letter A doesn't say that.  The letter A means,

4  I believe, who -- what company has -- has that policy.

5      Q.    But the -- the fact that there is a reference there

6  is referencing an actual commercial general liability policy;

7  is that right?

8      A.    That is correct.

9      Q.    All right.  And then there's a policy number in the

10  middle of that section, right?

11      A.    That is correct.

12      Q.    And then there are various coverages over on the

13  right with limits.  Do you see that?

14      A.    I do.

15      Q.    And then below that with the insurance letter B is

16  automobile liability policy for the same period.  Do you see

17  that?

18      A.    I do.

19      Q.    All right.  And then if you skip down a couple, do

20  you see a -- a box at the bottom that says worker's

21  compensation and employer's liability?

22      A.    I do.

23      Q.    And is there any letter in the left-hand column for

24  that particular category?

25      A.    There is not.

1   Q.   And is there any indication that there is a worker's

2   compensation and employer's liability policy in place for this

3   particular job?

4   A.   There is not.

5   Q.   And going back to the top of the document or near

6   the top, who is the insured we're talking about here?

7   A.   Craigue & Sons Home Exteriors.

8   Q.   And then a name is given?

9   A.   Nathan Craigue.

10  Q.   Okay.  Now, did you know Mr. Craigue personally?

11  A.   I -- I wouldn't recognize him if he's in the

12  courtroom.

13  Q.   So you have not actually met him; is that right?

14  A.   Not to my knowledge.

15  Q.   Okay.  Did you -- and that's enough on Exhibit 405.

16       Did you actually go to the jobsite while Craigue &

17  Sons was doing it at 280 Pleasant Street?

18  A.   I did.  I stopped by in August.

19  Q.   Okay.  So that's August of 2018?

20  A.   Yes, August of 2018.

21  Q.   And do you recall the occasion or why it was that

22  you stopped by?

23  A.   Shane Laliberte was on vacation and I just wanted to

24  swing by and make sure there was nothing affecting the -- the

25  tenants.  Again, my concern is the tenants.

1      Q.   Okay.  And do you recall the temperature that day?

2      A.   It was very warm.

3      Q.   And do you remember seeing anyone working there on

4 the siding and windows project?

5      A.   Yes, there was.  There was a man working under one

6 of those pop-up tents.

7      Q.   All right.  And just one man?

8      A.   That's all I saw that was -- that I could identify

9 as being working.

10     Q.   Okay.  And did you later learn that person's name?

11     A.   Well, we called him Skinny is how I know of him, but

12 I know that's not his name.

13     Q.   Okay.  And did you -- when you went to the visit --

14 on that site visit, did you go in and talk with the tenants?

15     A.   I -- I did not.  I just looked to see where they

16 were working and what was going on and everything.  There

17 didn't seem like there was anything of concern, so I did not.

18     Q.   All right.  And did you actually talk to the man

19 known as Skinny?

20     A.   If it was, it was simply just to acknowledge.  We

21 didn't have -- we didn't have a discussion.

22     Q.   All right.  And did -- you said that Shane Laliberte

23 was on vacation.  So was this a particular job one of the

24 places that Shane Laliberte would go to for --

25     A.   Yeah.

1     Q.   -- REI?

2     A.   Yes.  As part of his responsibilities, he would --

3 he would stop by on a regular basis, my understanding typically

4 in the morning, because he lived in Concord.

5     Q.   Okay.  And did -- so he was gone for a whole week

6 and you wanted to stop by sort of because he was absent?

7     A.   I was on my way home.  I live in Sugar Hill, so I --

8 and our office at the time was in Manchester.  So I swung by

9 just to check and see what was going on, make certain there was

10 no issues.

11     Q.   Okay.  And did you talk to Shane Laliberte while the

12 job was going on regularly about his visits to the property?

13     A.   I did not.

14     Q.   You didn't -- did you talk to him at all?

15     A.   About the project?

16     Q.   Yes.

17     A.   Just typically we had a Monday morning staff meeting

18 and so we would kind of review everything that was going on.

19 And so in general there probably was some discussion, but

20 nothing specific.

21     Q.   Okay.  The payments to Craigue & Sons, did Craigue &

22 Sons get paid the full 98,500 on this case by 280 Pleasant?

23     A.   They did.

24     Q.   And in what increments or with what timing were the

25 payments made, do you recall, roughly?

1      A.    I think there were three checks, but I'm not

2  positive of that.

3      Q.    All right.  And what -- you're familiar with the

4  accident that happened on August 28th?

5      A.    I am.

6      Q.    And was there a payment made after that?

7      A.    There was.

8      Q.    Okay.  So the final payment occurred after the

9  accident?

10     A.    Yes.

11     Q.    Did -- did Shane Laliberte have a separate company?

12     A.    He does.

13     Q.    And what company was that, again, in August of 2018?

14     A.    SKS.

15     Q.    All right.  And SKS, do you know what its further

16  name is?  Is it management or maintenance?

17     A.    I don't.  It's -- I mean, I refer to it as SKS.

18     Q.    And is that an LLC that Shane has?

19     A.    I believe it's an LLC.

20     Q.    All right.  But Shane was a full-time employee of

21  REI as property manager, right?

22     A.    That is correct.

23     Q.    But you knew that he had his own separate business?

24     A.    He did.  He did it for years, yes.

25     Q.    Okay.  And do you know whether SKS had a role at

1   280 Pleasant Street while the Craigue & Sons project was going

2   on?

3        A.    They had the landscaping contract.

4        Q.    Okay.  And did you know what that involved?

5        A.    It would involve -- during the summer, it would --

6   it would involve cutting the grass, picking up any debris.

7        Q.    Okay.  Are you also familiar with a company called

8   Harvey Building Materials?

9        A.    I am.

10       Q.    And where is that?

11       A.    I think they're headquartered in Manchester.

12       Q.    And does that provide building materials, as its

13   name says?

14       A.    The -- yeah, they primarily provide windows, siding,

15   and roofing.

16       Q.    Okay.  And do you know whether Craigue & Sons or

17   Nate Craigue had their own account at Harvey Building

18   Materials?

19       A.    I do not.

20       Q.    And do you know whether SKS and Shane Laliberte's

21   company had an account at Harvey Building Materials?

22       A.    I was aware that they had an account.

23       Q.    All right.  Were you aware at any point that

24   Mr. Craigue was ordering materials, but he was ordering it on

25   the account of SKS?

1          MR. MIRHASHEM:  Objection, leading.

2          THE COURT:  I'll allow it.  I'll allow it.

3          Go ahead.

4      A.   After the fact I knew that.  I didn't know it at the

5  time.

6      Q.   So during 2018, when this project was going on, you

7  did not -- no one told you that Mr. Craigue was using the SKS

8  account?

9      A.   No.

10      Q.   Okay.  That summer, did Craigue & Sons ever notify

11  REI that he had assigned the property to -- I'm sorry -- that

12  he'd assigned the work under the contract to any other company?

13      A.   Not to my knowledge.

14      Q.   There was no assignment you knew of?

15      A.   No.

16      Q.   And did he ever advise you that he was using

17  contractors as opposed to employees?  To your knowledge.

18      A.   Do you want to repeat the question?

19      Q.   Did Mr. Craigue or Craigue & Sons advise you that

20  they were using contractors as opposed to employees?

21      A.   No, there was no requirement for that.

22      Q.   And no discussion of that; is that right?

23      A.   Not with me, no.

24      Q.   Okay.  Now, we referred to the accident that

25  occurred August 28th.  Do you recall that?

1     A.    I do.

2     Q.    And do you remember where you were when you heard

3  about the accident?

4     A.    I was.  I was with Shane.

5     Q.    So Shane Laliberte?

6     A.    Yes.

7     Q.    And where were you and Shane Laliberte that day?

8     A.    I was in Bedford, New Hampshire.

9     Q.    And what were you doing together on that day?

10     A.    We had a -- we had a -- some construction work

11  taking place in Bedford and so Shane and I were -- were both

12  there.  It was pretty extensive work and so we were both there

13  at the site.

14     Q.    All right.  And, roughly, do you remember what time

15  you got the call?

16     A.    It was right before lunchtime, so --

17     Q.    Okay.  And that particular project, was that a

18  property management project or was it -- what kind of project

19  was it for REI that it was doing in Bedford?

20     A.    Yeah, it was related to property management.

21     Q.    All right.  Was that a large project for REI,

22  relatively large?

23     A.    It was -- it was a large project.  It was -- I don't

24  recall -- it was either the water or the sewer project in 2018,

25  so --

1      Q.    All right.  And, again, Mr. Laliberte would have

2   been the property manager for REI in -- responsible for that

3   work, is that right, for the Bedford job?

4      A.    He represented -- in this particular case, this was

5   a -- these are commercial condominiums.  So we -- our agreement

6   was with the association and so he would have been there on

7   behalf of the association.

8      Q.    Okay.  Again, after the accident, you did not speak

9   specifically to Mr. Craigue; is that right?

10     A.    I don't believe I've ever spoken to Mr. Craigue.

11     Q.    And do you recall who finished the job -- who or

12  what finished the remaining work on the siding and windows

13  project after the accident occurred?

14     A.    Yeah, it's my understanding the work was complete

15  and Skinny was just wrapping things up and -- but, to my

16  knowledge, there was no additional work that had to be done.

17     Q.    Okay.  And do you recall when the final check was

18  cut to Craigue & Sons?

19     A.    I do not.

20     Q.    Would it have been in September of 2018?

21           MR. MIRHASHEM:  Objection, leading.

22     Q.    You're just not sure?

23     A.    I don't know.  If you show me --

24           THE COURT:  Hold on.  Sustained.  Sustained.

25     Q.    Sorry.  You don't know?

1      A.   I don't know.  It was after -- after August 28th.  I

2  know that.

3            MR. DAVIS:  Okay.  If I may have just a moment.

4            No further questions.  Thank you.

5            THE COURT:  We're going to take our morning break

6  right now.  So we'll be back at 10:45.

7            THE CLERK:  All rise for the jury.

8              (Jury excused for the morning recess.)

9            THE COURT:  I'm going to see if I can read the

10  proposed limiting instruction during the break.  And have you

11  parties agreed on that?

12            MR. DAVIS:  Yes.  We just have to show -- Judge, we

13  made a slight amendment.

14            THE COURT:  All right.

15            Mr. Clark, if you need a break, you can step down.

16            THE WITNESS:  Thank you.

17            THE COURT:  All right.

18            MR. DAVIS:  Handing it up to --

19            THE COURT:  All right.  I'll look at this and then

20  we can talk before the jury comes back after the break.  So

21  10:45.

22             (Recess taken from 10:37 a.m. until 10:55 a.m.)

23            THE COURT:  I just want to make sure you're okay

24  with my edit.

25            MR. DAVIS:  Judge, I think the parties have no

1    objection.  We'd only note that should the door be opened and

2    should some of this evidence then be admitted, we might ask for

3    a second limiting instruction explaining that.  But as the

4    record is now, we have no objection.

5             THE COURT:  All right.  Understood.  And do you want

6    me to read this before we continue with the witness or do it at

7    the end of his cross?

8             MR. DAVIS:  I think it's -- whenever the Court

9    wishes.

10            THE COURT:  I think it makes more sense to wait

11   until he's off and then I'll give the instruction and then we

12   can call the next witness.

13            MR. MIRHASHEM:  May I just make a suggestion about

14   that, your Honor?

15            THE COURT:  Yes.

16            MR. MIRHASHEM:  So I think that the point that

17   Attorney Davis raises is a valid point and I think that it

18   might make more sense, instead of giving an instruction at this

19   point mid-trial and then when that witness testifies having

20   things change and then you instructing the jury about that, we

21   wait until the testimony of that witness, the Department of

22   Labor investigator and, you know -- and we would request that

23   you give it at the conclusion of his testimony, once we know

24   whether or not there is going to be any admissible testimony

25   about that matter.

1          THE COURT:  Okay.  So you would like this

2    instruction, but just wait until the end of -- is it Officer --

3          MR. MIRHASHEM:  Martineau.

4          THE COURT:  -- Kelly?  Martineau.  Okay.  Do you

5    have any problem with that?

6          MR. DAVIS:  No.

7          THE COURT:  None.  All right.  So we'll wait until

8    Martineau.  You may need to just remind me.  All right.

9          THE CLERK:  Remain standing for the jury.

10                    BEFORE THE JURY

11          THE COURT:  All right.  Attorney Mirhashem.

12          MR. MIRHASHEM:  Thank you, your Honor.

13                   CROSS-EXAMINATION

14   BY MR. MIRHASHEM:

15     Q.    Good morning.

16     A.    Good morning.

17     Q.    I have a few questions for you as well.  Let's start

18   with the contract that's been marked as Government Exhibit 400.

19   If we could have that brought up, please.

20          So under this contract, there was no problem with

21   Craigue & Sons using subcontractors on the job?

22     A.    That would be correct.

23     Q.    In fact, the --

24          THE CLERK:  Counsel, I'm sorry.  Do you want this

25   displayed to the jury?

1          MR. MIRHASHEM:  Yes, please.

2          THE CLERK:  Okay.

3     Q.    In fact, the contract in paragraph 8, which is the

4  next page -- if you can bring up paragraph 8 -- it specifically

5  contemplates the possibility of subcontractors because it

6  states that the contractor shall be responsible for all work

7  and all materials of every description done or used in

8  connection with the work whether done or used by contractor,

9  its employees, I assume, subcontractors, or others under the

10  direction of the contractor.

11          Correct?

12     A.    That is correct.

13     Q.    So a contractor can have subcontractors who work

14  under his direction?

15     A.    That is common, yes.

16     Q.    It's a common thing that you have subcontractors,

17  but you're still directing their work?

18     A.    That would -- that is correct.

19     Q.    Now, to have subcontractors on a job is not the same

20  as assigning the contract, correct?

21     A.    That is our understanding, yes.

22     Q.    You can have subcontractors and not in any way be in

23  violation of the prohibition against assignment in paragraph 9?

24     A.    That would be correct.

25     Q.    Now, you also answered some questions about the

1    liability insurance requirements which mostly are actually on

2    the top of this page and they start on the previous page.

3           And so workman's compensation insurance, under

4    paragraph 6, the top of which is being displayed on the screen

5    right now, applies to a contractor having employees, not a

6    contractor having subcontractors?

7    A.    The work is -- workers' compensation would be for

8    employees of the contractor.

9    Q.    Right.

10   A.    That is correct.

11   Q.    So -- so the contractor under this paragraph has to

12   have commercial general liability insurance, right?

13   A.    That is correct.

14   Q.    Has to have automobile liability insurance, right?

15   A.    That is correct.

16   Q.    But only needs to have worker's comp insurance for

17   the employees of the contractor and not its subcontractors?

18   A.    That would be correct.

19   Q.    And, by the way, this certificate of insurance that

20   you testified about, I just want to understand the paperwork

21   flow here.

22          Was this a document that you had seen before?

23   A.    I have seen it before today, but not -- not before

24   the work began, no.

25   Q.    But you did see it before today?

1      A.    Yes.

2      Q.    When did you first see it, approximately?

3      A.    I believe we probably went back and checked the file

4  when Skinny had his accident.

5      Q.    And then you gathered some papers and sent them to

6  whoever you needed to send the papers to?

7      A.    That is correct.

8      Q.    Now, going back to the contract and how it allows --

9  if you could put that up, paragraph 8 again.

10            Again, the -- the contractor, that would be

11  Craigue & Sons in this case, is allowed to use employees and

12  subcontractors and obviously this is not the only such contract

13  that REI has signed with contractors, right?

14      A.    That is correct.

15      Q.    You have a lot of experience in this area?

16      A.    We do.

17      Q.    And in your experience, it's not unusual for small

18  contractors to use all subcontractors on a job?

19      A.    That would be correct.

20      Q.    And then they would not need worker's comp liability

21  insurance?

22      A.    Under New Hampshire law, that's correct.

23      Q.    In New Hampshire there is no requirement for

24  worker's comp for subcontractors?

25            MR. DAVIS:   Objection, calls for a legal conclusion.

1              THE COURT:  Set a little more of a foundation for

2    that.

3         Q.    So I'm not going to get into the law, but you --

4    what you do have a lot of experience with is signing contracts

5    like this with small subcontractors -- with small contractors,

6    right?

7         A.    That is correct.

8         Q.    And in your experience, it's not uncommon for these

9    small contractors to use only subcontractors on a job?

10         A.    That would -- that would be correct.

11         Q.    Now, I want to ask you a few questions about Shane

12    Laliberte.  Now, he actually signed this particular contract as

13    an agent of REI, correct?

14         A.    That is -- well, as an agent for 280 Pleasant

15    Street, LLC, yes.

16         Q.    Right.  And it is unusual for REI to have Shane sign

17    instead of you sign; isn't that right?

18         A.    Shane is not an officer of REI Service Corporation.

19         Q.    So he really shouldn't have signed this contract?

20         A.    That -- typically, all the contracts are signed by

21    me.

22         Q.    Okay.  So even though typically they're all signed

23    by you, somehow Shane ended up signing this one?

24         A.    I may have been away.  I'm not in the office every

25    day.  So yes.

1    Q.    Okay.  And, now, Shane, as you testified, has his

2    own company, SKS Maintenance?

3    A.    Yes.

4    Q.    And the jury has heard testimony about checks that

5    were going from 280 Pleasant Street to the account of Craigue &

6    Sons.

7    A.    That is correct.

8    Q.    And they've heard testimony that in June, July, and

9    August of 2018, $56,450 went to Craigue & Sons?

10   A.    I don't have knowledge of that.  I didn't testify to

11   that.

12   Q.    That's why I -- I'm representing that to you.

13   A.    Okay.

14   Q.    I'm also representing to you that they've heard

15   testimony that some of that money went to SKS Maintenance?

16   A.    Not to --

17   Q.    Money would come in to Craigue & Sons.  And would

18   you have any knowledge of why it would go to SKS Maintenance?

19   A.    I have no knowledge of that.

20   Q.    Would you be surprised if most of it, in fact,

21   immediately went to SKS Maintenance?

22   A.    I don't -- I don't know what the arrangement was

23   between SKS and Craigue & Sons, so I couldn't speak to that.

24   Q.    I mean, Shane is signing on behalf of one side of

25   this contract, right?  There's two parties to this contract.

1   There's Shane Laliberte signing for REI as agent of

2   280 Pleasant Street, LLC, that's one side of the contract; the

3   other side of the contract is Craigue & Sons.  Right?

4       A.   That is correct.

5       Q.   And if Shane is on the one hand signing for one

6   side, on the other hand taking the money that's going to the

7   other side, is that something you were familiar with?

8       A.   I don't -- I don't understand the question.  I can

9   tell you that -- that if that contract had been presented to

10  me, I would have signed it.  As far as any -- any relationship

11  about where money was going, I know that I believe I signed

12  every check, which is typically what -- what is done.  And so

13  there were no checks from 280 Pleasant, to my knowledge, that

14  went to SKS other than in his contractual relationship as it

15  relates to landscaping.

16      Q.   Right.  And I'm asking -- I'm not suggesting that.

17      A.   Okay.

18      Q.   I'm suggesting that checks were going from Craigue &

19  Sons to SKS within a day or two after money coming in from

20  280 Pleasant.

21      A.   I have no knowledge.

22      Q.   Are you aware of that?

23      A.   I have no knowledge of that, no.

24      Q.   Had you ever heard that before today?

25      A.   No.

1        Q.    And you -- you testified about a final payment being

2   made, but it sounds like you have no precise memory of when

3   that final payment was made; is that right?

4        A.    That is correct.  I mean, this is a company that

5   manages many properties.  So I would have -- you know, I sign

6   hundreds of checks in a week.

7        Q.    Sure.  Just to clarify the structure of all the

8   different companies involved here, it's confusing that there's

9   the physical location 280 Pleasant Street, but there's also a

10  company called 280 Pleasant Street, LLC.  Correct?

11       A.    That is correct.

12       Q.    Which at least at the time of the events in this

13  case was owned by a doctor who's in New Jersey?

14       A.    And possibly his wife.  I don't -- but certainly the

15  individual that we dealt with was -- was the doctor.  He's the

16  one that came up with the name.

17       Q.    And so there was a property management agreement

18  between 280 Pleasant Street, LLC, and REI, correct?

19       A.    That is correct.

20       Q.    And so this agreement was a detailed agreement that

21  established the scope of your relationship with this other

22  entity's relationship?

23       A.    That -- that -- it identifies what would -- we will

24  do for him, yes.

25       Q.    In this agreement, the 280 Pleasant Street, LLC, is

1   referred to as the owner and REI is referred to as the manager.

2        A.   Okay.

3        Q.   Is that --

4        A.   That sounds reasonable.  I don't have it in front of

5   me, but if -- I'm sure that's the case.

6             MR. MIRHASHEM:  If I can mark as Defendant's Exhibit

7   B-15.  Can I approach the witness?

8             THE COURT:  Yes, you may.

9        Q.   So I'm showing you what's been marked as Defendant's

10  Exhibit B-15 for identification.

11       A.   Okay.

12       Q.   Does that appear to be the agreement between

13  280 Pleasant, LLC, and REI?

14       A.   It is.  I drafted it and I signed it.

15       Q.   And looking at paragraph 1, does it seem right that

16  there's an owner and manager and that's the relationship that

17  the two of you had?

18       A.   So it's -- it's defined in the -- in the very first

19  beginning, first paragraph, that the owner is 280 Pleasant

20  Street, LLC; it will be referred to after that as the owner;

21  and REI Service Corporation is identified as the manager and in

22  the balance of the agreement we refer to ourselves as manager.

23       Q.   And then this agreement contains a paragraph 10

24  which final sentence reads:  Nothing herein contained shall be

25  construed to establish the manager as an employee of the owner.

1           Did I read that correctly?

2      A.    That is correct.  That certainly was the intent.

3   We -- we were a contractor.

4      Q.    So when you had an agreement with this company,

5   280, LLC, your contract with them specified that you're not

6   their employee?

7      A.    That is correct.

8      Q.    The contract for the project as far as the windows

9   and siding allowed use of both employees and subcontractors?

10      A.    There was -- there's no restriction, yes.

11      Q.    Now, this agreement was an agreement for siding and

12   windows, right?

13      A.    That is correct.

14      Q.    There was no work that was going to be done on the

15   roof?

16      A.    The roof had been replaced by a different contractor

17   years -- the year before.

18      Q.    So if somebody was on a roof working with shingles,

19   that would be a roofing job?

20           MR. DAVIS:  Objection, calls for speculation.

21           THE COURT:  Overruled.

22      A.    So --

23      Q.    If somebody was on the roof working on shingles,

24   that would be part of a roofing job?

25      A.    I assume you're talking about roofing shingles.

1     Q.    Yes --

2     A.    Yes.

3     Q.    -- roofing shingles.

4     A.    If they were on a roof, shingling the roof, assuming

5   it was a shingled roof, that would be done, we would call that

6   a roofing job, that's correct.

7     Q.    It wouldn't be a windows or siding job?

8     A.    No, it would not.

9     Q.    Okay.  And Craigue & Sons was not under contract to

10  work on the roof with shingles, to reshingle the roof or

11  anything like that?

12    A.    As -- whether or not they were on the -- on -- on a

13  roof to do their job is different than roofing.

14    Q.    Right.

15    A.    And they --

16    Q.    They were allowed to be on the roof, but they

17  weren't working on reshingling the roof or their job would not

18  have involved the shingles on the roof?

19    A.    Their job should not have included anything to do

20  with the roof, yes.

21    Q.    Now, do you have any knowledge that the windows part

22  of this contract was a -- was actually being done by SKS and

23  not Craigue & Sons?  Do you have any knowledge about that at

24  all?

25    A.    I have no knowledge.  I don't believe that's true,

1  though.

2       Q.    Okay.  To your knowledge, it's not true that the

3  windows part was being done by SKS?

4       A.    That's -- that's my understanding.

5       Q.    Okay.  Now, do you know an Inspector Martineau with

6  the state of New Hampshire Department of Labor?

7       A.    I do not.

8             MR. MIRHASHEM:  I just need an exhibit sticker.

9       Q.    So I'm going to be showing you what is being marked

10  as Defendant's Exhibit B-16 for identification.

11             Is that a letter you wrote Mr. Martineau?

12       A.    It is.

13       Q.    And so you had some correspondence with

14  Mr. Martineau, but you didn't personally ever meet him; is that

15  right?

16       A.    Not to my recollection.  I think he came in and

17  tried to coerce information out of one of my employees.

18       Q.    How, to your knowledge, did Mr. Martineau try to

19  coerce information out of your employees?

20       A.    I wasn't there.  I can only -- only -- it's based

21  upon what my employee told me.

22       Q.    But in your letter to him, you were concerned that

23  somebody in your company was coerced into signing a statement

24  that said something about REI being the prime contractor to

25  Craigue & Sons; is that right?

1      A.    If that's what the letter says.  I mean, I didn't --

2      Q.    The letter, by the way, is dated September 18th,

3  2018; is that right?

4      A.    That is correct.

5      Q.    And so this is shortly after Skinny's accident,

6  correct?  I'll give you time to read the letter.

7      A.    Repeat your question, please.

8      Q.    This was shortly after Skinny's accident?

9      A.    I believe Skinny's accident was in August,

10  approximately August 28th maybe.

11      Q.    Correct.  And then shortly afterwards you wrote this

12  letter to Mr. Martineau, complaining about coercion and you

13  said that you denied being prime contractor to Craigue & Sons.

14  Is that -- is that accurate as far as the purpose of this

15  letter?

16      A.    Absolutely, because if we were the prime contractor,

17  we would pick up liability and we had nothing -- we were not a

18  party to any of the contracts.

19          MR. MIRHASHEM:  I have no further questions, your

20  Honor.

21          THE COURT:  Thank you.  Anything further, Attorney

22  Davis?

23          MR. DAVIS:  Briefly, Judge.

24          THE COURT:  Go ahead.

25                    REDIRECT EXAMINATION

1    BY MR. DAVIS:

2        Q.    Mr. Clark, you were asked about a job involving

3    shingles, do you recall that, by Mr. Mirhashem?

4        A.    If that's the defense counsel.

5        Q.    Yes, by defense counsel.

6        A.    Yes.

7        Q.    And you asked the question, you said, roofing

8    shingles; do you recall that?

9        A.    Yes.

10       Q.    Are there different kinds of shingles?

11       A.    There's -- there's -- well, there's -- yes, there

12   is.

13       Q.    All right.  And what other kinds that you're

14   familiar with?

15       A.    Well, there's -- there's types of shingles that can

16   be used for siding as well as roofing.

17       Q.    Okay.  So shingles can be siding themselves,

18   correct?

19       A.    There -- there are shingles that are used for

20   siding, yes.

21       Q.    Very good.  Okay.  And you were also asked did you

22   know that the windows part of the job was done by SKS.  Do you

23   recall that question?

24       A.    I do.

25       Q.    And you said you had no knowledge of that, correct?

1          A.     That is correct.

2          Q.     And also that you don't believe that to be true,

3    correct?

4          A.     That is correct.

5          Q.     And why is that, that you don't believe it to be

6    true?

7          A.     It's my understanding it was done by the -- by a

8    fellow by the name of Tom.

9          Q.     Okay.  And is that person SKS?

10         A.     Not to my knowledge, no.

11         Q.     All right.  And any idea -- well, the -- the job

12   could not be assigned, correct?  We've already read the

13   contract.

14         A.     The contract cannot be assigned, yes.

15         Q.     Right.  So that the contract prohibits Craigue &

16   Sons Home Exteriors from assigning some portion of the job to a

17   different company, right?

18         A.     No, that's not true.

19         Q.     Okay.  What is true?  Because it --

20         A.     The contract says it cannot assign the contract.

21         Q.     Okay.

22         A.     It does not prohibit them from using subcontractors

23   and, in fact, that's very common.  So if there was electrical

24   work, you would have an electrician; if there was plumbing

25   work, there would be a plumber.  So there's no --

94

1      Q.   Right.

2      A.   -- no prohibition for utilizing subcontractors.

3      Q.   Understood.  But Craigue & Sons was not permitted to

4  put some other company in its place to do the -- to do the

5  windows installment, right?

6      A.   I disagree.

7      Q.   It's general -- it would have to be the general

8  contractor for the job unless an assignment is approved; isn't

9  that correct?

10      A.   I disagree.  No, that's not -- that's not the case

11  at all.

12      Q.   Okay.

13      A.   I'm not a lawyer.

14      Q.   Okay.

15      A.   It seems like you're asking me legal questions.

16      Q.   Fair enough.

17           And explain -- just explain your disagreement, if

18  you would.

19      A.   Because an assignment is just that, an assignment.

20  So in this particular case, what's prohibited is for the --

21  Craigue & Sons, or the entity, the contractor, assigning that

22  contract for the work.

23           What you're talking about is hiring subcontractors

24  to do specific components of the work.  The overall

25  responsibility for the job would remain with Craigue & Sons.

1          Q.    And that never changed, correct?

2          A.    What hasn't changed?

3          Q.    The overall responsibility for the job remained with

4     Craigue & Sons.

5          A.    Craigue & Sons never assigned the job.

6          Q.    Okay.  You were also asked about the letter that you

7     wrote to Mr. Martineau.  Do you recall that?

8          A.    I recall the letter after seeing it, yes.

9          Q.    Okay.  And do you agree that you stated at the end

10    of the letter, as to the person who passed away, that you do

11    not pay him and have no contractual relationship with him?  Do

12    you agree that you said that?

13         A.    I don't know who him is.

14         Q.    Him being the -- Skinny.

15         A.    We hadn't -- we had no -- no contract -- REI Service

16    Corporation had no contractual relationship with Skinny.  We

17    never paid him, we never employed him, and I never met him

18    other than apparently on -- in August when I was on the job, he

19    was on the job.  But he was not introduced.  I didn't introduce

20    myself, I don't believe.

21              MR. DAVIS:  No further questions.  Thank you.

22              THE COURT:  Attorney Mirhashem.

23              MR. MIRHASHEM:  Thank you.

24                        RECROSS-EXAMINATION

25    BY MR. MIRHASHEM:

1    Q.    You and Attorney Davis just had a disagreement about

2    the legal term assignment of a contract; is that right?

3    A.    My understanding of what assignment is, yes.

4    Q.    Two people can have different understandings of what

5    a legal term means?

6    A.    I think that -- I think that's why there's court,

7    yes.

8    Q.    Now, you said that the windows were being done by

9    Tom.  What's Tom's last name?

10   A.    I can't recall.

11   Q.    And were you under the impression that Tom was

12   working for Craigue & Sons?

13          MR. DAVIS:  Objection to under the impression,

14   basis.

15   Q.    Did you know who Tom worked for?

16   A.    I have -- I have no knowledge.  My understanding,

17   though, is this individual, Tom, was working for himself

18   putting these windows in.

19   Q.    So the windows part of this contract that we were

20   just looking at was done by some other person not named in this

21   contract?

22          MR. DAVIS:  Objection, personal knowledge basis.

23          THE COURT:  Overruled.

24   Q.    Right?  Tom was doing the windows, not Craigue &

25   Sons.

1      A.     No, Craigue & Sons was responsible for doing --

2  doing the windows.  The individual, to my understanding, that

3  was actually doing the work was a fellow by the name of Tom.

4      Q.     Are you aware that there is a Tom who works for

5  Shane Laliberte?

6      A.     Not as an employee, no.

7      Q.     As anything.  Do they have a work relationship?

8      A.     They do.

9      Q.     Okay.  So there is a Tom who has a work relationship

10  with Shane Laliberte; he's not his employee, but they have a

11  work relationship.

12      A.     I know -- I know that Tom does a lot of work with

13  SKS, yes.

14      Q.     And was it that Tom who put the windows in?

15      A.     That is my understanding, yes.

16      Q.     Okay.  So a Tom who has a work relationship with SKS

17  actually did the windows job here, correct?

18      A.     Well, I -- I don't know who he was working for.  He

19  may -- my understanding is Tom is a contractor who does work

20  for many people.  He does do work, I know, with SKS.  He's done

21  work, I believe, with REI Service Corporation.  He does work

22  with others other than SKS.  So I assume, but I don't know,

23  that he was working for Craigue & Sons.

24      Q.     So it's your assumption that the Tom who put in the

25  windows was working for Craigue & Sons, but what you know about

1    Tom is that he does a lot of work with Shane Laliberte?

2         A.    They -- they have a -- they have a contractual

3    relationship where they do work for each other, yes.

4         Q.    So like Tom would be a subcontractor for Laliberte

5    if he put windows in for him?

6         A.    I don't have -- I don't know that.

7               MR. MIRHASHEM:  Okay.

8               THE COURT:  Anything further, Attorney Davis?

9               MR. DAVIS:  Nothing further.

10              THE COURT:  All right.  Mr. Clark --

11              THE WITNESS:  Yes.

12              THE COURT:  You're excused.  Thank you, sir.

13              THE WITNESS:  Thank you.

14              THE COURT:  You may call your next witness.

15              MR. DAVIS:  Scott Kelly.

16              MR. MIRHASHEM:  Your Honor -- your Honor, I'm just

17   asking for a sidebar.

18              THE CLERK:  Is it a sidebar?

19              THE COURT:  There's a sidebar, yes.

20              MR. DAVIS:  Can we have a sidebar, Judge?

21              THE COURT:  Yeah.  Just one moment.

22                         AT SIDEBAR

23              MR. MIRHASHEM:  Your Honor, I don't want to

24   cross-examine Scott Kelly until I know the information on

25   ▓▓▓▓▓▓▓▓▓  And I can explain why.

1          I'm concerned that he's going to testify on direct

2   now and then we're not even going to know what's happening with

3   ████████ until tomorrow.  So I'm just bringing that up so that

4   we can look forward.

5          THE COURT:  Okay.  Do you have a problem then with

6   when direct is over breaking for lunch and then you would have

7   the opportunity at that time before your cross to read through

8   the records?

9          MR. MIRHASHEM:  As long as we have everything,

10  that's fine.  I just want to be clear, your Honor.  I'm sorry

11  for repeating myself, but our request for exculpatory evidence

12  is not limited to the CI file.  Our claim is that they need to

13  check with the Concord Police Department and see what

14  exculpatory information there is about this person.  They need

15  to check with Sean Roberts to see what he knew, and they need

16  to check with William Carroll to see what he knew before the

17  cross-examination.

18          And so those are areas that I think are going to

19  come up during the testimony of Agent Kelly.

20          THE COURT:  Okay.  Well, let's do his direct and at

21  the end of his direct, when you're ready to cross, we will

22  figure out what to do and where to go.  Does that make sense?

23          MR. MIRHASHEM:  Thank you.

24          MR. DAVIS:  We have received the records now.  We

25  have them in the courtroom.

1          THE COURT:  All right.  He just hasn't had time to

2     look at them and he needs time to look at them and wants to do

3     that before the cross.

4          MR. DAVIS:  Yes.  And we haven't disclosed them yet,

5     so we're just looking at them ourselves.

6          THE COURT:  Okay.  All right.  Well, it may be a

7     long lunch break.

8          Okay.

9                    CONCLUSION OF SIDEBAR

10         THE CLERK:  Mr. Kelly, would you please take the

11    witness stand and raise your right hand.

12         **SCOTT KELLY**, having been first duly sworn, testified

13    as follows:

14         THE CLERK:  Thank you.  Please state your full name;

15    spell your last name for the record.

16         THE WITNESS:  Full name is Scott Wayne Kelly, my

17    last name is K-e-l-l-y.

18         THE CLERK:  Thank you very much, sir.  Please be

19    seated.

20                    DIRECT EXAMINATION

21    BY MR. DAVIS:

22    Q.   And, Mr. Kelly, you're permitted under the court

23    rules to be the sole person in the courtroom to remove his

24    mask, if you so choose.  So I invite you to do that, if you

25    would.

1      A.    Sure.  Okay.

2      Q.    Good morning.

3      A.    Good morning.

4      Q.    How are you employed?

5      A.    I'm employed by the Department of Labor OSHA.

6      Q.    And is that the Occupational Safety and Health

7  Administration?

8      A.    It is.

9      Q.    And that's a federal agency in the Department of

10 Labor?

11     A.    Yes, it is.

12     Q.    All right.  I want to ask about your background a

13 little bit.

14           Did you work for a time as a fire inspector?

15     A.    Yes.  I was a fire safety -- I was a fire safety

16 engineer for the state of Georgia for two years.

17     Q.    All right.  And how far back does that go that you

18 were working in Georgia in that way?

19     A.    That would have been in '90 -- '98 and '99.

20     Q.    All right.  And what did you do after that?

21     A.    I went to work for a large retail builder.

22     Q.    In Georgia?

23     A.    No.  This was a company out of Minneapolis,

24 Minnesota.

25     Q.    Okay.  And what did you do for that retail builder?

1    A.    I was actually a traveling superintendent.  So I --

2    Q.    What did that involve?

3    A.    I would have to go to multiple jobs and just run the

4    project.

5    Q.    And when you say run the project, just explain

6    basically what you were doing.

7    A.    Well, basically I wore many hats.  I could go -- I

8    could go and start the job when it was just dirt and when I was

9    done, it could be a complete building there.

10        So I'd have to run the contractors; I would have to

11   do contracts with them; I would have to also handle safety; I

12   would deal with building officials, city officials; I would

13   bill architects, engineers, and the owners of the property.

14   Q.    All right.  So did you gain a fair amount of

15   knowledge just about the whole construction industry in

16   general?

17   A.    I -- I would have to say yes.

18   Q.    All right.  Now, did you -- how long did you work

19   for that company?

20   A.    I worked for like two different companies and it

21   probably was -- I'd say around four years; and then I worked

22   for another company, same thing, another company out of

23   Chattanooga, Tennessee.

24   Q.    All right.  And what kind of business was that

25   company?

1       A.    Same thing.

2       Q.    All right.

3       A.    It was a large retail builder.

4       Q.    And what did you do for them?

5       A.    Exactly the same thing.

6       Q.    And did you go all around the country doing this?

7       A.    Yes.  Yes, I traveled.

8       Q.    All right.  And when did you stop doing that job for

9  that second company?

10      A.    The separate -- so I ended -- it ended in 2009

11  when -- you know, when everything was going bad in construction

12  at that time.  The economy was not doing very well.

13      Q.    All right.  And in 2009, did you get a job with

14  OSHA?

15      A.    Yes, I did.

16      Q.    And what is the name of that job?

17      A.    I am a -- I'm actually what they call a COSHO.

18      Q.    And is that C-O-S-H-O?

19      A.    Yes.

20      Q.    And what does that stand for, if you know?

21      A.    Compliance health and safety officer.

22      Q.    So you're an OSHA compliance safety and health

23  officer; is that right?

24      A.    Yes.

25      Q.    Okay.  What do you do in that job and have you been

1     doing that since 2009?

2          A.   Yes, I have.

3          Q.   So this is your 12th year or so?

4          A.   October will be exactly 12 years I'm with the

5     agency.

6          Q.   Very good.  And what does a -- what does a COSHO

7     for -- for OSHA do?

8          A.   Well, we're -- basically we're directed to do

9     inspections and then accident investigations by the area

10    director or one of the assistants.

11         Q.   All right.  And what is an inspection and what is an

12    accident investigation?  Can you describe those different

13    things?

14         A.   Well, it's almost the same thing.  There's more

15    details when there's an accident.

16              So for basic inspection, we go out -- we go out, we

17    interview the workers, the contractors on the job, we take

18    photos of several different things all as part of the

19    investigation.

20              And then for accidents there's actually, a lot of

21    times, a lot more work that needs to be done there.

22         Q.   All right.  So you can do an inspection of a

23    particular worksite where no accident has occurred; is that

24    right?

25         A.   That's -- that's true.

1      Q.    And you're just going to check to see if the

2   regulations are being followed correctly?

3      A.    Correct.  We'll show -- we're usually assigned or we

4   get what we call -- there's two different things.  It may be

5   called ResCon, which is residential construction, that we can

6   go out on a list of jobs that we need to, or there's a

7   commercial list.  Basically it's called like the dodge list.

8   But what it is it's set up for a lot of jobs that are in

9   New Hampshire and then we are assigned those jobs to go out and

10  look at them --

11     Q.    All right.

12     A.    -- for safety reasons.

13     Q.    And those -- those happen regardless of accidents --

14     A.    Correct.

15     Q.    -- or anyone being injured, right?

16           But then you also go immediately to -- to an

17  accident site from time to time?

18     A.    Yes.  It depends on how they come in, correct.

19     Q.    All right.  And so is part of your job inspecting

20  worksites?

21     A.    Yes, correct.  Yes.

22     Q.    And do you take photographs and look at materials,

23  that kind of thing?

24     A.    Yes, we -- we take several photos, we -- we take

25  photos of the equipment, we gather information off the

1    equipment.  We also would take photos and, let's say, the

2    vehicles that are on the jobsite, we take pictures of the

3    license plates, especially if we need to run some information.

4         Q.   All right.  And do you also do interviews?

5         A.   Yes.

6         Q.   And is it -- you do interviews frequently in your

7    job doing inspections?

8         A.   Every -- every inspection, we do interviews.

9         Q.   All right.  And who are the typical people that you

10   interview at a job inspection?

11        A.   Well, usually there's some kind of contractor,

12   subcontractor, subcontractor, or there would be just workers on

13   the jobsite that we would -- we would interview.

14        Q.   Okay.  Do you also write reports?

15        A.   Absolutely.  Yes.  Yes.

16        Q.   And do you recommend findings about various

17   regulations that OSHA enforces?

18        A.   We usually do it with a -- with an immediate

19   supervisor.  We'll look over the -- all the information with an

20   immediate supervisor and it would usually be up to the

21   supervisor or the area director to decide what citations are

22   issued.

23        Q.   Okay.  And the citations have to do with health and

24   safety standards for various industries; is that right?

25        A.   That's correct.

1      Q.    All right.  And in your time as a COSHO for OSHA,

2  starting in 2009, any idea how many accident investigations

3  you've done?

4      A.    Right now I've got a total of about 750 total

5  inspections with the agency.  I'm not sure exactly what the

6  number of accidents would be.

7      Q.    All right.  It would be a smaller number, though,

8  right?

9      A.    It would be -- it could be.  It -- it depends,

10  really, on the year.

11      Q.    Okay.  And, roughly, how many do you do a year,

12  accident investigations?

13      A.    Well, again, it may be anywhere from, say, five or

14  as many as 17 or 18.  It really depends.

15      Q.    All right.  But obviously the number of accident

16  investigations you're doing is fewer than all of the

17  inspections you're doing?

18      A.    Correct.

19      Q.    And is it fair to say accident investigations

20  typically take longer than a regular inspection?

21      A.    Yes.

22      Q.    Okay.  All right.  So directing your attention to

23  August 28th of 2018, do you recall that day?

24      A.    Yes.  Our office was contacted by Concord PD

25  dispatch.

1      Q.    All right.  And was that at about 11:40 a.m.?

2      A.    Yes.

3      Q.    All right.  And where is your office, your OSHA

4    office, located?

5      A.    We're at 53 -- 53 Pleasant Street.  Actually here --

6    actually here in the building.

7      Q.    All right.  So you can kind of just stroll over to

8    this courtroom from where your office is; is that right?

9      A.    Yes, sir.

10     Q.    All right.  And that day, were you -- you were at

11   your office here in Concord in the building?

12     A.    Yes, I was actually in our office.

13     Q.    Okay.  And did you get an accident referral that

14   day?

15     A.    Yes.

16     Q.    Okay.

17     A.    There was an accident referral, yes.

18     Q.    Describe what happened.

19     A.    Well, we got the accident referral and the

20   dispatcher stated that there had been a construction accident

21   inside the city at 280 Pleasant Street.

22     Q.    Okay.

23     A.    And the information was relayed to the area

24   director, my immediate supervisor.

25     Q.    All right.  And did the immediate supervisor make an

1    assignment?

2          A.    Yes.

3          Q.    And what was it?

4          A.    He assigned me to do the investigation.

5          Q.    Okay.  So it was your case; is that right?

6          A.    That's correct.

7          Q.    All right.  And were you advised what the status on

8    the scene was in terms of what Concord Police was doing?

9          A.    At the time we -- I understood that the worker had

10   actually been transported to the hospital with severe injuries.

11         Q.    Okay.  And what about the status of the scene?  What

12   was -- what was that?

13         A.    Well, we have it where the police officers will hold

14   the scene for us when we ask them to.

15         Q.    So the police officers can hold the scene for OSHA

16   to come and inspect?

17         A.    Yes.

18         Q.    All right.  And that happened here?

19         A.    It did.

20         Q.    All right.  Now, when you left your office, did you

21   bring any particular clothing or equipment that identified who

22   you were?

23         A.    Yes.  We have a -- a badge that we bring with us.

24   We normally have a vest.  We wear steel-toed boots and then we

25   wear -- always wear a hardhat and safety glasses.

1      Q.    All right.  And what does the hardhat say on it?

2      A.    On the front of it it actually says OSHA.

3      Q.    Okay.  And is that -- did you wear an OSHA hardhat

4  that day?

5      A.    Yes.

6      Q.    Okay.  So did you drive then to the worksite?

7      A.    Yes, I proceeded --

8      Q.    And how long did that take you?

9      A.    Just a few minutes.  We're about a mile down from

10  the location.

11      Q.    All right.  And what time did you get there about?

12      A.    I arrived at approximately twelve o'clock,

13  lunchtime.

14      Q.    All right.  And what did you see happening there

15  when you got there?

16      A.    Well, as I arrived on the scene, I noticed that

17  there were three Concord PD vehicles parked in front of the

18  building.

19      Q.    All right.  So that's Concord Police Department?

20      A.    Yes.

21      Q.    And did you meet and talk with them?

22      A.    Yes.  When I -- once I pulled up, I noticed that

23  there was a police officer standing next to the yellow police

24  tape.

25      Q.    All right.

1     A.    So I exit my car and went over and spoke with him.

2     Q.    And who was the first officer you spoke to?

3     A.    It was Officer Lovejoy.

4     Q.    Is that Christopher Lovejoy, Concord Police?

5     A.    Yes.

6     Q.    And was he in charge of the scene?

7     A.    At the time he was, yes.

8     Q.    Okay.  And, again, the person who'd fallen had

9  already been transported; is that right?

10    A.    Yes, sir.  He had -- he told me that the victim was

11  in really bad condition, so they transported him to the

12  hospital.

13    Q.    Okay.  So you didn't see the person who fell?

14    A.    I did not.

15    Q.    Okay.  Did you meet an Officer William, Bill,

16  Brouillet, also from Concord?

17    A.    Yes.  He came up just a little bit after.

18    Q.    And did you speak to him as well?

19    A.    Yes.

20    Q.    Okay.  Now, at some point did you meet a

21  ███████████████?

22    A.    He actually -- I was told -- when I was standing

23  there with the officers, I was told that he was actually back

24  at the jobsite.

25    Q.    That he had come back to the jobsite?

1        A.   Yes.

2        Q.   All right.  And did you find him around -- among the

3   people there?

4        A.   Yes.  He -- he walked up and -- he actually walked

5   up to us and I -- I walked up and talked to him and just --

6   just basically introduced myself and then asked about -- about

7   the -- the accident victim.

8        Q.   Okay.  And can you describe what he looked like that

9   day?

10       A.   What Mr. --

11       Q.   Just his general appearance, █████████

12       A.   Oh, he was a ██████████ and he appeared to be --

13   you know, it was obvious that he was somewhat upset, yes.

14       Q.   Okay.  And had he just returned from the hospital?

15       A.   Correct.

16       Q.   All right.  And did you -- at that point, did you

17   know that Skinny, the person who fell, had died or was it not

18   known at that point?

19       A.   No, it was not known right then.

20       Q.   Okay.  So what did you do next after you met

21   ██████████?

22       A.   Well, at that point I thought maybe I would try to

23   interview ██████████.

24       Q.   Okay.  Now, why did you want to do that, why

25   ██████████ as someone to interview?

1      A.    Well, for one reason is a lot of times when there

2    is -- when OSHA shows up at a jobsite, even though it's either

3    an accident or it's not, a lot of these folks that work there,

4    they usually just leave the jobsite.

5      Q.    So that can be a problem?

6      A.    Yes.

7      Q.    All right.  So what -- what do you try to do to

8    prevent that?

9      A.    Well, in this case, it was good because the police

10   actually held the scene for us.  So normally when they hold a

11   scene, they usually hold the workers there.

12     Q.    Okay.  And why did you want to interview a worker at

13   the scene?

14     A.    Well, I needed to interview him to find out exactly

15   what happened and then ask questions exactly who he was and was

16   he -- was he a witness.  So I would want to ask the questions

17   because he was actually there working with him.

18     Q.    Okay.  So you understood he was a coworker with

19   Skinny, the person who fell?

20     A.    Yes.

21     Q.    And you wanted to talk to him about what had

22   happened?

23     A.    Correct.

24     Q.    And did you also want to know about ██████████

25   employment status?

1        A.    Yes.

2        Q.    All right.  Can you explain -- why is that?  Why did

3   you care about that?

4        A.    Because with OSHA, we've got to determine

5   employer-employee relationship.

6        Q.    All right.  Explain that.  What do you mean?

7        A.    Well, the worker has to be an employee of the

8   company for OSHA to have jurisdiction.

9        Q.    All right.

10       A.    So it's very important that we -- we figure out who

11  they are.

12       Q.    So if a -- so you just said that the worker has --

13  has to have an employer-employee relationship for OSHA, your

14  agency, to have jurisdiction; is that right?

15       A.    That's correct.

16       Q.    And so if you go on to a site and you're trying to

17  assess safety, compliance with safety regulations, let's say,

18  but you find that there is no employer of any employees, are

19  you saying OSHA has no jurisdiction?

20       A.    Well, I'm saying that we also have -- have to

21  continue the investigation and we do a process of asking them

22  questions to determine what their status is.

23       Q.    But in the end, if someone's not an employee -- if

24  there's no employee on the site, as you're saying, OSHA doesn't

25  have jurisdiction?

1          A.    That would be -- that would be correct, yes.

2          Q.    All right.  And so is it a common thing for you to

3    do at an inspection or an accident investigation to try to

4    identify who exactly are the employees here?

5          A.    Yes.

6          Q.    All right.  And were you trying to do that on this

7    day as -- like in other days?

8          A.    Yes, sir.

9          Q.    All right.  Okay.  So did you -- did you make --

10   take steps to interview ▓▓▓▓▓▓▓▓

11         A.    At that -- at that time, I -- I didn't.

12         Q.    All right.  And at some point did you meet Nate

13   Craigue around this time?

14         A.    Right.  It was -- it was at this time that

15   Mr. Craigue had actually showed up and he introduced himself.

16         Q.    All right.  So you were talking to ▓▓▓▓▓▓▓ at the

17   time that you met Mr. Craigue; is that right?

18         A.    I was talking to him, yes, I -- yes.

19         Q.    All right.  And the person known as Nate Craigue, do

20   you see him in the courtroom today?

21         A.    I -- I do.

22         Q.    All right.  And would you point him out, please.

23         A.    He's sitting over here.

24         Q.    And what's he wearing, just clothing?

25         A.    I don't know.  I'd have to take a good look at him.

1    It's been a little while since I've seen him.

2              He's in the blue shirt.

3              MR. DAVIS:  All right.  Let the record reflect, your

4    Honor, the witness has identified the defendant.

5              THE COURT:  It will.

6         Q.   All right.  And was that the first time you'd met

7    Nate Craigue?

8         A.   It actually was not.

9         Q.   All right.  Well, I won't ask you about -- so you

10   actually knew him at that point?

11             MR. MIRHASHEM:  Objection.

12             THE COURT:  Sidebar.

13                            AT SIDEBAR

14             MR. MIRHASHEM:  Your Honor, we didn't know anything

15   about any prior contact and now the jury's left with an

16   impression that there may have been some prior investigation of

17   our client.  We had no knowledge of this.  If -- I would ask

18   for a proffer so that if the contact was innocuous, it could be

19   brought out.  So I don't know what the government's proffer is

20   to this prior contact.

21             THE COURT:  I think the government was surprised by

22   the answer.

23             MR. DAVIS:  It was surprised.  And I won't ask any

24   further question about it.  So ...

25             THE COURT:  Is that satisfactory to you?

1          MR. MIRHASHEM:  Honestly, not really, because what

2    was the relevance of did you know him before.  If he didn't,

3    doesn't do anything; if he did, now the jury's left with an

4    impression.

5          So I would ask the government to -- I mean, I guess

6    we need to find out what he's going to say and elicit that

7    there was no prior investigation of Mr. Craigue since nothing's

8    been disclosed to us.

9          MR. DAVIS:  I don't want to go there.  I don't think

10   the defense does either, I would guess.  I don't know.  I

11   didn't think he knew him and I was just trying to elicit that

12   he doesn't know anything about him.

13         THE COURT:  Let me ask you this, Attorney Mirhashem.

14   What about a quick limiting instruction, you heard about a

15   prior contact, but you're instructed not to speculate about

16   that and instructed to disregard it.

17         MR. MIRHASHEM:  Honestly, your Honor, my preference

18   would be -- I know it's inconvenient -- but take a quick break

19   and find out what the prior contact was, so that if it was

20   innocuous, it can be brought out.  But obviously --

21         THE COURT:  All right.  We will take a ten-minute

22   break then.

23         MR. MIRHASHEM:  Okay.

24                    CONCLUSION OF SIDEBAR

25         THE COURT:  We're going to take a very short break

1    and come back right around noon.  Okay?

2              THE CLERK:  All rise for the jury.

3                  (Jury excused from the courtroom.)

4              THE COURT:  Mr. Kelly, we're going to ask briefly

5    some questions out of the presence of the jury.  I'll let

6    Attorney Davis ask the questions.

7              THE WITNESS:  Okay.

8                       VOIR DIRE EXAMINATION

9    BY MR. DAVIS:

10        Q.   Officer Kelly, I think you just said you -- that

11   Mr. Craigue was known to you as of August 28th?

12        A.   I had known who he was, yes.

13        Q.   And can you just say how you knew -- how did you

14   know that?

15        A.   Well, because my immediate supervisor and

16   Mr. Craigue were friends, or are friends, and they -- they

17   played baseball together.

18        Q.   Okay.  So you knew -- you knew that -- you knew that

19   about Mr. Craigue, that he was friends with your supervisor?

20        A.   I knew what he had told me and then when we -- one

21   day we went downtown to get a -- some coffee at the coffee

22   shop.  A man and a child came in and as I was sitting there, my

23   supervisor told me that -- who he was.

24        Q.   I see.

25        A.   And then he walked up to the table and we talked for

1   a few minutes.

2        Q.   All right.  So your prior knowledge of him had

3   nothing to do with OSHA or OSHA violations or safety, anything

4   like that, correct?

5        A.   No.  Even after we started, I didn't really realize

6   who he was.

7        Q.   I see.

8        A.   Because I meet -- unfortunately, I meet so many

9   different people.  They tell me their names.  I don't remember.

10       Q.   Right.

11       A.   I'm better off with faces than I am with names.

12            So, no, I did not remember.

13       Q.   And last question, I think.  Do you know when you

14  made the connection that Mr. Craigue who was the subject of

15  that accident investigation was the person you'd met earlier

16  with your supervisor?  Do you know when that occurred to you?

17       A.   I -- honestly, I don't.  I think it was after I got

18  back to the office and --

19       Q.   I see.

20       A.   -- was going over the investigation with -- with my

21  supervisor.  Yes.

22            MR. MIRHASHEM:  My request would just be that the

23  government just do the same thing in the jury's presence so

24  that the jury learns that there was nothing, you know --

25            THE COURT:  Yes.

1          MR. MIRHASHEM:  -- prejudicial.

2          THE COURT:  I think that that's fair because the

3    jury would otherwise speculate.

4          All right.  If you need to use the restroom,

5    Mr. Kelly, you can do that, or you can just stay right there.

6    It's up to you.

7          THE WITNESS:  Yeah, I'm fine.

8          THE COURT:  Okay.  All right.  And if anyone else

9    needs to use the restroom real quick, we've still got five

10   minutes, so I'll let everybody do that.

11         THE CLERK:  All rise.

12       (Recess taken from 11:55 a.m. until 12:00 p.m.)

13                      BEFORE THE JURY

14         THE COURT:  Go ahead, Attorney Davis.

15    Q.    Officer Kelly, when we broke, I had asked you about

16   Mr. Nathan Craigue and whether you had met him before and you

17   said you had.  Correct?

18    A.    Yes.

19    Q.    And can you explain the circumstances in which you

20   met Mr. Craigue before August 28th of 2018?

21    A.    Yes.  Me and my supervisor was in downtown Concord

22   at a coffee shop having coffee and a man walked in with a small

23   child.  And my supervisor told me that that was a friend of his

24   that he played baseball with.  So they began talking and then

25   Mr. Craigue and his son came over to our table and talked and,

1    you know, he told me who he was.

2         Q.   All right.  And did he tell you that was Nate

3    Craigue?

4         A.   My supervisor said that his name was Nate Craigue,

5    yes.

6         Q.   Okay.  And do you remember how long before the

7    accident investigation that was that you met Mr. Craigue?

8         A.   It might have been -- it might have been a couple of

9    years.  I'm not sure exactly the date.

10        Q.   All right.  And when you first saw Mr. Craigue at

11   the accident scene, did you even remember that you had met him

12   before in a coffee shop in Concord?

13        A.   No.

14        Q.   All right.  When did you put that -- it was not

15   until later that you remembered that; is that right?

16        A.   When I got back to the office and was discussing

17   the -- discussing what was going on with my supervisor, he --

18   he informed me who that was.

19        Q.   And then you made the connection?

20        A.   Yes, sir.

21        Q.   Okay.  All right.  So let's go back to the jobsite.

22   You said that Mr. Craigue came up and introduced himself; is

23   that right?

24        A.   That's correct.

25        Q.   And what did he say to you at that time, do you

1    recall?

2        A.    At that point he didn't really say anything.  He

3    was -- he was standing around with all of us and then -- and

4    then at that point I thought maybe I'd try to interview him if

5    I could.

6        Q.    Okay.  And did you talk to him briefly there?

7        A.    No.  At that point, no.  Another officer walked up

8    and told us that -- unfortunately, that Mr. McKenna had died as

9    a result of his injuries.

10       Q.    All right.  So that was your first news that the

11   accident was fatal?

12       A.    That's correct.

13       Q.    Okay.  And so at that time, what happened with

14   Mr. Craigue?

15       A.    Well, Mr. -- Mr. Craigue actually just -- just

16   walked off.  I wasn't sure exactly what he said, something

17   about knowing Mr. -- Mr. McKenna, but then he just -- he walked

18   off at that time back towards -- like towards his car.

19       Q.    All right.  And was he obviously upset about the

20   news?

21       A.    Yes.  He appeared to be, yes.

22       Q.    And so he walked away from you for a while?

23       A.    Yes.

24       Q.    All right.  And so what did you do at that point?

25       A.    Well, at that point, ████████ was still standing

1  there, so I thought if he could talk to me, I'd like to

2  interview him.

3       Q.   Okay.

4       A.   So --

5       Q.   Did you ask him if he was willing to be interviewed?

6       A.   I did, and he stated he was.

7       Q.   Okay.  And did you make arrangements to be somewhere

8  and talk with him?  Where did you actually talk with him?

9       A.   Yeah, because of the confined area of where the

10  job was or how it was taped off, I wanted to get away from

11  certain -- there was more people there, so I wanted to get away

12  from everyone so I had some privacy with ▇▇▇▇▇.

13            So I asked the officer if I could go inside the

14  taped off area and interview ▇▇▇▇▇.

15       Q.   Okay.  And so did you do that?

16       A.   Yes.

17       Q.   And when you interviewed ▇▇▇▇▇, did you actually

18  sit down at that point?

19       A.   No, we were actually standing up.

20       Q.   Okay.  And ▇▇▇▇▇ said he's willing to talk to

21  you?

22       A.   Yes.

23       Q.   Okay.  Did you ask him questions about his status as

24  an employee or not, his status as a worker?

25       A.   Yes.  I asked him -- I asked him, you know, who he

1    was and who did he work for.  And he stated that -- that he was

2    a subcontractor.

3         Q.    All right.  And did he say for what company that he

4    was subcontracting to?

5         A.    Yes, Mr. Craigue.

6         Q.    Okay.  And did ███████ say how he was getting paid

7    for the subcontracting that he was doing?

8         A.    He said he was being paid at the end of the job with

9    a check from Mr. Craigue.

10        Q.    Okay.  How many times in that interview did he say

11   he was a subcontractor?

12        A.    Right offhand, I wouldn't be sure without relooking

13   at my notes.

14        Q.    All right.  Do you know if it was once or more than

15   once?

16        A.    I thought it was -- I honestly thought it was maybe

17   once.

18        Q.    Okay.  All right.  But you're -- you know he said

19   subcontractor?

20        A.    Yes, sir.

21        Q.    And did he offer that himself?

22        A.    Yes.

23        Q.    Okay.  Did he also tell you about the accident and

24   what he'd seen?

25        A.    Yes.  You know, he was -- he was talking about it or

1   trying to explain it a little bit, yes.

2          Q.    Okay.  And how long did that interview go on?

3          A.    It really didn't last very long because he was -- he

4   was acting like he was nervous and also he was upset.

5          Q.    All right.  And at one point did you make a decision

6   about whether you wanted to interview him again?

7          A.    Yes.

8          Q.    What did you decide?

9          A.    Well, because of the situation and everything, him

10  being nervous and all, I decided that I would definitely

11  interview him a second time.

12         Q.    All right.  Did you -- while you were talking to

13  ███████, did you see the defendant again, Mr. Craigue?

14         A.    Yes.

15         Q.    All right.  Can you describe where you first saw him

16  and what he was doing?

17         A.    Well, when I was talking to ███████  I noticed when

18  he was standing in front of me, he was acting nervous.  And I

19  had my back turned -- turned from the police tape and████████

20  was like he was nervous and he kept looking around me.

21               So when I looked back, I can see Mr. Craigue pacing

22  back and forth in front of the -- the police tape.

23         Q.    And how far was Mr. Craigue from you when you turned

24  around and saw him pacing?

25         A.    I would say it was pretty close.  It would be -- it

```
 1    might have been 10, 12 feet probably.
 2         Q.    And was it close enough for him to hear what you
 3    were talking about with ████████ --
 4              MR. MIRHASHEM:  Objection, calls for speculation.
 5         Q.    -- if you know?
 6              THE COURT:  Overruled.
 7         A.    I'm sorry?
 8              THE COURT:  You can answer the question.
 9              THE WITNESS:  Was it close -- I thought it possibly
10    could be close enough, yes.
11         Q.    Okay.  All right.  And what else was Mr. Craigue
12    doing then other than pacing back and forth?
13         A.    I wasn't really sure at the time.  I just noticed he
14    was -- he was pacing back and forth at the -- at the police
15    tape.
16         Q.    Okay.  So what did you do then with respect to
17    Mr. Craigue?
18         A.    So at that time, basically, I -- I went back to talk
19    more to the police officers and then it was a little bit later
20    that I talked to Mr. Craigue.
21         Q.    All right.  So you actually sat down with Mr. Nate
22    Craigue then?
23         A.    Yes, I did.
24         Q.    All right.  And where did that interview occur?
25         A.    There is a picnic table right in front of the
```

1    building and we sit there at the picnic table and talked.

2        Q.   Okay.  And who else was present for that interview?

3        A.   ████████████ as there.

4        Q.   Okay.  And where was he sitting?

5        A.   He was sitting at the exact table.  It was -- I

6    believe -- if I can remember right, Mr. -- Mr. Craigue was

7    sitting to the left of me and then ████████was sitting across.

8        Q.   All right.  And was ██████████ close enough so he

9    could hear what was being said?

10       A.   Yes.

11       Q.   And was it ever explained to you why ██████████was

12   listening in on the interview?

13       A.   No.  This is actually common on a jobsite.

14       Q.   And why is that?

15       A.   Well, because it -- it doesn't really matter if the

16   workers are hearing what the owner says.  It's just when we

17   talk to the workers, we have to do it in private so they can

18   feel free to talk to us.

19       Q.   Okay.  So you then did an interview of Mr. Craigue?

20       A.   Yes, I did.

21       Q.   And did he tell you the name of his company?

22       A.   Yes.

23       Q.   And what did he say about that?

24       A.   He said the name of the company was Nathan Craigue &

25   Sons Siding.

1    Q.   All right.  And did he tell you how long he'd

2    been -- they'd been in business and what they did?

3    A.   Yes, he said that they were -- they did siding and

4    windows and he also stated that they'd been in business for

5    several years.

6    Q.   All right.  And did he say they were at that jobsite

7    doing siding and --

8    A.   Yes.

9    Q.   -- siding work then?

10   All right.  Now, did you ask him a question about

11   his workers and what their status was?

12   A.   Yes.

13   Q.   And what question did you ask?

14   A.   I asked him about employees.

15   Q.   All right.  And what did Mr. Craigue say to you?

16   A.   Mr. Craigue stated he didn't have any employees.

17   Q.   And did he say what he had instead?

18   A.   He said the two workers were subcontractors.

19   Q.   Okay.  And did he say how he paid those

20   subcontractors?

21   A.   Well, at that time he said he paid them at the end

22   of the project.

23   Q.   Okay.  And when he referred to two, the two workers,

24   did you understand who he meant?

25   A.   Yes.

1      Q.   And who were they?

2      A.   That was ▮▮▮▮▮ and Mr. McKenna.

3      Q.   Okay.  And Mr. McKenna, the person who had fallen,

4  correct?

5      A.   Yes.

6      Q.   And then ▮▮▮▮▮▮ as well?

7      A.   Correct.

8      Q.   Okay.  Now, is paying at the end of the job, is that

9  something relevant to you as an OSHA investigator?

10     A.   Yes, that would be -- yes.

11     Q.   Okay.  And why is that relevant?

12     A.   Because that would be typically what you --

13          MR. MIRHASHEM:  Objection.

14          THE COURT:  Sustained.

15     Q.   Okay.  Did Mr. Craigue go on to talk about

16  Mr. McKenna, Skinny?

17     A.   Yes, he -- he basically said --

18     Q.   Yeah.

19     A.   Yes, he said he had known Mr. McKenna for several

20  years and that they had worked -- worked on many projects

21  together.

22     Q.   All right.  And did he tell you the name Skinny?

23     A.   Yes.  He said he -- that most people know him as

24  Skinny and not by his name.

25     Q.   Okay.  And did he tell you what his past work

1    relationship had been with Skinny in terms of working with him

2    at jobs?  Did he describe how that happened?

3         A.    Yes.  He -- he mentioned that he would be the one

4    that would go out and get jobs for the company and then he

5    would call around to see if someone wanted to go to work and it

6    was usually Mr. McKenna.

7         Q.    All right.

8         A.    And then -- yes.

9         Q.    Okay.  Go ahead.

10        A.    Well, then he said Mr. McKenna would be working for

11   other people and then he would contact him and then Mr. McKenna

12   would -- would come to work for him when he was working on like

13   larger jobs.

14        Q.    On larger jobs?

15        A.    Yes.

16        Q.    All right.  So you started out -- you said he would

17   be the one to get jobs.  When you say he, do you mean Mr. Nate

18   Craigue?

19        A.    Correct.

20        Q.    So Mr. Craigue would get the jobs, he told you --

21        A.    Correct.

22        Q.    -- right, but then he said that once he got a job,

23   he would see who wanted to work on it?

24        A.    That's correct.

25        Q.    And you said that Mr. McKenna was working for other

1   people?

2         A.    Yes.

3         Q.    All right.  But he said that on large jobs, he would

4   bring Mr. McKenna in?

5         A.    Yes.

6         Q.    Okay.  And did he, again, say what was Mr. McKenna's

7   status?

8         A.    Yes.  He said that Mr. McKenna was just a

9   subcontractor.

10        Q.    All right.  And he paid him when?

11        A.    I'm sorry?

12        Q.    He paid him when?

13        A.    He paid him at the end of the job.

14        Q.    All right.  And did he say anything else about how

15  he paid him or by what measurement he paid him?

16        A.    Yes.  He made a comment that he -- he paid them by

17  the square foot.

18        Q.    All right.  So what would that mean, to be paid by

19  the square foot?

20        A.    Well, that's just calculating the square foot of a

21  job that they'd been doing, a project.  So whatever work they

22  would be doing, they would be paid for the square foot for

23  whatever the work they accomplish.

24        Q.    Right.  So if you were being paid by the square

25  foot, you're not paid by the hour, right?

1     A.   No.

2     Q.   Okay.  All right.  And as Mr. Craigue was saying

3 these things to you, was ███████ listening?

4     A.   Yes.

5     Q.   And did ██████ say anything?

6     A.   No, he did not.

7     Q.   Okay.  Did Mr. Craigue give you an account of what

8 had happened that day at the job?

9     A.   He stated that he had arrived earlier, set the job

10 up, and then he went off to get materials for the job.

11     Q.   So he had gone to get materials?

12     A.   That's correct.

13     Q.   And did he say what brought -- what brought him back

14 to the jobsite?

15     A.   Yes.  He said that ██████ had contacted him and

16 told him that there'd been an accident.

17     Q.   Okay.  And then he came back at that time?

18     A.   That's correct.

19     Q.   All right.  While you were talking to Nate Craigue

20 that day, did he seem confused to you as he spoke to you?

21     A.   No.

22     Q.   Did he seem in any way affected by any substance?

23     A.   No.

24     Q.   Did he seem to have -- did he express any trouble

25 understanding you?

1      A.    No.

2      Q.    And did he say he had any trouble hearing you?

3      A.    No.

4      Q.    Okay.  So after you talked to him, where did he go

5  next?

6      A.    I was not sure.  I think -- I'm not -- I don't know

7  because I started doing my investigation.

8      Q.    All right.  And did you -- did you talk to him any

9  further on that day?

10      A.    I don't believe I did, no.

11      Q.    All right.  So how long were you on the scene that

12  day?

13      A.    For around two and a half hours.

14      Q.    Okay.  And during that time, did you conduct other

15  interviews?

16      A.    Yes.

17      Q.    Did you also take pictures?

18      A.    Yes.

19      Q.    And did you also inspect the site?

20      A.    Yes.

21      Q.    So you were doing an OSHA accident investigation

22  right there; is that right?

23      A.    Yes, that's correct.

24      Q.    All right.  So directing your attention to -- did

25  you then go back and begin to start your investigation and

1    begin to write reports?

2         A.    Correct.

3         Q.    All right.  And how long did your investigation go

4    on?

5         A.    It went from -- it went from the date to at least

6    October, late October.

7         Q.    Okay.  And is that -- is that relatively long for

8    you for an accident investigation or normal or short, what is

9    it?

10        A.    Well, it depends.  For accident investigations, they

11   do take a little longer.

12        Q.    Okay.  So was it kind of normal?

13        A.    Somewhat normal.

14        Q.    All right.  But for two months you're trying to

15   figure out what happened here --

16              MR. MIRHASHEM:  Objection, leading.

17        Q.    -- is that right?

18              THE COURT:  Sustained.

19        Q.    Did you work for two months?

20        A.    Yes.

21        Q.    All right.  Now, I want to ask you about one day,

22   September 5th of 2018.  Do you recall whether you went back to

23   280 Pleasant Street on that day?

24        A.    On -- I -- I'm not real sure.  I'd have to actually

25   look at the date or look at my notes on that, on that

1    particular date.

2        Q.    All right.  Do you remember the day you interviewed

3    Daniel Morrissey?

4        A.    I remember, yes.

5        Q.    Okay.  So I'm asking about that day.

6        A.    Okay.

7        Q.    And was Daniel Morrissey a witness who you talked

8    to?

9        A.    Correct.

10       Q.    All right.  Now, did you go into the building,

11   280 Pleasant Street, that day to talk to Mr. Morrissey?

12       A.    Yes, I did.

13       Q.    And as you left, do you recall what you saw?

14       A.    Yes.  As I was leaving the building, I was -- I was

15   looking at the job and I was looking at it to see if any more

16   work had been done on the jobsite.

17       Q.    And what did you -- what did you see?

18       A.    Well, it was -- I was looking and I saw some

19   different equipment that was not there; I mean as far as what

20   we call slide guard.  It's a bracket that's put on a roof to

21   prevent tools from being -- being -- falling off the roof.  So

22   it was removed.

23       Q.    All right.  So not all the same things were there;

24   is that what you're saying?

25       A.    That's correct.

1    Q.   All right.  Did you see a -- a trailer?

2    A.   Yes, I did.

3    Q.   All right.  Describe where you saw that trailer.

4    A.   It was actually set up on the back of the property

5    in the back -- in the parking lot.

6    Q.   All right.  And did you see the name on the trailer?

7    A.   Yes.

8    Q.   And what did it say?

9    A.   Nathan Craigue.

10   Q.   Okay.  And did you see Mr. Craigue anywhere?

11   A.   No.

12   Q.   And did you see anyone that you identified as

13   working for Craigue & Sons --

14   A.   I did not.

15   Q.   -- there?

16        But the trailer is still there, right?

17   A.   That's correct.

18   Q.   And you said you weren't sure what -- what day you

19   interviewed Mr. Morrissey?

20   A.   I'm not exactly sure, no, without overlooking my --

21   looking back at my notes.

22   Q.   Okay.  So I'm just handing you your report, page 14

23   of the report, which is Bates number 391.  Just at the bottom,

24   take your time --

25   A.   All right.  Correct.

1        Q.    -- Officer Kelly.

2        A.    Okay.  Okay.

3        Q.    And what day was it that you went -- went back and

4   saw the trailer still at the jobsite?

5        A.    That was September 5th, 2018.

6        Q.    Very good.  Thank you.

7              Now, as the investigation went on, did you conduct

8   additional interviews?

9        A.    Yes, I did.

10       Q.    And was one of those interviews a reinterview with

11   ████████████

12       A.    Yes.

13       Q.    And did he talk to you on October 30th of 2018?

14       A.    October 30th?

15       Q.    Yes.

16       A.    That's correct.

17       Q.    All right.  So at the end of October?

18       A.    Yes.

19       Q.    And did -- did Mr. -- did ████████ give you some

20   different information than he had given you on August 28th?

21       A.    Yes.

22       Q.    All right.  And you said before that one of the

23   things you're trying to do on a jobsite is to determine who the

24   employees are; is that right?

25       A.    Right.

1    Q.    And have you been told before in working for OSHA

2    that someone's a contractor --

3         MR. MIRHASHEM:  Objection.

4    Q.    -- a subcontractor?

5         MR. MIRHASHEM:  Objection.

6         THE COURT:  Sustained.

7    Q.    So let me ask it this way.  When you're uncertain

8    about the status of a particular worker at a site where you're

9    investigating, how does that affect the complexity of your

10   investigation or how can it?

11   A.    It adds a whole lot more work to our job.

12   Q.    All right.  So explain that to the jury.  What do

13   you mean?

14   A.    Well, we have to be a -- we have to do a whole lot

15   more research.  Again, we'd have to have a lot more records.

16   We would have to either ask the contractor to provide us

17   records, you know, and if for some reason they don't want to,

18   then we have to go back and issue subpoenas to try to get those

19   records.  And then we have to -- we may make multiple trips

20   back and try to reinterview people as many times as we need to

21   get the honest answers that are -- you know, the true answers

22   of what's going on.

23   Q.    And, again, this is because OSHA only has

24   jurisdiction if an employee is present on the site; is that

25   right?

1     A.    That's correct.

2           MR. DAVIS:  All right.  Could I have a brief

3   sidebar, Judge?

4           THE COURT:  Yes.

5                         AT SIDEBAR

6           MR. DAVIS:  Judge, the -- the question would be is

7   part of what OSHA does in doing accident or worksite

8   inspections is to determine all of the -- all of the employees

9   who are exposed to whatever the risk is at the site so that the

10  report has to list each employee who is exposed.

11          So I'd like to ask that question, but I want to

12  front it.

13          MR. MIRHASHEM:  I object.  There's no reason at this

14  point to get into exposure to risk.  I think the government has

15  clearly presented evidence about materiality.  I don't see what

16  the relevance is that he includes in his report names of

17  employees exposed to risk.  And to the extent that there's any

18  relevance, the probative value of that evidence is

19  substantially outweighed by the danger of unfair prejudice,

20  confusion of the issues, and misleading the jury.

21          So my objection is under Rules 401 and 403.

22          MR. DAVIS:  I'm wondering if defense is stipulating

23  to materiality.

24          MR. MIRHASHEM:  We don't have to stipulate to

25  materiality to avoid inadmissible evidence from coming in.  In

1     deciding probative value of evidence under Old Chief, the Court

2     is not limited to considering stipulations, but other evidence

3     that has already been admitted to establish the same point.

4     This person just testified that there was lengthy delay and

5     it's a lot more work when somebody says one versus the other.

6              And I certainly don't contest the government's right

7     to continue that line of inquiry; it's just the issue of

8     putting people's names down because they were at risk that I

9     don't -- I don't see how that's so probative on the issue of

10    materiality.

11             THE COURT:  Can I just interrupt and ask -- and I

12    haven't asked this yet, but does the defense object to the OSHA

13    instruction that Attorney Davis proposed?

14             MR. MIRHASHEM:  I haven't had a chance to look at it

15    carefully yet, but generally I don't think that -- well, I know

16    I can say that we don't have an objection to an instruction

17    about jurisdiction of OSHA as a government agency.

18             THE COURT:  Okay.  Because ultimately if, in fact,

19    the instruction stays out, then Attorney Davis would -- might

20    want to get some of what he was trying to establish in the

21    instruction out of this particular witness.

22             MR. MIRHASHEM:  I don't have objection to such an

23    instruction.  It's just honestly I haven't closely looked at

24    the wording of it because I didn't think that I needed to do

25    that yet.  But certainly we have no objection to the Court

1  instructing the jury on --

2          THE COURT:  On jurisdiction.

3          MR. MIRHASHEM:  -- on jurisdiction of OSHA, yes.

4          THE COURT:  Okay.  All right.  And how much longer

5  with this witness?  Are you going to get into much else?

6          MR. DAVIS:  Done.

7          THE COURT:  Okay.  And rephrase the question you

8  intend to ask him for me so I can rule on it.

9          MR. DAVIS:  The question would be in doing an OSHA

10 investigation, do you have -- do you have to determine the

11 number of employees who are exposed to any risk that you

12 encounter on the -- on the worksite.

13         THE COURT:  I'm going to exclude it.  I'm not seeing

14 enough relevance and I'm seeing prejudice with respect to the

15 risk.  And ultimately I find that under 403, the prejudice

16 substantially outweighs any probative value of that.

17         So you may be done at this point, but I'll let you

18 get back up and say you have no questions.

19                     CONCLUSION OF SIDEBAR

20         MR. DAVIS:  No further questions.  Thank you,

21 Officer Kelly.

22         THE COURT:  All right.  I think what we're going to

23 do, because it's 12:30, is take a lunch break.

24         And so, Mr. Kelly, you will be taking a lunch break

25 as well.  We'll come back at 1:30.  And you are still under --

```
 1   you're testifying, and so please don't talk to anybody during

 2   the break about your testimony.

 3             And the jury knows my instructions as well.  I'm not

 4   going to repeat those to you, but we will take our lunch break

 5   now and see you at 1:30.

 6             THE CLERK:  All rise for the jury.

 7                (Jury excused for the lunch recess.)

 8             THE COURT:  Officer Kelly, you may step down and you

 9   are relieved until 1:30.

10             Thank you, sir.

11             THE WITNESS:  Okay.

12             THE COURT:  Can counsel just give me a sense -- let

13   me turn on my mic -- the sense of the anticipated timing.

14   Here's my concern.  I keep the jury here for an hour for lunch

15   and then we find out for some reason that you can't go forward

16   with cross because you need to go through paperwork, you need

17   to make decisions.  And ultimately I just want to be able to

18   send the jury home ultimately if that's what's going to happen

19   today and I want to do it earlier rather than later.

20             So if counsel can just keep the Court informed, I'll

21   be in the building.  I'll be here for the hour.  And just let

22   me know where we're headed with this.  That would be very

23   helpful.

24             And if there are no concerns, you're going to be

25   able to do cross right at 1:30, then you don't need to notify
```

1   me of anything.

2          MR. MIRHASHEM:  Can I just ask, is the plan -- if I

3   review the material and ultimately there's a ruling that there

4   is some -- I think my understanding is already ███████ has

5   said enough that I should be allowed to cross-examine about

6   drug use in the relevant time period and really the CI issue is

7   what still needs to be resolved.

8          So my question is is the Court thinking that we're

9   going to resume with -- oh, you've already said that ████████

10  is going to come tomorrow, because I was thinking about -- I

11  was kind of in the middle of my cross with him.  Ideally, in

12  the normal course of events, I would have crossed him before

13  this agent testified.  So I'm little bit concerned that now I'm

14  going to be crossing him not knowing what ███████ ultimately

15  is going to say about his -- what was his drug use state in the

16  weeks that he was avoiding this person, what did he say to him.

17         So that's my concern.  I mean, I -- I was just

18  thinking that ██████, once we resolved this issue, is going

19  to be the next witness.  That was what I had been thinking.

20         THE COURT:  Well, I did release ███████ this

21  morning in the presence of counsel and ultimately we talked

22  about the sequence of events today.  It's going in as we

23  discussed.  So I don't know what to say about that.  To the

24  extent you need to call other witnesses or recall witnesses,

25  I'll let you make that decision.  Perhaps you can consult with

1    the government about timing.  I will let you both agree to put

2    on witnesses in whatever order you both agree to.

3             But right now, Officer Kelly's testifying and you

4    will cross-examine him before you -- you do any voir dire or --

5    or any further cross of ██████████.  I don't see any other way to

6    do this.

7             MR. MIRHASHEM:  I'll just mention that I did bring

8    this up before we started Officer Kelly's testimony.  I did

9    note that I -- I said that I foresaw a problem with calling him

10   when I don't have information about ██████.  And then I thought

11   that the agreement was, well, he's going to testify on his

12   direct and then we're going to see what happens next.

13            But I understand.  We'll certainly look at the

14   materials and then let the Court know.

15            THE COURT:  Right.  You may look at them and you may

16   be fine with cross-examining Kelly today.  So just let me know

17   what agreements you reach.

18            MR. DAVIS:  Just -- just a couple of points, Judge.

19   Thank you.

20            It isn't a big file, so it shouldn't take too long.

21   I do think that we're going to need or ask for a protective

22   order and what I'm hoping we can do is make an oral agreement

23   and make them subject to a protective order and give them to

24   them unredacted right now so that we can move here.  But

25   obviously there's -- there's names in here and things that

```
1    shouldn't be disclosed.

2              But, anyway, we can -- we can address that.  But I

3    do -- this is very sensitive material, obviously, and we want

4    it protected.

5              The other thing is my guess is that one thing that

6    could happen here is Mr. Mirhashem is ready not in one hour,

7    but two hours, to cross Mr. Kelly.  That is, you know, once we

8    disclose -- once he eats a little lunch, it may take him more

9    than until 1:30 to feel like he's got what he's got.

10             I'm just -- and so I don't know if -- if he says I

11   need until 2:00 or I need until 2:30, is that something the

12   Court would indulge or would the Court -- you know, would the

13   Court rather just say if we're going to do that, send him home

14   now.  Whatever is fine with us, but I'm just -- I just -- it

15   may be hard for the defense, in fairness, to be ready at 1:30.

16             THE COURT:  All right.  I'll cross that bridge and

17   make that decision.

18             MR. DAVIS:  Okay.

19             THE COURT:  I think you both know my priority is to

20   keep the case on time for the jury's sake.  If I have to send

21   them home, I'll explain that in open court and make that

22   decision at the time.  Okay?

23             THE CLERK:  All rise.

24             (Lunch recess taken at 12:36 p.m.)

25
```

C E R T I F I C A T E


        I, Liza W. Dubois, do hereby certify that

the foregoing transcript is a true and accurate transcription

of the within proceedings, to the best of my knowledge, skill,

ability and belief.


Submitted: 7/6/2021          */s/  Liza W. Dubois*
                             LIZA W. DUBOIS, RMR, CRR